# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| RICHARD BRAKEBILL, DELORIS BAKER, DOROTHY HERMAN, DELLA MERRICK, ELVIS NORQUAY, RAY NORQUAY, and LUCILLE VIVIER, on behalf of themselves, | ) ) ) ) ) ) ) | CIV No.: 1:16-CV-08 |
| Plaintiffs, | ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | ) ) | |
| ALVIN JAEGER, in his official capacity as the North Dakota Secretary of State, | ) ) ) | |
| Defendant. | ) | |

Plaintiffs, by and through their undersigned attorneys, allege on information and belief as follows:

## INTRODUCTION

1. This action is brought under the Voting Rights Act, 52 U.S.C. § 10301, and the Declaratory Judgment Act, 28 U.S.C. § 2201, by qualified Native American voters (or electors) in North Dakota who have been denied the right to vote and/or will be denied the right to vote through enforcement of North Dakota's recently enacted voter identification ("ID") laws. Plaintiffs seek to protect their right to vote under the United States Constitution, the North Dakota Constitution, and the Voting Rights Act.

1

2. North Dakota House Bill 1332 ("HB 1332") was enacted April 19, 2013, and made North Dakota's voter ID requirements significantly more restrictive. North Dakota House Bill 1333 ("HB 1333") was enacted April 23, 2015, and made the voter ID requirements even more restrictive. The voter ID portions of HB 1332 and 1333 are codified at N.D. CENT. CODE § 16.1-05-07. Plaintiffs seek a determination that the voter ID requirements in HB 1332 and HB 1333 disproportionately burden and disenfranchise Native Americans and: (a) have a discriminatory result in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2") in two distinct ways; (b) impose substantial and unjustified burdens on the fundamental right to vote in violation of the Fourteenth Amendment; (c) deny qualified voters equal protection under the law in violation of the North Dakota Constitution; and (d) make ownership of a voter ID a pre-condition and qualification to vote in violation of the North Dakota Constitution. For these and other reasons, these laws should be declared unlawful and enjoined.

## JURISDICTION AND VENUE

3. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and 52 U.S.C. § 10308(f). This Court has jurisdiction to grant both declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

4. Venue is proper in this court under 28 U.S.C. § 1391(b).

## PARTIES

5. All of the plaintiffs named in this Complaint are citizens of the United States, residents of North Dakota, Native Americans, and duly qualified electors eligible to vote in local, state, and federal elections in North Dakota. All plaintiffs have a direct, substantial, and legally protectable interest in the subject matter of this litigation.

6. Plaintiff Richard Brakebill is an enrolled member of the Turtle Mountain Band of Chippewa Indians and a United States Navy veteran. Mr. Brakebill is over the age of 18 and has lived in Rolla, North Dakota for at least ten years. Mr. Brakebill is therefore a qualified elector in North Dakota. Mr. Brakebill was denied the right to vote in the general election on November 4, 2014, because he did not possess a qualifying ID under HB 1332. He had a tribal ID without an address and an expired state of North Dakota ID with an old address. Mr. Brakebill presented these IDs to the poll workers on November 4, 2014, when attempting to vote, but was refused the right to vote because the IDs did not have a current residential address. Prior to the election, Mr. Brakebill attempted to obtain a qualifying ID numerous times, but he was unsuccessful because he does not have a copy of his Arkansas birth certificate. Mr. Brakebill lives on a fixed income and currently does not have a job, further constraining his ability to secure the documentation necessary to obtain a qualifying ID. As a result, he is unable to obtain an ID currently required under North Dakota law in order to vote.

7. Plaintiff Elvis Norquay is an enrolled member of the Turtle Mountain Band of Chippewa Indians. He is over 18 years of age, a citizen of the United States, and a citizen of North Dakota. Mr. Norquay has lived in Belcourt, North Dakota for around 25 years, and is therefore a qualified North Dakota elector. Mr. Norquay is a veteran of the U.S. Marine Corps and was denied the right to vote in the November 4, 2014 general election. When Mr. Norquay went to vote in November 2014, he presented his tribal ID, but was denied the right to vote because his tribal ID lists no address. Mr. Norquay does not have a state driver's license or ID, and does not have a birth certificate. Mr. Norquay cannot afford the documentation he needs to obtain a state ID nor the transportation to travel to a state drivers' license site ("DLS"). Likewise, he cannot

afford a new tribal ID. As a result, he is unable to obtain an ID currently required under North Dakota law in order to vote and does not need one for his everyday life.

8. Plaintiff Ray Norquay is a member of the Turtle Mountain Band of Chippewa Indians. Mr. Norquay has lived in Belcourt, North Dakota for most of his life, and consistently for about the last six years. He is over eighteen years of age and a citizen of the United States, and is therefore a qualified North Dakota elector. Mr. Norquay attempted to vote in the November 4, 2014 general election, but he was denied the right to vote because he only had a tribal ID that did not list his residential address. As a result of being denied the right to vote, he went to the tribal offices that same day and had to purchase a new tribal ID with his residential address on it. After purchasing the new ID, Mr. Norquay went back and was permitted to vote. Thus, Mr. Norquay had to pay to vote.

9. Plaintiff Della Merrick is a member of the Turtle Mountain Band of Chippewa Indians. Ms. Merrick has lived in Belcourt, North Dakota for about six years. She is over eighteen years of age and a citizen of the United States, and is therefore a qualified North Dakota elector. Ms. Merrick attempted to vote in the November 4, 2014 general election, but she was denied the right to vote because she only had a tribal ID that did not list her residential address. As a result of being denied the right to vote, she went to the tribal offices that same day and had to purchase a new tribal ID with her residential address on it. After purchasing the new ID, Ms. Merrick went back and was permitted to vote. Thus, Ms. Merrick had to pay to vote.

10. Plaintiff Lucille Vivier is a member of the Turtle Mountain Band of Chippewa Indians. Ms. Vivier has lived in Dunseith, North Dakota for about 11 years, and before that she lived in Belcourt, North Dakota her whole life. She is over eighteen years of age, a citizen of the United States, a citizen of North Dakota, and is therefore a qualified North Dakota elector. Ms. Vivier

4

attempted to vote in Dunseith for the November 4, 2014 general election, but she was denied the right to vote because she only had a tribal ID that did not list her residential address. Ms. Vivier does not have a social security card or a birth certificate. Ms. Vivier is unable to afford a tribal ID, the documentation necessary to obtain a state ID, or the transportation to travel to a DLS because she only receives disability income and must pay for the needs of the five children she cares for and her elderly mother. Three of the children she cares for have special needs, and thus Ms. Vivier has additional costs that are required for their care. Thus, Ms. Vivier cannot afford to obtain a state ID or a tribal ID with a residential address on it. Additionally, Ms. Vivier does not have a consistent residential address as the police department, emergency services, and post office have each given her a different address for her home. For all these reasons, she is unable to obtain an ID currently required under North Dakota law in order to vote.

11. Plaintiff Deloris Baker is an enrolled member of the Turtle Mountain Band of Chippewa Indians, and has lived in Dunseith, North Dakota all of her life. She is over eighteen years of age, a citizen of the United States, and a citizen of North Dakota. Ms. Baker is therefore a qualified North Dakota elector. Ms. Baker attempted to vote in the November 4, 2014 general election in Dunseith, but was denied the right to vote because she only had her tribal ID, and it did not list a residential address. Ms. Baker cannot afford to obtain a state ID. Her son supports her with his limited income, and she cares for two children, ages 12 and 13. Ms. Baker does not have a car, nor does she drive, and she cannot afford to pay someone to take her to a DLS or take her to the bus to get to a DLS to obtain a state ID. She likewise cannot afford a tribal ID. Thus, Ms. Baker is unable to obtain an ID currently required under North Dakota law in order to vote.

