IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | |
|---|---|
| RICHARD BRAKEBILL, *et al.*,<br><br>          Plaintiffs,<br>     v.<br><br>ALVIN JAEGER, in his official capacity as the North Dakota Secretary of State,<br><br>          Defendant. | Case No.  1:16-CV-008 (DLH)<br><br>**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA** |

     The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General to attend to the interests of the United States in any pending lawsuit.  This matter implicates the interpretation and application of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2"), a statute over which Congress accorded the Attorney General broad enforcement authority.  *See* 52 U.S.C. § 10308(d).  The United States has a substantial interest in ensuring Section 2's proper interpretation and uniform enforcement around the country.

     The United States respectfully submits that Defendant's Memorandum and Reply Memorandum in support of his Motion to Dismiss misstates the established legal standard under Section 2.  Def. Mem. 7-9 (ECF No. 16); Def. Reply Mem. (ECF No. 23).  Accordingly, the United States submits this Statement for the limited purpose of articulating the appropriate legal standard.

**I.     BACKGROUND**

     On January 20, 2016, Plaintiffs—members of the Turtle Mountain Band of Chippewa Indians—sued the North Dakota Secretary of State alleging, among other claims, that the voter identification requirements in North Dakota House Bill 1332 and House Bill 1333 violate

Section 2.  Compl. ¶¶ 177-211 (ECF No. 1).  Plaintiffs seek a declaration that HB 1332 and HB 1333 violate Section 2, an injunction barring enforcement of these laws in future elections, and authorization for federal observers to monitor elections under Section 3 of the Act, 52 U.S.C. § 10302.  *Id.* ¶¶ 212-217.  Plaintiffs argue that absent relief the challenged state laws will continue to deny the right of qualified Native American electors to vote on account of race or membership in a language minority group.  *Id.* ¶¶ 183, 191, 199, 205, 211.

In lieu of an answer, Defendant moved to dismiss for failure to state a claim.  Mot. to Dismiss (ECF No. 14).  As explained below, Defendant misstates governing Section 2 standards.

## II.  SECTION 2 OF THE VOTING RIGHTS ACT

Section 2 of the Voting Rights Act prohibits any state or political subdivision from imposing or applying a "voting qualification," "prerequisite to voting," or "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group.  52 U.S.C. § 10301(a).  Section 14(c)(1) of the Act defines the terms "vote" and "voting" to include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to registration, . . . casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast."  52 U.S.C. § 10310(c)(1).  Voter identification requirements like North Dakota's serve as a "prerequisite to voting," and more generally are a "standard, practice, or procedure" with respect to voting because they determine whether a ballot will be "included in the appropriate totals of votes cast."

A violation of Section 2 can be established not just by proof of a discriminatory purpose, *McMillan v. Escambia County*, 748 F.2d 1037, 1046 (5th Cir. 1984), but also "by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *see also Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1388 n.5 (8th Cir. 1995) (en banc) ("[O]ur inquiry

looks to the effect of voting practices on equal political opportunity rather than to their intent.").
Section 2(b) provides that a violation:

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b); *see also Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (holding that this test asks "whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice'" (quoting S. Rep. No. 97-417, at 28 (1982))). Section 2 requires a practical assessment of the "totality of the circumstances," 52 U.S.C. § 10301(b), to determine whether the challenged voting practice "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [nonminority] voters" to participate in the process and elect their preferred representatives. *Gingles*, 478 U.S. at 47; *see also Chisom*, 501 U.S. at 403 (noting that the Voting Rights Act must "be interpreted in a manner that provides the broadest possible scope in combating racial discrimination" (internal quotation marks and citation omitted)).

A two-step analysis determines whether the limitation at issue on casting a valid ballot results in denial or abridgment of the right to vote under Section 2.[1] First, the reviewing court assesses whether the limitation bears more heavily on minority citizens than nonminority citizens. This assessment incorporates both the likelihood that minority voters will face the

---

[1] Most Section 2 cases address vote dilution: election structures that render even eligible voters who are fully able to cast valid ballots without the equitable opportunity to elect representatives of choice. *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399 (2006); *Gingles*, 478 U.S. at 45. Nonetheless, "Section 2 prohibits all forms of voting discrimination, not just vote dilution." *Gingles*, 478 U.S. at 45 n.10 (citing S. Rep. No. 97-417, at 30). This case concerns vote denial or abridgement, rather than vote dilution.

