**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | |
|---|---|
| Richard Brakebill, Deloris Baker, Dorothy Herman, Della Merrick, Elvis Norquay, Ray Norquay, and Lucille Vivier, on behalf of themselves, | Civil No. 1:16-cv-8 |
| Plaintiffs, | |
| vs. | |
| Alvin Jaeger, in his official capacity as the North Dakota Secretary of State, | |
| Defendant. | |

# Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction

# Table of Contents

I.    Preliminary Statement ................................................................................................ 1

II.   Statement of Facts ..................................................................................................... 3

    A.   Historically, North Dakota has had Voter-Friendly
        Election Laws ................................................................................................... 3

    B.   Historically, North Dakota has Not had a Voter Fraud
        Problem ............................................................................................................ 5

    C.   North Dakota Recently Adopted the Most Restrictive
        Voter Identification Requirements in the Nation.............................................. 5

    D.   Thousands of Native Americans Living in North Dakota
        Do Not Have Qualifying Voter ID ................................................................... 8

    E.   Native Americans Living in North Dakota Face
        Substantial Burdens in Obtaining Qualifying Voter ID .................................... 9

        1.   Native Americans who currently lack qualifying
            voter ID face substantial burdens in obtaining a
            non-driver's ID card.................................................................................10

            a)   Native Americans trying to get a non-driver's
                ID face substantial burdens in providing
                proof of identification.............................................................10

            b)   Native Americans trying to get a non-driver's
                ID face substantial cost burdens ...........................................12

            c)   Native Americans trying to get a non-driver's
                ID face substantial travel/time burdens .......................................12

            2.   Native Americans who currently lack qualifying
             voter ID face substantial burdens in obtaining a
             new driver's license ...............................................................................14

            3.   Native Americans who currently lack qualifying
             voter ID face substantial burdens in updating their
             current non-driver ID or driver's license ................................................15

            4.   Many tribal government issued ID cards do not
             satisfy the new law because they do not show a

residential address and are substantially
burdensome to obtain ........................................................... 16

5.    Long term care ID certificates are not common ........................... 17

F.    North Dakota's New Voter ID Laws Have
Disenfranchised Native American Voters .......................................... 17

G.    North Dakota's New Voter ID Laws Disparately Impact
Native American Voters ...................................................................... 18

III.    The Legal Test for Preliminary Injunctive Relief .................................................. 22

IV.    Plaintiffs Are Likely To Prevail On the Merits ..................................................... 23

A.    Plaintiffs Are Likely To Prevail On Their Claims for
Violations of Section 2 of the Voting Rights Act .......................... 23

1.    The new voter ID laws impose a discriminatory
burden on Native Americans ....................................................... 25

2.    The discriminatory burden is caused by and linked
to social and historical discrimination that has and
continues to produce discrimination against
Native Americans ......................................................................... 25

a)    Senate factor 1: North Dakota has a long
history of voting-related discrimination ................................ 25

b)    Senate factor 2: Voting in North Dakota is
racially polarized .................................................................... 29

c)    Senate factor 3: North Dakota has used
voting practices or procedures to enhance
the opportunity for discrimination against
Native Americans ................................................................... 30

d)    Senate factor 5: The ability of Native
Americans to vote is hindered by the effects
of past discrimination in the areas of
education, employment, and health ....................................... 31

e)    Senate factor 7: Native Americans are not
fairly represented in elective offices in North
Dakota ..................................................................................... 33

f)   Senate factor 8:  North Dakota's elected officials have not been responsive to the needs of Native Americans .................................................33

g)   Senate factor 9:  There was no compelling need for the new voter ID laws............................................34

B.   Plaintiffs Are Likely to Prevail on Their Claim for Violation Of the 14th Amendment's Equal Protection Clause ...................................................................................35

1.   North Dakota's new voter ID laws make voting substantially more burdensome for Native Americans ............................................................36

2.   No compelling state interest necessitated North Dakota's new voter ID laws.......................................37

V.   Plaintiffs Will Suffer Irreparable Injury without Preliminary Injunctive Relief...................................................................................38

VI.   The Balance of Hardships Weighs In Favor of Preliminary Injunctive Relief...................................................................................39

VII.   Preliminary Injunctive Relief Will Serve the Public Interest ....................................39

VIII.   Conclusion...................................................................................40

# Table of Authorities

## U.S. Supreme Court Cases

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ............................................................................................................36

*Crawford v. Marion Cty. Election Bd.,*
    553 U.S. 181 (2008) ...............................................................................................30, 36, 37

*Norman v. Reed,*
    502 U.S. 279 (1992) ............................................................................................................36

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ............................................................................................................38

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) ...........................................................................................................3, 38

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) ............................................................................................................38

## Federal Appellate Cases

*ACLU of New Mexico v. Santillanes,*
    546 F.3d 1313 (10th Cir. 2008) .........................................................................................36

*Bone Shirt v. Hazeltine,*
    461 F.3d 1011 (8th Cir. 2006) ...........................................................................................24

*Frank v. Walker,*
    768 F.3d 744 (7th Cir. 2014)........................................................................................24, 30

*League of Women Voters of N.C. v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014)........................................................................................23, 24

*Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.,*
    59 F.3d 80 (8th Cir. 1995) ..................................................................................................23

*Obama for America v. Husted,*
    697 F.3d 423 (6th Cir. 2012)......................................................................................*passim*

*Ohio State Conference of N.A.A.C.P. v. Husted,*
    768 F.3d 524 (6th Cir. 2014) *vacated as moot sub nom. Ohio*
    *State Conference of The Nat. Ass'n For The Advancement of*

*Colored People v. Husted*, No. 14-3877, 2014 WL 10384647
(6th Cir. Oct. 1, 2014) ........................................................................... 23, 24, 25

*Planned Parenthood of Minn. v. Citizens for Cmty. Action*, 558 F.2d
861 (8th Cir. 1977) .................................................................................. 38

*Rogers Grp., Inc. v. City of Fayetteville*,
629 F.3d 784 (8th Cir. 2010) .................................................................. 38

*Veasey v. Abbott*,
796 F.3d 487 (5th Cir. 2015) *reh'g en banc granted*, 815 F.3d
958 (5th Cir. 2016) ................................................................................. *passim*

## Federal District Court Cases

*Lee v. Virginia State Bd. of Elections*,
No. 3:15CV357-HEH, 2016 WL 2946181 (E.D. Va. May 19,
2016) ....................................................................................................... 30

*MKB Mgmt. Corp. v. Burdick*,
954 F. Supp. 2d 900 (D.N.D. 2013) ........................................................ 22

*NAACP v. McCrory*,
No. 1:13CV658, 2016 WL 1650774 (M.D.N.C. Apr. 25, 2016) ............... 30

*Spirit Lake Tribe v. Benson Cty., N.D.*, No. 2:10-cv-095, 2010 WL
4226614 (D.N.D. Oct. 21, 2010). ............................................................ 29, 39

## State Court Cases

*State ex. rel. Tompton v. Denoyer*,
72 N.W. 1014 (N.D. 1897) ....................................................................... 28

*Swift v. Leach*,
178 N.W. 437 (N.D. 1920) ....................................................................... 28

## Federal Statute

52 U.S.C. § 10301(a) ....................................................................................... 23

## State Constitution and Statutes

N.D. Const. of 1889, art. v, § 121 ................................................................... 28

N.D. Cent. Code § 16.1-01-5.1 ......................................................................... 3

N.D. Cent. Code § 16.1-05-07 ........................................................................................6, 7

N.D. Cent. Code § 16.1-05-07(1), *amended by* H.B. 1332, 63rd Leg.
    Assemb., Reg. Sess. § 5 (2013) ................................................................ 4

N.D. Cent. Code § 16.1-05-07(2), *amended by* H.B. 1332, 63rd Leg.
    Assemb., Reg. Sess. § 5 (2013) ................................................................ 4

N.D. Cent. Code § 16.1-05-07(3), *amended by* H.B. 1332, 63rd Leg.
    Assemb., Reg. Sess. § 5 (2013) ................................................................ 4

## Other Authorities

*United States v. Benson Cty.*, No. 2:00-cv-30, Docket No. 2 (D.N.D.
    2000) ...........................................................................................................28

Secretary of State North Dakota, *North Dakota . . . . The Only State
    Without Voter Registration, What Should I Know About
    Voting in North Dakota* (July 2015),
    https://vip.sos.nd.gov/pdfs/Portals/votereg.pdf ..................................... 3

*Elections Performance Index*, Pew Charitable Trust (April 8, 2014),
    http://www.pewtrusts.org/en/multimedia/data-
    visualizations/2014/elections-performance-
    index#indicator ......................................................................................... 4

North Dakota Department of Transportation, *ID Card
    Requirements* (2015),
    http://dot.nd.gov/divisions/driverslicense/idrequirement
    s.htm. ................................................................................................. 10, 12

North Dakota Department of Transportation, *Proof of
    Identification Documents*, ID Card Requirements (2015),
    http://dot.nd.gov/divisions/driverslicense/docs/proof-of-
    identification-documents.pdf...................................................................10

North Dakota Department of Health, *Ordering a Certified Copy of a
    Birth Record*, Vital Records (2014),
    https://www.ndhealth.gov/vital/birth.htm................................. 10, 11

North Dakota Department of Transportation, *Driver's License
    Requirements* (2015),
    http://dot.nd.gov/divisions/driverslicense/dlrequirement
    s.htm .........................................................................................................15

National Conference of State Legislatures, Voter Identification
    Requirements – Voter ID Laws (Apr. 11, 2016),
    http://www.ncsl.org/research/elections-and-
    campaigns/voter-id.aspx. ........................................................................................30

United States Office of Indian Affairs, *Extracts From the Annual*
    *Report of the Secretary of the Interior*, 45 (1927) ........................................31

Inst. for Gov't Research, *The Problem of Indian Admin.* 357 (1928) ................................31

Committee on Labor Public Welfare, *Special Subcommittee on*
    *Indian Education, Indian Education: A National Tragedy, A*
    *National Challenge*, S. Rep. No. 91-501 (1969) ........................................31

# I.    Preliminary Statement.

Plaintiffs, seven Native American voters from North Dakota, brought this action under the Voting Rights Act and the United States and North Dakota Constitutions to invalidate North Dakota's new voter ID requirements. Bills enacted in 2013 (HB 1332) and 2015 (HB 1333) have transformed North Dakota's election system. Before, North Dakota was a voter-friendly state that allowed its citizens to vote based on a poll worker vouching for their identity, or by executing an affidavit under penalty of perjury declaring they are an eligible voter. Now, North Dakota has the nation's most restrictive voter ID requirements; citizens must present state-issued ID that shows both date of birth and a residential address to vote, or they will be denied the right to vote.

