**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | |
|---|---|
| Richard Brakebill, Deloris Baker, Dorothy Herman, Della Merrick, Elvis Norquay, Ray Norquay, and Lucille Vivier, on behalf of themselves, | Civil No. 1:16-cv-8 |
| Plaintiffs, | |
| vs. | |
| Alvin Jaeger, in his official capacity as the North Dakota Secretary of State, | |
| Defendants. | |

# Declaration of Matthew A. Barreto, Ph.D.

I, Matthew A. Barreto, declare as follows:

1.    I am currently a Professor of Political Science and Chicana/o Studies at the University of California, Los Angeles. I know of the facts set forth in this declaration of my own personal knowledge, and could and would competently testify to those facts if asked to do so.

## I.    Qualifications.

2.    I am the co-founder of the research firm Latino Decisions. Before I joined UCLA in 2015, I was a Professor at the University of Washington for more than nine years. At the University of Washington, I was an affiliated faculty member of the Center for Statistics and the Social Sciences (CSSS), and an adjunct Associate Professor of Law at the University's law school.

3.    I have taught courses on the Voting Rights Act, Racial and Ethnic Politics, Electoral Politics, Public Opinion, Immigration, and Introduction to Statistical Analysis and Advanced Statistical Analysis for Ph.D. students.

4.    I earned a Ph.D. in Political Science at the University of California, Irvine in 2005, with an emphasis on racial and ethnic politics in the United States, political behavior, and public opinion. Professor Bernard Grofman, a well-known expert in voting rights research, served as my principal dissertation advisor.

5.    I have published a peer-reviewed academic research paper on voter ID laws.

6.    I have conducted statewide public opinion surveys in Wisconsin, Pennsylvania, and Texas to assess rates of possession of voter identification. Previous courts have accepted these surveys as viable and accurate methods for determining ID possession rates by race and ethnicity. In 2014, in *Veasey v. Perry* (No. 13-CV-00193), the District Court, and later the Fifth Circuit Court of Appeals, found that my survey was statistically accurate and reported clear evidence that Hispanics and African Americans were disproportionately impacted by the Texas voter ID law.

7.    My full professional qualifications and activities are set forth fully in my curriculum vitae, a true and correct copy of which I have attached as Exhibit A.

## II.    Scope of Work.

8.    The Plaintiffs retained me to examine and analyze the possession rates of valid voter identification in North Dakota. More specifically, Plainitiffs asked me to assess whether there were any differences in possession rates between the Native American eligible voting population and the non-Native American eligible voting population.

9.    I worked on this project with Dr. Gabriel R. Sanchez. I have worked with Dr. Sanchez on similar projects in the past.

10.    To complete our analysis, Dr. Sanchez and I implemented a statewide survey of eligible voters in North Dakota to assess possession rates of voter ID as required by HB 1332 and HB 1333 to cast an in-person ballot.

## III. Summary of Findings.

11. Dr. Sanchez and I found:

- Native American eligible voters in North Dakota are less likely to possess a qualifying voter ID under current North Dakota law, as compared to non-Native Americans. The difference is statistically significant at the 99 percent level, the most rigorous level of social science testing.

- 23.5 percent of Native American eligible voters do not possess a qualifying voter ID. In contrast, 12.0 percent of non-Native Americans do not possess a valid ID.

- Native Americans are significantly less likely to possess the most common type of ID—a driver's license. Only 78.2 percent of Native Americans indicated they have a driver's license. In constrast, 94.4 percent of non-Native Americans indicated they have a driver's license.

- Native Americans face burdens in obtaining a state-issued ID. Many Native Americans lack the required underlying documents: 32.9 percent do not have a birth certificate; 21.6 percent do not have two documents showing a physical address; 5.6 percent lack a social security card or W2 showing a social security number. In total, 47.7 percent of Native Americans that currently do not have a valid voter ID do not have all three types of the underlying documents they would need to obtain a voter ID.

- Native Americans who currently lack a qualifying voter ID face logistical and financial burdens in obtaining a qualifying ID. Our survey results indicate: 29 percent will face a problem getting a ride to the nearest North Dakota Department of Transportation ("DOT") office; 44 percent will face a problem getting time off to visit the DOT during business hours; 36 percent will face a problem if they have to travel six miles each way to the nearest DOT office; and 47 percent state they will face a problem paying for public transit to get to the

nearest DOT office.

- ▪ Knowledge levels regarding the law are very low in North Dakota, especially among Native Americans. In fact, 21.4 percent of Native Americans are not aware that a voter ID law exists, and only 20.8 percent of Native Americans reported they had heard or seen an official announcement or advertisement by the State of North Dakota about the new voter ID law.

## IV.    Survey Design and Methodology.

## A.    General Outline of the Study.

12.    We designed a survey to specifically focus on the North Dakota voter ID law which went into effect in 2013. This research approach has three critical advantages for the purpose of identifying potential disparities in access to accepted forms of identification: 1) the use of a survey provides the opportunity to directly ask residents of North Dakota whether they are in possession of accepted voter ID and the underlying documents that may be used to obtain an accepted ID, 2) this study is focused on eligible voters and has sizable samples of Native Americans and non-Native Americans appropriate for statistical analysis, and 3) the survey also measured knowledge among respondents of the North Dakota identification law, and other potential barriers to access to obtaining accepted identification. This approach is an ideal way to assess rates of possession of accepted voter ID because eligible voters were contacted directly and asked what types of identification and other documents they currently possess. Other methods, such as examining existing large public databases, might also be used to provide information on the types of ID that individuals possess, depending on factors such as whether each type of relevant ID is recorded in a database and whether the relevant databases are available for review. While very useful, a database review may be limited to assessing ID possession among individuals included on the most recent roster of voters,

whereas our research was able to assess how the North Dakota voter ID law affects all eligible voters, and across all types of ID. Finally, a survey can ask more specifically about current physical possession of the relevant ID to capture any instances where IDs has been lost, stolen, misplaced, destroyed, etc. When combined with other approaches aimed at identifying the impact of the new law, the survey research discussed in this report helps provide a clear picture of the individuals across race, ethnicity, and other demographic factors who lack accepted ID.

13.     In sum, the data obtained through this survey provides an accurate and reliable depiction of the rates of possession of accepted voter ID in North Dakota, and of certain related matters. Because the percentage figures set forth in this report were obtained from a survey, these figures should be interpreted as estimates, which do contain a margin of error, or confidence interval. However, using standard and well-accepted statistical techniques, the margins of error associated with the percentage estimates were all evaluated and determined to be well within conventional standards, and we likewise determined whether the differential rates between groups (most importantly, between non-Native eligible voters and Native eligible voters) are statistically significant.

**14.**     Survey Methodology.

a.  **Survey research is a reliable and trusted method in the social sciences.** Within social science research, public opinion and political behavior have been longstanding areas of significant consequence and interest. The primary reason for using survey research to study possession of accepted voter ID is simple: if you want to know if the population has the required ID, just ask them. Early on, "pollsters" learned that you could learn a great deal about voter attitudes, and possibly even predict election results, through large quantitative surveys of the public. Over the past decades, the science of public opinion surveys

has expanded greatly and great expertise has been developed in how to accurately sample, construct, implement and analyze survey data.

b.  Survey research has become a hallmark of social science research, such that at a typical Political Science academic conference more than 500 different research papers using survey data are regularly presented. When surveys are implemented accurately, results generated from a sample of the population can be inferred to the larger population from which the sample is drawn, given the appropriate sampling error, or confidence interval that must always be accounted for.

c.  Survey research is a standard and widely accepted practice in social science and government research. The U.S. government regularly relies on survey methodology exactly like that relied upon in this expert report, in its collection of data and statistics, such as the U.S. Census American Community Survey and Current Population Survey, the Bureau of Labor Statistics Unemployment Survey, and surveys by the National Institutes of Health, the Department of Defense, and the Internal Revenue Service. In fact, the Office of Management and Budget has a division called the "Federal Committee on Statistical Methodology" which has reviewed best practices in survey research and recommended random digit dial ("RDD") as a method to avoid non-coverage bias because it samples all known telephone numbers. According to Michael Link, formerly a research scientist for the Centers for Disease Control and Prevention, "For more than three decades, RDD telephone surveys have been the predominant method for conducting surveys of the general public."

d.  The most important starting point for sound survey research is to acquire an accurate sample frame from which to draw the eventual sample of people interviewed. If the sample is reflective of the larger population,

and the survey is administered randomly, without bias, and with an adequate sample size and response rate the results of the eventual survey can be considered as statistically reliable estimate, at least for those questions directed at all persons sampled. According to Henry Brady, Professor of Political Science at the University of California, Berkeley, "Scientific surveys are one of these tools, and they have been widely used in the social sciences since the 1940s. No other method for understanding politics is used more, and no other method has so consistently illuminated political science theories with political facts… They provided the gold standard for measuring citizen opinions… No other social science method has proven so valuable."

e.  Mixed mode surveys that incorporate telephone and mail are considered highly accurate.  Harvard Political Scientist Stephen Ansolabehere and University of Massachusetts Political Scientist Brian Schaffner conducted a study that used both telephone and mail surveys and concluded that using both methods is highly reliable.[1] Moreover, a large body of interdisciplinary research demonstrates that a mixed-mode approach to the collection of survey data enhances the reliability of the data,

---

[1] Ansolabehere, Stephen, and Schaffner, Brian F. 2014. "Reexamining the validity of different survey modes for measuring public opinion in the U.S.: Findings from a 2010 Multi-Mode Comparison" *Political Analysis,* 22: 285-303; Atkeson, Lonna Rae, Adams, Alex, and Alvarez, Michael. 2014. "Non-Response and Mode Effects in Self-and-Interviewer-Administered Surveys." *Political Analysis,* 23: 304-320; Rao, Kumar, Kaminska, Olena, McCutcheon, Allan. 2010. "Recruiting Probability Samples for a Multi-Mode Research Panel with Internet and Mail Components." *Public Opinion Quarterly,* 74(1): 68-84; Ngo-Metzger, Kaplan, Sherrie, Sorkin, Dara, Clarridge, Brian, and Phillips, Russell. 2004. "Surveying Minorities with Limited English Proficiency: Does Data Collection Method Affect Data Quality Among Asian Americans?" *Medical Care,* 42(9): 893-900.

mitigating response bias and increasing sample representativeness.[2] Telephone surveys are more prone to partial responses, missing data and increasingly low response rates. Carefully executed mail surveys, and multi-mode surveys with multiple contacts promise to mitigate problems that arise from telephone only samples.[3] Methodologically speaking, survey experts advise the use of multi-mode designs to sample hard-to-reach populations more generally.[4] Researchers frequently combine mail and telephone to reach small and marginalized populations that may not have regular access to a telephone, and findings derived from this strategy are widely published across the social sciences.[5] Native

---

[2] Fowler, Floyd Jackson, Roman, Anthony, Di, Zhu Xiao. 1998. "Mode Effects in a Survey of Medicare Prostate Surgery Patients." *Public Opinion Quarterly,* 62: 29-46; Sakshaug, Joseph W., Ting, Yan, Tourangeau, Roger. 2010. "Non-response Error, Measurement Error, and Mode of Data Collection: Tradeoffs in a Multi-Mode Survey of Sensitive and Non-Sensitive Items." *Public Opinion Quarterly,*  74(5): 907-933. Leeuw, Edith. 2005. "To Mix or Not to Mix Data Collection Modes in Surveys." *Journal of Official Statistics*, 21(2): 233-255; Chang, Linchiat, and Krosnick, Jon. 2009. "National Surveys via RDD Telephone Interviewing versus the Internet." *Public Opinion Quarterly,* 73(4): 641-678.

[3] Hayashi, Takuya. 2007. "The Possibility of Mixed –Mode Surveys in Sociological Studies." *International Journal of Japanese Sociology,* 16: 51-63; Rao, Kumar, Kaminska, Olena, McCutcheon, Allan. 2010. "Recruiting Probability Samples for a Multi-Mode Research Panel with Internet and Mail Components." *Public Opinion Quarterly,* 74(1): 68-84.

[4] Czaja, Ronald, and Blair, Johnny. 2004. *Designing Surveys: A guide to Decisions and procedures.* 2nd edition. Thousand Oaks: Pine Forge Press; Atkeson, Lonna Rae, Lisa A. Bryant, Alex N. Adams, Luciana Zilberman, and Kyle L. Saunders. 2011. Considering mixed mode surveys for questions in political behavior: Using the Internet and mail to get quality data at reasonable costs. *Political Behavior* 33:161–78.