12. Plaintiff Dorothy Herman is an enrolled member of the Turtle Mountain Band of Chippewa Indians and a retired teacher. She is 75 years old, has lived in North Dakota for about

5

43 years, and has voted throughout that time. Ms. Herman lives in Rolla, North Dakota and has lived there for about ten years. She is over eighteen years of age, a citizen of the United States and a citizen of North Dakota, and is therefore a qualified North Dakota elector. Prior to the election, Ms. Herman had in her possession an expired state ID with the correct residential address and a tribal ID without an address. Because her state ID was expired, Ms. Herman attempted to obtain a new state ID at the DLS in Rolla, North Dakota during its advertised operating hours prior to the election. The DLS, however, was closed. When she attempted to get a new ID a second time prior to the election, the DLS informed her that they would not issue a new ID to her—her expired state ID was insufficient documentation of her identity, and she needed a birth certificate. To obtain an ID, they told her she would have to make a third trip to the DLS and pay $8 after she located all of her documentation. Ms. Herman saw an advertisement about the new voter ID law prior to the 2014 general election, and based on that advertisement she thought she had a qualifying voter ID – her tribal ID. Thus, Ms. Herman did not make a third trip to the DLS prior to the election. When Ms. Herman attempted to vote in Rolla in the 2014 general election with her tribal ID and expired state ID, she was denied the right to vote because her tribal ID did not have an address and her state ID was expired. When she was turned away on the day of the election, she attempted to pay to get a tribal ID with an address, but the tribal office was closed. She returned to the DLS a third time after the election and paid the $8 to obtain a new state identification card. Ms. Herman survives on her school teacher's retirement income and her husband's social security. For Ms. Herman, the expense and difficulty to obtain an ID ultimately prevented her from voting.

13. Defendant Alvin Jaeger is the North Dakota Secretary of State and is sued in his official capacity. The North Dakota Secretary of State is the State's chief election officer. The Office of

the North Dakota Secretary of State is responsible for coordinating the implementation of HB 1332 and HB 1333.

## STATEMENT OF FACTS

### NORTH DAKOTA'S VOTER ID RULES BEFORE HB 1332 AND 1333

14. North Dakota is the only state in the United States that does not have voter registration. N.D. CENT. CODE § 16.1-01-5.1. It was one of the first states to adopt voter registration in the 1800s, but was the first state to abolish it in 1951. Instead, North Dakota established numerous small voting precincts, which ensured that election boards knew the voters who came to the polls to vote on Election Day and could detect people who should not be voting in the precinct.

15. The North Dakota Constitution provides that there are only three qualifications to be an elector: "[e]very Citizen of the United States, who has attained the age of eighteen years and who is a North Dakota resident, shall be a qualified elector." N.D. CONST. art. II, § 1. The North Dakota Constitution further provides: "When an elector moves within the state, he shall be entitled to vote in the precinct from which he moves until he establishes voting residence in another precinct. The legislative assembly shall provide by law for the determination of residence for voting eligibility, other than physical presence." *Id.*

16. Similarly, North Dakota statutes provide that "every citizen of the United States who is eighteen years or older; a resident of this state; and has resided in the precinct at least thirty days next preceding any election, except as otherwise provided in regard to residency in chapter 16.1-14, is a qualified elector." N.D. CENT. CODE § 16.1-01-04(1).

17. For the purpose of elections, "every qualified elector may have only one residence, shown by an actual fixed permanent dwelling, establishment, or any other abode." N.D. CENT. CODE § 16.1-01-04(2).

18. Prior to passage of HB 1332 and 1333, North Dakota elections were rated first in the nation for election performance by the Pew Charitable trust in 2008, 2010, and 2012. *Elections*

*Performance Index*, PEW CHARITABLE TRUST, (April 8, 2014),

http://www.pewtrusts.org/en/multimedia/data-visualizations/2014/elections-performance-

index#indicator. This rating is based on the Elections Performance Index, or EPI, which tracks 17

distinct indicators of election administration effectiveness. A state's overall average is calculated

from its performance on all 17 indicators, relative to all states across comparable federal election

cycles—either presidential or midterm. *Id.* at *EPI 101.* Some of the indicators include data

completeness, voting wait time, provisional ballots cast, provisional ballots rejected, and

registration or absentee ballot problems. *Id.*

   19.  Prior to passage of HB 1332 and 1333, a poll clerk in North Dakota was merely required

to "request" that a qualified voter show identification that included the individual's residential

address and date of birth to prove they were qualified. N.D. CENT. CODE § 16.1-05-07(1),

*amended by* H.B. 1332, 63rd Leg. Assemb., Reg. Sess. § 5 (2013).  If one form of ID did not

have both the residential address and birthdate, the voter could utilize two forms of ID in

combination. *Id.*

   20.  Valid forms of ID included: a North Dakota driver's license or non-driver's ID card; a

U.S. passport; an ID card from a federal agency; an out of state driver's license or non-driver's

ID card; an ID card issued by a tribal government; a valid student ID; a military ID card; a utility

bill dated thirty days prior to Election Day, including cell phone bills and student housing bills

(online printouts were acceptable); and a change of address verification letter from the U.S.

Postal Service.

   21.  Alternatively, if the voter could not provide those forms of ID, there were two other fail-

safe methods that would allow them to prove they were qualified. First, a member of the election

board or a poll clerk who knew the voter could personally vouch that the individual was a

qualified elector in the precinct, and the person was then allowed to vote.  N.D. CENT. CODE §

16.1-05-07(2), *amended by* H.B. 1332, 63rd Leg. Assemb., Reg. Sess. § 5 (2013).  Second, if no

one could vouch for him or her, the election board challenged the person's right to vote, but the

person could then execute a voter affidavit swearing to the fact that he or she was a qualified elector who could vote in the precinct. N.D. CENT. CODE § 16.1-05-07(3), *amended by* H.B. 1332, 63rd Leg. Assemb., Reg. Sess. § 5 (2013).  If the voter agreed to sign the affidavit, the election board and poll clerks were required to allow the voter to vote. *Id.*

### ENACTMENT OF HB 1332 AND 1333

22.  HB 1332 was enacted on April 19, 2013, and significantly altered the voter ID requirements in North Dakota. HB 1333 was enacted on April 24, 2015, and made the voter ID requirements even more restrictive and burdensome.

23.  The legislative procedure utilized to pass HB 1332 was unusual.

24.  A "hoghouse" amendment was used to pass HB 1332.

25.  Public hearings are held on every bill in legislative standing committees. *See Legislative Branch Function and Process*, NORTH DAKOTA LEGISLATIVE PORTAL, http://www.legis.nd.gov/research-center/library/legislative-branch-function-and-process (last visited Jan. 10, 2016).

26.  However, after the public hearings, these committees may choose to modify the contents of an original bill before they send it back to the house or senate for a vote. *See id.*

27.  A hoghouse amendment replaces the entire text of a bill with new text.  *North Dakota Legislative Council*, NORTH DAKOTA LEGISLATIVE DRAFTING MANUAL 63 (2015), http://www.legis.nd.gov/files/general/2015draftingmanual.pdf?20160111162015. Because committee amendments are made after the public hearings take place, hoghouse amendments are not subject to public hearing.

28.  Hoghouse amendments are disfavored. *Id.*

29.  HB 1332 limited the forms of ID voters could use at the polls. First, it required that the ID used must contain the voter's residential address and date of birth. A P.O. Box number is not an acceptable type of address. Second, HB 1332 restricted the acceptable forms of ID to: (1) a

North Dakota driver's license; (2) a North Dakota non-driver's identification card; (3) a tribal government issued identification card; or (4) an alternative form of identification prescribed by the Secretary of State if a qualified voter did not possess one of the other official forms of identification. H.B. 1332, 63rd Leg. Assemb., Reg. Sess. § 5; *see* N.D. CENT. CODE § 16.1-05-07. The Secretary of State only prescribed two additional forms of ID prior to the passage of HB 1333: (1) a student identification certificate, and (2) a long-term care identification certificate.

30. HB 1332 also prevented voters from using a driver's license or ID from another state in combination with other ID in order to vote.

31. HB 1332 limited a qualified elector's ability to vote in other ways as well.

32. The new law eliminated the voucher and affidavit fail-safe that previously could be utilized by qualified voters who did not produce an ID when requested by the poll clerk.

33. North Dakota became the only state in the country with a strict voter identification law that does not provide voters that lack ID with a fail-safe provision.

34. After passage of HB 1332, which was essentially on a party-line vote, qualified voters that showed up to the polls but did not have a qualifying ID were completely denied their right to vote.

35. As mentioned above, the legislature made the voter ID law even more restrictive with the passage of HB 1333, utilizing another amendment.

36. When HB 1333 was first introduced in the North Dakota House, it would have alleviated some of the stringent requirements of HB 1332.

37. The original version would have permitted electors to use an expired driver's license plus a U.S. Postal Service change of address form or bill and bank statement with identification that had a non-current address in order to prove current residency within the precinct.

10

38.  The Senate, however, removed these provisions and amended the bill to make the voter ID requirements even more restrictive.