burden and their relative ability to overcome that burden. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 245 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015); *Poor Bear v. Cnty. of Jackson*, No. 5:14-cv-5059, 2015 WL 1969760, at *6 (D.S.D. May 1, 2015); *Spirit Lake Tribe v. Benson Cnty.*, No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. Oct. 21, 2010).[2] Second, if a disparity is established, the reviewing court engages in an "intensely local appraisal" of the "totality of the circumstances" in the jurisdiction at issue to determine whether the challenged practice works in concert with historical, social, and political conditions to produce a discriminatory result. *See League of Women Voters*, 769 F.3d at 245-46; *Poor Bear*, 2015 WL 1969760, at *7 n.9; *Spirit Lake Tribe*, 2010 WL 4226614, at *3.[3]

The answer to the second question is informed in part by "the 'typical' factors that Congress noted in Section 2's legislative history," generally known as the Senate Factors, although "'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.'" *League of Women Voters*, 769 F.3d at 245 (quoting *Gingles*, 478 U.S. at 45); *see also Husted*, 768 F.3d at 554; *Gonzales*, 677 F.3d at 405; *Poor Bear*, 2015 WL 1969760, at *5-6; *Spirit Lake Tribe.*, 2010 WL 4226614, at *3 (relying on Senate Factors without articulating them as such). These factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

---

[2] *See also Ohio State Conf. of the NAACP v. Husted*, 768 F.3d 524, 555-56 (6th Cir. 2014), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014); *Gonzalez v. Arizona*, 677 F.3d 383, 406 (9th Cir. 2012) (en banc), *aff'd on other grounds sub nom. Arizona v. Inter Tribal Council of Ariz.*, 133 S. Ct. 2247 (2013); *Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400, 413 (5th Cir. 1991).

[3] *See also Husted*, 768 F.3d at 556-57; *Gonzalez*, 677 F.3d at 407; *Operation Push*, 932 F.2d at 405.

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction[;]

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36-37 (citing S. Rep. No. 97-417, at 28-29). The Senate Factors are "neither comprehensive nor exclusive," and "other factors may also be relevant and may be considered." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 29); *see also Harvell*, 71 F.3d at 1385 (noting non-exclusivity). These factors are not limited to considering the relevant jurisdiction's conduct but also that of other governmental entities and private individuals. *See, e.g.*, *Gingles*, 478 U.S. at 80; *cf. White v. Regester*, 412 U.S. 755, 765-70 (1973) (addressing evidence relating to the target jurisdiction, other government entities, and private individuals, in the context of a constitutional vote dilution claim). Examining the Senate Factors helps the court to determine whether the challenged practice, in light of current social and political conditions in the jurisdiction, results in a discriminatory denial or abridgement of the right to vote through less

5

opportunity for the allegedly affected group to participate in the political process relative to other voters.

## III. DEFENDANT'S ERRONEOUS LEGAL STANDARD

Defendant's motion to dismiss inaccurately states Section 2 standards. Eliding decades of well-established law, Defendant argues that (1) "the factual allegations in the Complaint are not legally material to resolving" the Section 2 claim, Def. Mem. 1; (2) the Voting Rights Act is not implicated unless a jurisdiction has "denied" citizens the opportunity to vote by making it "needlessly hard to get" required identification, Def. Mem. 8; (3) socioeconomic disparities are relevant to the totality-of-circumstances analysis only if those disparities result from official discrimination by the jurisdiction at issue, Def. Mem. 8; Def. Reply Mem. 5-6; and (4) plaintiffs must establish that the jurisdiction treats voters differently on the basis of race or membership in a language minority group, Def. Mem. 8-9. For the reasons that follow, these arguments are without merit and should be rejected.

### A. Section 2 Requires a Fact-Intensive Analysis.

Defendant argues that "the factual allegations in the Complaint are not legally material to resolving the issue presented by the Complaint." Def. Mem. at 1. Not so. Section 2 claims are particularly fact-dependent and thus ill-suited for resolution at the motion to dismiss stage. *See, e.g.*, *Metts v. Murphy*, 3633 F.3d 8, 11 (1st Cir. 2004) (en banc) (per curiam). Section 2 requires an inquiry "peculiarly dependent upon the facts of each case," incorporating analysis of both the "design and impact of the contested electoral mechanisms," and a "searching practical evaluation" of the jurisdiction's "past and present reality." *Gingles*, 478 U.S. at 79 (internal quotation marks and citations omitted). Courts reviewing Section 2 claims have thus "repeatedly emphasized the necessity for very detailed findings of facts." *Buckanaga v. Sisseton Indep. Sch. Dist. No. 54-5*, 804 F.2d 469, 472, 477-78 (8th Cir. 1986); *see also Velasquez v. City of Abilene*,

6

725 F.2d 1017, 1020 (5th Cir. 1984). Accordingly, Defendant's argument fails: factual allegations are essential to a plaintiff's Section 2 claims and intrinsic to the totality of the circumstances analysis this Court must undertake.