The new ID requirements are needlessly and substantially burdensome for all the people of North Dakota. But they impose disproportionate burdens on Native Americans. Thousands of Native Americans in North Dakota do not have qualifying voter IDs (such as driver's licenses), or the resources to easily obtain qualifying IDs—because they do not have the money to pay the license fees or for travel, or they do not have the forms of ID required to get a new ID (*e.g.*, a birth certificate or social security card), or they do not have the time or means of transportation to track down documents and get to a state office. Consequently, the North Dakota laws disenfranchised Native Americans in the 2014 elections, and, without change, will prevent many from voting in the 2016 elections.

Because North Dakota's new ID requirements improperly burden and disenfranchise Native Americans, they violate the Voting Rights Act and the U.S. and North Dakota Constitutions. To prevent these laws from undermining and interfering with this year's important general election, Plaintiffs move for a preliminary injunction.

Plaintiffs satisfy the requirements for preliminary injunctive relief. The most important element of the four-part preliminary injunction test is the likelihood of success on the merits. Plaintiffs easily satisfy this element.

**Plaintiffs are likely to prevail on their claims for violations
of Section 2 of the Voting Rights Act**

To determine whether the challenged voter ID laws violate Section 2 of the Voting Rights Act, the Court must evaluate the "totality of the circumstances" to determine whether the voter ID laws impose a discriminatory burden on Native Americans (*i.e.*, so they have less opportunity than others to participate in the political process), and whether that burden is caused by or linked to social and historical conditions that have produced or currently produce discrimination against Native Americans. In this case, Plaintiffs will establish the new laws do impose an unacceptable discriminatory burden on Native Americans by showing, among other things, that:

- Native Americans have long suffered from discrimination in North Dakota, and this discrimination has contributed to higher rates of poverty and unemployment, and lower levels of education. In turn, this discrimination has been directly reflected in state laws and practices seeking to make voting and other forms of electoral participation more difficult for Native Americans.

- North Dakota voting is polarized along racial lines, with Native Americans significantly more likely to vote for Democrats than white voters.

- The new voter ID laws are having a disparate negative impact on Native Americans, because many more Native Americans than whites lack qualifying voter ID and lack the means to easily obtain qualifying voter ID.

- Native Americans have been historically underrepresented in state and local governments in North Dakota.

- North Dakota has never had a voter fraud problem, let alone a problem of sufficient magnitude to justify such restrictive new voter ID laws.

**Plaintiffs are likely to prevail on their claim for violation of
the Fourteenth Amendment's equal protection clause**

To prevail on this claim, Plaintiffs must show that the severity of the burdens on the

right to vote imposed by the new voter ID laws outweighs the state's interest in enacting the laws. In this case, Plaintiffs easily will show severe burdens, including the burden of having to pay to obtain qualifying IDs. Plaintiffs also will establish that the state's purported primary interest in preventing voter fraud does not justify the burdens.

Irreparable harm is present as well. Courts presume irreparable injury when constitutional rights are threatened or impaired, and the U.S. Supreme Court has declared voting to be perhaps the most important right of all, stating that all other "rights, even the most basic, are illusory if the right to vote is undermined."[1]

It is critical that the State of North Dakota provide Native Americans an equal and meaningful opportunity to participate fully in the upcoming 2016 election. For these reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction enjoining North Dakota from enforcing the new voter ID laws during this year's election. North Dakota should conduct the 2016 election according to the ID requirements in place before the enactment of HB 1332 and HB 1333—a system the Defendant frequently praised in public statements and that was regarded as the nation's best.

## II.    Statement of Facts.

## A.    Historically, North Dakota has had Voter-Friendly Election Laws.

North Dakota is the only state that does not require voter registration.[2] Until just recently, North Dakota used a system of small voting precincts, whereby election boards and poll workers generally knew who were and were not eligible voters in their precincts.[3] If a poll clerk happened not to know a voter, they could ask that voter to produce one of

---

[1] *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

[2] N.D. Cent. Code § 16.1-01-5.1.

[3] Secretary of State North Dakota, *North Dakota . . . . The Only State Without Voter Registration, What Should I Know About Voting in North Dakota* (July 2015), https://vip.sos.nd.gov/pdfs/Portals/votereg.pdf.

many forms of acceptable ID showing the voter's residential address and birthday.[4] If one form of ID did not provide both pieces of information, a voter could use two pieces of ID that, in combination, provided address and birth date information.[5] If a voter could not produce the requested ID, he or she could fall back on two "fail-safe" mechanisms to prove their voting eligibility. First, a member of the election board or a poll clerk simply could vouch for the voter.[6] Second, the voter could execute an affidavit swearing under penalty of perjury that he or she was a qualified elector in the precinct.[7]

Due to these and other regulations and processes, organizations have lauded North Dakota's electoral system.[8] In 2008, 2010, and 2012, the Pew Charitable Trust rated North Dakota's election system the nation's best in overall performance.[9] Pew bases its rating on its Elections Performance Index, which tracks 17 indicators of administration effectiveness. Some of the indicators include data completeness, voting wait time, provisional ballots cast, provisional ballots rejected, and registration or absentee ballot problems.

In the aftermath of the 2012 elections, there did not appear to be any known problem

---

[4] Under the prior law, valid forms of ID included: a North Dakota driver's license or non-driver's ID card; a U.S. passport; an ID card from a federal agency; an out of state driver's license or non-driver's ID card; an ID card issued by a tribal government; a valid student ID; a military ID card; a utility bill dated 30 days before Election Day, including cell phone bills and student housing bills (online printouts were acceptable); and a change of address verification letter from the U.S. Postal Service.

[5] N.D. Cent. Code § 16.1-05-07(1), *amended by* H.B. 1332, 63rd Leg. Assemb., Reg. Sess. § 5 (2013).

[6] N.D. Cent. Code § 16.1-05-07(2), *amended by* H.B. 1332, 63rd Leg. Assemb., Reg. Sess. § 5 (2013).

[7] N.D. Cent. Code § 16.1-05-07(3), *amended by* H.B. 1332, 63rd Leg. Assemb., Reg. Sess. § 5 (2013).

[8] McCool Decl. ¶ 70.

[9] *Elections Performance Index*, Pew Charitable Trust (April 8, 2014), http://www.pewtrusts.org/en/multimedia/data-visualizations/2014/elections-performance-index.

with elections in North Dakota.

## B.     Historically, North Dakota has not had a Voter Fraud Problem.

North Dakota's prior voting requirements did not result in voter fraud.[10] In the 1970s, former North Dakota Governor Lloyd Omdahl surveyed election officials about the issue. The officials reported only one case of voter fraud, involving a farmer who voted in his old precinct after he had moved.[11] In 2013, when North Dakota was considering new voter ID laws, the Secretary of State reported that in the 2012 elections, out of 325,862 total votes cast (10,517 of which were cast after voters submitted affidavits of eligibility), there were only nine cases of potential voter fraud. A 2012 study on voter fraud alleged a mere three cases of people allegedly voting twice in North Dakota.[12]

In a 2006 letter, the defendant in this case, North Dakota Secretary of State Alvin Jaeger, bragged that "during my fourteen years as Secretary of State and the state's chief election officer, my office has not referred any cases of voter fraud to the United States Attorney, the North Dakota Attorney General, or to local prosecutors. We haven't had any to refer."[13] Similarly, in 2008, former Governor Omdahl stated: "North Dakota conducted elections without voter registration for 56 years without fraud. Voting fraud is not in our blood."[14]

## C.     North Dakota Recently Adopted the Most Restrictive Voter Identification Requirements in the Nation.

On April 19, 2013, North Dakota enacted HB 1332. The sponsors introduced the bill as

---

[10] McCool Decl. ¶¶ 35-44.

[11] McCool Decl. ¶ 36.

[12] McCool Decl. ¶ 40.

[13] McCool Decl. ¶ 36.

[14] McCool Decl. ¶ 36.

a "hog house" amendment.[15] By using this disfavored legislative maneuver, the North Dakota Legislature avoided any hearings on the legislation.[16]

HB 1332 imposed new voter ID requirements on voting-eligible citizens:

- To be acceptable, any voter ID must provide the voter's ***residential*** address (post office box numbers are not sufficient) and his or her date of birth.

- A voter must submit one of these forms of ID: (1) a North Dakota driver's license; (2) a North Dakota non-driver's ID card; (3) a tribal government issued ID card; or (4) an alternative form of ID prescribed by the Secretary of State in a case where the voter did not possess any of the other acceptable forms of ID.

The new law also did away with North Dakota's voucher and affidavit fail-safe mechanisms.[17] With respect to the fourth category of acceptable ID, the Secretary of State prescribed two forms: (1) a student ID certificate; and (2) a long-term care ID certificate.[18]

Just over two years later, on April 24, 2015, North Dakota adopted HB 1333. In its original form, HB 1333 softened some of the harshness of HB 1332. But the bill, as passed, actually imposed additional restrictions on North Dakota voters:

- The bill removed the ability of the Secretary of State to prescribe new forms of qualifying ID, and denied students the option of using college ID certificates (leaving long-term care certificates as the only acceptable ID prescribed by the Secretary of State and limiting the number of acceptable IDs to four).

- The bill clarified that driver's licenses and non-driver ID cards must be current.

- The bill clarified that military ID is not acceptable, except for service members

---

[15] A "hog house" amendment is one in which new text entirely replaces the previous text of a bill. None of the original text remains.

[16] McCool Decl. ¶ 34.

[17] *See* N.D. Cent. Code § 16.1-05-07.