[5] Dillman, Don, Lesser, Virginia, Mason, Robert, Carlson, John, Willits, Fern, Robertson, Rob, and Burke, Bryan. 2007. "Personalization of Mail Surveys for General Public and Populations with a Group Identity: Results from Nine Studies." *Rural Sociology,* 72(4): 632-646; Leeuw, Edith. 2005. "To Mix or Not to Mix Data Collection Modes in Surveys." *Journal of Official Statistics*, 21(2): 233-255; Harris, Lisa, Weinberger, Morris, and Tierney, William. 1997. "Assessing Inner-City Patients' Hospital Experiences: A Controlled Trial of Telephone Interviews Versus Mailed Surveys." *Medical Care,* 35(1): 70-76; Ngo-Metzger, Kaplan, Sherrie, Sorkin, Dara, Clarridge, Brian, and Phillips, Russell. 2004. "Surveying

Americans are considered hard to reach due to the fact that they are numerically small, geographically dispersed, more likely to lack telephones relative to other populations, and language and cultural barriers decrease trust in the interviewer and the surveying organization.[6] Thus, multiple modes of contact, including mail, is the best strategy for collecting data that accurately represent the population. This is the strategy developed by the U.S. Census Bureau in an effort to mitigate undercounting the population, thus constituting the most rigorous means of sampling Native Americans available to researchers.[7]

15.     Principal Focus: Racial disparities in possession of ID in North Dakota. The current study is focused on whether eligible Native and eligible non-Native voters in North Dakota have statistically different rates of possession of accepted voter ID, and the survey was designed to address the provisions of the North Dakota law. For example, when respondents were asked to confirm that they had an "up-to-date" driver's license or other accepted form of voter ID, survey interviewers confirmed that, for those types of ID that expire, the ID was either current or had expired – to match the provision in the law. Respondents were also asked to indicate whether they were in possession of any of the accepted forms of voter ID: a North Dakota driver's license, a North Dakota non-driver

---

Minorities with Limited English Proficiency: Does Data Collection Method Affect Data Quality Among Asian Americans?" *Medical Care,* 42(9): 893-900; Ansolabehere, Stephen, and Schaffner, Brian F. 2014. "Reexamining the validity of different survey modes for measuring public opinion in the U.S.: Findings from a 2010 Multi-Mode Comparison" *Political Analysis,* 22: 285-303.

[6] Lavell, Bridget, Larsen, Michael D., and Gunderson, Craig. 2009. "Research Synthesis: Strategies for Surveys of American Indians." *Public Opinion Quarterly,* 73(2): 385-403.

[7] Lavell, Bridget, Larsen, Michael D., and Gunderson, Craig. 2009. "Research Synthesis: Strategies for Surveys of American Indians." *Public Opinion Quarterly,* 73(2): 385-403; Hatcher,WilliamW. Jr. 2002. "Conducting the Decennial Census on theNavajo Indian Reservation 1990 and 2000." Proceedings of the Survey Research Methods Section, American Statistical Association, 1400–5.

identification card that was issued by the North Dakota Department of Transportation, a Tribal government-issued identification card or one issued by the Bureau of Indian Affairs, or a long-term care identification certificate issued by a North Dakota facility. This information provided directly by respondents was utilized to create our measure of accepted ID that is used throughout the report[8].

16.     This study was designed to assess if there were any statistically significant differences in rates of possession, or lack of possession, of accepted voter ID based on race and ethnicity. To assess this, the survey started by asking respondents to provide their race/ethnicity (see Exhibit B for full survey questionnaire).

17.     Respondents could self-report their racial or ethnic group, and like the Census, respondents were allowed to select one or more racial groups. After establishing eligibility to participate in the survey, all respondents were asked: "We want to make sure we get a correct and accurate sample of all people here in North Dakota.  Do you consider any part of your family ancestry to be Native American or American Indian?" Anyone who indicated "yes" was counted as Native American. Following this question, respondents were asked a standard Census question on race and ethnicity and could select White or Anglo, Native American or American Indian, Black or African American, Hispanic or Latino, Asian American, or Other.  For both of these questions the interviewers were provided with a list of possible tribe names that a respondent might indicate, so that they could be appropriately recorded as Native American.  This list can be found on the bottom of page 1 of Exhibit B, the survey questionnaire.  At the close of the survey, we asked additional demographic question such as whether respondents are currently an enrolled member of any Native American tribe, and if so, which tribe, as well as whether or not they currently live on a designated Native American reservation or Tribal government area.

---

[8] The survey also asked about a student identification certificate issued by an accredited North Dakota college or university, but this was not considered an accepted ID as per HB 1332/1333.

18.    To assess the differential rates of possession of accepted voter ID, in-group percentages are presented for individuals who do not possess the various forms of voter ID as well as for potential burdens faced for non-Native and Native respondents to the survey. In addition to the frequencies associated with possession of accepted forms of ID, results from a series of statistical tests are presented to determine whether eligible Native voters in North Dakota are disproportionately impacted by the North Dakota voter ID law. In this case, logistic regression was utilized to determine whether or not different groups (racial groups in this case) are distinct from each other when observing binary outcomes, such as possession of acceptable voter ID. Logistic regression is the most appropriate statistical analysis to test these relationships for two reasons: first, because the outcome variable of interest, possession of an accepted voter ID, is binary and logistic regression is best at estimating a 0,1 binary dependent variable, and second, because the regression provides a more precise, accurate, and strict test of statistical significance than does a chi-square or t-test comparison of means. Although we find similar results for the chi-square and t-tests in our analysis, the results of the regression analysis provide a direct test of whether possession rates of acceptable ID vary in a statistically significant manner for Native Americans, as compared to non-Native Americans.

19.    As is the norm in the social sciences, standard levels of significance are utilized of .001, .010, .050, and .100 to determine if a result is statistically significant. For example, if a relationship is statistical significanct at 99 percent certainty – that is, we have 99 percent statistical certainty that the difference we observe is real and not the result of sampling error. Similarly, if the pr value is .050, then we can say that the observed difference would achieve statistical significance at 95 percent certainty. The statistical significance, or confidence interval, essentially takes into account the survey margin of error, and degree of difference in results to determine if the differences observed are real and true.

20.    We also occasionally present raw number estimates of the number of

persons affected. These estimates are included to provide further insight into the scope of the effects of HB 1332 and 1333, and are not used to assess the presence or extent of differential effects by group since that differential analysis necessarily depends upon comparisons of the rates among the different groups. The raw number estimates are extrapolations based on applying the survey's percentage estimates to the Census data for the citizen voting age population of North Dakota.

21.    Finally, it was critical that respondents to the survey were both residents of North Dakota and eligible to vote. The survey therefore started with the following question that was used as a screener for eligibility to participate in the study: "Okay, just to make sure you are eligible to take part in our survey about voting, can you confirm that you are 18 or over, and currently a U.S. citizen, and have lived here in North Dakota for more than 30 days?" Therefore, any relationships between race and ethnicity and possession of accepted voter identification are specific to the voting eligible population of the state.

22.    <u>Survey Design</u>. In designing a survey, researchers must consider three important topics to ensure their project is of the highest quality and follows social scientific standards. Two of the three relate to the design of the survey, and are discussed in this subsection of the report.

23.    The first issue concerns the population for which inferences will be made and the method of interacting with that population. In this case, inferences will be made about the rates of possession of accepted voter identification for the eligible voting population in the state of North Dakota (and related matters). With this in mind, the most accurate and efficient way to contact this population should be determined. The most common approaches are through the use of (1) random digit dial, (2) household listed phone samples, and (3) address-based mail samples.

24.    Random digit dial, or RDD, takes the known area codes and prefixes for a given geographic area, and randomly generates the last four digits of phone numbers and

calls those numbers entirely at random. This increases the likelihood that every possible phone number in North Dakota has an equal chance of being called.

25.     A second approach that is also used quite extensively is randomly calling listed household samples. Rather than calling randomly generated phone numbers (some of which may not exist), a listed sample starts with the known universe of actual phone numbers for landline and/or cell phone subscribers that currently reside in a geographic area (North Dakota in this case). Listed samples are far more efficient than pure RDD because they greatly reduce the number of "dead numbers" dialed and allow interviewers to focus on known working phone numbers. Listed samples are especially useful if researchers are interested in drilling down into a particular sub-group within the population such as racial or ethnic minorities, or registered voters. Sample vendors can sell a listed sample of all households in a particular area, or they can provide sample records for just Native households. Likewise, sample vendors sell lists of known cell phone/wireless phone numbers for particular geographic areas, and those can then be randomly dialed as part of a survey. One of the advantages of using a survey firm with extensive experience purchasing lists is that the firm is able to secure these lists from the most reputable vendors available. This includes being able to secure cell-phone users who may have cell-phone numbers from outside of North Dakota but who actually reside within the state.

26.     Finally, drawing on the social science literature, we implemented an address-based mail survey to addresses and P.O. boxes for part of the Native American oversample. This allowed us to reach respondents who may not have regular landline or cellphone access, and also to more accurately reach Native Americans across the state of North Dakota.

27.     For this particular survey, several sample components were used. First, a statewide sample of 900 eligible voters, representative of the full demographics of North Dakota was targeted. Respondents were randomly contacted by cell phone and landline.

This initial sample provides the survey power to analyze internal variation within the state's overall population. Second, in order to reach a reliable sample of Native eligible voters, two separate listed-sample oversamples were undertaken to provide a larger sample from which we can draw more accurate generalizations. A total of 456 additional Native American respondents were interviewed in the telephone and mail targeted samples. These robust samples provide the ability to explore variation within each population as needed, and ensure that the margins of error associated with our results are well within accepted levels. In both instances, the survey reached eligible voters in landline and cell-phone-only households. Sample sizes and configurations are set forth in Table A, and further discussed below.

28.    Table A: Sample Composition

|  | Landline | Cell phone | Mail | Total |
|---|---|---|---|---|
| Native American | 110 | 56 | 290 | 456 |
| White, non-Native | 521 | 243 | 23 | 787 |
| Other | 56 | 32 | 0 | 88 |
| Total | 687 | 331 | 313 | 1,331 |

29.    The second issue to ensure that a survey meets all social science standards concerns the design and construction of the survey questionnaire itself. In designing the questionnaire, researchers should follow best practices established by existing social science research, as well as groups such as the American Association of Public Opinion Research (AAPOR). It is important that questions are direct, objective, and neutral, not meant to lead respondents to give one particular answer over another, and should give respondents an appropriate range of available answer choices. With modern survey technology, CATI questionnaires should always be programmed to rotate question wording, randomize answer choices, rotate options forward-to-back and more, to ensure that no priming takes place whereby respondents lean towards one type of answer

because it is always read as the first option. For this project, we strictly followed the best social science practices for designing and implementing a survey.

30.     The full questionnaire is included as an appendix to this document (Exhibit B) so that readers can see that all of these criteria were followed in designing and implementing this survey. In this instance, the survey questionnaire contained five main sections: first, screening questions to establish eligibility to participate in the study; second, questions focused on accepted voter ID; third, questions that probed rates of possession of documentary proof of citizenship, identity, and residency; fourth, questions about possible burdens to acquire an ID; and fifth, demographic questions concerning the sample.

31.     <u>Telephone Survey Execution</u>. The third issue to ensure that a survey meets social science standards concerns the implementation of the survey instrument. In executing a survey, all possible respondents must have an equal chance to respond, participate, and be included. For example, if potential respondents were only called at home at 1:00 pm in the afternoon on Fridays, this would result in a sample that would be distinct from the overall population of North Dakota since many would not be able to participate in the study because they would have been at work during the call time. Instead, researchers should take an approach that gives each potential respondent an equal opportunity to be included in the survey.

32.     The actual phone calls and implementation of the current survey was handled by Pacific Market Research (PMR), a market research firm in Renton, Washington, under our supervision and direction. This is a highly reputable survey firm that has implemented many surveys for applied, legal and academic research including surveys implementing similar designs as that used here for the purposes of exploring differences in public opinion and voting behavior. Further, Pacific Market Research implemented the surveys we performed for similar voter ID studies in the litigation noted above in Pennsylvania, Wisconsin, and Texas, and the courts in those cases found the survey data to

be reliable and consistent with accepted social science practices.