39.  The amendment that became HB 1333 also removed the ability of the Secretary of State to prescribe new forms of qualifying ID, and took away the option for students to use college identification certificates that the Secretary had previously recognized as an acceptable voter ID. It did, however, statutorily keep the long-term care certificate as a valid form of ID.

40.  As a result, North Dakota now permits citizens to use only four forms of qualifying ID in order to vote.

41.  Additionally, HB 1333 made clear that driver's licenses and non-driver ID cards must be current and not expired to be accepted at the polls. Under HB 1333, military identification is not an acceptable form of ID, except for service members stationed away from their North Dakota residence.

42.  HB 1333 also restricted absentee voting.

43.  Prior to passage of HB 1333, absentee voters without a qualifying ID could submit an absentee ballot if another qualified elector vouched for his or her qualifications.

44.  HB 1333 removed this provision for everyone except disabled voters, thus also severely restricting absentee voting.

45.  Enactment of HB 1332 disenfranchised and imposed significant barriers for qualified Native American voters by establishing strict voter ID and residence requirements. Those requirements had the result of denying Native Americans, including Plaintiffs, an equal opportunity to participate in the political process.

46. The strict voter ID requirements of HB 1332 and 1333 interact with social and historical conditions to cause an inequality in the opportunities enjoyed by Native American and White voters to participate in the political process and elect their preferred representatives.

## HB 1332'S AND 1333'S BURDEN ON NATIVE AMERICANS

### GENERAL NATIVE AMERICAN DEMOGRAPHICS IN NORTH DAKOTA

47. According to the 2010 Census, North Dakota had a total population of 672,591.

48. According to the 2010 Census, North Dakota had a Native American population, alone, of 36,591(5.4%). The total number of individuals identifying either as Native American, or as Native American and at least one other race, was 42,996 (6.4%).

49. According to the 2010 Census, 8,320 Native Americans lived on the Turtle Mountain Reservation – home of the Turtle Mountain Band of Chippewa Indians. *Statistics*, NORTH DAKOTA INDIAN AFFAIRS COMMISSION, www.nd.gov/indianaffairs/?id=76 (last accessed Jan. 11, 2016). The Turtle Mountain Reservation is located in Rolette County, North Dakota. It is approximately 72 square miles in area.

50. The Fort Berthold Indian Reservation, home of the Three Affiliated Tribes (Mandan, Hidatsa, and Arikara), has 4,556 Native Americans living on the reservation according to the 2010 Census. *Id.* The Fort Berthold Indian Reservation occupies sections of six counties in North Dakota: Mountrail, McLean, Dunn, McKenzie, Mercer, and Ward. The Fort Berthold Indian Reservation covers approximately 980,000 acres.

51. The Spirit Lake Reservation, home of the Spirit Lake Tribe, has 3,587 Native Americans living on the reservation according to the 2010 Census. *Id.* The Spirit Lake Reservation occupies sections of four counties in North Dakota: Benson, Eddy, Nelson, and Ramsey. The Spirit Lake Reservation covers approximately 245,120 acres.

52. The Lake Traverse Reservation is the home of the Sisseton Wahpeton Oyate, and has only eight Native Americans living on the North Dakota side of the reservation according to the

2010 Census. According to the 2013 American Indian Population and Labor Force Report by the Bureau of Indian Affairs, there were 448 tribal members living on the North Dakota portion of the Lake Traverse Reservation. *2013 American Indian Population and Labor Force Report*, U.S. DEPARTMENT OF THE INTERIOR (2014), http://www.bia.gov/cs/groups/public/documents/text/idc1-024782.pdf. The Lake Traverse Reservation covers approximately 250,000 acres. The northern portion of the Reservation is located in Sargent and Richland counties in southeastern North Dakota.

53. The Standing Rock Reservation, home of the Standing Rock Sioux Tribe, has 3,492 Native Americans living on the reservation according to the 2010 Census. The Standing Rock Reservation is located in Sioux County, North Dakota. The reservation covers approximately 2.3 million acres.

54. Chart 1 below provides the number of Native American people living in each of the fourteen North Dakota counties whose territory is wholly or partly on Indian reservations, according to the 2010 U.S. Census.

*Chart 1*

| North Dakota County | Reservation and Tribe(s) | Number of County Residents That are Native American; Percentage of the County Population (U.S. Census 2010) |
|---|---|---|
| Rolette | Turtle Mountain Reservation: Turtle Mountain Band of Chippewa Indians | 10,763; 77.2% |
| Mountrail | Fort Berthold: Three Affiliated Tribes | 2,348; 30.6% |
| McLean | Fort Berthold: Three Affiliated Tribes | 625; 7% |

13

| Dunn | Fort Berthold: Three Affiliated Tribes | 449; 12.7% |
| McKenzie | Fort Berthold: Three Affiliated Tribes | 1,412; 22.2% |
| Mercer | Fort Berthold: Three Affiliated Tribes | 196; 2.3% |
| Ward | Fort Berthold: Three Affiliated Tribes | 1630; 2.6% |
| Sargent | Lake Traverse: Sisseton Wahpeton Oyate | 20; 0.5% |
| Richland | Lake Traverse: Sisseton Wahpeton Oyate | 330; 2% |
| Benson | Spirit Lake Reservation: Spirit Lake Tribe | 3,663; 55% |
| Eddy | Spirit Lake Reservation: Spirit Lake Tribe | 58; 2.4% |
| Nelson | Spirit Lake Reservation; Spirit Lake Tribe | 30; 1% |
| Ramsey | Spirit Lake Reservation; Spirit Lake Tribe | 994; 8.7% |
| Sioux | Standing Rock Reservation; Standing Rock Sioux Tribe | 3,492; 84.1% |

*Profile of General Population and Housing Statistics: 2010 Demographic Profile Data*, U.S. CENSUS BUREAU, Table DP-1 (2010), http://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t (set to decennial census and modified for state and county data sets).

UNEMPLOYMENT IS GREATER FOR NATIVE AMERICANS IN NORTH DAKOTA

55. According to the 2009-2013 American Community Survey 5-Year Estimates, North Dakota as a whole has an unemployment rate of 3.3%, and a not in labor force rate of 29.5%.

14

56. According to the same survey, the unemployment rate for the White population in North Dakota is 2.8%, while the unemployment rate for the Native American population in North Dakota is 10.3%. The percentage of White people not in the labor force in North Dakota is 29%, while the percentage of Native Americans not in the labor force in North Dakota is 42.8%.

57. Chart 2 below displays the estimated percentage of employed American Indians and Alaska Natives in civilian jobs for each tribe in North Dakota, according to the federal Bureau of Indian Affairs ("BIA").

*Chart 2*

| Tribe | Estimated percentage of American Indian/Alaska Native Population Employed in Civilian Jobs in the Tribal Statistical Area | Estimated percentage of American Indian/Alaska Native Population Employed in Civilian Jobs in the Tribal Statistical Area and Nearby Counties |
|---|---|---|
| Three Affiliated Tribes | 50.9-61% | *Unavailable* |
| Turtle Mountain Band of Chippewa Indians | 35.4-44.1% | *Unavailable* |
| Standing Rock Sioux Tribe | *Unavailable* | 44.5-53.1% (North Dakota only) |
| Spirit Lake Tribe | 39.9-47.2% | 40.2-50.6% |
| Sisseton-Wahpeton Oyate | 48.7-57.9% (North and South Dakota) | |

*2013 American Indian Population and Labor Force Report*, U.S. DEPT. OF THE INTERIOR, 50-51 (2014), http://www.bia.gov/cs/groups/public/documents/text/idc1-024782.pdf.

POVERTY IS GREATER FOR NATIVE AMERICANS IN NORTH DAKOTA

58. According to the 2009-2013 American Community Survey 5-Year Estimates, North Dakota as a whole has a family poverty rate of 7.1%. This statistic represents the number of families whose income in the past 12 months was below the poverty level. The state has an

individual poverty rate of 11.9%, which includes individuals whose income in the past 12 months was below the poverty level. *Poverty Status in Past 12 Months, 2009-2013 American Community Survey 5-Year Estimates*, U.S. CENSUS BUREAU, Tables S1701 and S1702 http://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t (modified for state data sets).

59.  According to the 2009-2013 American Community Survey, the Fort Berthold Reservation has a family poverty rate of 18.6%. Families with at least one Native American household member have a poverty rate of 27.3%. Native American individuals have a poverty rate of 29.2%. *Id.*(modified for reservation data sets).