### B. Section 2 Does Not Require Proof that a Jurisdiction Has Made Voting "Needlessly Hard" or "Denied" Citizens the Right to Vote.

Defendant also asserts that "[u]nless North Dakota makes it needlessly hard to get the valid identification, it has not denied anything to any voter," and is thereby free from potential liability under Section 2. Def. Mem. 8. This is wrong for two reasons.

First, Section 2 prohibits the "abridgment" as well as the outright "denial" of the right to vote. 52 U.S.C. § 10301(a). This prohibition does not require that a challenged practice deprive minority voters completely of the ability to vote. *See, e.g.*, *Black's Law Dictionary* (9th ed. 2009) (defining "abridge" as "reduce or diminish"). It requires only that plaintiffs establish they have "less opportunity" to participate relative to other voters. 52 U.S.C. § 10301(b). All electoral rules with a material disparate "effect on a person's ability to exercise [the] franchise" implicate the Voting Rights Act. *Cf. Perkins v. Matthews*, 400 U.S. 379, 387 (1971) (addressing Section 5); *see also Poor Bear*, 2015 WL 1969760, at *7 (concluding that Section 2 protects equal opportunity to cast a ballot via in-person absentee voting); *Spirit Lake Tribe*, 2010 WL 4226614, at *3 (enjoining polling place closures under Section 2).[4]

---

[4] *See also Chisom*, 501 U.S. at 408 (Scalia, J., dissenting) (explaining that Section 2 would be violated if "a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites"); *League of Women Voters*, 769 F.3d at 244-47 (same day registration and out-of-precinct voting); *Husted*, 768 F.3d at 552-53 (early in-person voting); *Operation Push*, 932 F.2d at 402 (dual registration requirement and prohibition on satellite registration). In typical vote dilution cases, minority voters similarly experience no outright disenfranchisement; their votes simply have less effective weight than those of other voters. *See Gingles*, 478 U.S. at 42-48 (holding that minority plaintiffs who cast ballots but could not equitably elect candidates of choice had proven a Section 2 violation).

Second, a Section 2 claim does not depend on whether it is "needlessly hard" for any particular voter to obtain the required identification. Rather, the correct analysis focuses on the affected group's relative ability to obtain the required identification in the context of the social and political reality of the jurisdiction at issue. Whether or not a burden is "needlessly hard" is relevant only to consideration of a policy's tenuousness and itself ill-suited for resolution at the motion to dismiss stage. Moreover, the resolution of that question alone would not be dispositive of Plaintiffs' Section 2 claim under the requisite totality of circumstances analysis.

Under Section 2, in evaluating a prerequisite to voting such as a voter identification requirement, a court first assesses the likelihood that minority voters will face a barrier to voting and their relative ability to overcome a material burden on the franchise. The court should then consider whether the challenged law results in discriminatory denial or abridgment of the right to vote under a totality of the circumstances, relying in part on Senate Factor evidence. *See* Part II, *supra*. The difficulty of obtaining requisite identification relates directly to the burden imposed by a law, under the first stage of analysis for a denial or abridgment claim. *See, e.g.*, *Gonzalez v. Arizona*, 677 F.3d 383, 407 (9th Cir. 2012) (en banc), *aff'd on other grounds sub nom. Arizona v. Inter Tribal Council of Ariz.*, 133 S. Ct. 2247 (2013) (requiring evidence of minority voters' "ability or inability to obtain or possess identification for voting purposes"). But while an assertion that it is "*needlessly* hard to get the valid identification" necessary to vote, Def. Mem. 8 (emphasis added), may well relate to the tenuousness of the underlying policy, that is only one Senate Factor among many. And, of course, no single Senate Factor is required to establish a Section 2 violation. *See Gingles*, 478 U.S. at 48-51 (contrasting the Senate Factors with three necessary preconditions to a Section 2 vote dilution claim).