[18] On September 30, 2013 and June 27, 2014, the ACLU asked the Secretary of State to prescribe 12 additional forms of acceptable ID. The Secretary denied these requests.

stationed away from their North Dakota residences.

- ▪ The bill eliminated a voucher provision for absentee voting (except for disabled absentee voters).[19]

A survey by the National Conference of State Legislatures (NCSL) classified North Dakota as a "strict" non-photo ID state. The chart below compares the types of IDs deemed acceptable IDs in the NCSL's "strict" states:[20]

| | KS | MS | IN | ND | GA | TN | TX | VA | WI |
|---|---|---|---|---|---|---|---|---|---|
| Home state driver's license or ID | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| U.S. passport | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| U.S. military ID with photo | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Permitted to use expired ID | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | |
| Religious accommodation | ✓ | ✓ | ✓ | | | ✓ | ✓ | | ✓ |
| Veterans ID Card | ✓ | ✓ | ✓ | | ✓ | | | ✓ | ✓ |
| Home state college/university ID | ✓ | ✓ | ✓ | | ✓ | | | ✓ | ✓ |
| Tribal ID | ✓ | ✓ | | ✓ | ✓ | | | ✓ | ✓ |
| Any federal government ID | ✓ | ✓ | ✓ | | ✓ | | | ✓ | |
| Home state handgun/ firearm license | ✓ | ✓ | | | | ✓ | ✓ | ✓ | |
| Home state voter ID | ✓ | ✓ | | | ✓ | | ✓ | ✓ | |
| Any home state photo ID | | ✓ | ✓ | | ✓ | ✓ | | | |
| Any home state sub-jurisdiction ID | ✓ | ✓ | | | ✓ | | | ✓ | |
| Home state/U.S. pub. employee ID | ✓ | ✓ | | | ✓ | | | ✓ | |
| Exemption nursing facility | | | | ✓ | | ✓ | | | ✓ |
| Indigence accommodation | | | ✓ | | | ✓ | | | ✓ |
| U.S. citizenship cert. w/ photo | | | | | | | ✓ | | ✓ |
| Any state driver's license | ✓ | ✓ | | | | | | | |
| Public school district employee ID | ✓ | ✓ | | | | | | | |
| Exception for disabilities | | | | | | ✓ | ✓ | | |
| Any state concealed-handgun license | ✓ | | | | | | | | |

---

[19] *See* N.D. Cent. Code § 16.1-05-07.

[20] *See* Campbell Decl. Ex. A. (footnotes omitted).

*Richard Brakebill, et al. v. Alvin Jaeger,* Case No. 1:16-cv-0008
Memorandum ISO Motion for Preliminary Injunction

And because North Dakota stands alone in not having any fail-safe provisions, it has to be considered the most restrictive voter ID law in the nation.[21]

Proponents of HB 1332 and HB 1333 asserted the new laws were necessary to curb voter fraud. Given the historical lack of voter fraud in the state, opponents complained that the bills amounted to "a solution looking for a problem."[22] The political climate only furthered suspicions about the underlying motives for enacting the law. At that time, Republican-dominated legislatures throughout the country were adopting stringent voter ID laws based on model legislation proposed by the American Legislative Exchange Council (ALEC), with some politicos openly admitting the new laws would suppress turnout among voters who typically vote for Democrats.[23] In line with the national Republican trend, North Dakota's Republican-dominated legislature passed HB 1332 after Democrat Heidi Heitkamp won the 2012 Senate race.

## D.  Thousands of Native Americans Living in North Dakota Do Not Have Qualifying Voter ID.

According to a statistical survey of North Dakota voters performed by Drs. Matthew A. Barreto and Gabriel R. Sanchez (hereafter, "Barreto/Sanchez Survey"), more than 72,500 voting-eligible citizens in North Dakota lack a qualifying voter ID under the new laws.[24] This includes an estimated 7,984 Native Americans, or 23.5 percent of the total voting-eligible Native American population (as compared to only 12.0 percent of non-Native Americans that lack a qualifying ID).[25] The number is also significant among Native Americans who have actually exercised their right to vote:  15.4 percent of North Dakota Native Americans who voted in the 2012 presidential election presently lack a valid voter

---

[21] McCool Decl. ¶ 114.

[22] McCool Decl. ¶ 38.

[23] McCool Decl. ¶¶ 48-58.

[24] Barreto Decl. ¶ 40.

[25] Barreto Decl. ¶¶ 11, 39-40.

ID (as compared to only 6.9 percent of non-Native Americans).[26]

## E.    Native Americans Living in North Dakota Face Substantial Burdens in Obtaining Qualifying Voter ID.

"Due to considerable resources deficits, Native Americans who lack a valid ID will face numerous barriers and burdens if they want to vote and try to obtain an ID."[27]

Perhaps the most fundamental problem is the fact that many Native Americans do not even know about the new voter ID requirements.[28] According to the Barreto/Sanchez Survey, 21.4 percent of Native Americans are not at all aware of the new laws, and only 20.8 had heard about the law.[29] Lucille Vivier, Dorothy Herman, LaDonna Allard, and Dr. McCool all confirmed the survey results—people have either not heard about the new voter ID laws or found the advertisements about them to be misleading.[30] Thus, 89.3 percent of Native Americans currently believe they do have sufficient ID to vote (when only 76.5 percent actually do have proper ID).[31] Obviously, these voting-eligible citizens are unlikely to obtain qualifying voter ID,[32] and face disenfranchisement in the upcoming election.

In addition, Native Americans face substantial and disproportionate burdens in obtaining each form of ID deemed acceptable under the new law. As detailed below, obtaining any one of the approved forms of ID almost always involves a fee or charge, and in nearly all cases requires travel. It also helps to have a computer with Internet access, a credit card, a car, the ability to take time off work, and familiarity with the system of government and its bureaucracy. Thus, obtaining qualifying voter ID is much easier to

---

[26] Barreto Decl. ¶ 41.

[27] Barreto Decl. ¶ 57.

[28] *See, e.g.,* Allard Decl. ¶ 4.

[29] Barreto Decl. ¶ 43.

[30] Vivier Decl. ¶ 3; Herman Decl. ¶ 4; Allard Decl. ¶ 4; McCool Decl. ¶ 73.

[31] Barreto Decl. ¶ 43.

[32] Barreto Decl. ¶ 43.

accomplish for people who live in urban areas, have a good income, are computer-literate, have a computer and printer, have a good car and gas money, have a flexible schedule, and understand how to navigate the state's administrative procedures. The typical Native American living in North Dakota who lacks qualifying voter ID does not have these assets.[33]

## 1. Native Americans who currently lack qualifying voter ID face substantial burdens in obtaining a non-driver's ID card.

## a) Native Americans trying to get a non-driver's ID face substantial burdens in providing proof of identification.

To get a non-driver's ID in North Dakota, "PROOF OF IDENTIFICATION IS REQUIRED."[34] In other words, you need an ID to get an ID. North Dakota's Department of Transportation website lists nine "[a]cceptable forms of identification." The first listed item is a "U.S. birth certificate (state certified; Government issued)."[35] The Barreto/Sanchez Survey found that 32.9 percent of Native Americans who presently lack qualifying voter ID do not have a birth certificate.[36] For these people, getting one is difficult.

One obstacle is money. Birth certificates cost at least $7.[37] Impoverished Native Americans, such as Lucille Vivier, lack the disposable income to pay for a birth certificate, or may make the tough decision not to spend their limited resources on a birth certificate.[38]

---

[33] McCool Decl. ¶ 69.

[34] North Dakota Department of Transportation, *ID Card Requirements* (2015), http://dot.nd.gov/divisions/driverslicense/idrequirements.htm.

[35] North Dakota Department of Transportation, *Proof of Identification Documents*, ID Card Requirements (2015), http://dot.nd.gov/divisions/driverslicense/docs/proof-of-identification-documents.pdf.

[36] Barreto Decl. ¶ 44.

[37] North Dakota Department of Health, *Ordering a Certified Copy of a Birth Record*, Vital Records (2014), https://www.ndhealth.gov/vital/birth.htm.

[38] McCool Decl. ¶¶ 90-92; Barreto Decl. ¶¶ 50, 57; Vivier Decl. ¶¶ 2, 5, 8, 10.

Another barrier is that to get a birth certificate, a person must present "proof of identity." Again, you need an ID to get an ID. This can be a state-issued photo ID, a driver's license, a Bureau of Indian Affairs issued tribal ID card, a military ID card, or a U.S. passport or Visa.[39] A Native American applicant lacking a qualifying voter ID probably lacks these forms of ID as well. Such applicants can still satisfy the ID requirement by presenting *two* of the following: social security card; utility bill with current address; pay stub showing name and social security number; car registration showing current address; and an IRS tax return. The Barreto/Sanchez Survey found that many Native Americans who presently lack qualifying voter ID cannot provide these documents:

- 21.6 percent of such Native Americans do not have two documents that show their residential address. One reason for this is that many Native Americans simply do not have residential addresses; the Post Office delivers their mail to post office boxes.[40] Another reason is that, on many reservations, the residential address system produces conflicting and problematic results.[41]

- 5.6 percent of such Native Americans do not have a social security card or a W2 evidencing their social security number.[42]

- Many Native Americans lack access to transportation, and, thus, have no car registration showing their current address.[43]

Another acceptable form of ID is a "Valid, unexpired U. S. Passport." A passport application costs $110. This is an exorbitant amount for impoverished Native Americans.[44]

---

[39] North Dakota Department of Health, *Ordering a Certified Copy of a Birth Record*, Vital Records (2014), https://www.ndhealth.gov/vital/birth.htm.

[40] Barreto Decl. ¶¶ 11, 44; Allard Decl. ¶ 8; Vivier Decl. ¶ 6.

[41] Vivier Decl. ¶ 6 (describing the many addresses she has been given).

[42] Barreto Decl. ¶ 44.

[43] McCool Decl. ¶ 83; Webster Decl. ¶ 20; Allard Decl. ¶ 9.

[44] McCool Decl. ¶ 62.