33.    As discussed above, two sampling approaches were used in this survey. First, PMR implemented a pure RDD approach obtaining an overall sample of 900 eligible voters. Numbers were randomly generated, and then randomly selected phone numbers were dialed. To target Native American eligible voters for the telephone oversample, PMR procured a listed sample of high-density Native American census tracts, and then randomly selected phone numbers to be dialed. An additional sample list, of known cell/wireless-only households, also was used to ensure that residents who do not have a landline telephone were still included in the survey. This step was important, as more and more people are moving toward cell phone usage and cancelling their land-line telephones. Adding a cell-phone sample ensures that the data can speak to all aspects of the population. In all cases, calls were made from 4pm – 9pm local time Monday through Friday, and 12pm – 8pm local time Saturday and Sunday, beginning on July 30, 2015, and continuing until August 31, 2015. Landline numbers were auto-dialed and wireless numbers were manually dialed. If a respondent completed the survey, or refused to participate, that respondent was taken off the call list for future calls. Phone numbers were dialed and re-dialed up to five times in order to avoid any possible non-response bias that may result from only making one or two attempts per number. A full analysis of the data indicates that non-response bias did not present any problems in this study, given that up to five call-back attempts were used, and thus did yield hard-to-reach respondents. Phone numbers were "released" in batches of 100, and dialed until all numbers were exhausted, and then a second batch was made available, and so on.

34.    Overall, Pacific Market Research reported a Response Rate-3 of 23.9 percent and a Cooperation Rate-3 of 37.4 percent, calculated as per the American Association of Public Opinion Research (AAPOR) guidelines[9]. In the field of survey research, response

---

[9]    For more on AAPOR guidelines: http://www.aapor.org/Response_Rates_An_Overview1.htm. The response rate refers to

rates between 20 and 30 percent and considered to be accurate and in an accepted range, and this project falls within that range.[10]

35.    <u>Mail Survey Execution</u>. In addition to the telephone survey, Pacific Market Research implemented an address and post office box sampling procedure to obtain 313 completed surveys via the mail.  Surveys were printed on hard copy and sent to randomly selected addresses, or P.O. boxes in and around Native American reservations between August 13, 2015 and November 30, 2015.  Some address listed samples also included non-reservation addresses for enrolled tribal members. The survey also included a cover letter from the Native American Rights Fund explaining that they had contracted with PMR to implement the survey, and to make clear that the survey was voluntary and that all responses would be kept strictly confidential.  In both the telephone and mail survey, respondents were also provided with a contact name and telephone number at PMR if they had any questions

36.    With respect to the mail survey, Pacific Market Research reported a Response Rate of 5.5 percent.

37.    After collecting the data for the main North Dakota sample, and the Native American oversample, the underlying demographic characteristics of the respective samples were examined and compared to the known universe estimates for each from the 2014 U.S. Census, *American Community Survey* (ACS) for North Dakota.  Where there were any discrepancies, a weighting algorithm was applied to balance the sample, called raking

---

percent of individuals who agreed to take the survey out of the overall number of cases in the sample. In contrast, the cooperation rate refers the percent of individuals who agreed to take the survey out of the overall number of individuals reached by researchers.

[10] Scott Keeter et. al. 2006. "Gauging the Impact of Growing Nonresponse on Estimates from a National RDD Telephone Survey," *Public Opinion Quarterly*. 70(5)

ratio estimation,[11] so that the final samples that were tabulated for the analysis were in line with the U.S. Census estimates for the state.  For example, it is well known in survey research that younger people, say under 25 years old, are harder to reach than older people who are over age 65.  If 8 percent of survey respondents are age 18-24 years old, but census data tells us they are actually 14 percent of the eligible voting population, then each young person needs to be "up-weighted" so that collectively they represent 14 percent of the sample.  Overall, the discrepancies between the collected data and the Census population estimates were quite small and the resulting weights that were employed were also quite small.  Still, by weighting the data to known Census ACS demographics for each group, or for the state at large, we can ensure that the results are reflective of the eligible voting population in North Dakota. This helps to ensure that the sample generated for the report is reflective of the overall population, and consequently, that the inferences made regarding possession rates of accepted ID are reflective of that target population as well.  Weighting of survey data is a very common and accepted approach in social science research when inferences are made to the larger population.[12]

## V.    Under North Dakota's Current Voter ID Laws, Thousands of Native Americans Do Not Possess Qualifying ID, and Therefore Will Not be Able to Vote.

38.    I understand that, as of 2013, North Dakota law requires individuals to produce voter identification when seeking to vote in person on Election Day or as part of in-person early voting. I further understand that if a person fails to produce qualifying ID, they will not receive a ballot and cannot vote. My understanding is that the following

---

[11] Michael Battaglia et. al. 2004. "Tips and Tricks for Raking Survey Data (a.k.a. Sample Balancing)" Proceedings of the Survey Research Methods Section, American Statistical Association.

[12] Eun Sul Lee and Ronald Forthofer. 2006. *Analyzing Complex Survey Data.* Sage Publications.

forms of identification satisfy the new Voter ID law:

- A North Dakota driver's license.

- A North Dakota non-driver ID card issued by North Dakota's DOT.

- A Tribal government-issued ID card.

- A long-term care ID card issued by a North Dakota facility.

To satisfy the law, these forms of identification must be current, and must show the prospective voter's name, current physical address and birthdate.

39.   Among the overall population of eligible voters in North Dakota, a sizeable number of citizens do not currently possess an acceptable form of voter ID. From our survey, we estimate that Native Americans are almost ***twice more likely*** to lack a valid ID than non-Native Americans in North Dakota:

- 23.5 percent of the Native American population that is eligible to vote does not have a valid voter ID.

- 12.0 percent of the non-Native population that is eligible to vote does not have a valid voter ID.

This difference is statistically significant at the 98 percent confidence level in the chi-square test, and at over the 99 percent confidence level in logistic regression.

40.   In terms of raw numbers, approximately 72,501 eligible voters currently do not possess qualifying voter ID in North Dakota. This includes 7,984 Native Americans out of the estimated 33,974 Native Americans eligible to vote in North Dakota as of 2014.

41.   The disparity is also present among North Dakotans who voted in 2012 presidential election:

- 15.4 percent of Native Americans living in North Dakota who indicated they voted in the 2012 presidential election now lack a valid voter ID.

- Only 6.9 percent of non-Native Americans living in North Dakota who indicated they voted in the 2012 presidential election now lack a valid voter ID.

This difference is statistically significant in the chi-square test at the 93 percent confidence level and at 99 percent confidence level in the logistic regression.

42.    The data compel the conclusion that a racial disparity exists in possession rates of qualifying voter ID between Native Americans and non-Native Americans among both eligible voters generally, and also among those who voted in the previous presidential election, with Native American voters significantly less likely to have a qualifying voter ID.

43.    Our survey further found that a lack of accurate information might affect the ability of eligible voters lacking a qualifying voter ID to ever obtain qualifying voter ID:

- 89.3 percent of Native Americans believe they currently do have an acceptable voter ID, even though only 76.5 percent of them actually do have an acceptable voter ID.

- 21.4 percent of Native Americans living in North Dakota are not at all aware of the state's new voter ID law and associated requirements.

- When asked if they have seen or heard any official announcements or advertisements concerning the new voter ID law, just 20.8 percent of Native Americans reported they had seen or heard something. This suggests outreach is anemic.

These results suggest that many potential voters who currently lack a qualifying voter ID will be less likely to even attempt to secure the required ID simply because they believe they are already complying with the law.

## A.    Native Americans Disproportionately Lack the Documents They Need to Obtain Qualifying ID.

44.    Our survey results indicate a large number of eligible individuals do not possess documentary proof of citizenship and documentary proof of identity needed to acquire an accepted form of voter ID. As the table below shows, high percentages of Native Americans who currently lack voter ID do not currently possess the documents they would need to

obtain a qualifying ID (*i.e.,* birth certificate with their current legal name, documents showing residential address, and documents showing social security number). Indeed, based on our survey results, we estimate that ***3,808 Native Americans lack both a valid ID and lack the underlying documents to be able to obtain a valid ID****.*

Percentage of Native Americans who do not have voter ID who do not possess the three types of documents needed to obtain voter ID..............................................................................**47.7%**

Percentage of Native Americans who do not have voter ID who do not possess a birth certificate showing their current legal name .......................................................................**32.9%**

Percentage of Native Americans who do not have voter ID who lack two documents showing their address ......................................**21.6%**

Percentage of Native Americans who do not have voter ID who do not have a social security card or a W2 evidencing their social security number ................................................**5.6%**

Estimated number of Native Americans who do not have voter ID and who lack the documents to obtain voter ID .................................................................................................**3,808**

45.    The percentage of Native Americans who lack the underlying documents and will be unable to obtain a valid voter ID—47.7 percent—is significantly higher in North Dakota than we have observed in other states where it was still a problem. In Texas, 30.4 percent of African Americans who lacked a photo ID also lacked underlying documents and 23.4 percent of Latinos who lacked a photo ID also lacked underlying documents.

## B.    Native Americans Disproportionately Lack the Resources Needed to Obtain Qualifying ID.

46.    For those who lack an acceptable voter ID, some amount of resources are likely needed to obtain a qualifying ID. For example, citizens will need to have the proper information and know-how to navigate bureaucratic systems to obtain copies of birth certificates, naturalization records, social security cards, marriage or divorce certificates,

etc. In addition, they might have to take time off work or school to visit the appropriate state or county office, and find a means of transportation. Under any scenario, eligible voters who lack ID will face some potential burdens in attempting to obtain an accepted ID.

47.    As the figures below demonstrate, Native Americans face greater financial challenges than non-Native Americans in obtaining qualifying voter ID. They make less money, they do not have the same amount of education, they are less likely to own their own home, and they have less access to transportation. The conclusion is stark and straightforward: isolating the population who currently lacks a valid ID, Native Americans are far lower resourced than non-Native Americans in North Dakota.

|  | Native Americans | Non-Native Americans |
|---|---|---|
| Percentage of citizens lacking voter ID who have household incomes under $10,000 | 22.3% | 12.3% |
| Percentage of citizens lacking voter ID who own their own homes | 42.3% | 63.1% |
| Percentage of citizens lacking voter ID who own or lease a car | 73.9% | 88.0% |
| Percentage of citizens lacking voter ID who have not finished High School | 34.5% | 5.7% |
| Percentage of citizens lacking voter ID who graduated from college | 8.7% | 32.9% |

## C.    Native Americans Disproportionately Face Burdens in Trying to Obtain Qualifying ID.

48.    In our survey, we focused on whether those respondents who lacked a valid voter ID would encounter burdens in attempting to obtain qualifying ID. More specifically, we wanted to find out whether eligible voters who lack qualifying ID may face expenses and other burdens in (1) learning where to go to obtain an ID; (2) gathering all necessary

documents to present to the issuing official; (3) obtaining transportation to get to a place where they can get an ID; and (4) taking time to visit an appropriate office during business hours. We asked a battery of questions aimed at assessing whether respondents who lack a valid ID card feel as though they would face increased costs or burdens to obtain an ID. In our empirical analysis, Native American face burdens at a statistically disproportionate rate than do non-Natives.

49. As the table below indicates, we found that Native Americans disproportionately face burdens in knowing where to go to get a qualifying ID, in getting to an office where they can obtain an ID, and in being able to get time off to travel to an office to get an ID.

|  | Native Americans | Non-Native Americans |
|---|---|---|
| Percentage of citizens lacking voter ID who know the location of the nearest DOT office | 64.9% | 85.2% |
| Percentage of citizens lacking voter ID who reported it would be a hardship to have to get a ride get to the nearest DOT office | 29% | 19.3% |
| Percentage of citizens lacking voter ID who reported it would be problem getting off work to go to a DOT office to obtain ID | 44.1% | 26.2% |
| Percentage of citizens lacking voter ID who reported it would be a problem to travel six miles each way to a DOT office to obtain ID | 36.7% | 17.3% |
| Percentage of citizens lacking voter ID who reported it would not be a problem at all to travel six miles each way to a DOT office to obtain ID | 44.4% | 79.0% |
| Percentage of citizens lacking voter ID who reported it would be a definite problem to travel 30 miles each way to a DOT office to obtain ID | 31.3% | 23.1% |

| | | |
|---|---|---|
| Percentage of citizens lacking voter ID who reported it would not be a problem at all to travel 30 miles each way to a DOT office to obtain ID | 34.2% | 50.3% |
| Percentage of citizens lacking voter ID who reported it would be a hardship if they had to rely on public transportation to travel to a DOT office to get ID | 47.3% | 23.1% |

50.    Other potential issues which those who lack a valid ID reported would be a problem include: tracking down or paying for documents such as their original birth certificate, making it to the DOT office if it is only open during normal business hours, such as 8 a.m. to 5 p.m., and finally, the anticipated long lines and wait times at the DOT.