60.  The Lake Traverse Reservation has a family poverty rate of 15%. Families with at least one Native American household member have a poverty rate of 36.9%. Native American individuals have a poverty rate of 40.8%. *Id.*

61.  The Spirit Lake Reservation has a family poverty rate of 41.3%. Families with at least one Native American household member have a poverty rate of 49.9%. Native American individuals have a poverty rate of 53.5%. *Id.*

62.  The Standing Rock Reservation has a family poverty rate of 33.6%. Families with at least one Native American household member have a poverty rate of 46%. Native American individuals have a poverty rate of 51.3%. *Id.*

63.  The Turtle Mountain Reservation has a family poverty rate of 36.9%. Families with at least one Native American household member also have a poverty rate of 36.9%. Native American individuals have a poverty rate of 40.1%. *Id.*

64.  As Chart 3 below reveals, the 2009-2013 American Community Survey 5-Year Estimates also shows that a disproportionately large percentage of individual Native Americans live below the poverty line when compared with White North Dakotans when broken down by county.

*Chart 3*

|  | Percentage of all Citizens Living Below Poverty Line | Native Americans Living Below Poverty Line | White North Dakotans Living Below Poverty Line |
|---|---|---|---|
| North Dakota | 11.9% | 39.6% | 9.6% |
| Sioux County | 40.5% | 45% | 10.6% |
| Rolette County | 36% | 41.4% | 13.5% |
| Benson County | 35.8% | 53.2% | 13.8% |
| Mountrail County | 12.3% | 21.9% | 7.8% |
| McKenzie County | 13.8% | 47.2% | 6% |
| Dunn County | 10.1% | 21.1% | 9.1% |
| Ramsey County | 12.1% | 47.1% | 7.7% |
| McLean County | 10.9% | 18.5% | 10.4% |
| Sargent County | 7.4% | 31.6% | 7% |
| Ward County | 9.1% | 29% | 8.5% |
| Mercer County | 7.3% | 29.8% | 6.8% |
| Richland County | 11.8% | 22.9% | 11.1% |

*Poverty Status in Past 12 Months, 2009-2013 American Community Survey 5-Year Estimates*,

U.S. CENSUS BUREAU, Table S1701,

http://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t (last visited Jan. 11,

2016) (modified for county and state data sets).

### NATIVE AMERICANS ARE DISPROPORTIONATELY HOMELESS

65.   Additionally, Native American people make up a disproportionate part of the state's

homeless population. According to a 2014 point-in-time survey of homeless persons conducted

for the U.S. Department of Housing and Development by the North Dakota Coalition for

Homeless People, the total homeless population in North Dakota was 1,258. Of the total number

of homeless people, 213 were American Indian or Alaska Native, making up 16.9% of the total,

despite the fact that Native Americans make up only about 5% of the total state population. The

point in time survey for 2015 had similar results.

### NATIVE AMERICANS FACE GREATER HEALTH THREATS IN NORTH DAKOTA

66.   The North Dakota Department of Health has released data from the 2010 census showing

that among ten leading causes of death, the rate of death for Native American North Dakotans is

higher than for the state's general population. North Dakota Dept. of Health, *North Dakota*

*American Indian Health Profile* (2014),

http://www.ndhealth.gov/healthdata/communityhealthprofiles/American%20Indian%20Commun

ity%20Profile.pdf.

67.   The rate of infant and child deaths is also much higher among Native Americans in North

Dakota than among the general population. *Id.*

68.   Greater numbers of Native Americans in North Dakota are living with a disability than in

the general North Dakotan population. While 8.6% of North Dakotans 18-65 live with a

disability, 17.5% of Native Americans in the state do. *Id.*

18

### NATIVE AMERICANS ARE LESS LIKELY TO HAVE ACCESS TO TRANSPORTATION IN NORTH DAKOTA

69.  The 2006-2010 American Community Survey shows that 4.8% of White households in North Dakota lacked access to a vehicle, while 10.5% of Native American households did not have access to a vehicle. Native American households are twice as likely to be unable to access a motor vehicle.

70.  In four counties in North Dakota, 8% or more of households lack access to a motor vehicle. Those counties include Sioux (12.5%); Benson (8.4%); Pierce (8.3%); and Rolette (8.2%.) Sioux, Benson, and Rolette counties have the largest percentages of Native American residents of North Dakotan counties.

### OBTAINING A QUALIFYING STATE ID IN NORTH DAKOTA

71.  The Secretary of State estimated that approximately 10% of North Dakota's voting age population lack qualifying ID to vote.

72.  As the statistics above show, qualified Native American voters face substantial obstacles to obtaining an acceptable form of voter ID.

73.  According to a nationwide study, citizens earning less than $25,000 a year are twice as likely to lack documentation necessary to obtain qualifying forms of ID. Brennan Ctr. For Justice, *Citizens Without Proof* (2006), http://www.brennancenter.org/sites/default/files/legacy/d/download_file_39242.pdf. The same report found that citizens earning less than $35,000 a year are more than twice as likely to lack current government-issued photo identification. *Id.*

74.  Poverty is much higher for Native Americans in North Dakota, and as a result Native Americans in North Dakota disproportionately lack underlying documentation for, possession of, and access to qualifying forms of ID required by HB 1332 and 1333.

75. Although North Dakota law allows for use of an "official form of ID issued by a Tribal government," Plaintiffs, as well as many other Native Americans in North Dakota, do not possess tribal government IDs containing a residential address, which is required by HB 1332 and 1333.

76. Further, some tribal IDs are issued by the BIA.

77. Residential or "911" addresses have only recently arrived on the reservations in North Dakota.

78. As a result, many tribal members do not know their residential address. Some tribal members have been told they have more than one residential address, and many either may not have one, or believe they do not.

79. Many tribal IDs do not include any address, and most tribes and the BIA do not require that tribal citizens put a "residential address" on tribal IDs.

80. Even among tribal IDs that include a form of address, due to lack of residential mail delivery and the relatively recent issuance of residential (911) addresses, many tribal citizens only list a P.O. Box address on their tribal IDs because that is the address they utilize for conducting their affairs or the address that they know.

81. Native Americans disproportionately lack unexpired qualifying forms of ID that contain a current residential address when compared with non-Native Americans in North Dakota.

### LIMITED HOURS OF, AND DISTANCE TO, NORTH DAKOTA DLS SITES

82. In order to obtain a North Dakota driver's license or a nondriver ID card, a qualified voter in North Dakota must go to one of North Dakota's 27 DLSs.

83. There is not a single DLS on an Indian reservation in North Dakota.

84. Moreover, the DLSs closest to North Dakota Indian reservations typically have very limited hours and are often located in places that are difficult for Native Americans to access.

85. For instance, the closest DLS to the Standing Rock Reservation is in either Carson or Bismarck. The Carson site is only open the first Wednesday of every month from 9:00 a.m. to 3:20 p.m. Otherwise, an individual living on the Standing Rock Reservation would have to travel to Bismarck to obtain a state ID. The mean travel distance for voting age Native Americans from the Standing Rock Reservation to a DLS is 60.8 miles, and the mean travel time is 106.6 minutes.

86. The closest DLS to the Turtle Mountain Reservation, located in Rolla, is only open on the second and fourth Tuesday of every month and only from 9:40 a.m. to 3:20 p.m.  The next closest site to the Turtle Mountain Reservation, located in Bottineau, is only open the first and third Tuesday of every month and only from 9:30 a.m. to 3:30 p.m.  The mean travel distance for voting age Native Americans from Turtle Mountain Reservation to a DLS is eleven miles, and the mean travel time is 17.4 minutes.

87. The closest DLS to the Fort Berthold Reservation is either in Watford City or Beulah. The Watford City site is only open on the first and third Wednesday of each month from 9:40 a.m. to 3:40 p.m.  The Beulah site is only open on the second and fourth Wednesday of each month from 9:40 a.m. to 3:20 p.m.  Otherwise, a tribal member on the Fort Berthold Reservation would have to travel farther to Williston or Minot.  The mean travel distance for voting age Native Americans from Fort Berthold Reservation to a DLS is 49.6 miles. The mean travel time is 84.6 minutes.

88. The closest DLS to the Lake Traverse Reservation is either the Oakes site or the Wahpeton site.  The Oakes DLS is only open on the second Wednesday of each month from 9:20

21

a.m. to 3:40 p.m. The Wahpeton site is only open on the first and third Thursday of each month from 8:20 a.m. to 4:40 p.m. The mean travel distance for voting age Native Americans from Lake Traverse Reservation to a DLS is 40.1 miles, and the mean travel time is 64.3 minutes.