Defendant offers no support for the argument that Plaintiffs must allege that North Dakota makes it "needlessly hard" for Native Americans to get valid identification in order to succeed on a section 2 claim, although it appears to be drawn from *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1551 (2015).[5] But the *Frank* court cited no authority for the novel proposition that unless a state with a strict photographic voter identification law "makes it needlessly hard to get photo ID, it has not denied anything to any voter" and thereby does not violate Section 2. *Frank*, 768 F.3d at 753. And no such authority exists. Neither the Voting Rights Act's text, its legislative history, nor prior judicial precedents even suggest that Section 2 plaintiffs must allege, let alone prove, "needlessness" as an irreducible element of a claim.[6] Rather, courts have consistently struck down discriminatory election practices, notwithstanding legitimate government interests that might justify other policies or even the same policy in a different context. *See, e.g.*, *United States v. Texas*, 252 F. Supp. 234 (W.D. Tex.) (three-judge court) (striking down Texas's poll tax even though it served as the State's voter registration system and purportedly reduced voter fraud), *aff'd*, 384 U.S. 155 (1966); *Smith v. Clinton*, 687 F. Supp. 1310, 1318 (E.D. Ark.) (three-judge court) (striking down multimember district despite finding that the underlying state policy "is not tenuous"), *aff'd*, 488 U.S. 988 (1988). *See generally LULAC v. Clements*, 999 F.2d 831, 871 (5th Cir. 1993) (en banc) ("Proof of a merely non-tenuous state interest discounts one [Senate] factor, but cannot defeat liability."); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1047 (D.S.D. 2004) ("[E]ven a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's

---

[5] The full Seventh Circuit denied rehearing en banc by an equally divided court. *See Frank v. Walker*, 773 F.3d 783 (7th Cir. 2014) (Posner, J., dissenting).

[6] In *Barnett v. City of Chicago*, the Seventh Circuit assessed whether a challenged districting "plan needlessly impairs a minority group's voting power" by determining whether "any nondiscriminatory alternative" existed. 141 F.3d 699, 701-02 (7th Cir. 1998). Thus, *Barnett* merely used needlessness as a synonym for redressability.

showing through other factors that the challenged practice denies minorities fair access to the process." (quoting S. Rep. No. 97-417, at 207 n.117)), *aff'd*, 461 F.3d 1011 (8th Cir. 2006).

### C. Effects of Past Discrimination that Hinder Minority Voters' Ability to Participate Effectively in the Political Process Are Relevant to a Section 2 Claim.

Defendant erroneously argues that the totality of circumstances inquiry requires a plaintiff to allege that "any difference in economic circumstances is discrimination attributable" to the defendant jurisdiction and that the statute does not protect against a jurisdiction's decision to impose a discriminatory voting practice, so long as the "societal effects of private discrimination" are the primary impetus for the law's discriminatory result. Def. Mem. 8. Nothing in Section 2's text or legislative history limits the Senate Factor analysis of the relevant social and political conditions to official, state-sponsored discrimination by the jurisdiction in question. To the contrary, in considering the "totality-of-circumstances" of a burden that disproportionately falls on minority citizens, a court analyzes whether the challenged voting practice "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and [nonminority] voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. Among other Senate Factor evidence probative of a causal link between a challenged electoral practice and a discriminatory result, courts must examine the extent to which members of a minority group bear the effects of discrimination in such areas as education, employment, and health. *Gingles*, 478 U.S. at 69 (quoting S. Rep. No. 97-417, at 29); *see also Whitfield v. Democratic Pty.*, 890 F.2d 1423, 1430-31 (8th Cir. 1990).

Congress's intent to take the result of both public and private conduct into account is evident from several Senate Factors. The extent of racially polarized voting, the existence of a candidate slating process, and the use of overt or subtle racial appeals in political campaigns, for

example, all reflect Congress's intent for the totality-of-circumstances analysis to examine far more than official, state-sponsored discrimination. *See Gingles*, 478 U.S. at 36-37. And Senate Factor five, Defendant's focus here, directs courts to consider only the extent to which members of a minority group "bear the effects of discrimination," from whatever source. *Gingles*, 478 U.S. at 69; *see also Buckanaga*, 804 F.2d at 474-75 (addressing "any lingering effects of discrimination as evidenced by economic and social disparity between Indians and whites"); *cf. Gingles*, 478 U.S. at 36 (defining the first Senate Factor, in contrast, as limited to "the extent of any history of *official* discrimination" (emphasis added)). Thus, the Eighth Circuit has noted that socioeconomic disparities resulting from past discrimination may currently impede minority voters' ability to participate equally in the electoral process, without suggesting that such discrimination must be purely public to implicate the Act. *See Whitfield*, 890 F.2d at 1430-32; *cf. id.* at 1431 ("[D]isproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of [minority] participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." (quoting S. Rep. No. 97-417, at 29 n.114)).