The other seven forms of acceptable ID—"Report of a Birth Abroad issued by the U. S. Department of State," "Certificate of Naturalization," "Certificate of Citizenship," "Valid, unexpired Permanent Resident Card," "Unexpired Employment Authorization Card," "Unexpired Foreign Passport with I-94," and "I-94 Card Stamped Refugee or Asylee"—are all irrelevant and unobtainable to Native Americans born in the United States.[45]

Overall, the Barreto/Sanchez Survey found that 47.7 percent of Native Americans who do not currently have qualifying voter ID lack the underlying documents they need to obtain acceptable ID. ***This translates to 3,808 Native Americans***.[46]

### b) Native Americans trying to get a non-driver's ID face substantial cost burdens.

Cost presents another barrier to obtaining a non-driver ID. According to North Dakota's Department of Transportation website, it costs $8 to get a non-driver's ID card if you have a driver's license or need to replace a lost or stolen ID.[47] For example, Dorothy Herman had to pay $8 to update her non-driver ID.[48] Native Americans who currently lack qualifying voter ID might not be able to afford that.

### c) Native Americans trying to get a non-driver's ID face substantial travel/time burdens.

Having the ID documents needed to get a non-driver's ID is not enough. A person also must personally "visit one of the ND Drivers License Sites."[49] There are no Drivers License Sites (DLS) on any of North Dakota's Indian reservations. Moreover, a successful visit to a DLS requires knowledge and experience dealing with bureaucratic institutions, means of

---

[45] McCool Decl. ¶ 62.

[46] Barreto Decl. ¶ 44.

[47] North Dakota Department of Transportation, *ID Card Requirements* (2015), http://dot.nd.gov/divisions/driverslicense/idrequirements.htm.

[48] Herman Decl. ¶ 7.

[49] North Dakota Department of Transportation, *ID Card Requirements* (2015), http://dot.nd.gov/divisions/driverslicense/idrequirements.htm.

transportation, money to pay for the transportation, and the free time to travel the often significant distances to such sites. Overcoming these obstacles can be difficult for undereducated and impoverished Native Americans:

- **Many do not know where to go**. According to the Barreto/Sanchez Survey, only 64.9 percent of Native Americans lacking a qualifying voter ID know the location of the nearest DLS (as compared to 85.2 percent of non-Native Americans).[50]

- **Many lack means of transportation**. According to the Barreto/Sanchez Survey, only 73.9 percent of Native Americans lacking a qualifying voter ID own or lease a car (as compared to 88 percent of non-Native Americans); 29 percent of such Native Americans believe it would be a hardship to get a ride to the nearest DLS office (as compared to 19.3 percent of non-Native Americans); and 47.3 of such Native Americans believe it would be a hardship if they had to rely on public transportation to get to a DLS (as compared to 23.1 percent of non-Native Americans).[51]

- **Travel distances to a DLS are significant**. For the average voting-eligible Native American in North Dakota, the average travel distance to the closest DLS is nearly 20 miles (as compared to about 11 miles for non-Native Americans). This translates to more than 70 minutes of travel time for a round trip. For Native Americans living on a reservation, the travel distance can be as great as 60 miles one way (for an average round trip travel time of 106.6 minutes), and the statewide average for a Native American on a reservation is

---

[50] Barreto Decl. ¶ 49.

[51] Barreto Decl. ¶¶ 47, 49; *see also* Vivier Decl. ¶ 2 (does not own a vehicle); Brakebill Decl. ¶ 12 (same); Allard Decl. ¶ 9 (many people at Standing Rock lack transportation); Webster Decl. ¶¶ 20-21.

29 miles (for an average round trip travel time of 50.3 minutes).[52]

- ▪ **Drivers License Sites are not easily accessible**. There are no DLSs on any reservations in North Dakota. Because there are no DLSs on any reservations in North Dakota, access for Native Americans is severely limited. North Dakota only has 27 DLSs in the entire state—just one site per 2,600 square miles. Only four of these sites are open five days a week (excepting holidays). Twelve of the sites are open less than six hours on one day a month (or even less than that). One office is only open for a total of 28 hours per calendar year.[53]

Because of these issues, travel to a DLS to obtain a non-driver's ID card (or a driver's license) is substantially burdensome for Native Americans.[54] The Barreto/Sanchez Survey found that 44.1 percent of Native Americans lacking a qualifying voter ID reported they would have difficulty taking time off from work to travel to a DLS (compared to 26.2 percent of non-Native Americans), and 36.7 percent of such Native Americans said it would be a problem to travel even six miles each way to a DLS (compared to 17.3 percent of non-Native Americans).[55] The personal experiences of declarants Richard Brakebill, Lucille Vivier, Dorothy Herman, and LaDonna Allard further confirm the substantial burdens Native Americans encounter in obtaining qualifying voter IDs.[56]

## 2.    Native Americans who currently lack qualifying voter ID face substantial burdens in obtaining a new driver's license.

One shocking finding from the Barreto/Sanchez Survey is that only 78.2 percent of

---

[52] Webster Decl. ¶¶ 33-34, 38-39; *see also* Allard Decl. ¶¶ 5-6 (more than a 60-mile drive from Fort Yates to nearest DLS).

[53] Webster Decl. ¶¶ 11, 24-25; *see also* Brakebill Decl. ¶ 13 (limited hours of DLS in Rolla); Herman Decl. ¶ 3 (same).

[54] McCool Decl. ¶¶ 59, 69, 71, 75.

[55] Barreto Decl. ¶ 49.

[56] Brakebill Decl. ¶¶ 5-15 ; Vivier Decl. ¶¶ 1-10; Herman Decl. ¶¶ 1-10; Allard Decl. ¶¶ 1-11.

voting-age Native Americans have a driver's license.[57] Of course, that means that 21.8 percent do not have a license.[58] Getting one is burdensome in several respects (which likely explains why so many Native Americans do not presently have one).

As with non-driver's IDs, acquiring a new driver's license requires a personal visit to a DLS. As detailed in Section II(E)(1)(c), such a visit would be burdensome for Native Americans who currently lack qualifying voter ID. Further, getting a new driver's license also requires proof of ID—the same forms of ID required to obtain a non-driver's ID. As detailed in Section II(E), obtaining the acceptable forms of ID is problematic for Native Americans.

Finally, according to North Dakota's Department of Transportation website, a new license could cost as much as $25—$5 to take the written test, $5 to take a road test, and $15 for the license fee.[59] Many impoverished Native Americans simply do not have the disposable income to pay for these fees.[60]

### 3. Native Americans who currently lack qualifying voter ID face substantial burdens in updating their current non-driver ID or driver's license.

Many existing non-driver's IDs and driver's licenses will not suffice as qualifying voter ID because they do not reflect the person's current residential address.[61] As discussed above, many do not have residential addresses. For those that do, North Dakota provides three ways for a person to update their license to show their current address. Each way presents burdens for Native Americans:

---

[57] Barreto Decl. ¶ 11.

[58] *See, e.g.*, Vivier Decl. ¶ 3; Brakebill Decl. ¶¶ 5, 12; Herman Decl. ¶ 3.

[59] North Dakota Department of Transportation, *Driver's License Requirements* (2015), http://dot.nd.gov/divisions/driverslicense/dlrequirements.htm

[60] Vivier Decl. ¶¶ 2, 5; Brakebill Decl. ¶¶ 4, 15.

[61] Barreto Decl. ¶ 40 (more than 72,500 voting-eligible citizens in North Dakota lack qualifying voter ID under new laws, including 7,984 Native Americans).

- ▪ The first way is to update the address online. This requires the person to have access to a computer and an Internet connection. This is a problem. A survey of Native Americans in the Bismark/Mandan area found that only 61 percent had their own computers, and only about half had access to the Internet. Those figures are likely much lower for Native Americans living in rural areas and on reservations given the higher levels of poverty.[62]

- ▪ The second way is to visit a DLS and personally update the information. For all the reasons described in Section II(E)(1)(c) above, travelling to a DLS can be very burdensome.

- ▪ The third way to update a license (or non-driver ID) is to travel to a DLS and get a new one. As discussed in Section II(E)(2) above, this is burdensome in several respects.

### 4. Many tribal government issued ID cards do not satisfy the new law because they do not show a residential address and are substantially burdensome to obtain.

Many tribal IDs would not satisfy North Dakota's requirement of showing the "applicant's current or most recent North Dakota residential address." Many houses on Indian reservations either do not have residential addresses (the Post Office delivers their mail to post office boxes), or there is no clear address, so tribal IDs do not reflect any addresses.[63] Also, obtaining new tribal IDs can be burdensome:  they cost money, and one must travel to tribal headquarters to get one.[64] And many Native Americans (including all those living on the Standing Rock Reservation) only have IDs issued by the federal Bureau of Indian Affairs; they do not have IDs issued by tribal governments. Thus, these IDs would

---

[62] McCool Decl. ¶ 84; Allard Decl. ¶ 9 (discussing lack of access to a computer at Standing Rock).

[63] McCool Decl. ¶ 75; Allard Decl. ¶¶ 8-9; Vivier Decl. ¶¶ 4, 7.

[64] McCool Decl. ¶ 66.

not satisfy the voter ID laws' definition of a "tribal government issued" ID card.

## 5.  Long-term care identification certificates are not common.

This form of identification is only available to a very small portion of the population.[65]

## F.  North Dakota's New Voter ID Laws Have Disenfranchised Native American Voters.

Studies have found that higher costs of participation lead to lower participation rates in elections. This is especially true among the poor. And the higher participation costs imposed by North Dakota's new voter ID laws—in terms of the time and money costs associated with obtaining qualifying voter ID—have had a negative impact on electoral participation.[66] North Dakota officials have admitted the new laws resulted in poll workers turning away voters because they did not have qualifying ID.[67] North Dakota poll workers turned away many Native Americans because their driver's licenses, non-driver IDs or tribal IDs did not show current residential addresses.[68] Some had an expired state ID showing the correct residential address but were still turned away.[69] Indeed, after the 2014 primary election, the Secretary of State noted that the number of problems were higher with tribal IDs during that election.