## VI.    Implications for Electoral Outcomes.

51.    The disparate impact of the North Dakota Voter ID law has important implications for electoral outcomes. The implication for those who lack a valid voter ID on Election Day is that they will not be able to vote. Thus, the law has the potential to dilute the vote of certain protected classes of citizens. Our survey findings regarding the political preferences of Native Americans and non-Natives in North Dakota indicates a political environment characterized by racially divergent voting interests.

52.    As set forth in the table below, Native Americans are much more likely to identify as Democrats than non-Native Americans. These differences are statistically significant at greater than 99 percent confidence level in both chi-square tests and regression analysis.

| | Native Americans | Non-Native Americans |
|---|---|---|
| Percentage identifying as Republicans | 17.0% | 33.1% |

| Percentage identifying as Democrats | 37.7% | 16.9% |
|---|---|---|
| Percentage of citizens who voted in the 2012 presidential election who identify as Democrats | 48.8% | 18.9% |

53.   In addition, recent important elections demonstrate considerable differences between the voting patterns of Native Americans and non-Native Americans in North Dakota. The 2012 U.S. Senate contest between Democrat Heidi Heitkamp and Republican Rick Berg provides an example of racially polarized voting in a close election. Heitkamp defeated Berg by less than 3,000 votes—less than 1 percent of all ballots cast. Official election results can be found on the North Dakota Secretary of State website.[13] Looking at the election results by county reveals that Native Americans had different voting preferences than non-Natives. While Heitkamp won 50.2 percent of the statewide vote, she dominated in counties heavily populated by Native Americans:

- In Sioux County, which is more than 80 percent Native American, Heitkamp won 83 percent of the vote.

- In Rolette County, which is 77 percent Native American, Heitkamp won 80 percent of the vote.

- In Benson County, which is majority Native American, she won 67 percent of the vote.

Conversely, Heitkamp did relatively poorly in counties with almost no Native American voters. For example, in Billing County and Golden Valley County, which are both less than 1 percent Native American, Heitkamp won less than 30 percent of the vote.

54.   Going lower to the precinct level further shows the pattern of racially polarized voting. In Sioux County precinct Fort Yates West (a precinct that is more than 90 percent Native American), Heitkamp won 96.3 percent of the vote. Further West in the Selfridge

---

[13]

http://results.sos.nd.gov/resultsCTY.aspx?eid=35&text=Race&type=SW&rid=5002&osn=110&map=CTY

precinct of Sioux County (which is 53 percent Native American), Heitkamp won only 59.7 percent of the vote. This same pattern can be found in Rolette County. The Turtle Mountain Reservation voting precinct, which is more than 90 percent Native American, voted 92.6 percent for Heitkamp, while the Rolla city voting precinct which is just 48 percent Native American voted 59.2 percent for Heitkamp.

55.    These same patterns of racially polarized voting are also apparent in North Dakota state legislative elections. For example, legislative district 31 overlaps with the Standing Rock Reservation and Sioux County.[14] In 2014, Republican Donald Schaible defeated Democrat Kristen Vesledahl districtwide. But Vesledahl prevailed in the most heavily Native American precincts. In the two Fort Yates precincts of Sioux County, Vesledahl won more than 80 percent of the vote. However, in Hettinger County, in the Mott precinct (which is less than two percent Native American), Vesledahl won just 9.6 percent of the vote. There are dozens and dozens of similar election result patterns that show a very high degree of correlation between the race and ethnicity of the voters within a precinct and their candidates of choice. Across almost any election in North Dakota, it is clear that Native American and non-Native American voters have different candidate preferences which amount to racially polarized voting.

56.    The question here is just simply whether Native Americans—who are less likely to possess a valid photo ID—have different voting preferences than Non-Native Americans, or Whites. The reason for their preferences are not relevant. In *Teague v. Attala County*, 92 F.3d 283, 285 (5th Cir. 1996), the court held that the plaintiffs did not have to disprove other factors other than race affected voting patterns. The court just focused on the results of elections and evidence showing that Blacks and Whites had substantially different voting patterns was enough to meet the *Gingles* standards. That is, other factors can be associated

---

[14]

http://results.sos.nd.gov/resultsCTY.aspx?eid=126&text=Race&type=LG&rid=8016&osn=200&map=DIST

with voting, but the only standard is whether different racial groups are voting differently. This ideal is based in the key opinion by Justice Brennan in *Thornburg v. Gingles*, 478 U.S. 30, 44-45 (1986). Specifically, Justice Brennan wrote "it is the difference between the choices made by black and white voters and not the reason for the difference that leads to blacks having less opportunity to elect their candidates of choice." Justice Brennan advanced his evidentiary standard regarding racially polarized voting by repudiating certain arguments made by the state of North Carolina (and the United States as amicus). The state argued that statistical evidence must demonstrate not only that there is a correlation between the race of the voters and their choice of candidates, but also that race (as opposed to other factors such as socioeconomic status or party affiliation) is the principal reason for the voters' selections. According to the plurality, however, the proper inquiry under Section 2 is to ask whether voters of different race favor different candidates, not why they do so. Exploring the reasons for the relationship between race and votes cast interjects intent into the analysis, and "the legal concept of racially polarized voting incorporates neither causation nor intent," according to Justice Brennan (p. 62).

## VII.  Conclusion.

57.   Through a statewide survey of eligible voters across North Dakota Dr. Gabriel Sanchez and I have found clear racial disparities in possession of an acceptable voter ID between Native Americans and non-Native Americans. Native American eligible voters are statistically less likely to possess a valid ID. Furthermore, we have found that a large percentage of Native Americans who lack qualifying voter ID also lack the necessary underlying documents needed to obtain such an ID. Due to considerable resources deficits, Native Americans who lack a valid ID will face numerous barriers and burdens if they want to vote and try to obtain an ID. Finally, Native Americans have different political and partisan preferences than non-Natives in North Dakota and if Native Americans are disproportionately excluded from voting their vote will be diluted.

Executed on June 19, 2016 at Agoura Hills, CA.


I declare under penalty of perjury that the foregoing is true and correct.


_____

Matthew A. Barreto

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2016, the document titled "**Declaration of Matthew A. Barreto, Ph.D.**" was electronically filed with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing ("NEF") to:

Christopher S. Joseph
Assistant Attorney General
State Bar ID No. 07450
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
Email csjoseph@nd.gov

DATED:  June 20, 2016


By:  _/s Matthew Campbell_____
        Matthew Campbell

Matthew Campbell, NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
**NATIVE AMERICAN RIGHTS FUND**
1506 Broadway
Boulder, Colorado 80302
Phone: (303) 447-8760
Fax: (303) 443-7776

# EXHIBIT A

# MATT A. BARRETO – BARRETOM@UCLA.EDU
## DEPT OF POLITICAL SCIENCE, 3284 BUNCHE HALL, LOS ANGELES CA 90095 / 909.489.2955

| | |
|---|---|
| **EMPLOYMENT**: | **Professor**, Political Science, University of California Los Angeles (2015 – present) |
| | **Professor,** Chicana/o Studies, University of California Los Angeles (2015 – present) |
| | |
| | Dept. Political Science, University of Washington |
| | **Professor** (2014 – 2015) |
| | **Associate Professor** (2009 – 2014) |
| | **Assistant Professor** (2005 – 2009) |
| | **Director,** Washington Institute for the Study of Ethnicity and Race |
| | **Director,** Center for Democracy and Voting Rights, UW School of Law |
| | |
| | Affiliated Research Centers |
| | |
| | Chicano Studies Research Center (CSRC) |
| | University of California, Los Angeles |
| | |
| | Politics of Race, Immigration, and Ethnicity Consortium (PRIEC) |
| | University of California, Riverside |
| | |
| | Center for the Study of Los Angeles (CSLA) |
| | Loyola Marymount University |
| | |
| **PERSONAL:** | Born: June 6, 1976 |
| | San Juan, Puerto Rico |
| | |
| | High School: 1994, Washburn Rural HS, Topeka, KS |
| | |
| **EDUCATION:** | **Ph.D., Political Science, June 2005** |
| | University of California – Irvine |
| | Sub Fields: American Politics / Race, Ethnicity and Politics / Methodology |
| | Thesis: <u>Ethnic Cues: The Role of Shared Ethnicity in Latino Political Participation</u> |
| | Thesis Committee: Bernard Grofman (chair), Louis DeSipio, Katherine Tate, Carole Uhlaner |
| | Thesis Awards: *Ford Foundation Dissertation Fellowship for Minorities, 04-05* |
| | *University of California President's Dissertation Fellowship, 04-05* |
| | *University of California Institute for Mexico & the U.S. Dissertation Grant, 04-05* |
| | |
| | **Master of Science, Social Science, March 2003** |
| | University of California – Irvine |
| | |
| | **Bachelor of Science, Political Science, May 1998** |
| | Eastern New Mexico University, Portales, NM |
| | Minor: English.  Cumulative GPA: 3.9, *Summa Cum Laude* |

M.A. Barreto / UCLA / Curriculum Vitae / Feb 2016

## PUBLICATION RECORD

Google Scholar citation indices:    Cites: 1,706    h-index: 21    i10-index: 32    Years post-PhD: 11    Cites/year: 155

### BOOK MANUSCRIPTS:

Barreto, Matt and Gary Segura. 2014. Latino America: How America's Most Dynamic Population is Poised to Transform the Politics of the Nation. Public Affairs Books. (Sept)

Barreto, Matt and David Leal, editors. 2015. Race, Class, and Precinct Quality in American Cities. Springer Press.

Christopher Parker and Matt Barreto. 2013. Change They Can't Believe In: The Tea Party and Reactionary Politics in America. Princeton University Press. *Winner: APSA Best Book Award for Race, Ethnicity, Politics, 2014*

Barreto, Matt. 2010. Ethnic Cues: The Role of Shared Ethnicity in Latino Political Participation. University of Michigan Press

### PEER-REVIEWED ARTICLES

49. Barreto, Matt, Collingwood, Loren, Christopher Parker, and Francisco Pedraza. 2015. "Racial Attitudes and Race of Interviewer Item Non-Response." *Survey Practice*. 8:3.

48. Barreto, Matt and Gary Segura 2015. "Obama y la seducción del voto Latino." *Foreign Affairs Latinoamérica*. 15:2 (Jul).

47. Barreto, Matt and Loren Collingwood 2015. "Group-based appeals and the Latino vote in 2012: How immigration became a mobilizing issue." *Electoral Studies*. 37 (Mar).

46. Collingwood, Loren, Matt Barreto and Sergio García-Ríos. 2014. "Revisiting Latino Voting: Cross-Racial Mobilization in the 2012 Election" *Political Research Quarterly*. 67:4 (Sep).

45. Bergman, Elizabeth, Gary Segura and Matt Barreto. 2014. "Immigration Politics and Electoral Consequences: Anticipating the Dynamics of Latino Vote in the 2014 Election" *California Journal of Politics and Policy*. (Feb)

44. Barreto, Matt and Sergio García-Ríos. 2012. "El poder del voto latino en Estados Unidos en 2012" *Foreign Affairs Latinoamérica*. 12:4 (Nov).

43. Collingwood, Loren, Matt Barreto and Todd Donovan. 2012. "Early Primaries, Viability and Changing Preferences for Presidential Candidates." *Presidential Studies Quarterly*. 42:1(Mar).

42. Barreto, Matt, Betsy Cooper, Ben Gonzalez, Chris Towler, and Christopher Parker. 2012. "The Tea Party in the Age of Obama: Mainstream Conservatism or Out-Group Anxiety?." *Political Power and Social Theory*. 22:1(Jan).

41. Dana, Karam, Matt Barreto and Kassra Oskoii. 2011. "Mosques as American Institutions: Mosque Attendance, Religiosity and Integration into the American Political System." *Religions*. 2:2 (Sept).

40. Barreto, Matt, Christian Grose and Ana Henderson. 2011. "Redistricting: Coalition Districts and the Voting Rights Act." *Warren Institute on Law and Social Policy*. (May)

39. Barreto, Matt and Stephen Nuño. 2011. "The Effectiveness of Co-Ethnic Contact on Latino Political Recruitment." *Political Research Quarterly*. 64 (June). 448-459.

38. Garcia-Castañon, Marcela, Allison Rank and Matt Barreto. 2011 "Plugged in or tuned out? Youth, Race, and Internet Usage in the 2008 Election." *Journal of Political Marketing*. 10:2 115-138.