89.   The closest DLS to the Spirit Lake Reservation is in Devil's Lake.   That site is open every weekday from 8:00 a.m. to 4:45 p.m., except Wednesdays.   The mean travel distance for voting age Native Americans from Spirit Lake Reservation to a DLS is 14 miles. The mean travel time is 25.3 minutes.

90.   There are no DLS sites open on Saturday or Sunday in North Dakota, and the times and hours that the DLS sites are open change periodically.

91.   For some Native Americans, traveling these distances would be unduly burdensome and costly given their lack of access to transportation and the time needed during working hours.

92.   Charts 4 and 5 below illustrate the limited hours of, and average travel distances and times to, a DLS from each North Dakota reservation.

*Chart 4*

| Reservation | Mean Travel Distance to a DLS for Voting Age Native Americans | Mean Travel Time to a DLS for Voting Age Native Americans |
|---|---|---|
| Ft. Berthold | 49.6 miles | 84.6 minutes |
| Turtle Mountain | 11.0 miles | 17.4 minutes |
| Spirit Lake | 14.0 miles | 25.3 minutes |
| Standing Rock | 60.8 miles | 106.62 minutes |
| Lake Traverse | 40.1 miles | 64.3 minutes |
| All Reservations | 29.4 miles | 50.3 minutes |

22

*Chart 5*

| Reservation | Closest Driver's Licensing Site(s) | Hours of Operation* |
|---|---|---|
| Standing Rock | Carson | 1st Wed. of the month, 9:00 AM-3:20 PM |
| Standing Rock | Bismarck | Mon.-Fri., 7:30 AM-4:45 PM |
| Turtle Mountain | Rolla | 2nd and 4th Tues., 9:40 AM-3:20 PM |
| Turtle Mountain | Bottineau | 1st and 3rd Tues., 9:30 AM-3:30 PM |
| Fort Berthold | Watford City | 1st and 3rd Wed., 9:40 AM-3:40 PM |
| Fort Berthold | Beulah | 2nd and 4th Wed., 9:40 AM-3:20 PM |
| Lake Traverse | Oakes | 2nd Wed., 9:20 AM-3:40 PM |
| Lake Traverse | Wahpeton | 1st and 3rd Thurs., 8:20 AM-4:40 PM |
| Spirit Lake | Devil's Lake | Mon., Tues., Thurs., Fri., 8:00 AM-4:45 PM |

*Hours of operation are based on a North Dakota Department of Transportation document revised September 2015. N.D. Dep't. of Transp., *Drivers License Sites* (2015), https://www.dot.nd.gov/divisions/driverslicense/docs/Drivers%20Lic%20Sites.pdf.

ACCESS TO TRANSPORTATION

93.  As discussed above, when compared to White voters, Native American voters disproportionately lack access to transportation necessary to access driver's license locations.

Likewise, taking public transit requires much more time, making it difficult to do so when an individual is working.

94.  It will be severely burdensome or impossible for many Native Americans without vehicles to access a DLS.

### COSTS

95.  High rates of poverty and unemployment among Native Americans in North Dakota prevent, and will continue to prevent, many Native Americans from travelling to a DLS and obtaining a requisite ID for voting.

96.  The lack of a nearby DLS with wide-ranging operating hours places a substantial cost burden on Native Americans when attempting to exercise their right to vote in North Dakota.

97.  For those that do have to work, they will likely be required to take work off to make it to the DLS due to the very limited hours.

98.  The distance to state DLSs, lack of access to transportation, low incomes of Native Americans, and limited hours of DLS operation requiring time off from work combine with social and historical conditions to make access to these locations an unduly burdensome expense for Native American voters. This excessive burden and expense falls disproportionately on Native Americans.

99.  The cost and lack of access to documents necessary to obtain the required voter ID is also disproportionately burdensome for Native Americans in North Dakota.

100. HB 1332 waived the fee associated with the issuance or renewal of a non-driver ID card for eligible applicants that do not already have a North Dakota Driver's license. If, however, an eligible applicant for a non-driver ID already has a driver's license, or is seeking a replacement for an unexpired non-driver ID, there is an $8 fee.

24

101. Additionally, the North Dakota DLSs apply the non-driver fee waiver inconsistently.

102. Accordingly, for Native Americans that need a duplicate ID, they will have to pay $8 to obtain a state ID in order to exercise their right to vote, in addition to any transportation costs, the costs for any supporting documentation, and any costs due to loss of work because the offices have such limited hours.

103. A renewal for a non-commercial driver's license is $15.

104. Assuming a person can obtain a ride or other transportation to a DLS during its limited hours, that person must show proof of identity (name, date of birth, and legal presence in the U.S.) in order to get an ID.

105. Obtaining the required documentation to prove identity costs time and money.

106. The least expensive document to prove identity is a North Dakota birth certificate, which costs $7.

107. If a voter is born out of state, however, the cost is likely more.

108. Also, Native Americans disproportionately lack birth certificates.

109. Additional documentation – and additional costs – are required if the person's name has changed, for example due to marriage.

110. For those having to produce U.S. citizenship and naturalization papers, the cost for those papers is $345.

111. Obtaining a North Dakota birth certificate and driver's license or non-driver ID presents a conundrum for many Native American voters: the North Dakota Department of Health ("DOH") requires an ID to obtain a certified copy of a birth certificate, but the applicant needs the birth certificate to procure the state ID necessary to obtain the birth certificate; other forms of ID accepted by DOH are either expensive or have limited availability.

25

112. For someone seeking a license or non-driver ID, proof of a physical residential address is required.

113. The Department of Transportation does not accept a P.O. Box as proof of a residential address.

114. Many qualified Native American voters will have a hard time furnishing one or more of the limited, acceptable forms of proof of residential address in order to obtain a qualifying ID in North Dakota.

115. Individuals without a physical residential address will not be able to obtain a free non-driver ID.

116. Neither HB 1332 nor HB 1333 provided waivers or exemptions from the underlying documentation required for an applicant to obtain a non-driver ID card, or from the costs and fees associated with obtaining this underlying documentation. Nor do these laws address any fees that will be imposed on voters who must obtain the requisite underlying documentation from out-of-state agencies.

117. Similarly, North Dakota has not provided any funding to offset the cost faced by prospective voters purchasing new tribal ID cards that have residential addresses.

118. For example, a new Turtle Mountain tribal ID card is $10.

119. Even though the state advertises the non-driver IDs as "free," there is a disproportionate cost to obtain the ID for some voters.

120. Moreover, there is the burden of time, transportation, and cost to obtain an ID and the documentation needed to get one, and many Native American voters will find it impossible to overcome all these hurdles to obtain the required ID and documentation due to social and historical conditions that lead to their economic circumstances.

121. Due to the costs involved in obtaining a qualifying ID, many Native American voters have been, and will continue to be disenfranchised.

122. Other states with strict voter ID laws have provisions that protect indigent voters from the prohibitive costs of obtaining this underlying documentation.

123. Wisconsin, for example, provides that applicants can still obtain a free ID for voting purposes if the "applicant is unable to provide documents for proof of name and date of birth [or United States citizenship] required by [Wisconsin law] which require a fee to a government agency to obtain." An indigent voter must fill out a form in lieu of providing the documents. *Obtaining an Identification (ID) Card*, WIS. DEP'T. OF TRANSP., http://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/id-card.aspx (last visited Jan. 10, 2016).

124. Social and historical conditions lead to high rates of poverty and unemployment among Native Americans in North Dakota, which prevent and will continue to prevent many Native Americans from obtaining the requisite underlying documentation necessary to obtain an ID required for voting.

125. The passage of HB 1332 and 1333 caused this disproportionate impact to Native Americans.

### THE SECRETARY OF STATE'S CAMPAIGN

126. In March of 2014, the Secretary of State announced a statewide advertising campaign, utilizing federal funds, to educate the North Dakota public on the requirements of HB 1332 - then the new voter ID law.

127. The Secretary of State's campaign to educate qualified electors about HB 1332 and 1333's requirements has been insufficient.  Not all qualified electors heard or saw the education

materials, and electors who did hear or see the materials found them misleading. The State's education materials left qualified electors believing that their tribal ID was a qualifying form of ID, when many tribal IDs do not contain a residential address as required under HB 1332 and 1333. Because electors believed they had qualifying ID, they did not attempt to obtain a new ID before attempting to vote and were ultimately denied the right to vote due to lack of a qualifying ID.