Defendant's argument again appears to be drawn from *Frank*. *See* 768 F.3d at 753. But nothing in Section 2's text, its legislative history, or prior Voting Rights Act precedent suggests that in assessing the totality of circumstances, a court may consider only discrimination by the jurisdiction itself. Such discrimination is surely relevant, but is not exclusively so. "[T]he literal language of the fifth Senate factor does not even support the reading that only discrimination by [the defendant jurisdiction] may be considered; the limiting language describes the people discriminated against, not the discriminator." *Gomez v. City of Watsonville*, 863 F.2d 1407,

1417-19 (9th Cir. 1988); *see also Harvell*, 71 F.3d at 1390 (emphasizing that "the recognized historic effects of discrimination . . . impact negatively on minority political participation").[7] Moreover, the second and sixth Senate factors—the extent of racially polarized voting and the presence of overt or subtle racial appeals in political campaigns—concern private action that is particularly relevant as a danger sign for discriminatory state action, *see Rogers v. Lodge*, 458 U.S. 613, 624 (1982), or whose impact may be amplified by such state action. Ultimately, it is the intensely local analysis of all factual circumstances existing within a jurisdiction, regardless of source, that will determine whether a state action, such as imposing a particular voter identification requirement, results in a Section 2 violation.[8] Thus, this Court should follow well-

---

[7] *See also Buckanaga*, 804 F.2d at 474-75 (holding that the district court erred by failing to address evidence of broad socioeconomic disparities, without reference to their sources); *Bone Shirt*, 336 F. Supp. 2d at 1018-34, 1037-41 (recounting the history of official and unofficial discrimination and setting out socioeconomic disparities without concern for their cause); *cf. United States v. Blaine Cnty.*, 363 F.3d 897, 913 (9th Cir. 2004) (rejecting argument that the first Senate Factor "could only look at official discrimination by [the defendant jurisdiction], not the state or federal government").

[8] Of course, as Plaintiffs have also alleged, North Dakota has a well-documented history of discrimination against Native Americans generally, and with respect to voting in particular. *See* Compl. ¶¶ 142-176; *see also, e.g.*, *Spirit Lake Tribe*, 2010 WL 4226614, at *2 (recognizing "a historic pattern of voting discrimination" against Native American voters); Consent Decree ¶ 14, *United States v. Benson Cnty.*, No. 2:00-cv-30 (D.N.D. Mar. 10, 2000) (ECF No. 2) (recognizing that Native American citizens in one North Dakota county have "suffered from a history of official racial discrimination in voting and other areas"); *Swift v. Leach*, 178 N.W. 437, 438-41 (N.D. 1920) (holding that Native Americans were eligible voters only because white witnesses testified that the Native American voters were "civilized" and had "severed" tribal relationships); *State ex rel. Tompton v. Denoyer*, 72 N.W. 1014, 1019 (N.D. 1897) (noting contemporaneous statute excluding Native Americans from the franchise "unless they had entirely abandoned their tribal relations, and were in no manner subject to the authority of any Indian chief or Indian agent"); N.D. Const. art. V, § 121 (limiting the franchise to "[c]ivilized persons of Indian descent who shall have severed their tribal relations two years next preceding such election") (original text), *as amended*, N.D. Const. art. II, § 1 (1979); N.D. Indian Affairs Comm'n, *1949-1999: 50 Years of Tribal/State Relations* 3 (1999) (describing conclusion of Commission that "Indians should be assimilated into the general citizenry"); N.D. Advisory Comm'n to the U.S. Comm'n on Civil Rights, *Civil Rights Enforcement Efforts in North Dakota*, ch. 7 (Nov. 1999) ("Systemic discrimination continues to occur in relation to fair housing, equal employment, and education, to name a few, particularly against Native Americans."); Jeanette Wolfley, *Jim Crow, Indian Style: Disenfranchisement of Native Americans*, 16 Am. Indian L. Rev. 167, 182-83 (1991) (describing discrimination in North Dakota in the context of broader discrimination against Native Americans).

established precedent in considering all past or present discrimination, public and private, when assessing whether a challenged voting practice violates Section 2.