Plaintiff Lucille Vivier's story is exemplary. In November 2014, Ms. Vivier went to the polling place to vote. Ms. Vivier does not have a driver's license or a non-driver's ID card, but she does have a tribal ID. When she presented her tribal ID at the polling place, the poll workers informed her that her ID was not acceptable because it did not show a residential address. Consequently, the poll workers refused to let Ms. Vivier vote. After the election,

---

[65] McCool Decl. ¶ 68.

[66] McCool Decl. ¶¶ 70-76; Webster Decl. ¶¶ 9, 27-29, 40-41.

[67] McCool Decl. ¶ 71.

[68] McCool Decl. ¶ 75; Vivier Decl. ¶¶ 3-4; Herman Decl. ¶ 5; Brakebill Decl. ¶ 6.

[69] Herman Decl. ¶ 5.

Ms. Vivier looked into getting an acceptable form of ID, but found that the costs of the ID itself and the time and money costs associated with traveling to a DLS were simply too much. She also had difficulty determining her residential address. Thus, despite her desire to vote and her prior history of voting, the new voter ID laws will prevent Ms. Vivier from voting in future elections.[70]

Plaintiff Richard Brakebill was also denied his right to vote in the November 2014 election. Before the election, Mr. Brakebill attempted to get a new form of ID at a DLS, but was told he needed a birth certificate (which he did not have) to get a new ID because his driver's license had expired. Nevertheless, Mr. Brakebill went to a polling place on election day and produced his expired driver's license and his tribal ID. The poll workers told him his license was unacceptable because it had expired and that his tribal ID was insufficient because it did not show a residential address.[71]

State poll workers also barred Plaintiff Dorothy Herman from voting in the 2014 election. Before the 2014 general election, Ms. Herman made two trips to a DLS to try to obtain a new ID card. After seeing an advertisement stating that tribal IDs would be an acceptable form of ID, Ms. Herman thought she would be able to vote. But when she showed up at the polling place, the poll workers told her that her tribal ID was inadequate because it did not have a residential address on it. They also refused to accept her driver's license because it had expired. Thus, she did not vote.[72]

## G.  North Dakota's New Voter ID Laws Disparately Impact Native American Voters.

Native Americans living in North Dakota disproportionally live in severe poverty. According to an American Community Survey covering the years 2009-2013, 21.7 percent

---

[70] Vivier Decl. ¶¶ 1-10.

[71] Brakebill Decl. ¶¶ 5-6.

[72] Herman Decl. ¶¶ 3-5.

of voting-age Native Americans had incomes below the poverty line, compared to only 7.6 percent of non-Native Americans.[73] Another ACS study reported that 37.7 percent of all Native Americans live in poverty, compared to 5.3 percent of Anglo families.[74]

Other economic statistics reflect the disparate living conditions for Native Americans:

- The ACS study reported a median household income for non-Native Americans at $56,566, compared to only $29,909 for Native Americans.[75]

- The ACS study found that the average income for non-Native Americans living in North Dakota is $73,313, compared to $48,763 for Native Americans.[76]

- The Barreto/Sanchez Survey found that 22.3 percent of Native Americans who lack voter ID have household incomes of less than $10,000, compared to just 12.3 percent for non-Native Americans.[77]

- The ACS study found that 29.5 percent of Native American households in North Dakota are headed by a female with no husband present, compared to just 6.7 percent for non-Native Americans.[78]

- The unemployment rates on reservations are staggering. For example, unemployment at the Standing Rock and Turtle Mountain reservations is nearly 70 percent.[79]

Given the disparities in living conditions, it is not surprising that North Dakota's new voter ID laws are having and will continue to have a disproportionately negative impact on

---

[73] Webster Decl. Ex. A, at ¶ 18.

[74] McCool Decl. ¶ 81.

[75] McCool Decl. ¶ 81.

[76] McCool Decl. ¶ 81.

[77] Barreto Decl. ¶ 47.

[78] McCool Decl. ¶ 81.

[79] McCool Decl. ¶ 86-87.

Native American voting-eligible citizens.[80] Plaintiffs' expert declarants have found that:

- 23.5 percent of Native American eligible voters do not now possess a qualifying voter ID. In contrast, only 12.0 percent of non-Native Americans do not possess a valid ID.[81]

- 15.4 percent of Native Americans who voted in the 2012 presidential election now lack a valid voter ID, compared to only 6.9 percent of non-Native Americans who voted in the 2012 presidential election.[82]

- Only 78.2 percent of Native Americans have a driver's license that they could potentially use as a qualifying voter ID. In contrast, 94.4 percent of non-Native Americans have a driver's license.[83]

- Native Americans are disproportionately more likely to lack the formal educational background that could help them obtain qualifying forms of voter ID. For example, 34.5 percent of Native Americans who lack voter ID never finished high school, compared to only 5.7 percent of non-Native Americans.[84]

- Native Americans who currently lack a qualifying voter ID disproportionally face logistical and financial burdens in obtaining a qualifying ID. For example, only 64.9 percent of Native Americans lacking voter ID know the location of the nearest DSL, compared to 85.2 percent of non-Native Americans; only 73.9 percent of Native Americans who lack voter ID own or lease a car, compared to 88 percent of non-Native Americans; 10.5 percent of Native Americans lack access to a motor vehicle, compared to only 4.8 percent of white households; 44.1 percent of Native Americans who lack qualifying voter ID would have a

---

[80] McCool Decl. ¶¶ 92, 117; Barreto Decl. ¶¶46-47, 57.

[81] Barreto Decl. ¶¶ 11, 39.

[82] Barreto Decl. ¶ 41.

[83] Barreto Decl. ¶ 11.

[84] McCool Decl. ¶¶ 79-80.

problem getting time off work to go to a DSL to obtain qualifying ID, compared to only 26.2 percent of non-Native Americans; and, on average, Native Americans in North Dakota must travel twice as far as whites to visit a DLS, and 36.7 percent of Native Americans who lack a qualifying voter ID would face problems traveling six miles each way to a DSL to obtain ID, compared to only 17.3 percent of non-Native Americans.[85]

The fact that the new laws have had a disproportionate impact on Native Americans should come as no surprise. Indeed, that likely was the intent behind the law. The Barreto/Sanchez Survey found that Native Americans are more than twice as likely as non-Native Americans to identify as Democrats. Among those who voted in 2012, the gap is even wider: the survey reported that 48.8 percent of Native Americans who voted in the 2012 presidential election identified as Democrats, compared to only 18.9 percent of non-Native Americans.[86] A study by Dr. Michael C. Herron of 2008 and 2010 statewide races in North Dakota also found racially polarized voting. Dr. Herron concluded:

> Using standard statistical techniques, publicly available election returns, and data from the 2010 Census, I conclude that Native Americans in North Dakota cast votes for Democratic candidates at a greater rate than did white voters in the state. This exemplifies racially polarized voting.[87]

The preference of Native Americans for Democratic candidates proved decisive in the 2012 Senate race between Democrat Heidi Heitkamp and Republican Rick Berg. Heitkamp defeated Berg by less than 3,000 votes. That small margin can be attributed to the overwhelming support Heitkamp received from Native Americans. For example, in Sioux County, which is more than 80 percent Native American, Heitkamp won 83 percent of the vote, and in Rolette County, which is 77 percent Native American, Heitkamp won 80

---

[85] Barreto Decl. ¶ 47, 49; Webster Decl. ¶ 20, 34, 41.

[86] Barreto Decl. ¶ 52.

[87] Herron Decl. Ex. A, at 19-20.

percent of the vote.[88] If fewer Native Americans had voted in 2012, Berg very well could have won the election.

Studies have found that "strict voter identification laws do, in fact, substantially alter the makeup of who votes and ultimately do skew democracy in favor of whites and those on the political right. These laws significantly impact the representativeness of the vote and the fairness of democracy."[89] The Republican Party appears to have taken note. Republican lawmakers and operatives have freely admitted that they have secured passage of voter ID laws to help Republicans win elections.[90] A wide-ranging survey of voter ID laws published in *Political Research Quarterly*, concluded: "the GOP appears to have opted for coalition maintenance instead of coalition expansion ... by embracing several restrictive voting reforms whose true purpose is to marginally curtail the participation of voters typically aligned with the Democratic Party."[91]

Thus, after the 2012 elections, the Republican-dominated state government of North Dakota adopted strict voter ID laws, and the targeted voters were Native Americans.[92] This will reduce the political influence of Native Americans:  "Native Americans have different political and partisan preferences than non-Natives in North Dakota and if Native Americans are disproportionately excluded from voting their vote will be diluted."[93]

## III.   The Legal Test for Preliminary Injunctive Relief.

Under Eighth Circuit law, this Court must consider "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the

---

[88] Barreto Decl. ¶ 53.

[89] McCool Decl. ¶ 57.

[90] McCool Decl. ¶¶ 51-54.

[91] McCool Decl. ¶ 57.

[92] *See* McCool Decl. ¶ 58.

[93] Barreto Decl. ¶ 57.

injunction will inflict on other parties litigant [sic]; (3) the probability that movant will succeed on the merits; and (4) the public interest."[94] It is generally understood that "likelihood of success on the merits is [the] most significant."[95] Thus, Plaintiffs will start their analysis with this element of the test.

## IV.    Plaintiffs Are Likely To Prevail On The Merits.

## A.    Plaintiffs Are Likely To Prevail On Their Claims For Violations Of Section 2 Of The Voting Rights Act.

Plaintiffs' first two causes of action claim violations of the Voting Rights Act.[96] Section 2 of the Voting Rights Act proscribes any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgment of the right of any citizen . . . to vote on account of race or color."[97] "Section 2 applies to any 'standard, practice, or procedure' that makes it harder for an eligible voter to cast a ballot, not just those that actually prevent individuals from voting."[98]

Appellate courts have adopted a two-part framework for evaluating Section 2 vote denial claims. The two elements are:

> [1] [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and

---

[94] *MKB Mgmt. Corp. v. Burdick*, 954 F. Supp. 2d 900, 904 (D.N.D. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)).

[95] *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995) (quoting *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992)).

[96] Compl. ¶¶ 177-91, ECF Document No. 1.

[97] 52 U.S.C. § 10301(a).