37. Barreto, Matt, Victoria DeFrancesco, and Jennifer Merolla. 2011 "Multiple Dimensions of Mobilization: The Impact of Direct Contact and Political Ads on Latino Turnout in the 2000 Presidential Election." *Journal of Political Marketing*. 10:1

36. Barreto, Matt, Loren Collingwood, and Sylvia Manzano. 2010. "Measuring Latino Political Influence in National Elections" *Political Research Quarterly*. 63:4 (Dec)

35. Barreto, Matt, and Francisco Pedraza. 2009. "The Renewal and Persistence of Group Identification in American Politics." *Electoral Studies*. 28 (Dec) 595-605

34. Barreto, Matt and Dino Bozonelos. 2009. "Democrat, Republican, or None of the Above? Religiosity and the Partisan Identification of Muslim Americans" *Politics & Religion* 2 (Aug). 1-31

33. Barreto, Matt, Sylvia Manzano, Ricardo Ramírez and Kathy Rim. 2009. "Immigrant Social Movement Participation: Understanding Involvement in the 2006 Immigration Protest Rallies." *Urban Affairs Review*. 44: (5) 736-764

32. Grofman, Bernard and Matt Barreto. 2009. "A Reply to Zax's (2002) Critique of Grofman and Migalski (1988): Double Equation Approaches to Ecological Inferences." *Sociological Methods and Research*. 37 (May)

31. Barreto, Matt, Stephen Nuño and Gabriel Sanchez. 2009. "The Disproportionate Impact of Voter-ID Requirements on the Electorate – New Evidence from Indiana." *PS: Political Science & Politics*. 42 (Jan)

30. Barreto, Matt, Luis Fraga, Sylvia Manzano, Valerie Martinez-Ebers, and Gary Segura. 2008. "Should they dance with the one who brung 'em? Latinos and the 2008 Presidential election" *PS: Political Science & Politics*. 41 (Oct).

29. Barreto, Matt, Mara Marks and Nathan Woods. 2008. "Are All Precincts Created Equal? The Prevalence of Low- Quality Precincts in Low-Income and Minority Communities." *Political Research Quarterly*. 62

28. Barreto, Matt. 2007. "*Sí Se Puede!* Latino Candidates and the Mobilization of Latino Voters." *American Political Science Review*. 101 (August): 425-441.

27. Barreto, Matt and David Leal. 2007. "Latinos, Military Service, and Support for Bush and Kerry in 2004." *American Politics Research*. 35 (March): 224-251.

26. Barreto, Matt, Mara Marks and Nathan Woods. 2007. "Homeownership: Southern California's New Political Fault Line?" *Urban Affairs Review*. 42 (January). 315-341.

25. Barreto, Matt, Matt Streb, Fernando Guerra, and Mara Marks. 2006. "Do Absentee Voters Differ From Polling Place Voters? New Evidence From California." *Public Opinion Quarterly*. 70 (Summer): 224-34.

24. Barreto, Matt, Fernando Guerra, Mara Marks, Stephen Nuño, and Nathan Woods. 2006. "Controversies in Exit Polling: Implementing a racially stratified homogenous precinct approach." *PS: Political Science & Politics*. 39 (July) 477-83.

23. Barreto, Matt, Ricardo Ramírez, and Nathan Woods. 2005. "Are Naturalized Voters Driving the California Latino Electorate? Measuring the Impact of IRCA Citizens on Latino Voting." *Social Science Quarterly*. 86 (December): 792-811.

22. Barreto, Matt. 2005. "Latino Immigrants at the Polls: Foreign-born Voter Turnout in the 2002 Election." *Political Research Quarterly*. 58 (March): 79-86.

21. Barreto, Matt, Mario Villarreal and Nathan Woods. 2005. "Metropolitan Latino Political Behavior: Turnout and Candidate Preference in Los Angeles." *Journal of Urban Affairs*. 27(February): 71-91.

20. Leal, David, Matt Barreto, Jongho Lee and Rodolfo de la Garza. 2005. "The Latino Vote in the 2004 Election." *PS: Political Science & Politics*. 38 (January): 41-49.

19. Marks, Mara, Matt Barreto and Nathan Woods. 2004. "Harmony and Bliss in LA? Race and Racial Attitudes a Decade After the 1992 Riots." *Urban Affairs Review*. 40 (September): 3-18.

18. Barreto, Matt, Gary Segura and Nathan Woods. 2004. "The Effects of Overlapping Majority-Minority Districts on Latino Turnout." *American Political Science Review*. 98 (February): 65-75.

17. Barreto, Matt and Ricardo Ramírez. 2004.  "Minority Participation and the California Recall: Latino, Black, and Asian Voting Trends 1990 – 2003." *PS: Political Science & Politics.* 37 (January): 11-14.

16. Barreto, Matt and José Muñoz.  2003. "Reexamining the 'politics of in-between': political participation among Mexican immigrants in the United States." *Hispanic Journal of Behavioral Sciences.* 25 (November): 427-447.

15. Barreto, Matt. 2003. "National Origin (Mis)Identification Among Latinos in the 2000 Census:  The Growth of the  "Other Hispanic or Latino" Category."  *Harvard Journal of Hispanic Policy.* 15 (June): 39-63.

*Edited Volume Book Chapters*

14. Barreto, Matt and Christopher Parker. 2015. "Public Opinion and Reactionary Movements: From the Klan to the Tea Party" In Adam Berinsky (ed.) New Directions in Public Opinion. 2nd edition. New York: Routledge Press.

13. Barreto, Matt and Gabriel Sanchez. 2014. "A 'Southern Exception' in Black-Latino Attitudes?." In Anthony Affigne, Evelyn Hu-Dehart, Marion Orr (eds.) Latino Politics en Ciencia Política. New York: New York University Press.

12. Barreto, Matt, Ben Gonzalez, and Gabriel Sanchez. 2014. "Rainbow Coalition in the Golden State? Exposing Myths, Uncovering New Realities in Latino Attitudes Towards Blacks." In Josh Kun and Laura Pulido (eds.) Black and Brown in Los Angeles: Beyond Conflict and Coalition. Berkeley, CA: University of California Press.

11. Barreto, Matt, Loren Collingwood, Ben Gonzalez, and Christopher Parker. 2011. "Tea Party Politics in a Blue State: Dino Rossi and the 2010 Washington Senate Election" In William Miller and Jeremy Walling (eds.) Stuck in the Middle to Lose: Tea Party Effects on 2010 U.S. Senate Elections. Rowman & Littlefield Publishing Group.

10. Jason Morin, Gabriel Sanchez and Matt Barreto. 2011. "Perceptions of Competition Between Latinos and Blacks: The Development of a Relative Measure of Inter-Group Competition." In Edward Telles, Gaspar Rivera-Salgado and Mark Sawyer (eds.) Just Neighbors? Research on African American and Latino Relations in the US. New York: Russell Sage Foundation.

9. Grofman, Bernard, Frank Wayman and Matt Barreto. 2009. "Rethinking partisanship: Some thoughts on a unified theory." In John Bartle and Paolo Bellucci (eds.) Political Parties and Partisanship: Social identity and individual attitudes. New York: Routledge Press.

8. Barreto, Matt, Ricardo Ramírez, Luis Fraga and Fernando Guerra. 2009. "Why California Matters: How California Latinos Influence the Presidential Election." In Rodolfo de la Garza, Louis DeSipio and David Leal (eds.) Beyond the Barrio: Latinos in the 2004 Elections. South Bend, ID: University of Notre Dame Press..

7. Francisco Pedraza and Matt Barreto. 2008. "Exit Polls and Ethnic Diversity: How to Improve Estimates and Reduce Bias Among Minority Voters." In Wendy Alvey and Fritz Scheuren (eds.) Elections and Exit Polling. Hoboken, NJ: Wiley and Sons, Inc..

6. Adrian Pantoja, Matt Barreto and Richard Anderson. 2008. "Politics y la Iglesia: Attitudes Toward the Role of Religion in Politics Among Latino Catholics" In Michael Genovese, Kristin Hayer and Mark J. Rozell (eds.) Catholics and Politics. Washington, D.C: Georgetown University Press..

5. Barreto, Matt. 2007. "The Role of Latino Candidates in Mobilizing Latino Voters: Revisiting Latino Vote Choice." In Rodolfo Espino, David Leal and Kenneth Meier (eds.) Latino Politics: Identity, Mobilization, and Representation. Charlottesville: University of Virginia Press.

4. Abosch, Yishaiya, Matt Barreto and Nathan Woods. 2007. "An Assessment of Racially Polarized Voting For and Against Latinos Candidates in California." In Ana Henderson (ed.) Voting Rights Act Reauthorization of 2006: Perspectives on Democracy, Participation, and Power:. Berkeley, CA: UC Berkeley Public Policy Press.

3. Barreto, Matt and Ricardo Ramírez. 2005. "The Race Card and California Politics: Minority Voters and Racial Cues in the 2003 Recall Election." In Shaun Bowler and Bruce Cain (eds.) Clicker Politics: Essays on the California Recall. Englewood-Cliffs: Prentice-Hall.

2. Barreto, Matt and Nathan Woods. 2005. "The Anti-Latino Political Context and its Impact on GOP Detachment and Increasing Latino Voter Turnout in Los Angeles County." In Gary Segura and Shawn Bowler (eds.) Diversity in Democracy: Minority Representation in the United States. Charlottesville: University of Virginia Press.

1. Pachon, Harry, Matt Barreto and Frances Marquez. 2004. "Latino Politics Comes of Age in the Golden State." In Rodolfo de la Garza and Louis DeSipio (eds.) Muted Voices: Latino Politics in the 2000 Election. New York: Rowman & Littlefield

M.A. BARRETO / UCLA / CURRICULUM VITAE / Feb 2016

### *RESEARCH AWARDS AND FELLOWSHIPS*

| July 2013 | Ford Foundation<br>Center for Democracy and Voting Rights | *$200,000 – 12 months* |
|---|---|---|
| April 2012 | American Values Institute [With Ben Gonzalez]<br>Racial Narratives and Public Response to Racialized Moments | *$40,000 – 3 months* |
| Jan 2012 | American Civil Liberties Union Foundation [With Gabriel Sanchez]<br>Voter Identification Laws in Wisconsin | *$60,000 – 6 months* |
| June 2011 | State of California Citizens Redistricting Commission<br>An Analysis of Racial Bloc Voting in California Elections | *$60,000 – 3 months* |
| Apr 2011 | Social Science Research Council (SSRC) [With Karam Dana]<br>Muslim and American? A national conference on the political and social<br>incorporation of American Muslims | *$50,000 – 18 months* |
| Jan 2011 | impreMedia [With Gary Segura]<br>Latino public opinion tracking poll of voter attitudes in 2011 | *$30,000 – 6 months* |
| Oct 2010 | National Council of La Raza (NCLR) [With Gary Segura]<br>Measuring Latino Influence in the 2010 Elections | *$128,000 – 6 months* |
| Oct 2010 | We Are America Alliance (WAAA) [With Gary Segura]<br>Latino and Asian American Immigrant Community Voter Study | *$79,000 – 3 months* |
| May 2010 | National Council of La Raza (NCLR) [With Gary Segura]<br>A Study of Latino Views Towards Arizona SB1070 | *$25,000 – 3 months* |
| Apr 2010 | Social Science Research Council (SSRC) [With Karam Dana]<br>Muslim and American? The influence of religiosity in Muslim political incorporation | *$50,000 – 18 months* |
| Oct 2009 | American Association of Retired Persons (AARP) [With Gary Segura]<br>Health care reform and Latino public opinion | *$25,000 – 3 months* |
| Nov 2008 | impreMedia & National Association of Latino Elected Officials (NALEO)<br>[With Gary Segura] 2008 National Latino Post-Election Survey, Presidential Election | *$46,000 – 3 months* |
| July 2008 | National Association of Latino Elected Officials (NALEO) [With Gary Segura]<br>Latino voter outreach survey – an evaluation of Obama and McCain | *$72,000 – 3 months* |
| June 2008 | The Pew Charitable Trusts, Make Voting Work Project<br>[with Karin MacDonald and Bonnie Glaser] Evaluating Online Voter Registration<br>(OVR) Systems in Arizona and Washington | *$220,000 – 10 months* |
| April 2008 | National Association of Latino Elected Officials (NALEO) &<br>National Council of La Raza (NCLR), 2008 Latino voter messaging survey | *$95,000 – 6 months* |
| Dec. 2007 | Research Royalty Fund, University of Washington<br>2008 Latino national post-election survey | *$39,000 – 12 months* |
| Oct. 2007 | Brenan Center for Justice, New York University<br>[with Stephen Nuño and Gabriel Sanchez]  Indiana Voter Identification Study | *$40,000 – 6 months* |
| June 2007 | National Science Foundation, Political Science Division [with Gary Segura]<br>American National Election Study – Spanish translation and Latino oversample | *$750,000 – 24 months* |