**VOUCHER AND AFFIDAVIT**

128. The Secretary of State stated that the total number of individuals who utilized the affidavit provision in the election before the adoption of HB 1332 was 10,517.

129. Native Americans disproportionately relied on the affidavit and voucher fail-safe provisions that were removed by HB 1332 and were therefore disproportionately burdened by the elimination of those provisions.

**VOTER DISENFRANCHISEMENT**

130. The Secretary of State's office and North Dakota Association of Counties endeavored to track the number of people that attempted to vote in the June 2014 primaries and were disenfranchised. Chart 6 below provides the number of people denied the right to vote in North Dakota counties where reservations are located, and the number of those that returned to vote with qualifying ID in the 2014 primary election.

*Chart 6*

| COUNTY | Number with ID, But Not Updated | Number with No ID | Number that Returned to Vote | Comments |
|---|---|---|---|---|
| Benson | 0 | 6 | 1 | One returned with ID and voted – several attempted to use a Tribal ID with no physical address listed |

28

| Dunn | No Response | | | |
|---|---|---|---|---|
| McKenzie | No Response | | | |
| McLean | No Response | | | |
| Mercer | 0 | 0 | 0 | |
| Mountrail | No Response | | | |
| Ramsey | 0 | 0 | 0 | There were a few tribal members who had tribal IDs with no residential address, but they all had driver's licenses, so they were able to vote successfully. The local media did a great job of helping get the word out. |
| Richland | 0 | 1 | 0 | |
| Rolette | 20 | 35 | 0 | 30-35 of the people turned away only had tribal IDs that did not have their residential address on it. The remaining 15-20 had drivers' licenses but their records did not place them in the precinct in Rolette County. |
| Sargent | 0 | 2 | 0 | One individual claimed not to have an ID. The other attempted to use their passport to vote in person. |
| Sioux | 0 | 4 | 4 | All returned with ID and voted. |
| Ward | 0 | 2 | 0 | Long term residents had not yet obtained ND IDs. |

131. After the 2014 primary election, the Secretary of State noted that the number of problems were higher with tribal IDs during that election.

132. Additionally, during the 2014 general election, a significant number of voters were turned away from polling locations because they did not meet the requirements set forth by the voter ID law and the Secretary of State's office.

133. Following the general election, the North Dakota Association of Counties surveyed all 53 county auditors, 25 of which responded.

134. According to the feedback from the 25 county auditors - less than half of all of the county auditors - around 1200 voters were disenfranchised due to improper voter ID.

135. The passage of HB 1333 made the voter ID requirements even more stringent. It is likely that it will only further contribute to the disenfranchisement of Native American and other North Dakotan voters.

136. In the absence of relief under Section 3(a) of the Voting Rights Act, 52 U.S.C. § 10302(a), there is a danger that North Dakota will continue to violate the Voting Rights Act and the voting guarantees of the Fourteenth and Fifteenth Amendments in the future.

### NORTH DAKOTA'S INTERESTS AND THE LACK OF EVIDENCE OF VOTER FRAUD

137. The state has identified four reasons why the voter ID law was purportedly necessary despite its sound election administration: 1) to prevent and cut down on voter fraud; 2) to streamline the voting process; 3) to cut down on the perception that the affidavit ballots get mixed in with the other ballots and they cannot be retrieved; and 4) to make the election process fair, open, and honest.

138. Voter ID laws only address one type of fraud: in person voter fraud. The legislative record is devoid of any evidence of in person voter fraud in North Dakota.

139. Even if the law were drawn to address this type of fraud, the very strict approach that North Dakota took results in disenfranchisement of significant numbers of qualified Native American and other voters.

140. An election where a large percentage of voters cannot vote because of obstacles created by the state, which are arbitrarily restrictive and not necessary, is not free, fair, and open.

30

141.  The overly-restrictive nature of North Dakota's voter ID law is further illustrated by the fact that all states with strict voter ID laws provide a fail-safe option as well as exceptions for indigent voters, which North Dakota does not.

### HISTORY OF DISCRIMINATION IN NORTH DAKOTA

142.  North Dakota has a long history of discrimination against Native Americans generally, and with voting in particular.

### DISCRIMINATION IN VOTING

143.  This Court has previously recognized the history of discrimination in North Dakota against Native Americans with regard to voting. *See Spirit Lake Tribe v. Benson Cty., N.D.*, No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. 2010) (citing *State ex rel. Tompton v. Denoyer*, 72 N.W. 1014, 1019 (N.D. 1897); United States v. Benson Cty., N.D., No. 2:00-cv-30, ECF No. 2 (D.N.D. 2000) (Consent Judgment and Decree) *available at* http://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/benson_cd.pdf.

144.  An Amendment to North Dakota's initial Constitution, adopted and ratified in 1898, specifically addressed whether Native Americans were eligible voters. N.D. CONST. of 1898, art. v, § 121. Article V, Section 121 provided that only "[c]ivilized persons of Indian descent" who "severed their tribal relations two years next preceding such election" were eligible to vote. *Id.* Thus, in order to vote, Native Americans had to be "civilized" and had to have explicitly "severed their tribal relations." *Id.* This insidious classification only applied to Native Americans and was not removed until 1922.

145.  The North Dakota Constitution also established an educational test requirement as a precondition for voting. The requirement stated "the legislature shall by law establish an educational test as a qualification, and may prescribe penalties for failing, neglecting, or refusing to vote at any general election." *Id.*   Literacy tests were a common method used to disenfranchise minority voters, and were addressed by the Voting Rights Act. *See South Carolina*

31

*v. Katzenbach*, 383 U.S. 301, 312, 316  (1966) (discussing the discriminatory use of literacy tests and the Voting Rights Act's ban of such tests).

146.  Further, the North Dakota Code had, under "section 480, Rev. Codes," a provision that did not allow Native Americans to be voters "unless they had entirely abandoned their tribal relations, and were in no manner subject to the authority of any Indian chief or Indian agent." *Denoyer*, 72 N.W. at 1019.

147.  In *Denoyer*, Native American voters in North Dakota had to take their quest to get a voting precinct on the Spirit Lake Reservation to the North Dakota Supreme Court because the County had denied them the right to have a precinct on the reservation. *Id.* at 1015.

148.  In 1920 in *Swift v. Leach*, 178 N.W. 437 (N.D. 1920), the North Dakota Supreme Court was asked to apply the "civilized persons" constitutional provision to Native American voters. While the Court found that the Native American plaintiffs were eligible voters in that case, it required the local Superintendent of the Bureau of Indian Affairs, as well as other witnesses, to testify that the Natives "live just the same as white people" to show that they were "civilized" and had "severed" their tribal relationship. *Id.* at 438-40. This was despite the Appellant's argument that the Native Americans, by being dependent on the federal government, could not be "civilized persons." *Id.* at 441.

149.  Discrimination against Native American voters in North Dakota is not a relic of the 19th and early 20th century.  In 2000, the Justice Department filed an action against Benson County, North Dakota in this Court to enforce Section 2 of the Voting Rights Act for conducting at large elections that gave Native Americans less opportunity to participate in the political process. The parties entered into a consent decree and Benson County agreed to change the way it conducted elections from one at-large district to five separate districts, with two majority Native American districts. United States v. Benson Cty., N.D., No. 2:00-cv-30, ECF No. 2 (D.N.D. 2000) (Consent

Judgment and Decree) *available at*

http://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/benson_cd.pdf.

150. In 2010, Spirit Lake again had to file suit to keep a polling place on its reservation, and this Court found that the removal of that polling place was likely a violation of Section 2. *Spirit Lake Tribe v. Benson Cty., N.D.*, No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. 2010). After a preliminary injunction hearing, the polling place was reestablished on the reservation. *Id.* at *6.

### DISCRIMINATION IN OTHER AREAS

151. Native Americans bear the effects of discrimination in other areas in North Dakota as well, which hinders their ability to participate effectively in the political process.