### D. Section 2's Test Is More Than an "Equal-Treatment" Requirement.

Defendant asserts that Section 2 does not provide redress when the process for obtaining identification in the defendant jurisdiction is facially open to all voters regardless of race or language minority status. Def. Mem. 8-9. Here too Defendant errs, ignoring the text, history, and purpose of Section 2(b).

In response to the Supreme Court's decision in *City of Mobile v. Bolden*, 446 U.S. 55 (1980), which had held that Section 2 prohibited only intentionally discriminatory practices, Congress amended Section 2 in 1982 to restore an evidentiary standard developed in earlier cases, which did not require proof of discriminatory intent. *See Gingles*, 478 U.S. at 43-45; S. Rep. No. 97-417, at 15, 27-28, 30. As the Supreme Court has explained, the "essence" of the restored results-based claim is that a challenged law, even when facially neutral, "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [nonminority] voters" to participate in the political process and elect their preferred representatives. *Gingles*, 478 U.S. at 47. Thus, the "equal-treatment requirement" advocated by Defendant would effectively restore the discriminatory intent requirement from which Congress decisively departed. Indeed, Defendant would impose an even higher burden because an "equal-treatment" test focuses solely on the form of the challenged law without looking at whether it was enacted for a discriminatory purpose.

Likewise, the Section 2 test does not impose an "equal-outcome command," as Defendant suggests. Def. Mem. 9. To the contrary: demonstrating only a disparity in the rates at which different minority groups possess the requisite identification is not enough to

13

prove a Section 2 violation.  *See, e.g.*, *Gonzalez*, 677 F.3d at 405-407 & nn.33-34.  Rather, a plaintiff must also show that the disparity leads to a discriminatory result.  In this case, the Section 2 test ensures a detailed, fact-intensive examination of the full range of the allegations in the complaint: that socioeconomic and geographic disparities—along with a history of discrimination in housing, employment, and education, among other things—help to explain both the decreased rate at which Native Americans currently possess the required identification and the increased difficulty they face in obtaining it.  Thus, the Section 2 inquiry is not concerned with mere statistical disparities, but rather the question whether a prerequisite to voting imposes a material disparate burden tied to the effects of public and private discrimination on Native American voters, in a way that yields less opportunity for Native Americans to participate in the political process and elect representatives of choice.

      Finally, the existence of a facially neutral law does not end the Section 2 inquiry.  Def. Mem. at 8.  Section 2 prohibits "facially neutral" voting practices that nonetheless lead to the discriminatory result of members of a minority group as a class having "less opportunity than other members of the electorate to participate in the political process."  52 U.S.C. § 10301(b); *Gingles*, 478 U.S. at 35; *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990).  *See also, e.g.*, *League of Women Voters*, 769 F.3d at 245 (holding that Section 2 prohibits certain facially neutral election administration measures that "disproportionately impact minority voters"); *Stabler v. Cnty. of Thurston*, 129 F.3d 1015, 1021-22 (8th Cir. 1997) (holding that a facially neutral redistricting plan violated Section 2 with respect to Native American voters).

### IV.    CONCLUSION

      For the preceding reasons, this Court should apply the established legal standard under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, to resolve Defendant's motion to dismiss.

Date:  April 5, 2016

                                            Respectfully submitted,

                                            VANITA GUPTA
                                            Principal Deputy Assistant Attorney General
                                            Civil Rights Division

                                            */s/ Victor J. Williamson*
                                            T. CHRISTIAN HERREN JR
                                            RICHARD DELLHEIM
                                            VICTOR J. WILLIAMSON
                                            DANIEL J. FREEMAN
                                            Attorneys, Voting Section
                                            Civil Rights Division
                                            United States Department of Justice
                                            950 Pennsylvania Avenue NW
                                            Room 7254 NWB
                                            Washington, D.C.  20530
                                            (202) 305-0036
                                            victor.williamson@usdoj.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Statement of Interest of the United States of America was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to all attorneys of record.

Dated:  April 5, 2016.

By:     */s/Victor J. Williamson*
        Victor J. Williamson