[98] *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 552 (6th Cir. 2014) vacated as moot *Ohio State Conference of NAACP v. Husted*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

[2] [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.[99]

In "assessing both elements, courts should consider 'the totality of the circumstances.'"[100] In analyzing the "totality of circumstances," "courts have looked to certain 'typical' factors pulled directly from the Voting Rights Act's legislative history."[101] These nine so-called "Senate factors" are:

[1] The history of voting-related discrimination in the pertinent State or political subdivision;

[2] The extent to which voting in the elections of the pertinent State or political subdivision is racially polarized;

[3] The extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

[4] The exclusion of members of the minority group from candidate slating processes;

[5] The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

[6] The use of even subtle racial appeals in political campaigns;

[7] The extent to which members of the minority group have been elected to public office in the jurisdiction;

[8] Evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group; and

---

[99] *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) (citations and internal quotation marks omitted); *see also Veasey v. Abbott*, 796 F.3d 487, 504 (5th Cir. 2015), *reh'g en banc granted*, 815 F.3d 958 (5th Cir. 2016); *Husted*, 768 F.3d at 554 (applying two-part framework above); *cf. Frank v. Walker*, 768 F.3d 744, 754–55 (7th Cir. 2014).

[100] *League of Women Voters*, 769 F.3d at 240; *see also Husted*, 768 F.3d at 554.

[101] *League of Women Voters*, 769 F.3d at 240; *see Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021-22 (8th Cir. 2006) (discussing application of senate factors in vote-dilution case).

[9] The extent to which the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous.[102]

In this case, Senate factors 1, 2, 3, 5, 7, 8 and 9 are relevant.[103]

## 1. The new voter ID laws impose a discriminatory burden on Native Americans.

As discussed at length in Sections II above, the new voter ID laws impose a discriminatory burden on Native Americans. Native Americans disproportionately: lack acceptable ID, live in poverty, have to travel further, and have less access to transportation. Additionally, Native Americans disproportionately relied on the fail-safe provisions abolished by HB 1332 and HB 1333. Thus, the new voter ID law clearly imposes a disparate impact on Native Americans.[104]

## 2. The discriminatory burden is caused by and linked to social and historical discrimination that has and continues to produce discrimination against Native Americans.

Like the voter ID law in Texas, North Dakota's new voter ID laws interact with social and historical conditions to cause an inequality in the electoral opportunities enjoyed by Native Americans. An analysis of the relevant Senate factors illuminates this point.

### a) Senate factor 1: North Dakota has a long history of voting-related discrimination.

Native Americans living in North Dakota have long suffered from entrenched discrimination that has manifested itself in voting discrimination.[105] Before North Dakota

---

[102] *League of Women Voters*, 769 F.3d at 240.

[103] In vote denial claims such as this one, courts have found "Senate factors one, three, five and nine particularly relevant" because "they specifically focus on how historical or current patterns of discrimination 'hinder [minorities'] ability to participate effectively in the political process." *Husted*, 768 F.3d at 555.

[104] *See, e.g., Veasey,* 796 F.3d at 505-09 (district court did not err in finding Texas voter ID had discriminatory burden on minorities).

[105] McCool Decl. ¶¶ 16-32.

even became a state, in 1874, the *Bismarck Tribune* editorialized: "The American people need the country the Indians now occupy…. An Indian war would do no harm, for it must come, sooner or later."[106] Nearly 125 years later, a 1999 report by the North Dakota Advisory Committee to the U.S. Commission on Civil Rights found that discrimination in the state was still prevalent, concluding: "Many forms of discrimination have been ongoing in the State for several decades, and it appears that limited accomplishments have been realized to solve those issues…. Systemic discrimination continues to occur…."[107]

The discrimination continues to this day. The controversy that erupted over the University of North Dakota's "Fighting Sioux" team mascot provides a recent example. Native American groups and other advocacy organizations campaigned to stop UND from using the mascot. They met with fierce resistance, and the conflict dragged on for more than 20 years. People expressed their opinions in an overtly racist manner. According to a group of UND students, a local store displayed a sign reading: "Redskins, go back to the reservations, leave their name alone."[108] T-shirts conveyed racist messages. One displayed obscene images of Indian people engaging in sex acts with bison (the team mascot of UND rival North Dakota State University). Another for-sale T-shirt read: "If they were called the drunken, lazy, welfare collecting, free cheese eating, whiny ass Sioux, then you would have something to complain about." And another T-shirt depicted the head of an Indian in full headdress under the words: "Siouxper Drunk."[109] Others taped posters to the doors of the Indian Studies Program at UND expressing racist insults, such as:

- "If the name has to go, so should your funding"

- "Wish I could go to school for free"

---

[106] McCool Decl. ¶ 16.

[107] McCool Decl. ¶ 20.

[108] McCool Decl. ¶ 26.

[109] McCool Decl. ¶ 26.

- "Go back to the res, or work @ the Casino, prairie nigga"

- "Drink 'em lots o' fire water"

- "if you get rid of the 'Fighting Sioux' then we get rid of your <u>FREE</u> schooling!"

- "Find something better for time 'like a job'"

- "You lost the war. Sorry."[110]

Ultimately, the state held a referendum and voters approved changing the mascot. That led to a lawsuit trying to block any name change. The NCAA finally resolved the issue in 2012 when it demanded that UND move away from the "hostile and abusive" name.[111] UND teams are now known as the "Fighting Hawks."

Dr. McCool has collected powerful testimony from many Native Americans regarding the discrimination they live with on a daily basis in North Dakota.[112] As one interviewee stated:

> We live with it [discrimination] all the time. ***I don't observe it, I live it***. Let me give you an example. I was invited to go to a conference on tourism in North Dakota; it was about making people feel welcome. I went to the desk to register and give the woman my registration fee, but the woman at the desk refused my money and told me I was not allowed to attend the conference. I went away but decided to go back in and another lady came up to me. She apologized and took my conference fee. She explained to me that the first woman at the desk 'doesn't like Indians.' This is common.[113]

Another said, "You see it [discrimination] everywhere. ... you see it in the vandalism in our area. I see writings on bathroom stalls that say 'prairie nigger,' and 'white power,' and the swastika."[114] Even public officials do not conceal their racist views. "We heard the former

---

[110] McCool Decl. ¶ 27 (University of North Dakota Graduates n.d.).

[111] McCool Decl. ¶ 28 (Kolpack 18 Nov. 2015; Walsh 19 Oct. 2015; Houska 20 Nov. 2015).

[112] McCool Decl. ¶ 29.

[113] McCool Decl. ¶ 29 (quoting Allard interview; emphasis added).

[114] McCool Decl. ¶ 29 (quoting Taft interview).

sheriff say the Indians around here are about as smart as the ridge-runnin' niggers we have down south. He said that while he was sheriff."[115]

The historical discrimination against Native Americans generally has carried over into voting eligibility. Evidence of this can be found in North Dakota laws and court decisions:

- North Dakota's original Constitution, adopted in 1889, only allowed "civilized" Native Americans who had explicitly "severed their tribal relations" to vote.[116] This provision stood until 1922.

- The Supreme Court of North Dakota, in the 1897 case of *State ex. rel. Tompton v. Denoyer*, recognized that the North Dakota Code, under "section 480, Rev. Codes," included provisions that prohibited Native Americans from voting "unless they had entirely abandoned their tribal relations."[117]

- The Supreme Court of North Dakota, in the 1920 case of *Swift v. Leach*, in applying the "civilized persons" provision of the state constitution, required the local Superintendent of the Bureau of Indian Affairs and other witnesses to testify that the plaintiff Native Americans who sued to establish their eligibility to vote, "live just the same as white people" and had "severed" their tribal relationship.[118]

- In the 2000 case of *United States v. Benson Cty.*, this Court entered a consent decree stating: "Native American Citizens within Benson County have suffered from a history of official racial discrimination in voting and other areas, such as education, employment, and housing. Native American citizens in Benson County continue to bear the effects of this past discrimination, reflected in

---

[115] McCool Decl. ¶ 29 (quoting anonymous2 interview).

[116] N.D. Const. of 1889, art. v, § 121.

[117] *State ex. rel. Tompton v. Denoyer*, 72 N.W. 1014, 1019 (N.D. 1897).

[118] *Swift v. Leach*, 178 N.W. 437, 438-40 (N.D. 1920).

their markedly lower socioeconomic status compared to the white population. These factors hinder Native Americans' present-day ability to participate effectively in the political process."[119]

▪ In the 2010 case of *Spirit Lake Tribe v. Benson Cty., N.D.*, this Court, in entering a preliminary injunction against the closing of certain polling locations, stated: "The historic pattern of discrimination suffered by members of the Spirit Lake Tribe is well-documented."[120]

North Dakota's electoral results also reflect racism. As one person told Dr. McCool: "There was discrimination against Turcotte [a Native American sheriff in Rolette County]. They made it so miserable for him as sheriff that he quit . . . . Some of them just couldn't see an Indian being sheriff."[121]

## b)     Senate factor 2:  Voting in North Dakota is racially polarized.

North Dakota presently suffers from racially polarized voting.[122] As discussed in Section II(G) above, North Dakota Native Americans are more likely than whites to vote for Democrats. And when an Anglo runs against a Native American, voters vote according to race. As one person stated, "[d]o Native Americans have a propensity to vote for their own? Yes, [and] the same is true with whites."[123] Racially polarized voting is also evident in races involving only Anglos, such as the previously discussed 2012 U.S. Senate contest between Democrat Heidi Heitkamp and Republican Rick Berg. Heitkamp won the election by less than 3,000 votes, and her victory was due in no small part to the huge pluralities she won

---

[119] *United States v. Benson Cty., Consent J. & Decree 2:00-cv-30, ECF No. 2, Mar. 10, 2000.*

[120] *Spirit Lake Tribe v. Benson Cty., N.D.*, No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. Oct. 21, 2010).

[121] McCool Decl. ¶ 30 (quoting A. McCloud, E. McCloud interviews).

[122] McCool Decl. ¶ 30; Barreto Decl. ¶¶ 51-56; Herron Decl. Ex. A, at 11-20.