**M.A. Barreto / UCLA / Curriculum Vitae / Feb 2016**

*RESEARCH GRANTS AND FELLOWSHIPS CONTINUED…*

| | | |
|---|---|---|
| Oct. 2006 | University of Washington, Vice Provost for Undergraduate Education<br>Absentee voter study during the November 2006 election in King County, WA | *$12,000 – 6 months* |
| Mar. 2006 | Latino Policy Coalition Public Opinion Research Grant [with Gary Segura]<br>Awarded to the Washington Institute for the Study of Ethnicity and Race | *$40,000 – 18 months* |
| 2005 – 2006 | University of Washington, Institute for Ethnic Studies, Research Grant | *$8,000 – 12 months* |
| Mar. 2005 | Thomas and Dorothy Leavey Foundation Grant [with Fernando Guerra]<br>Conduct Exit Poll during Los Angeles Mayoral Election, Mar. 8 & May 17, 2005<br>Awarded to the Center for the Study of Los Angeles | *$30,000 – 6 months* |
| 2004 – 2005 | Ford Foundation Dissertation Fellowship for Minorities | *$21,000 – 12 months* |
| 2004 – 2005 | University of California President's Dissertation Fellowship | *$14,700 – 9 months* |
| 2004 – 2005 | University of California Mexico-US (UC MEXUS) Dissertation Grant | *$12,000 – 9 months* |
| Apr – 2004 | UC Regents pre-dissertation fellowship, University of California, Irvine, | *$4,700 – 3 months* |
| 2003 – 2004 | Thomas and Dorothy Leavey Foundation Grant [with Fernando Guerra]<br>Awarded to the Center for the Study of Los Angeles | *$20,000 – 12 months* |
| 2002 – 2003 | Ford Foundation Grant on Institutional Inequality [with Harry Pachon]<br>Conducted longitudinal study of Prop 209 on Latino and Black college admittance<br>Awarded to Tomás Rivera Policy Institute | *$150,000 – 12 months* |
| 2002 – 2003 | Haynes Foundation Grant on Economic Development [with Louis Tornatzky]<br>Knowledge Economy in the Inland Empire region of Southern California<br>Awarded to Tomás Rivera Policy Institute | *$150,000 – 18 months* |
| 2001 – 2002 | William F Podlich Graduate Fellowship, Center for the Study of Democracy,<br>University of California, Irvine | *$24,000 – 9 months* |

**M.A. Barreto / UCLA / Curriculum Vitae / Feb 2016**

### _ARTICLES UNDER REVIEW/WORKING PAPERS_:

Garcia-Rios, Sergio and Matt A. Barreto. "Politicized Immigrant Identity, Spanish Language Media and Immigrant Political Mobilization in 2012." Revise and Resubmit.

Barreto, Matt, Natalie Masuoka and Gabe Sanchez. "Religiosity, Discrimination and Group Identity Among Muslim Americans" Revise and Resubmit

Dana, Karam, Matt Barreto and Bryan Wilcox-Archuleta. "Religiosity and Muslim American Political Incorporation" [Under review]

Barreto, Matt, Stephen Nuño, and Gabriel Sanchez, Hannah Walker. "Race, Class and Barriers to Voting in the 21st Century: The Unequal Impact of Voter ID Laws." [Under review]

Barreto, Matt Karam Dana, and Kassra Oskooii. "No Sharia, No Mosque: Orientalist Notions of Islam and Intolerance Toward Muslims in the United States" [Under review]

Barreto, Matt, David Redlawsk and Caroline Tolbert. "Framing Barack Obama: Muslim, Christian or Black?" [ Under review ]

Barreto, Matt and Adrian Pantoja. "Politics and Religion in the Schoolhouse: Latino religiosity and attitudes towards education policies." [ Under review ]

Barreto, Matt and Gabe Sanchez. "Latinos, Blacks, and Black Latinos: Competition, Cooperation, or Indifference?" [ Under review ]

**M.A. BARRETO / UCLA / CURRICULUM VITAE / Feb 2016**

### _CONSULTING EXPERT_:

- Texas, 2014, Testifying Expert for Plaintiffs in Texas voter ID lawsuit, Veasey v. Perry 2:13-cv-00193
- Galveston County, TX Redistricting, 2013, Expert report for Dunn & Brazil, LLC, Demographic analysis, vote dilution analysis, and racially polarized voting analysis for Section 2 lawsuit Galveston County JP/Constable districting
- Pasadena, TX Redistricting, 2013, Expert report for Dunn & Brazil, LLC, Demographic analysis, voter registration analysis, and racially polarized voting analysis for Section 2 lawsuit within Pasadena School District
- Harris County, TX Redistricting, 2011, Testifying Expert for Dunn & Brazil, LLC, Demographic analysis, voter registration analysis, and racially polarized voting analysis for Section 2 lawsuit within Harris County
- Pennsylvania, 2012, Testifying Expert for ACLU Foundation of Pennsylvania in voter ID lawsuit, Applewhite v. Commonwealth of Pennsylvania No. 330 MD 2012
- Milwaukee County, WI, 2012, Testifying Expert for ACLU Foundation of Wisconsin in voter ID lawsuit, Frank v. Walker 2:11-cv-01128(LA)
- Orange County, FL, 2012, Consulting Expert for Latino Justice/PRLDEF, Racially polarized voting analysis in Orange County, Florida
- Anaheim, CA, 2012, Consulting Expert for Goldstein, Demchak & Baller Legal, Racially polarized voting analysis for CVRA redistricting case Anaheim, CA
- Los Angeles County, CA, 2011, Consulting Expert for Goldstein, Demchak & Baller Legal, Racially polarized voting analysis for three redistricting cases in L.A.: Cerritos Community College Board; ABC Unified Schools; City of West Covina
- Harris County, TX Redistricting, 2011, Consulting Expert for Dunn & Brazil, LLC, Demographic analysis, voter registration analysis, for Section 5 objection within Harris County
- Monterey County, CA Redistricting, 2011, Consulting Expert for City of Salinas, Demographic analysis, creation of alternative maps, and racially polarized Voting analysis within Monterey County
- Los Angeles County Redistricting Commission, 2011, Consulting Expert for Supervisor Gloria Molina, Racially Polarized voting analysis within L.A. County
- State of California, Citizens Redistricting Commission, 2011, Consulting Expert, Racially polarized Voting analysis throughout state of California
- Asian Pacific American Legal Center, 2011, Racially Polarized Voting analysis of Asian American candidates in Los Angeles for APALC redistricting brief
- Lawyers' Committee for Civil Rights and Arnold & Porter, LLP, 2010-12, Racially Polarized Voting analysis of Latino and Asian candidates in San Mateo County, concerning San Mateo County Board of Supervisors
- ACLU of Washington, 2010-11, preliminary analysis of Latino population patterns in Yakima, Washington, to assess ability to draw majority Latino council districts
- State of Washington, 2010-11, provided expert analysis and research for _State of Washington v. MacLean_ in case regarding election misconduct and voting patterns
- Los Angeles County Chicano Employees Association, 2008-10, Racially Polarized Voting analysis of Latino candidates in L.A. County for VRA case, concerning L.A. County Board of Supervisors redistricting (6 reports issued 08-10)
- Brennan Center for Justice and Fried, Frank, Harris, Shriver & Jacobson LLP, 2009-10 Amicus Brief submitted to Indiana Supreme Court, _League of Women Voters v. Rokita_, regarding access to voter identification among minority and lower resource citizens
- State of New Mexico, consulting expert for state in _AAPD v. New Mexico_, 2008,
- District of Columbia Public Schools (DCPS), statistical consultant for survey methodology of opinion survey of parents in DCPS district (for pending suit), 2008,
- Brennan Center for Justice, 2007-08, Amicus Brief submitted to U.S. Supreme Court, and cited in Supreme Court decision, _Crawford v. Marion County_, regarding access to voter identification among minority and lower-resource citizens
- Los Angeles County Chicano Employees Association, 2002-07, Racially Polarized Voting analysis of Latino candidates in L.A. County for VRA case, concerning L.A. County Board of Supervisors redistricting (12 + reports issued during 5 years)
- Monterrey County School Board, 2007, demographic and population analysis for VRA case
- Sweetwater Union School District, 2007-08, Racially Polarized Voting analysis, and demographic and population analysis for VRA case
- Mexican American Legal Defense Fund, 2007-08, Racially Polarized Voting analysis for Latino candidates, for City of Whittier city council races, for VRA case
- ACLU of Washington, 2008, preliminary analysis of voting patterns in Eastern Washington, related to electability of Latino candidates
- Nielsen Media Research, 2005-08, with Willie C. Velasquez Institute, assessed the methodology of Latino household recruitment in Nielsen sample

M.A. BARRETO / UCLA / CURRICULUM VITAE / Feb 2016

| | | |
|---|---|---|
| ***TEACHING EXPERIENCE:*** | UCLA & UW | 2005 – Present |

- Minority Political Behavior (Grad Seminar)
- Politics of Immigration in the U.S. (Grad Seminar)
- Introduction to Empirical/Regression Analysis (Grad Seminar)
- Advanced Empirical/Regression Analysis (Grad Seminar)
- Political Participation & Elections (Grad Seminar)
- The Voting Rights Act (Law School seminar)
- Research methodology II  (Law School Ph.D. program seminar)
- U.S. Latino Politics
- Racial and Ethnic Politics in the U.S.
- Politics of Immigration in the U.S.
- Introduction to American Government
- Public Opinion Research
- Campaigns and Elections in the U.S.
- Presidential Primary Elections

**Teaching Assistant**
University of California, Irvine                                    2002 – 2005

- Intro to American Politics (K. Tate)
- Intro to Minority Politics (L. DeSipio)
  **Recognized as Outstanding Teaching Assistant, Winter 2002**
- Statistics and Research Methods (B. Grofman)
  **Recognized as Outstanding Teaching Assistant, Winter 2003**

| | | |
|---|---|---|
| ***BOARD & RESEARCH APPOINTMENTS*** | **Founding Partner**<br>Latino Decisions | 2007 – Present |

**Senior Research Fellow**
Center for the Study of Los Angeles, Loyola Marymount University        2002 – Present

**Board of Advisors**
American National Election Study, University of Michigan        2010 – Present

**Research Advisor**
American Values Institute / Perception Institute        2009 – Present

**Advisory Board**
States of Change: Demographics & Democracy Project        2014 – Present
*CAP, AEI, Brookings Collaborative Project*

**Expert Consultant**
State of California, Citizens Redistricting Committee        2011 – 2012

**Senior Scholar & Advisory Council**
Latino Policy Coalition, San Francisco, CA        2006 – 2008

**Board of Directors**
CASA Latina, Seattle, WA        2006 – 2009

**Faculty Research Scholar**
Tomás Rivera Policy Institute, University of Southern California        1999 – 2009

**M.A. BARRETO / UCLA / CURRICULUM VITAE / Feb 2016**

_**PHD STUDENTS**_        UCLA & UW

**Committee Chair or Co-Chair**
- Francisco I. Pedraza – Texas A&M University (UW Ph.D. 2008)
- Loren Collingwood – University of California, Riverside (UW Ph.D. 2012)
- Betsy Cooper – Public Religion Research Institute, Washington DC (UW Ph.D. 2014)
- Sergio I. Garcia-Rios – Cornell University (UW Ph.D. 2015)
- Hannah Walker – Rutgers University (UW Ph.D. 2016)
- Kassra Oskooii – _in progress_ (UW ABD)
- Angela Ocampo – _in progress_ (UCLA ABD)
- Ayobami Laniyonu – _in progress_ (UCLA ABD)

**Committee Member**
- Raynee Gutting – Loyola Marymount University (Stony Brook Ph.D. 2015)
- Christopher Towler – Western Washington University (UW Ph.D. 2014)
- Benjamin F. Gonzalez – Highland College (UW Ph.D. 2014)
- Marcela Garcia-Castañon – San Francisco State University (UW Ph.D. 2013)
- Justin Reedy (Communications) – University of Oklahoma (UW Ph.D. 2012)
- Dino Bozonelos – Cal State San Marcos (UC Riverside Ph.D. 2012)
- Brandon Bosch – University of Nebraska (UW Ph.D. 2012)
- Karam Dana (Middle East Studies) – UW Bothell (UW Ph.D. 2010)
- Jessica Stewart – _in progress_ (UCLA ABD)
- Jonathan Collins – _in progress_ (UCLA ABD)
- Patrick Rock (Social Psychology) – _in progress_ (UCLA ABD)
- Nazita Lajevardi – _in progress_ (UC San Diego ABD)
- Kiku Huckle – _in progress_ (UW ABD)

# EXHIBIT B

**North Dakota voter identification study / NARF**

## MODE = TELEPHONE SURVEY

S0. Type of Sample

RDD / Landline……1
RDD / Wireless……2
Household Listed…… 3

S1.    [IF LISTED] Hello, may I please speak with Mr./Ms.  [INPUT THE NAME OF RESPONDENT]?