### Education

152. The "past federal policy was to assimilate American Indians into United States culture, in part by deliberately suppressing, and even destroying, traditional tribal religions and culture in the 19th and early 20th centuries." *Bear Lodge Multiple Use Ass'n v. Babbit*, 175 F.3d 814, 817 (10th Cir. 1999). "By the late 19th Century federal attempts to replace traditional Indian religions with Christianity grew violent. In 1890 for example, the United States Cavalry shot and killed 300 unarmed Sioux men, women and children en route to an Indian religious ceremony called the Ghost Dance[.]" *Id.*

153. Indeed, the government administered Indian trust funds to pay Christian denominations to educate the Indians about Christianity – a policy upheld by the Supreme Court. *Reuben Quick Bear v. Leupp*, 210 U.S. 50, 81-82 (1908).

154. Native Americans in North Dakota were not exempt from this overt discrimination and cultural assimilation.

155. Christian and government boarding schools were set up all over in North Dakota to indoctrinate the Native Americans into Christianity, or "civilization." *See e.g.* UNITED STATES

33

OFFICE OF INDIAN AFFAIRS, EXTRACTS FROM THE ANNUAL REPORT OF THE SECRETARY OF THE INTERIOR, 45 (1927).

156. There were at least 19 boarding or day schools in North Dakota for Native Americans. COMMISSIONER OF INDIAN AFFAIRS, ANNUAL REPORTS OF THE DEPARTMENT OF THE INTERIOR FOR THE FISCAL YEAR ENDED JUNE 30, 1903 18, 20, 23 (1904).

157. In 1921, the federal government recognized the disparity in Native American education in the *Meriam Report: The Problem of Indian Administration* ("Meriam Report"). The Meriam Report showed that the theory of removing Native children "as far as possible" from their home environment did not work, and that Native schools in general were "distinctly below the accepted social and educational standards of school systems in most cities and the better rural communities." INST. FOR GOV'T RESEARCH, THE PROBLEM OF INDIAN ADMIN. 346 (1928). For instance, in 1920 in North Dakota the rural illiteracy rate was only 2.2%, but the Native Americans showed an illiteracy rate of 29.6%. *Id.* at 357.

158. While many Native Americans attended federal schools, the effects of discrimination were still felt even after Native Americans began attending public schools.

159. The 1969 Report by the Senate Committee on Labor and Public Welfare, entitled *Indian Education: A National Tragedy – A National Challenge*, otherwise known as the "Kennedy Report," highlighted the failure of public schools. COMMITTEE ON LABOR PUBLIC WELFARE, SPECIAL SUBCOMMITTEE ON INDIAN EDUCATION, INDIAN EDUCATION: A NATIONAL TRAGEDY – A NATIONAL CHALLENGE, S. REP. NO. 91-501 (1969) [hereinafter *Kennedy Report*]. The report found that Indian children were subjected to humiliating stereotypes in the public school setting, faced language discrimination, felt a sense of powerlessness and experienced depression, and generally did not receive education relevant to their cultures. Evidence showed that dropout rates were higher and reading levels lower among Indian children. *Id.* at 23-31. The report also found that Indian people were generally prevented from serving on school boards. *Id.*

160. The effects of discrimination in the educational setting are still felt by Native Americans in North Dakota.

161. The North Dakota Native Education Division in the North Dakota Department of Public Instruction has noted that Native American students constitute approximately 8.9% of the total North Dakota enrolled student population.

162. The North Dakota Native Education Division found that for many Native students, "the dominant culture of the public school is incompatible with their own cultures and languages. There are differences in distinct and various ways of acquiring knowledge, forms of communication, familial structures, and sociological, cultural, and linguistic modes [of] learning of Native learners, which can cause problems for Native American students in the school environment. Socio-economic issues also complicate the learning environment as well. The consequences of these issues are realized by low achievement scores, [and] high dropout and transfer rates. For example, the 1999 dropout rate for Native American students [in North Dakota] was 42.2 percent. The economic conditions of many Native communities reveal high incidences of poverty, unemployment, and health problems for Native children and their families." N.D. Dep't of Pub. Transp., *Educational Condition*, nd.gov, https://www.nd.gov/dpi/SchoolStaff/IME/Programs_Initiatives/IndianEd/resources/EducationalC ondition/ (last visited Jan. 12, 2016).

163. According to the 2009-2013 American Community Survey 5-Year Estimates, Native American residents in North Dakota are far more likely to lack a high school diploma than other groups in the state as a whole—18.6% of Native American residents over the age of 25 lack a high school diploma compared to 9.1% of the state as a whole. Only 8.4% of White residents over the age of 25 have less education than a high school diploma.

164. According to the Department of Education Office of Civil Rights, Native American students receive out of school suspensions at much higher rates than their White counterparts.

165. From 2011-2012, 9% of male Native Americans were given out of school suspensions in North Dakota, while only 2% of White male students were given out of school suspension. Likewise, 6% of female Native American students were given out of school suspensions in 2011-2012, while only 1% of White female students were given out of school suspensions.

166. The kindergarten retention rate in North Dakota shows similar disparity. According to the Department of Education Office of Civil Rights, between 2011-2012, 8% of Native American kindergarten students were retained an extra year in North Dakota compared to 4% of their White counterparts.

167. Thus, as the North Dakota Native American Education division documented, the effects of historical discrimination in North Dakota continue to have a negative impact on Native Americans.

### Loss of Land

168. The loss of Native American land through the discriminatory allotment policies also still plagues Native Americans. As was stated in the 1948 Hoover Commission's evaluation of the allotment policy: "Two-thirds of Indian-owned land, including much of the best land, was alienated before the Allotment policy was abandoned. If the 90 million acres lost through the process had remained in Indian ownership, the problem of poverty among most tribes could be solved with less difficulty and with more certainty today." Kennedy Report at Appendix I, 149-150.

169. Likewise, Senator Robert Kennedy recognized in 1968 that the "Allotment Act succeeded in the period of the next 40 years in diminishing the Indian tribal economic base from 140 million acres to approximately 50 million acres of the least desirable land. Greed for Indian resources and intolerance of Indian cultures combined in one act to drive the American Indian into the depths of a poverty from which he has never recovered." *Id.* at 150.

170. For instance, In 1882 the Turtle Mountain Reservation constituted 22 townships in North Dakota, but by 1884 it was reduced to two townships and the remainder was opened up to the public domain.

171. Likewise, the Great Sioux Reservation, which covered Wyoming, Montana, Nebraska, Colorado, North Dakota, and South Dakota, was diminished greatly by 1890. Nine million acres of land were lost.

### North Dakota Indian Affairs Commission

172. Another formal area of discrimination in North Dakota was the North Dakota Indian Affairs Commission, which had several recommendations from its inception to "assimilate" Native Americans into mainstream culture.  That was despite the fact that the Commission was established to facilitate relationships with North Dakota Tribes. As the North Dakota Indian Affairs Commission has recognized, it has encompassed the negative rhetoric of termination, assimilation, and relocation for Indian tribes. It was not until 1959 and the roots of self-determination that the tribes within North Dakota acquired representation on the Commission.

### Lending Discrimination

173. Federal judicial intervention has been necessary to eliminate numerous other devices intentionally used to discriminate against Native Americans in North Dakota. One notable example includes lending discrimination directed at Native Americans. In 2010, Native American farmers settled a class-action lawsuit for denying them farm loans. The lead plaintiff, Marilyn Keepseagle is from the Standing Rock Sioux Reservation. Evidence in the lawsuit showed that farm agents discriminated against Native farmers systematically.

174. In 2014, the Department of Housing and Urban Development settled a suit on behalf of a Native American couple from North Dakota who was refused a loan because their property was located on the reservation.

175. As the unemployment, poverty, education and other statistics above show, Native Americans in North Dakota have been subject to social and historical discrimination that still impacts them to this day.

176. This social and historical discrimination hinders North Dakota Native Americans' ability to participate effectively in the political process because they are now less able, and often unable, to obtain the necessary documentation and qualifying ID that is now required to vote.

## CAUSES OF ACTION

### COUNT ONE: HB 1332 AND 1333'S VOTER ID REQUIREMENT VIOLATES SECTION 2 OF THE VOTING RIGHTS ACT.

177. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all other paragraphs of this complaint.

178. Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has either the purpose or the result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

179. Due to social and economic conditions caused by and linked to historical and ongoing discrimination, including poverty, unemployment, lower educational attainment, higher rates of disability, and lack of access to transportation, Native American voters are disproportionately burdened by HB 1332 and 1333.

180. Native Americans disproportionately lack the requisite voter ID, due to the effects of historical and ongoing discrimination and are disproportionately burdened by HB 1332 and 1333's strict voter ID requirements, resulting in an adverse discriminatory impact on Native American voters.