[123] McCool Decl. ¶ 30 (quoting Boucher interview).

in counties and precincts that are heavily Native American.[124]

As Barreto and Sanchez conclude: "Across almost any election in North Dakota, it is clear that Native American and non-Native American voters have different candidate preferences which amount to racially polarized voting."[125]

### c)    Senate factor 3: North Dakota has used voting practices or procedures to enhance the opportunity for discrimination against Native Americans.

As discussed in Sections II(C) and IV(A)(2)(a) above, North Dakota has enacted restrictive voter eligibility and other electoral laws that expressly or effectively enhanced discrimination against Native Americans. The new voter ID laws are just the most recent example of this.[126] The abolition of the fail-safe mechanisms are especially significant. Native Americans disproportionately relied on poll workers vouching for them when they went to vote, and Native Americans also disproportionately utilized the affidavit option of voting. Now there are no fail-safe mechanisms, leaving Native Americans to suffer from the disproportionate impact of the strictest voter ID requirements in the nation. Indeed, all other "strict" voter ID states have a fail-safe mechanism,[127] and they permit more than four forms of acceptable ID.[128]

---

[124] Barreto Decl. ¶¶ 53-54; *see also* Barreto Decl. ¶ 55 (example of polarized voting in 2014 state legislature election).

[125] Barreto Decl. ¶ 55; *see also* Herron Decl. Ex. A, at 19-20.

[126] McCool Decl. ¶¶ 22, 23, 33, 117; Barreto Decl. ¶ 57.

[127] *See, e.g., Crawford v. Marion Cty. Election Bd.,* 553 U.S. 181, 186 (2008) (discussing affidavit and provisional ballot system in Indiana); *Veasey,* 796 F.3d at 495 (discussing availability of provisional ballots for those that lack ID at polls in Texas); *Frank,* 768 F.3d at 746 (same for Wisconsin); *Lee v. Virginia State Bd. of Elections*, No. 3:15CV357-HEH, 2016 WL 2946181, at *1 (E.D. Va. May 19, 2016) (same for Virgina); *North Carolina State Conference of NAACP v. McCrory*, No. 1:13CV658, 2016 WL 1650774, at *156 (M.D.N.C. Apr. 25, 2016) (discussing North Carolina's reasonable impediment exception, among others).

[128] *See, e.g., Veasey*, 796 F.3d at 494 (state ID, military ID, citizenship ID, passport, concealed carry license, and Election Identification Certificate); *Frank*, 768 F.3d at 746 (drivers' licenses, Wisconsin state ID cards, passports, military ID, recent naturalization

### d)  Senate factor 5:  The ability of Native Americans to vote is hindered by the effects of past discrimination in the areas of education, employment, and health.

Due to a host of factors including poverty and access, Native Americans are much less formally educated than their fellow North Dakota citizens. According to the Barreto/Sanchez Survey, only 8.7 percent of Native Americans who lack qualifying voter ID graduated from college, compared to 32.9 percent of non-Native Americans; and 34.5 percent of Native Americans who lack qualifying voter ID never finished high school, compared to only 5.7 percent of non-Native Americans.[129] Other studies have reported similar findings.[130] This is not a recent phenomenon; Native Americans in North Dakota have historically faced discrimination in education.[131]

In terms of employment, only 58 percent of Native Americans in North Dakota are in the labor force, compared to 71 percent of their Anglo counterparts. And the jobs Native Americans hold pay less: 30.5 percent of Native Americans work in service occupations compared to only 16 percent of Anglos, and only 25.6 percent of Native Americans work in

---

papers, photo ID issued by a recognized Indian tribe, or signed photo ID issued by a college or university); *Lee*, 2016 WL 2946181, at *1 (state IDs, passport, U.S. IDs, college ID, employee ID); *McCrory*, 2016 WL 1650774, at *14 (state IDs, passport, military ID, veterans ID, tribal enrollment card, another state ID); National Conference of State Legislatures, *Voter Identification Requirements – Voter ID Laws* (Apr. 11, 2016), http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx.

[129] Barreto Decl. ¶ 47.

[130] McCool Decl. ¶ 80.

[131] *See* U.S. Office of Indian Affairs, *Extracts From the Annual Report of the Secretary of the Interior* 45 (1927) (boarding schools set up in North Dakota to "indoctrinate" and "assimilate" Native Americans); Inst. for Gov't Research, *The Problem of Indian Admin*. 357 (1928) (in 1920, rural illiteracy rate was only 2.2% in North Dakota, but Native Americans had illiteracy rate of 29.6%); Committee on Labor Public Welfare, Special Subcommittee on Indian Education, *Indian Education: A National Tragedy, A National Challenge,* S. Rep. No. 91-501, xii, 24-25 (1969) (dropout rates were higher and reading levels lower among Indian children and that Indian people were generally prevented from serving on school boards).

"management, business, science and arts," compared to 35.2 percent of Anglos.[132] These poor employment numbers translate to very poor comparative numbers in the areas of home ownership and home values, homelessness, mean and median household incomes, access to motor vehicles, phone service, Internet access, and access to legal services.[133]

Native Americans living in North Dakota also suffer from poor health.[134] Nationally, Native Americans have higher mortality and infant mortality rates.[135] Native Americans aged 18-64 in North Dakota are more than twice as likely as non-Native Americans to suffer from a disability (17.5 percent as compared to 8.6 percent).[136] Mental health is also a problem:  14.3 percent of Native American high school students have attempted suicide, compared to only 8.2 percent of Anglos; and 18.7 percent of Native American middle school students have attempted suicide, compared to only 5.2 percent of Anglos.[137]

Access to quality health care is also problematic for Native Americans. There are only two Indian Health Service hospitals in North Dakota (at Fort Yates and Belcourt). Access to other hospitals is limited because Native Americans in North Dakota are three times more likely than Anglos to lack health insurance. Thus, twice as many American Indians as Anglos reported that they needed a doctor in the past year but could not afford one.[138]

The bleak social and historical conditions for many Native Americans hinder their ability to obtain qualifying voter ID and participate in the electoral process through voting.[139] As one Native American stated:

---

[132] *See* McCool Decl. ¶¶ 81, 86-87.

[133] McCool Decl. ¶¶ 82-89.

[134] McCool Decl. ¶¶ 93-98.

[135] McCool Decl. ¶ 93.

[136] McCool Decl. ¶ 95.

[137] McCool Decl. ¶ 97.

[138] McCool Decl. ¶ 94.

[139] McCool Decl. ¶¶ 77, 92.

The problem is that the poverty is so high on the reservation that people can't afford to go and get a state ID, just a driver's license or state ID; they just can't afford it ... everything falls back to poverty. They have no cars, no gas money, they have no resources to get to a state office.[140]

### e) Senate factor 7: Native Americans are not fairly represented in elective offices in North Dakota.

Native Americans have had practically no representation in North Dakota's state government. For example, few Native Americans have been elected to the legislature from areas featuring large populations of Native Americans. In districts characterized by the Indian Affairs Commission as "Tribal Districts," only one of 24 elected legislators is Native American. And only one Native American appears on a state-produced list of 42 representatives of districts "on/around" American Indian reservations. There are no Native American representatives on the legislature's Tribal and State Relations Committee.[141]

Similarly, few Native Americans have been elected to county offices in those counties featuring large numbers of Native Americans. The three counties where Native Americans comprise more than 50 percent of the total population collectively have 13 county commissioners, and only two of them are Native Americans.[142]

One person explained why so few Native Americans are involved in North Dakota's government: "It's systemic. We are not really a part of the system; it has been built around us."[143]

### f) Senate factor 8: North Dakota's elected officials have not been responsive to the needs of Native Americans.

The fact that Native Americans have suffered from a lack of educational, financial and other resources for decades in North Dakota reflects a lack of responsiveness by the elected

---

[140] McCool Decl. ¶ 90.

[141] McCool Decl. ¶ 100-01.

[142] McCool Decl. ¶ 103.

[143] McCool Decl. ¶ 107.

officials of North Dakota.[144] Moreover, elected representatives occasionally have been outright hostile to the needs and concerns of Native Americans. For example, in a 2013 meeting of the North Dakota Council on Abused Women at Spirit Lake, Congressman Kevin Cramer referred to all tribal governments as "dysfunctional," disparaged tribal judicial systems, and then reportedly said: "I want to ring the Tribal Council's neck and slam them against the wall."[145] Congressman Cramer later claimed he was "misunderstood."

One person explained the feelings that many Native Americans have about their state government:

> There is an inherent level of distrust between Native people and the government. Many Natives avoid state elections altogether because we've been screwed over by both Democrats and Republicans, at every point in history, on just about every issue. So when we do choose to participate, we should at least be treated with the same level of respect as our non-Native counterparts.[146]

As another interviewee said: "Overall the state of North Dakota can do more. We're not asking them to pick us up and carry us to the poll, but just assist us, and don't ask questions about our IDs. Natives should be able to vote without the hardship of a state ID."[147]

## g)    Senate factor 9:  There was no compelling need for the new voter ID laws.

"Tenuous" means "lacking a sound basis."[148] There was no basis for HB 1332 and HB 1333. The sponsors of the bill claimed that new ID requirements were primarily necessary to clamp down on voter fraud. But there have been only a handful of voter fraud cases in modern North Dakota history. Indeed, North Dakota already had laws on the books

---

[144] McCool Decl. ¶¶ 77-98.

[145] McCool Decl. ¶ 24.

[146] McCool Decl. ¶ 113 (quoting Luger 6 Nov. 2014).

[147] McCool Decl. ¶ 116 (quoting McCloud interview).