RESPONDENT AVAILABLE … CONTINUE  … 1
RESPONDENT IS NOT AVAILABLE … CALL-BACK SCHEDULED … 2
**DON'T KNOW/NO OPINION (DK)/ REFUSED TO ANSWER (RF)** … TERMINATE … 9

Hello, my name is _____.  This is not a sales call. I am calling on behalf of Pacific Market Research, as part of a non-partisan, university research project.  We are conducting a short public opinion survey about important issues in the state of North Dakota.

S2.    Okay, just to make sure you are eligible to take part in our survey about voting, can you confirm that you are 18 or over, and currently a U.S. citizen, and have lived here in North Dakota for more than 30 days?

Yes........................................................................................ 1
No – not eligible………..TERMINATE ........................... 2
Don't Know / Refused….TERMINATE........................ 99

S3.    In talking to people about voting, we often find that many people are not on the current voting list because they have not voted in a recent election.  How about you? Would the official voter records at the Secretary of State's office indicate that you are listed on the current central voter file, or not?

Yes........................................................................................ 1
No........................................................................................ 2
Don't Know / Refused....................................................... 99

S4.    We want to make sure we get a correct and accurate sample of all people here in North Dakota.  Do you consider any part of your family ancestry to be Native American or American Indian?

Yes........................................................................................ 1
No........................................................................................ 2
Don't Know / Refused....................................................... 99

S5.    Okay, and what do you consider your race or ethnicity to be? [ALLOW MULTIPLE RESPONSES, RECORD ORDER]

White / Anglo … …  1
Native American / American Indian…….2
Black / African American…… 3
Hispanic / Latino…… 4
Asian American…… 5
Other [SPECIFY]…… 6
Don't know…88
Refused…… 99

**Note to interviewer** – possible specific tribe names include: Mandan Hidatsa, Arikara, Yanktonia, Sisseton, Wahpeton, Oyate, Hunkpapa, Dakotah, Nakotah, Lakotah, Sioux, Pembina Chippewa, Cree, Metis

Other tribal names may include: Sisseton-Wahpeton Oyate Tribe, Spirit Lake Nation, Standing Rock Nation, Three Affiliated Tribes, Turtle Mountain Band of Chippewa

**START MAIN QUESTIONNAIRE**

1. [IF S3=1] Here in North Dakota, some people vote in person at a polling place, and some have a mail or absentee ballot sent to them. How about you, when you have voted is it usually: in-person at a polling place, do you sometimes vote by mail or absentee ballot, or do you always vote by mail or absentee ballot?

Polling place...........................................................................1
Sometimes by mail/absentee ballot ......................................2
Always by mail/absentee ballot .............................................3
Do not vote (VOL)..................................................................4
Don't Know/Not Sure .........................................................88
Refused ................................................................................99

1B. [IF Q1=1 or 2] When you vote in person at a polling place, do you always vote on Election Day, do you sometimes vote early before election day, or do you <u>ALWAYS</u> vote early before election day?

Usually vote on Election Day ................................................1
Sometimes before Election Day.............................................2
Always vote early....................................................................3
Do not vote (VOL)..................................................................5
Don't Know/Not Sure .........................................................88
Refused ................................................................................99

2. Different states have different rules on what a voter needs to show the poll worker before they can vote at the polling place. As far as you know, does North Dakota have a law that **REQUIRES** voters to show a valid ID before they can vote in-person at their polling place either early or on Election Day, or is this not required in North Dakota to vote in-person?

Yes, North Dakota requires ID ..............................................1
No, they do NOT require ID .................................................2
Something else........................................................................3
Don't Know/Not Sure .........................................................88
Refused ................................................................................99

3. And if a poll worker did happen to ask you to show a valid ID in order to vote, as far as you know, do you currently possess a valid ID required to vote?

Yes..........................................................................................1
No............................................................................................2
Maybe / Depends ...................................................................3
Don't Know/Not Sure ...........................................................4
Refused ................................................................................99

4. In prior years, if a person's name was not found on the voter list, you could still sign-in and vote as long as you signed an affidavit swearing that you were in fact an eligible voter in North Dakota.  In any past elections, did you ever have to sign a paper to vote because your name was not already on the voter list?

Yes..........................................................................................1
No............................................................................................2
Don't Know/Not Sure ...........................................................4
Refused ................................................................................99

**North Dakota voter identification study / NARF**

**Possession of Valid ID**

4. Switching topics, do you happen to have a **North Dakota** driver's license? [If Respondent asks: This must be a driver's license from the state of North Dakota]

Yes.................................................................................... 1
No..................................................................................... 2
Don't know/Not Sure ........................................................ 88
Refused ............................................................................ 99

4A. [IF Q4 = 1] Is your license currently valid, or is it suspended or revoked? Or maybe it was lost or stolen and you don't currently have it in your possession?

None of these – it is valid.............................................. 1
Suspended ...................................................................... 2
Revoked .......................................................................... 3
Lost or stolen.................................................................. 4
Don't Know/Not Sure ..................................................... 88
Refused .......................................................................... 99

4B. [IF Q4 = 1]  If you can, take your driver's license out real quick and check the expiration date?  Is the expiration date after July 1, 2015, or like some people we've talked to, did it expire before July 1, 2015?

If don't know or don't have license: "Well, when was the last time you went and had your driver's license updated? Was it in the last 6 years, since June 2009, or was it sometime BEFORE that?

Yes, it expires after July 1, 2015............................... 1
Yes, in the last 6 years since 2009.......................... 2
No, it expired BEFORE July 2015 ...................... 3
No, not updated in last 6 years ............................ 4
Maybe / not sure / can't remember ..................... 5
Don't know ..................................................... 88
Refused ........................................................ 99

4C. [IF Q4=1] Okay, and does your driver's license have your current and accurate full residential address listed? … Or does your license contain a P.O. Box, an old address or have no residential address listed?

*NOTE TO INTERVIEWER: CONFIRM ANSWER BEFORE MOVING ON*

It has current and full address............................. 1
It has a P.O. Box................................................ 2
It has an old address ......................................... 3
None, no address listed...................................... 4
Don't know ..................................................... 88
Refused ........................................................ 99

5. [IF Q4 = 2-99 or Q4A=2/99 or Q4B=3/99 or Q4C=2/99] Okay, instead of a driver's license, do you happen to have a North Dakota non-driver identification card that was issued by North Dakota Department of Transportation?

Yes.................................................................... 1
No...................................................................... 2
Don't know/Not Sure ........................................... 88
Refused ............................................................ 99

**North Dakota voter identification study / NARF**

5A. [IF Q5 = 1]  If you can, take your ID card out real quick and check the expiration date?  Is the expiration date after <u>July 1, 2015</u>, or like some people we've talked to, did it expire before <u>July 1, 2015</u>?

If don't know or don't have your ID card: "Well, when was the last time you went and had your ID card updated? Was it in the last 6 years, since June 2009, or was it sometime BEFORE that?

> Yes, it expires after July 1, 2015............................................ 1
> Yes, in the last 6 years since 2009...................................... 2
> No, it expired BEFORE July 2015 ...................................... 3
> No, not updated in last 6 years ............................................ 4
> Maybe / not sure / can't remember .................................... 5
> Don't know ........................................................................ 88
> Refused .............................................................................. 99

5B. [IF Q5=1] Okay, and does your non-driver ID card have your current and accurate full residential address listed? … Or does your ID card contain a P.O. Box, an old address or have no residential address listed?

*NOTE TO INTERVIEWER: CONFIRM ANSWER BEFORE MOVING ON*

> It has current and full address............................................ 1
> It has a P.O. Box................................................................ 2
> It has an old address.......................................................... 3
> None, no address listed...................................................... 4
> Don't know ........................................................................ 88
> Refused .............................................................................. 99

6. [IF ENTERED Q5 SERIES, AND Q5=2/99 or Q5A=3/99 or Q5B=2/99] Okay, do you have any of these other types of identification? Please tell me yes or no for each type: [Check all that apply]

A. Tribal government issued identification card or Bureau of Indian Affairs issued ID card

> Yes, Tribal government issued............................................. 1
> Yes, BIA issued…............................................................... 2
> No....................................................................................... 3
> Don't know ........................................................................ 88
> Refused .............................................................................. 99

B. Student identification certificate issued by a North Dakota college or university

*NOTE TO INTERVIEWER: Verify this is a <u>certificate</u> and not just a student ID card*

> Yes...................................................................................... 1
> No....................................................................................... 2
> Don't know ........................................................................ 88
> Refused .............................................................................. 99

C. [If 6B = 1] What is the name of the university or college you are attending that has issued you an identification certificate?

(Please record the exact name identified by the respondent}        _____

D. Long-term care identification certificate provided by a North Dakota facility

*NOTE TO INTERVIEWER: Verify this is a <u>certificate</u> and not just an ID card*

Yes..................................................................................... 1
No....................................................................................... 2
Don't know ....................................................................... 88
Refused ............................................................................. 99

7A. [IF Q6B = 1] Does your tribal government or BIA issued identification card have an expiration date printed on it, and is it currently up-to-date and non-expired?

Yes, it is current........................................................... 1
No, it is expired ............................................................. 2
Does not have expiration date printed on it...................... 3
Don't know ..................................................................... 88
Refused .......................................................................... 99

7B. [IF Q6B = 1] Does your student ID certificate have an expiration date printed on it, and is it currently up-to-date and non-expired?

Yes, it current ............................................................... 1
No, it is expired ............................................................. 2
Does not have expiration date printed on it...................... 3
Don't know ..................................................................... 88
Refused .......................................................................... 99

7C. [IF Q6C = 1] Does your long-term care ID certificate have an expiration date printed on it, and is it currently up-to-date and non-expired?

Yes, it current ............................................................... 1
No, it is expired ............................................................. 2
Does not have expiration date printed on it...................... 3
Don't know ..................................................................... 88
Refused .......................................................................... 99

8A. [IF Q6A=1] Okay, and does your Tribal government or BIA issued ID card have your current and accurate full residential address listed? … Or does your Tribal ID contain a P.O. Box, an old address or have no residential address listed?

*NOTE TO INTERVIEWER: CONFIRM ANSWER BEFORE MOVING ON*

It has current and full address.............................. 1
It has a P.O. Box.................................................. 2
It has an old address ........................................... 3
None, no address listed......................................... 4
Don't know ......................................................... 88
Refused .............................................................. 99

8B. [IF Q6B=1] Okay, and does your student ID certificate have your current and accurate full residential address listed? … Or does your student certificate contain a P.O. Box, an old address or have no residential address listed?

*NOTE TO INTERVIEWER: CONFIRM ANSWER BEFORE MOVING ON*

It has current and full address..................................................1
It has a P.O. Box .........................................................................2
It has an old address...................................................................3
None, no address listed...............................................................4
Don't know ............................................................................. 88
Refused .................................................................................. 99

8C. [IF Q6C=1] Okay, and does your long-term care ID certificate have your current and accurate full residential address listed? … Or does your certificate contain a P.O. Box, an old address or have no residential address listed?

*NOTE TO INTERVIEWER: CONFIRM ANSWER BEFORE MOVING ON*

It has current and full address..................................................1
It has a P.O. Box .........................................................................2
It has an old address...................................................................3
None, no address listed...............................................................4
Don't know ............................................................................. 88
Refused .................................................................................. 99

**Underlying Documents Needed for ID**

9. Okay, and were you born in the United States, Puerto Rico, or another country?

United States..............................................................................1
Puerto Rico .................................................................................2
Another country……….SKIP TO Q14................................3
(Don't know) ......................................................................... 88
(Refused) ............................................................................... 99

10. [If Q9=1] And which state were you born in? {MENU WITH ALL STATES+PR AND OTHER US TERRITORY, LIST NORTH DAKOTA 1st}

RECORD SPECIFIC STATE _____

11. [SKIP IF Q9=3] Think about the last time you had to use or show your birth certificate?  Some of the people we've talked to have lost or misplaced their official birth certificate. How about you? Do you have your original, or an official certified copy - NOT A PHOTOCOPY - of your birth certificate with you - or like some people, do you NOT have your original or certified copy of your birth certificate?