181. HB 1332 and 1333 eliminated the voucher and affidavit processes that a qualified elector could previously use to prove his or her qualifications without having a qualifying ID.

182. Viewed in the totality of circumstances, North Dakota's implementation and enforcement of HB 1332 and 1333 has and will continue to individually and collectively interact with economic, historical, and ongoing social conditions in North Dakota – including, but not limited to, poverty, unemployment, lower educational attainment, and lack of access to transportation – and result in a denial or abridgement of equal opportunities for Native American voters to participate in the political process, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

183. Without an order enjoining the implementation and enforcement of HB 1332 and 1333, Defendants will continue to violate Section 2, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

### COUNT TWO: HB 1332 AND HB 1333'S ELIMINATION OF THE VOUCHER AND AFFIDAVIT FAIL-SAFE PROVISIONS VIOLATES SECTION 2 OF THE VOTING RIGHTS ACT.

184. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all other paragraphs of this complaint.

185. Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has either the purpose or the result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

186. Due to social and economic conditions caused by historical and ongoing discrimination, including poverty, unemployment, lower educational attainment, higher rates of disability, and

lack of access to transportation, Native American voters are disproportionately burdened by HB 1332 and 1333.

187. Native Americans disproportionately lack the requisite voter ID, due to the effects of historical and ongoing discrimination and are disproportionately burdened by the North Dakota Election Code's requirement that voters possess, and prove possession of, a residential address.

188. Native Americans disproportionately relied on the voucher and affidavit process to vote in North Dakota.

189. HB 1332 and 1333 eliminated the voucher and affidavit processes that a qualified elector could previously use to prove the qualifications necessary to vote.

190. Viewed in the totality of circumstances, North Dakota's implementation and enforcement of HB 1332 and 1333 has and will continue to individually and collectively interact with economic, historical, and on-going social conditions in North Dakota – including, but not limited to, poverty, unemployment, lower educational attainment, and lack of access to transportation – and result in a denial or abridgement of equal opportunities for Native American voters to participate in the political process, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

191. Without an order enjoining the implementation and enforcement of HB 1332 and 1333, Defendants will continue to violate Section 2, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

**COUNT THREE: HB 1332 AND HB 1333 PLACE UNCONSTITUTIONAL BURDENS ON QUALIFIED ELECTORS IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.**

192. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all other paragraphs of this complaint.

40

193. The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." It prohibits the imposition of severe burdens on the fundamental right to vote unless they are narrowly drawn to advance a compelling state interest. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

194. The burdens of HB 1332 and 1333 on qualified North Dakota electors are severe.

195. Here, Plaintiffs' right to vote is burdened by the arbitrary and unjustified imposition of a strict voter ID law with no fail-safe provision and no provision to protect the right of indigent qualified electors to vote. Plaintiffs, as well as many other qualified electors do not possess a qualifying ID and face significant obstacles to procuring one. This has resulted, and will continue to result in, disenfranchisement of Plaintiffs and other qualified voters. After observing and documenting evidence of disenfranchisement, the state did not attempt to protect the rights of these voters but rather tightened the restrictions on qualified electors.

196. The state's interest is not compelling, and the law is not narrowly tailored to advance the state's asserted interest.

197. HB 1332 and 1333 do not actually further a compelling state interest.

198. Additionally, HB 1332 and 1333 are not reasonable restrictions on the right to vote.

199. Without an order enjoining the implementation and enforcement of HB 1332 and 1333, Defendants will continue to violate the Equal Protection Clause, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

**COUNT FOUR: HB 1332 AND 1333 VIOLATE THE NORTH DAKOTA EQUAL PROTECTION CLAUSE.**

200. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all other paragraphs of this complaint.

201. North Dakota Constitution Article I, §§ 21 and 22 provide the state's guarantee of equal protection to its citizens. Section 21 states: "No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens." In North Dakota, strict scrutiny is applied to "an inherently suspect classification or infringement of a fundamental right." A law that significantly interferes with such a right must promote a compelling state interest, and its distinctions must be necessary to further its purpose. *Hector v. City of Fargo*, 844 N.W. 2d 542, 554 (N.D. 2014) (citing *Gange v. Clerk of Burleigh Cty. Dist. Court*, 429 N.W.2d 429, 433 (N.D. 1988).

202. Article II, Section 1 of the North Dakota Constitution provides that "every citizen of the United States, who has attained the age of eighteen years and who is a North Dakota resident shall be a qualified elector."

203. The right to vote is a fundamental right and the most essential part of a functional democratic system. North Dakota's "whole election system . . . is built up and founded on the fundamental principle that every elector shall be given the opportunity to vote for or against any candidate." *Stern v. City of Fargo*, 122 N.W. 403, 408 (N.D. 1909).

204. HB 1332 and 1333 severely burdens and significantly interferes with the fundamental right of qualified Native American and other North Dakota electors to vote. These provisions do

42

not actually further a compelling interest, are not narrowly tailored to a compelling interest, and are not carried out by the least restrictive means.

205. Without an order enjoining the implementation and enforcement of HB 1332 and 1333, Defendants will continue to violate the North Dakota Equal Protection Clause, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

## COUNT FIVE: HB 1332 AND 1333 ESTABLISH NEW VOTER QUALIFICATIONS IN VIOLATION OF THE NORTH DAKOTA CONSTITUTION.

206. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all other paragraphs of this complaint.

207. Under the North Dakota Constitution, "[e]very citizen of the United States, who has attained the age of eighteen years and who is a North Dakota resident, shall be a qualified elector." N.D. CONST., art. II, § 1.

208. The North Dakota Supreme Court has stated that "where the Constitution prescribes the qualifications of electors the Legislature is powerless to add or subtract from those qualifications." *Spatgen v. O'Neil*, 169 N.W. 491, 494 (N.D. 1918); *see also Johnson v. Grand Forks Cty*, 113 N.W. 1071, 1072-74 (N.D. 1907) (holding that the payment of a fee to run for office was an unconstitutional qualification).

209. The requirements in HB 1332 and 1333 mandating ownership of a specific form of state or tribally issued ID in order to vote is an elector qualification added by the legislature that is not in the North Dakota constitution.

210. Because the legislature cannot add additional qualifications to those contained in the North Dakota Constitution, the additional qualification is unconstitutional.

211. Without an order enjoining the implementation and enforcement of HB 1332 and 1333, Defendants will continue to violate the North Dakota Constitution, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter an order:

212. Declaring HB 1332 and HB 1333 unconstitutional under the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution and enjoining Defendants from enforcing the requirements of those provisions;

213. Declaring that HB 1332 and HB 1333 violate Section 2 of the Voting Rights Act, and

      **a.**    enjoining Defendants from enforcing the requirements of HB 1332 and 1333; and

      **b.**    authorizing the appointment of Federal observers by the Director of the Office of Personnel Management in accordance with section 8 of the Voting Rights Act to serve for such period of time as the Court shall determine is appropriate to enforce the guarantees of the Fifteenth Amendment to the United States Constitution, as provided by 52 U.S.C. § 10302(a);

214. Declaring HB 1332 and HB 1333 unconstitutional under the Equal Protection Clause of the North Dakota Constitution;

215. Declaring HB 1332 and HB 1333 unconstitutional under Article II, § I of the North Dakota Constitution;

216. Awarding Plaintiffs' attorney fees and costs as allowed and required by law, including, but not limited to, 42 U.S.C. § 1988, 52 U.S.C. § 10310, and the Private Attorney General Doctrine; and

217. Ordering such additional relief as the interests of justice may require, together with the costs and disbursements in maintaining this action.

Respectfully submitted this 20th day of January, 2016,

Tom Dickson, ND Bar No. 03800
tdickson@dicksonlaw.com
Dickson Law Office
P.O. Box 1896
Bismarck, North Dakota 58502
P: (701) 222-4400
F: (701) 258-4684

Matthew Campbell, NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
Telephone: (303) 447-8760

Joel West Williams, PA Bar No. 91691
williams@narf.org
NATIVE AMERICAN RIGHTS FUND
1514 P Street NW (Rear), Suite D
Washington, D.C. 20005
Telephone: (202) 785-4166

Richard de Bodo, CA Bar No. 128199
rich.debodo@morganlewis.com
Morgan, Lewis & Bockius LLP
1601 Cloverfield Blvd., Ste. 2050 North
Santa Monica, CA 90404-4082
Phone 1.310.255.9055
Fax 1.310.907.2000