[148] McCool Decl. ¶ 35.

prohibiting the kind of "impersonation" voter fraud that voter ID laws purportedly address. HB 1332 and HB 1333 were classic cases of a "solution looking for a problem."[149] Before any consideration of HB 1332 the Defendant himself said this about North Dakota's elections system: "What we have works and works very well."[150]

The foregoing discussion of the relevant Senate Factors establishes that Plaintiffs are likely to prove at trial that an analysis of the "totality of the circumstances" establishes that North Dakota's new voter ID laws impose a discriminatory burden on Native Americans and that the burden is caused by and linked to social and historical discrimination in North Dakota. Therefore, the new voter ID laws violate Section 2 of the Voting Rights Act. As Dr. McCool concluded:

> Given historical trends, socio-economic conditions, troubled Indian-Anglo relations, geographical isolation, and the unique political position of Indian tribes in the American polity, voter ID requirements have placed an especially difficult burden on American Indian people living in North Dakota. The large body of information I have collected supports the conclusion that North Dakota's voter ID laws have directly and demonstrably impaired the ability of some American Indians to participate in the electoral process and elect candidates of their choice.[151]

## B.    Plaintiffs Are Likely to Prevail on Their Claim for Violation Of the 14th Amendment's Equal Protection Clause.

Plaintiffs' third cause of action alleges violation of the Equal Protection Clause of the 14th Amendment.[152] "The Equal Protection Clause applies when a state either classifies voters in disparate ways or places restrictions on the right to vote."[153]

---

[149] McCool Decl. ¶ 38.

[150] McCool Decl. ¶ 36.

[151] McCool Decl. ¶ 117.

[152] Compl. ¶¶ 192-99, ECF No. 1 (stating cause of action for violation of the Equal Protection Clause of the 14th Amendment to the U.S. Constitution).

[153] *Obama for America v. Husted,* 697 F.3d 423, 428 (6th Cir. 2012) (citation omitted).

The U.S. Supreme Court has held:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights."[154]

"This standard is sufficiently flexible to accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote."[155] Even "slight" burdens imposed on voting rights must be justified by relevant and legitimate state interests "sufficiently weighty to justify the limitation."[156]

Here, no state interest is sufficient to outweigh the burdens imposed by the new laws.

## 1.   North Dakota's new voter ID laws make voting substantially more burdensome for Native Americans.

As discussed above, thousands of Native Americans presently lack qualifying voter ID. For those citizens to ever vote again, they will have to incur significant burdens. One such burden is paying fees to secure the right to vote.[157] The U.S. Supreme Court has held voting eligibility requirements that require payment to be *per se* unconstitutional.[158] Plaintiffs

---

[154] *Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (citations omitted); *see also ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008) ("the appropriate test when addressing an Equal Protection challenge to a law affecting a person's right to vote is to 'weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule.'" (quoting *Crawford,* 553 U.S. at 190)).

[155] *Obama for America,* 697 F.3d at 429.

[156] *Norman v. Reed*, 502 U.S. 279, 288-89 (1992).

[157] Allard Decl. ¶¶ 7, 10; Herman Decl. ¶ 7; Brakebill Decl. ¶¶ 8, 10-11, 14.

[158] *See Crawford*, 553 U.S. at 198 ("The fact that most voters already possess a valid driver's license, or some other form of acceptable identification, would not save the statute under our reasoning in *Harper*, if the State required voters to pay a tax or a fee to obtain a new photo identification.").

Richard Brakebill and Dorothy Herman, and likely many other Native Americans, were forced by the new voter ID laws to pay for qualifying ID so that they could exercise their right to vote.[159] Other burdens include having to take the time to navigate through governmental bureaucracies to obtain underlying documents and forms of ID; having to incur the costs of travel to a DLS; and having to incur the costs associated with taking time off from work to travel, in some cases, hundreds of miles, to a DLS.[160]

Moreover, as discussed in Section II(G) above, Native Americans disproportionately experience these burdens because of higher levels of poverty, unemployment, and homelessness, and their lower levels of education, and access to transportation.

## 2.  No compelling state interest necessitated North Dakota's new voter ID laws.

The burdens imposed by the new voter ID laws on Native Americans are substantial. Thus, the state's interest in the new laws must be compelling to survive constitutional scrutiny. It is not.

The purported primary state interest—voter fraud—is insufficient to justify the burdens imposed by the new voter ID laws and the removal of the fail-safe provisions. As discussed in Section II(B) above, there have been only a handful of alleged voter fraud cases in recent North Dakota history. The number of voters the law has disenfranchised, or potentially will disenfranchise, far outweighs the fraud the law was designed to prevent. Further, unlike the other strict voter ID states, North Dakota did not have a compelling reason that necessitated removing the fail-safe mechanisms that protected the right to vote.[161]

Any other purported state interest cannot possibly be compelling. Before the passage

---

[159] Brakebill Decl. ¶ 8, 10-11, 14; Herman Decl. ¶ 7.

[160] McCool Decl. ¶¶ 59-75; Barreto Decl. ¶ 46; Webster Decl. ¶ 12.

[161] *Crawford*, 553 U.S. at 197-98 (emphasizing significance of fail-safe mechanism to provide an "adequate remedy").

of HB 1332 and HB 1333, North Dakota had perhaps the nation's premier election system. As mentioned above, it was voted best in America in 2008, 2010 and 2012. There simply was no need to change the voter eligibility laws in North Dakota.

## V.    Plaintiffs Will Suffer Irreparable Injury Without Preliminary Injunctive Relief.

The U.S. Supreme Court has repeatedly recognized the foundational and fundamental importance of voting rights. In the 1886 case of *Yick Wo v. Hopkins*, the Court stated "the political franchise of voting" is "a fundamental political right, because [it is] preservative of all rights."[162] In 1964, in *Reynolds v. Sims*, the Court stated "the right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."[163] Indeed, in *Wesberry v. Sanders*, the Court declared that, "[o]ther rights, even the most basic, are illusory if the right to vote is undermined."[164] And when constitutional rights such as the right to vote "are threatened or impaired, ***irreparable injury is presumed***."[165]

The inability of a damages award to fully compensate Plaintiffs is another basis for a finding of irreparable injury. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.'"[166] That is the case here. No monetary value can be assigned to the right to

---

[162] *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

[163] *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

[164] *Wesberry*, 376 U.S. at 17.

[165] *Obama for America*, 697 F.3d at 436 (6th Cir. 2012) (emphasis added); *id.* ("A restriction on the fundamental right to vote therefore constitutes irreparable injury."); *see also Planned Parenthood of Minn., Inc. v. Roedler*, 558 F.2d 861, 867 (8th Cir. 1977) (Plaintiff's "showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.").

[166] *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010) (quoting *Gen. Motors Corp. v. Harry Brown's, L.L.C.*, 563 F.3d 312, 318-19 (8th Cir. 2009)).

vote. Nor should such an important and symbolic right be reduced to monetary valuations. As the court in *Spirit Lake Tribe v. Benson Cty., N.D.*, stated:

> Once a citizen is deprived of his right of suffrage in an election there is usually no way to remedy the wrong. There is no process for ordering 're-votes' in Congressional or legislative elections. Once an election is over, it is over and it is little consolation to say that the problem will be remedied in the next election.[167]

For these reasons, Plaintiffs have satisfied the irreparable injury element of the preliminary injunction test.

## VI.    The Balance Of Hardships Weighs In Favor of Preliminary Injunctive Relief.

Without preliminary injunctive relief, thousands of North Dakota voting-eligible Native American citizens (and also many other state citizens) will be denied their right to participate in the upcoming presidential election. That is a permanent and irreversible injury. Conversely, given the lack of any voter fraud in North Dakota and North Dakota's prior history of free and open elections, the State will suffer no hardship if the Court issues injunctive relief and North Dakota conducts the upcoming election in the same award-winning way it conducted elections before the passage of HB 1332 and HB 1333. Indeed, North Dakota's Secretary of State boasted in a 2006 letter that North Dakota "has had an excellent history of conducting elections that are accurate and trustworthy. Our citizens respect the voting process . . . What we have works and works very well."[168]

## VII.    Preliminary Injunctive Relief Will Serve The Public Interest.

As discussed in Section V above, the right to vote is a "precious" and "fundamental" right that helps protect all other rights. Thus, the public has a strong interest in exercising

---

[167] *Spirit Lake Tribe v. Benson Cty., N.D.*, No. 2:10-cv-095, 2010 WL 4226614, at *5 (D.N.D. Oct. 21, 2010).

[168] McCool Decl. ¶ 36.

the fundamental political right to vote.[169] And because that "'interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful,'" the "public interest therefore favors permitting as many qualified voters to vote as possible."[170]

## VIII. Conclusion.

For all the foregoing reasons, Plaintiffs respectfully request that the Court order the requested preliminary injunctive relief.

Dated: June 20, 2016              Respectfully submitted,


                                By:  /s Matthew Campbell
                                      Matthew Campbell

                                Matthew Campbell, NM Bar No. 138207,
                                CO Bar No. 40808
                                mcampbell@narf.org
                                NATIVE AMERICAN RIGHTS FUND
                                1506 Broadway
                                Boulder, Colorado 80302
                                Phone: (303) 447-8760
                                Fax: (303) 443-7776

                                Tom Dickson, ND Bar No. 03800
                                tdickson@dicksonlaw.com
                                **DICKSON LAW OFFICE**
                                P.O. Box 1896
                                Bismarck, North Dakota  58502
                                Phone: (701) 222-4400
                                Fax: (701) 258-4684

---

[169] *See Obama for America,* 697 F.3d at 436-37 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).

[170] *Obama for America*, 697 F.3d at 437 (quoting *Hunter v. Hamilton Cty. Bd. Of Elections,* 635 F.3d 219, 244 (6th Cir. 2011)).

Joel West Williams, PA Bar No. 91691
williams@narf.org
**NATIVE AMERICAN RIGHTS FUND**
1514 P Street NW (Rear), Suite D
Washington, D.C. 20005
Phone: (202) 785-4166

Richard de Bodo, CA Bar No. 128199
Rich.debodo@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1601 Cloverfield Blvd., Suite 2050 North
Santa Monica, CA  90404-4082
Phone:  (310) 255-9055
Fax:      (310) 907-2000

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2016, the document titled "**Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction**" was electronically filed with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing ("NEF") to:

Christopher S. Joseph
Assistant Attorney General
State Bar ID No. 07450
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
Email csjoseph@nd.gov

Dated:   June 20, 2016


By:  _/s Matthew Campbell_____
Matthew Campbell

Matthew Campbell, NM Bar No. 138207,
CO Bar No. 40808
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
Phone: (303) 447-8760
Fax: (303) 443-7776