Yes, has birth certificate........................................................1
No, does not have birth certificate.........................................2
Don't know/Not Sure ..............................................................88
Refused .................................................................................. 99

12. [If Q11=1] Does your birth certificate reflect your current legal name, or has your legal name changed since birth due to adoption, marriage, divorce, or some other reason? {PROBE: Why did it change}

Yes, reflects current legal name ............................................... 1
No, name changed: marriage.................................................. 2
No, name changed: divorce.................................................... 3
No, name changed: adoption ................................................. 4
No, name changed: other reason............................................ 5
Don't know/Not Sure ......................................................... 88
Refused ............................................................................ 99

13A. [IF Q12=2] If your name changed due to marriage, do you have a certified copy of your marriage license?

Yes, I have a marriage license ......1
No, do not have a marriage license ......2
Don't know/Not Sure......88
Refused......99

13B. [IF Q12=3/99] If your name changed, do you have a certified copy of a court order indicating your name change?

Yes, I have a copy of court order......1
No, do not have a copy of court order......2
Don't know/Not Sure......88
Refused......99

14. Do you happen to have a U.S. passport or passport card?

Yes.................................................................................... 1
No..................................................................................... 2
Don't know/Not Sure ......................................................... 88
Refused ............................................................................ 99

15A. [IF Q14=1] Is the expiration date on your passport after July 1, 2015, or like some people we've talked to, did it expire before July 1, 2015? [IF NECESSARY: Prompt: "Most U.S. passports are valid for 10 years after they have been issued, and then they expire"]

Yes, it current ................................................................. 1
No, it is expired................................................................ 2
Maybe / not sure / can't remember .................................... 3
Don't know ...................................................................... 88
Refused ............................................................................ 99

15B.[If Q15A=1 ] Does your passport reflect your current legal name, or has your legal name changed since birth due to adoption, marriage, divorce, or some other reason? {PROBE: Why did it change}

Yes, reflects current legal name ............................................... 1
No, name changed: marriage.................................................. 2
No, name changed: divorce.................................................... 3
No, name changed: adoption ................................................. 4
No, name changed: other reason............................................ 5
Don't know/Not Sure ......................................................... 88
Refused ............................................................................ 99

16. [IF Q9=3] Okay, do you happen to have your U.S. certificate of citizenship or a U.S. certificate of naturalization, a certification of birth issued by the State Department, or like some people we have talked to, have you lost or misplaced it? [IF NECESSARY: "This would be if you were born outside the United States"]

Yes, I have it ............................................................................ 1
No, do not have ........................................................................ 2
Don't know ............................................................................. 88
Refused .................................................................................. 99

17. And how about a social security card? Do you currently have your actual Social Security Card, not a print out or photocopy?

Yes, has social security card ................................................... 1
No, does not have ................................................................... 2
Don't know ............................................................................. 88
Refused .................................................................................. 99

18. [IF Q17=2/99] Instead of a social security card, do you have a W-2 or 1099 Tax form, or a pay stub which has your name **and social security number** listed on it?

Yes, has one of these documents ........................................... 1
No, does not have ................................................................... 2
Don't know ............................................................................. 88
Refused .................................................................................. 99

19. Often times when you go to get a driver's license or state ID card you need to show proof of address. Here in North Dakota you need to show 2 types of documents with your current residential address. This question is completely anonymous and confidential, but important for research purposes.

For each document that I read, just tell me yes or no, if you have that document with <u>YOUR NAME</u> and **full current residential address, not a P.O. Box** and you could produce it at the North Dakota DOT if you were going to get a driver's license or non-driver ID card.

How about _____

*NOTE TO INTERVIEWER: CONFIRM DOCUMENT HAS PHYSICAL ADDRESS, NOT PO BOX*

19.1 A government issued tax form
19.2 Bank statement
19.3 Mortgage document
19.4 Home owners or renters insurance policy
19.5 Utility bill
19.6 Credit card statement
19.7 Pay stub or earnings statement
19.8 Rent receipt
19.9 Phone bill
19.10 Transcript or report card from accredited school

Yes ........................................................................................ 1
No .......................................................................................... 2
Don't know / not sure / can't remember .......................... 88
Refused .................................................................................. 99

20. It's hard to vote in every single election, and some people we've talked to say they didn't vote in some recent elections. Thinking back to the 2012 presidential election on November 6th 2012, try to remember as accurately as possible if you voted in the 2012 presidential election between Barack Obama and Mitt Romney, here in North Dakota.  Did you vote in the November 2012 election or not?

Yes .............................................................................................. 1
No ............................................................................................... 2
Don't know / not sure / can't remember ........................... 88
Refused ..................................................................................... 99

**Section on Possible Barriers to Obtaining ID Card**

21. [IF NO VALID LICENSE OR ID CARD] Do you happen to know where the nearest North Dakota Department of Transportation office is in relation to your home, work or school?

Yes .............................................................................................. 1
No ............................................................................................... 2
Don't know / not sure / can't remember ........................... 88
Refused ..................................................................................... 99

22. [IF NO VALID LICENSE OR ID CARD] Have you ever been to the North Dakota Department of Transportation office, either to try and get a license or non-driver ID card?

Yes .............................................................................................. 1
No ............................................................................................... 2
Don't know / not sure / can't remember ........................... 88
Refused ..................................................................................... 99

23. [IF NO VALID LICENSE OR ID CARD] Of the following list, please tell me if any of the items would, or would not pose a problem for you, if you needed to go to the North Dakota Department of Transportation office, called the "DOT office" on Monday through Friday during normal business hours to obtain, or update your driver's license or state ID card?

Would it be [rotate front/back] a definite problem, somewhat of a problem, only a little problem, or not at all a problem?

| | Degree of a problem | | | | |
| --- | --- | --- | --- | --- | --- |
| | Definite | Some | Little | None | Don't know | Refused |
| A. Finding out where the nearest DOT office is | 1 | 2 | 3 | 4 | 88 | 99 |
| B. Getting a ride to the DOT office | 1 | 2 | 3 | 4 | 88 | 99 |
| C. Getting time off from work or school | 1 | 2 | 3 | 4 | 88 | 99 |
| D. Getting the necessary documents in order, such as my original birth certificate | 1 | 2 | 3 | 4 | 88 | 99 |
| E. Having to travel about 6 miles each way to the nearest DOT office in your community | 1 | 2 | 3 | 4 | 88 | 99 |
| F. Having to travel about 30 miles each way to the nearest DOT office in your community | 1 | 2 | 3 | 4 | 88 | 99 |
| G. Having to wait in line at the DOT office for about one hour to get your ID | 1 | 2 | 3 | 4 | 88 | 99 |

| | | | | | | |
|---|---|---|---|---|---|---|
| H. Having to wait in line at the DOT office for about two hours to get your ID | 1 | 2 | 3 | 4 | 88 | 99 |
| I. Using or paying for public transit to get there | 1 | 2 | 3 | 4 | 88 | 99 |
| J. Paying for any required documents you may not have, such as original birth certificate | 1 | 2 | 3 | 4 | 88 | 99 |
| K. Making it to the required office during their normal business hours <u>such as 8am to 5pm only</u> | 1 | 2 | 3 | 4 | 88 | 99 |
| L. Making it to the required office during their normal business hours <u>Monday through Friday only</u> | 1 | 2 | 3 | 4 | 88 | 99 |

24. Over the past few months, have you seen or heard any official announcements or advertisements by the state of North Dakota about the new voter identification law on the radio, TV, newspaper, Twitter, Facebook or the Internet?

Yes, I have heard information ................................................. 1
No, I have not heard any information................................... 2
Don't know / not sure / can't remember.......................... 88
Refused .................................................................................. 99

25. Of the following list, please tell me yes or no, if you believe each type of identification can be used to establish proof of identity for purposes of voting in North Dakota

    A.  North Dakota driver's license
    B.  United States Military identification card
    C.  Employment or work identification from a State of North Dakota agency
    D.  Employment or work identification from a Federal agency such as the FBI or Department of Justice
    E.  United States Passport
    F.  University or College issued identification card

Yes.......................................................................................... 1
No........................................................................................... 2
Don't know / not sure / can't remember.......................... 88
Refused .................................................................................. 99

**DEMOGRAPHICS**

D1. How long have you lived in North Dakota? [FOLLOW UP: "How many years"]

[ RECORD NUMBER OF YEARS: _____; REFUSED=999, 0=LESS THAN ONE YEAR – ASK FOLLOW UP "How many months?" ]

D2. And how long have you lived at your current address? [FOLLOW UP: "How many years"]

[ RECORD NUMBER OF YEARS: _____; REFUSED=999, 0=LESS THAN ONE YEAR – ASK FOLLOW UP "How many months?" ]

D3. [IF S4=1 or S5=2] Are you currently an enrolled member of any Native American tribe?  Which Tribe?

No .......................................................................................... 0
Turtle Mountain ................................................................... 1
Standing Rock ....................................................................... 2
Three Affiliated Tribes ......................................................... 3
Sisseton-Wahpeton Oyate .................................................... 4
Spirit Lake Nation ................................................................ 5
Other Tribe [RECORD NAME] ......................................... 6
Don't know / not sure / can't remember ......................... 88
Refused ............................................................................... 99

D4.  Do you currently live on a designated Native American reservation or Tribal government area?

Yes ....................................................................................... 1
No .......................................................................................... 2
Don't know / not sure / can't remember ......................... 88
Refused ............................................................................... 99

D5.  What is the name of the county you currently live in?
[If they don't know county name, "How about the name of the city?"]       _____

DROP DOWN LIST OF ALL COUNTIES
IF DK COUNTY, RECORD CITY NAME

D6. What is the highest level of education you completed? Just stop me when I read the correct category.

Grades 1 – 8 ......................................................................... 1
Some High School ............................................................... 2
High School graduate or GED ............................................ 3
Some College/Technical School ......................................... 4
College graduate .................................................................. 5
Post-graduate education ...................................................... 6
(Don't know) ..................................................................... 88
(Refused) ........................................................................... 99

D7. In what year were you born? [ __ __ __ __ ]

D8.  Do you currently own your own home, are you renting, or something else?

Own.................................................................... 1
Rent.................................................................... 2
Something else.................................................. 3
Don't know........................................................ 88
Refused............................................................. 99

D9. Do you own or lease a car, or does someone in your household own or lease a car that you have regular access to?

Yes, I own or lease............................................ 1
Yes, someone in my house does......................... 2
No...................................................................... 3
Don't know........................................................ 88
Refused............................................................. 99

D9B. [IF D9=3-99] Do you have regular access to some other form of reliable transportation or mass transit including the bus or the train?

Yes..................................................................... 1
No...................................................................... 2
Don't know........................................................ 88
Refused............................................................. 99

D10. Generally speaking, do you think of yourself as a Republican, a Democrat, an independent, or something else?

Republican......................................................... 1
Democrat........................................................... 2
Independent....................................................... 3
Other party........................................................ 4
Don't know........................................................ 88
Refused............................................................. 99

D11.  This final question is just for statistical purposes, to help us better classify the answers.  Your response is completely anonymous, but extremely important to our research. What was your total combined household income in 2014 before taxes.  Just stop me when I read the correct category.

Less than $10,000............................................. 1
$10,000 to less than $20,000............................ 2
$20,000 to less than $30,000............................ 3
$30,000 to less than $40,000............................ 4
$40,000 to less than $50,000............................ 5
$50,000 to less than $60,000............................ 6
$60,000 to less than $80,000............................ 7
$80,000 to less than $100,000 ......................... 8
$100,000 to less than $150,000 ....................... 9
More than $150,000.......................................... 10
(Don't know) .................................................... 88
(Refused) ......................................................... 99

D11B. [IF D10=88/99]  Okay, how about something a little different.  Was your household income below $20,000 or above $20,000 in 2014?  Again, this information is confidential, but very important to the survey.

Less than $20,000.................................................................. 1
More than $20,000................................................................ 2
(Don't know) ...................................................................... 88
(Refused) ........................................................................... 99

Thank you for your time.

[IF RESPONDENT ASKS FOR MORE INFORMATION ABOUT SURVEY:  "This survey was conducted by Pacific Market Research and is completely anonymous and confidential.  If you have any questions or concerns you can contact Pacific at phone number 425-271-2300"]

D12. [ DO NOT READ ALOUD] Record respondent's gender

Male.................................................................................. 1
Female............................................................................... 2