**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | |
|---|---|
| Richard Brakebill, Deloris Baker, Dorothy Herman, Della Merrick, Elvis Norquay, Ray Norquay, and Lucille Vivier, on behalf of themselves, | Civil No. 1:16-cv-8 |
| Plaintiffs, | |
| vs. | |
| Alvin Jaeger, in his official capacity as the North Dakota Secretary of State, | |
| Defendants. | |

# Declaration of Daniel McCool, Ph.D.

I, Daniel McCool, Ph.D., declare as follows:

1.    I am a professor of Political Science at the University of Utah. I have personal knowledge of the facts set forth in this declaration and could and would competently testify to those facts if asked to do so.

## I.    Qualifications.

2.    I received a B.A. in Sociology from Purdue University, and a Ph.D. in Political Science from the University of Arizona. I have a doctoral minor in Latin American History.

3.    For more than 30 years I have conducted research regarding the political relationship between American Indians and Anglos.[1] One of my first publications, while still

---

[1] Throughout this Declaration I will use the term, "Anglo" to refer to people who are not American Indian. Even though that term is not entirely accurate—it includes people who are not of European descent—it is preferable to referencing people in the negative as "Non-Natives" or "Non-Indians." "Anglo" is also a fairly standard term in the academic literature. I use the terms "American Indian" and "Native American" interchangeably.

in graduate school in 1982, was on Indian voting patterns. Many of my publications focus on Indian voting, land, water, and environmental issues.

4.     All of my research has a strong historical context. From 1998 to 2007 I was the director of the American West Center, where I administered several grants and contracts dealing with Indian land, water, and sovereignty issues. In 2007 I co-authored *Native Vote: American Indians, The Voting Rights Act, and the Right to Vote* (Cambridge University Press). My most recent edited book is *The Most Fundamental Right: Contrasting Perspectives on the Voting Rights Act* (Indiana University Press, 2012).

5.     I have served as an expert witness in six Voting Rights Act cases:

- *U. S. v. South Dakota*
- *U.S. v. Blaine County*
- *Bone Shirt v. Hazeltine*
- *Cottier v. City of Martin*
- *Koyukak v. Treadwell*
- *Navajo Nation v. San Juan County, UT*

All of these cases were Section 2 cases except *Koyukak*, which was a Section 203 case. The plaintiffs in all of these cases were American Indians or Alaska Natives.

6.     My vita is attached as Exhibit A. A list of the references I have used in preparing this Declaration is attached as Exhibit B. The citations in this Declaration are to those references.

## II.    Methodology and Approach.

7.     Plaintiffs engaged me to address this fundamental research question: Given the political, sociological, and economic conditions in North Dakota, and the new requirements for a state-recognized identification to vote, do American Indians in North Dakota have an equal opportunity to participate in the political process?

## A.    Guiding Sources.

8.    My analysis, and choice of research questions, is guided by three sources. The first source is the three factors enunciated by the U. S. Supreme Court in the 1986 case of *Thornburg v Gingles*. These factors are commonly referred to as the "Gingles Factors." These factors are:

- A minority group is sufficiently compact geographically that a district in which the group constitutes a majority can be drawn.

- The minority group has a history of political cohesiveness and bloc voting.

- The white majority has a history of voting as a group to usually defeat the minority group's preferred candidate.

9.    The second source is the "Senate Factors." The Senate report that accompanied the 1982 amendments to the Voting Rights Act identified these factors as important indices of racially troubled jurisdictions. The nine "Senate Factors" are:

1. A history of official voting-related discrimination in the state or political subdivision.

2. The extent to which voting in the elections of the state or political subdivision is racially polarized.

3. The extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet voting.

4. The exclusion of members of the minority group from candidate slating processes.

5. The extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.

6. The use of overt or subtle racial appeals in political campaigns.

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

8. The responsiveness of state and local officials to the needs of minorities.

9. The tenuousness of the policy underlying voting laws, standards, and practices.[2]

I consider these factors because they are "for courts to use when assessing whether a particular practice or procedure results in prohibited discrimination in violation of Section 2 [of the Voting Rights Act]."[3] They represent various "tools," practices, and socio-economic and historic conditions that are indicative of problematic relationships between minority and majority populations, based on the preponderance of the evidence.[4]

10. The third source is the factors identified in the 1977 case of *Village of Arlington Heights v. Metropolitan Housing Development Corporation* as being indicators of intentional discrimination. These factors are:

- The impact of the redistricting plan.

- The historical background of the redistricting plan, particularly if it reveals a series of decisions undertaken with discriminatory intent.

- The sequence of events leading up to the enactment of the redistricting plan.

- Whether the redistricting plan departs, either procedurally or substantively, from the normal practice.

- Contemporaneous statements and viewpoints held by members of the adopting body or others who may play a significant role in the process.

11. There is considerable overlap in some of these factors, and not all of them are relevant to this case, so I have combined some of them in my analysis, and excluded those that are irrelevant.

## B.    Use of Qualitative Methods.

12. My analysis relies on a well-recognized methodology known as Qualitative

---

[2] Senate Report 1982: 28-29.

[3] Katz 2005: 3. Also see: *Pope v. Albany* 2015.

[4] Senate Report 1982: 29.

Methods.[5] I employ this methodology by using data and information gleaned from multiple and overlapping sources, including: in-person interviews, newspapers (including editorials and letters to the editor), past court cases, interest group publications, oral histories, secondary published sources such as books and articles, online sources (chat rooms, websites, blogs), business advertising and business policies, campaign flyers and publicity, church records, and documents and studies created by tribal, local, state, and federal governments, including voting data and census data. I also review photographs, videos, and other visual "data." I examine these multiple sources for significant long-term trends across multiple sources of information and data. Confidence levels increase when consistent patterns of responses appear across multiple sources over a sustained period of time. Reliability is achieved by utilizing a very large number of documents that represent many different types of sources, and finding consistent patterns across these diverse sources.

13. Qualitative Methods is well recognized in the social sciences. The Consortium on Qualitative Research Methods was established in 2001.[6] The American Political Science Association organized a section on Qualitative Methods in 2003.[7] By 2003 almost half of all peer-reviewed articles in Political Science journals utilized Qualitative Methods.[8] Syracuse University, with funding from the National Science Foundation, established a "Qualitative Data Repository" to assist researchers who utilize this method.[9] There are many methodology textbooks that focus on Qualitative Methods; most are written by political scientists but others are by authors in fields such as public health, anthropology, sociology, and increasingly the humanities.

14. Qualitative Methods is well-suited for analyzing voting rights cases because it is

---

[5] Denzin and Lincoln, 2000, 2011.

[6] Consortium on Qualitative Research Methods, n.d.

[7] American Political Science Association, n.d.

[8] Bennett, Barth, and Rutherford 2003.

[9] Qualitative Data Repository, n.d.

adept at analyzing phenomena that are complex, long-term, multi-dimensional, and subject to rapid change. Lamont and White note that Qualitative Methods is "particularly useful for studying timely topics such as group identities and boundaries [and] race, class, gender..."[10] It is also particularly useful to study phenomena that occur over long periods of time, due to the large number of variables and factors that change over time.[11]

15.   In preparing this declaration, I have relied on a standard approach to Qualitative Methods that utilizes large amounts of data to reach robust and reliable conclusions. For this Declaration I have read or reviewed thousands of pages of documents from 115 sources. I also interviewed 27 people who live in North Dakota, whom I refer to in this Declaration as "interviewees." With just a few exceptions, I asked each interviewee the same set of questions.[12] Those questions are:

1.   Do you think racial discrimination is a problem in North Dakota?

2.   Have you experienced difficulties attempting to vote?

3.   Have there been efforts to discourage or prevent American Indians from voting?

4.   Is there an atmosphere of racial polarization in the state?

5.   In elections where an Indian ran against an Anglo, do the Indians tend to vote for the Indian candidate, and the Anglos vote for the Anglo candidate? Is race a factor in such elections?

6.   Have the new requirements for an ID made it more difficult to vote? Have you personally experienced difficulties? Do you know of anyone who has?

7.   Is it more difficult for American Indians to vote because of long distances, poor

---

[10] 2009: 5.

[11] See: Bartolini 2013.

[12]  I asked different questions when talking with subject-matter experts such as academics, administrators, and people involved in policy-making; those questions reflected the particular expertise of the person I was interviewing.

roads, or the location of polling places, long distances to the state offices that issue IDs?

8. Is state government and county government responsive to the needs of American Indians?

9. Do American Indians have an equal opportunity to elect candidates of their choice in North Dakota elections?

As I mentioned above, a full list of the references I used in preparing this declaration is attached as Exhibit B.

## III. American Indians Historically Have Been Discriminated Against And Voting in North Dakota Has Been Racially Polarized (Senate Factors 1, 2).

16. North Dakota has a long and troubled history with its American Indian citizens.[13] The conflict between Anglos and Indians goes back to territorial days, when the *Bismarck Tribune* editorialized: "The American people need the country the Indians now occupy…. An Indian war would do no harm, for it must come, sooner or later."[14]

17. More than 100 years later, that troubled history was still evident in a 1999 report by the North Dakota Advisory Committee to the U.S. Commission on Civil Rights. The Committee report noted the testimony of state officials:

▪ "[S]ince 1957, as a member of the North Dakota legislature and from his involvement with other organizations," a former state senator said, "'the question of discrimination has always been one of the chief topics of … discussion.'"[15]

▪ A member of the House commented on one of the many problems confronting Native Americans in his urban district: "Within that district, about 600 people are Native American, which is the largest number of Native Americans in any

---

[13] See, for example: *Turtle Mountain Band of Chippewa Indians v. United States* 1974; North Dakota Legislative Council 1997; Richardson 2011.

[14] Karolevitz, 1975: 99.  (quoting June 17, 1874 editorial)

[15] North Dakota Advisory Committee 1999: 7.

district in the State, except those districts that have reservations within them. There are also 1,400 mobile homes and 1,800 apartments constituting some of the poorest people in the district ... . What I'm really saying is that we have a very high percentage of very vulnerable people, people who have less voice, people who have less power, people who have less mobility."[16]

▪ A member of the House noted that "discrimination occurs on a regular basis against Native Americans."[17]

18.   American Indian leaders also gave testimony to the Advisory Committee:

▪ The chairman of the Three Affiliated Tribes noted: "For our tribal populations, civil rights enforcement has been infrequent, at best, in North Dakota."[18]

▪ The President of United Tribes Technical College stated that discrimination ranged from "'we do not rent to Indians' notices that appeared over 20 years ago in a Bismarck hotel, to United Tribes Technical College students being followed today by security personnel at the local malls and stores in Bismarck."[19]

▪ The Director of the state Indian Affairs Commission said this about a case of employment discrimination: "an individual was passed over for promotions and was subject to racial slurs in the workplace. Some comments included, 'go back to the reservation to your squaw,' 'go back to the reservation and eat dog,' and 'all Indian women are whores.'"[20]

▪ A native woman who was a columnist for the *Bismarck Tribune* said that "[Native] people are angry, frustrated, and have a sense of hopelessness," and described a recent ad referred through the state Job Service that attached instructions saying "Do not send Native Americans."[21]

19.   Additional testimony was given by a Methodist minister, who noted:

"An American Indian [was] treated differently from whites at a business establishment when she attempted to write a personal check," and an

---

[16] Advisory Committee 1999: 35-36

[17] Advisory Committee 1999: 37.

[18] p 38.

[19] p. 38.

[20] p. 40.

[21] p. 64.

assistant U. S. Attorney said she witnessed "discrimination toward women and other minority groups, most notably Native Americans, all the time."[22]

20.    The Advisory Committee Report concluded: "Many forms of discrimination have been ongoing in the State for several decades, and it appears that limited accomplishments have been realized to solve those issues.… Systemic discrimination continues to occur.…"[23] That report was issued 17 years ago, but my research indicates discrimination against American Indians in North Dakota continues to be a problem.

21.    In the past, overt statements of racial discrimination were common; it was an accepted practice and an accurate reflection of prevailing belief systems. More recently, discrimination has become much more subtle, with people using certain code words or phrases in place of explicitly racist language—although there are exceptions as we shall see below.[24] A recent study of the North Dakota court system reiterated this distinction: "Research has identified two kinds of bias: overt and implicit.… Most racial and ethnic bias occurs in a pervasive yet subtle manner, referred to as implicit bias."[25] As a tribal college administrator put it, "there is a lot of self-censoring that goes on in the mainstream media; there is no need to say something bigoted to deny service; just do it."[26] Another observer described discrimination in North Dakota this way:  "it's not open and outright. I think the Native community would likely say yes. Do I hear background talk from white people about this? Sure."[27] However, there are still plenty of examples of discrimination and allegations of discrimination.

22.    Some cases of discrimination involved violations of the Voting Rights Act. In *U.S.*

---

[22] p. 66.

[23] p. 75.

[24] Dick and Wirtz 2011; Hill 2008.

[25] North Dakota Commission 2012: 3

[26] Neumann interview.

[27] Cook interview.

*v. Benson County*, Native voters claimed the at-large method of electing county commissioners had prevented them from having an equal opportunity to elect candidates of their choice; indeed, no American Indian had been elected to the county commission. The District Court agreed, and the resulting consent decree ordered the county to change to a district system and noted:

> "Racially polarized voting patterns prevail in elections for the Benson County Commission, and Native American voters in Benson County are politically cohesive. In elections involving Native American candidates and white candidates for the Benson County Commission, Native American voters vote consistently for Native American candidates and white voters vote sufficiently as a bloc to defeat the Native American voters' candidates of choice…. Native American citizens within Benson County have suffered from a history of official racial discrimination."[28]

23.   In the case of *Spirit Lake Tribe v. Benson County,* the American Indian plaintiffs argued that the closure of three voting places made voting more difficult for tribal members to vote. The District Court agreed that closing two of those voting places, which were on the reservation, would create a "disparate impact,"[29] and must be kept open. The Court noted: "The historic pattern of discrimination suffered by members of the Spirit Lake Tribe is well-documented."[30]

24.   Tensions rose again at Spirit Lake in 2013 when Congressman Kevin Cramer made controversial comments to a group called the North Dakota Council on Abused Women. This group deals with problems associated with violence against women, especially on Indian reservations. According to some people at the meeting, Congressman Cramer referred to all tribal governments as "dysfunctional," disparaged tribal judicial systems, and then reportedly said: "I want to ring the Tribal Council's neck and slam them

---

[28] *U. S. v. Benson County* 2000: 4.

[29] 2010: 6.

[30] 2010: 5.

against the wall."[31] Congressman Cramer later claimed he was "misunderstood," explaining:

> "This may have been the result of my tone and rhetoric, better suited for active debate in Congress rather than in addressing the protectors of our most vulnerable citizens. I apologize, and welcome future discussion to address my meaning, and to further our common cause."[32]

25.    Another event that provoked accusations of racism and discrimination was the conflict over the "Fighting Sioux" team mascot—what the *Wall Street Journal* described as the "contentious nickname" for the University of North Dakota ("UND").[33] Numerous Native groups and other advocacy organizations conducted a prolonged campaign to stop UND from using this mascot. They met with fierce resistance, and the conflict dragged on for more than 20 years. The National Congress of American Indians, the NAACP, most of the Sioux tribes, the Mandan/Hidatsa/Arikara Affiliated Tribes, and the Turtle Mountain Chippewa Tribe demanded an end to the mascot.[34]

26.    The mascot controversy was an emotional issue, and some people expressed their opinions in an overtly racist manner. According to a group of students formed to lobby UND to change the mascot, a local store displayed a sign reading: "Redskins, go back to the reservations, leave their name alone."[35] Some t-shirts produced at that time conveyed racist messages. One displayed obscene images of Indian people engaging in sex acts with bison (the team mascot of UND rival North Dakota State University). Another available-for-sale t-shirt read: "If they were called the drunken, lazy, welfare collecting, free cheese eating, whiny ass Sioux, then you would have something to complain about."

---

[31] Merrick n.d.; Spirit Lake Tribe 29 Mar. 2013; Ecoffey 2013

[32] Schilling 1 April 2013; Dickinson Press Staff 29 Mar. 2013.

[33] Futterman 26 Mar. 2015.

[34] University of North Dakota Graduates n.d.

[35] University of North Dakota Graduates n.d.

Another t-shirt depicted the head of an Indian in full headdress under the words: "Siouxper Drunk."[36]

27.   During the controversy, someone taped posters to the doors of the Indian Studies Program at UND expressing racist insults:

- "If the name has to go, so should your funding"
- "Wish I could go to school for free"
- "Go back to the res, or work @ the Casino, prairie nigga"
- "Drink 'em lots o' fire water"
- "if you get rid of the "Fighting Sioux" then we get rid of your FREE schooling!"
- "Find something better for time 'like a job'"
- "You lost the war. Sorry."[37]

28.   The issue became so big that the state actually held a referendum and voters approved changing the mascot. That did not stop some people from filing a lawsuit in an effort to stop the name change. The NCAA finally forced the change in 2012 because it considered the name "hostile and abusive."[38]

29.   Nearly all of the people I interviewed felt that discrimination is a problem in North Dakota, and described many of the typical attributes of a racially polarized society. Here are some of their comments:

- "When I ran… on a statewide ballot, I really got a flavor of that [discrimination]. People would say to me 'we don't vote for Indians.'…. It [being perceived as an Indian—he actually is not an enrolled member] was stuck in my face quite a few times."[39]
- "We live with it [discrimination] all the time. I don't observe it, I live it. Let me give you an example. I was invited to go to a conference on tourism in North

---

[36] ICTMN Staff 14 May 2014.

[37] University of North Dakota Graduates n.d.

[38] Kolpack 18 Nov. 2015; Walsh 19 Oct. 2015; Houska 20 Nov. 2015.

[39] Boucher interview.

Dakota; it was about making people feel welcome. I went to the desk to register and give the woman my registration fee, but the woman at the desk refused my money and told me I was not allowed to attend the conference. I went away but decided to go back in and another lady came up to me. She apologized and took my conference fee. She explained to me that the first woman at the desk 'doesn't like Indians.' This is common."[40]

- "I've had it [discrimination] pulled on me all the time, especially by law enforcement.... I've been stopped for 'DWI'—driving while Indian.[41] They don't pull over white people for little things or no reason."[42]

- "Yes [discrimination is a problem]. I talk to enough people during the day and I've heard enough complaints. And, I've experienced it myself."[43]

- "Discrimination is not only White-to-Native, it's Native-to-Native, family-to-family. I grew up in Colorado. I have never experienced as much racism in my life as there is here.... ."[44]

- "You see it [discrimination] everywhere. At a recent basketball tournament even the referees were, well, with questionable calls. And you see it in the vandalism in our area. I see writings on bathroom stalls that say 'prairie nigger,' and 'white power,' and the swastika."[45]

- "Our children have to work with the white man and they pay taxes. Every place they work there has been discrimination."[46]

- "Yes I do [think discrimination is a problem]. ... there are preconceived notions and collective judgments out there..... Natives also have a stereotype of whites."[47]

---

[40] Allard interview.

[41] There is evidence that "Driving While Indian," and other disparate treatment of American Indians in the criminal justice system, does indeed occur. See: North Dakota Commission 2012: 67, 90-91). As a focus group in the study put it, "White courts are designed for White society" (p. 140).

[42] J. Turcotte interview.

[43] Kary interview.

[44] C. Turcotte interview.

[45] Taft interview.

[46] A. McCloud ad E. McCloud interviews.

[47] Nordmark interview.

- "Absolutely, there is no question about it [that racial discrimination is a problem].... Part of the problem is that tribal entities are resistant to collaborating with 'white' organizations. My theory on that is that historical 'rules' and structure have been used against them, so the Natives do not want to work with them [Whites]."[48]

- "We used to ride with the sports teams [from Standing Rock] to some of those small towns in the 1980s. I would see signs calling us 'prairie niggers.'"[49]

- "We live here, it's non-stop, every day. We experience it in public life, driving down the highway, shopping, filling out forms. I brought a friend here who is a Jew. He is quite dark and looks like he could be Native. We don't have many Jews in North Dakota, so I told him he would be mistaken for an Indian. I took him into a store, and they followed us all around the store. He immediately noticed it. Just for fun we decided to walk down an aisle and I turned left and he turned right just to see what the clerk would do. At another store no one would wait on him, but they would wait on all the white people around him. It was very obvious to him that he was getting treated that way. It's non-stop."[50]

- "Yes [racial discrimination is a problem], because of the history of North Dakota, and there are still very deep-seated alliances that are cultural, familial, community-based. North Dakota is a very racist state."[51]

- "We heard the former sheriff say the Indians around here are about as smart as the ridge-runnin' niggers we have down south. He said that while he was sheriff."[52]

- "Yes, we are strongly segregated, not only on reservations, but even in the urban community. Our schools are segregated.... And I think people are racist."[53]

- "They call us names; if we're at sports events, the kids on the opposing team will tell our team to go back to the rez, things like that. If they are in a group— the Caucasians—that's when they say things. My mom was trying to write a check for her purchase at a store, but the clerk would not take her check because she's from the reservation. My mom has never been on welfare; she's

---

[48] Carbone interview.

[49] Eagle interview.

[50] Anonymous3 interview.

[51] Morgan interview.

[52] anonymous2 interview.

[53] Stromme interview.

worked all her life."[54]

- "I [an enrolled member at Fort Berthold] was born and raised in Bismarck. Growing up here in Bismarck was an intentional move by our parents because they didn't want us to experience the discrimination on the reservation and the rural anti-Indian mentality…. There is a mentality across the board that my people are less."[55]

30.   The interviewees also commented repeatedly about the polarized nature of voting when an Indian and an Anglo run against each other:

- "When I ran [a Lakota woman running for a House district] I took all of Sioux County and none of Morton County. I took Grant County—there are tribal members there. Whites voted for my opponent."[56]

- "Do Native Americans have a propensity to vote for their own? Yes, the same is true with whites."[57]

- "My brother [an American Indian] ran for sheriff [Rolette County]…. He came out ahead because he got all the Indian votes. The last two sheriff races the Indians won; the Native voters elected him."[58]

- "There was discrimination against Turcotte [Native American sheriff in Rolette County]. They made it so miserable for him as sheriff that he quit…. Some of them just couldn't see an Indian being sheriff."[59]

- "Yes [Indians vote for Indians and Anglos vote for Anglos] in the city council races [in Rolla]."[60]

- "…racism would create barriers for any non-white candidate for state office. Natives can elect Natives, but for larger offices [beyond local] I don't see a Native candidate gaining traction."[61]

---

[54] Agard interview.

[55] Jones interview.

[56] Allard interview.

[57] Boucher interview.

[58] J. Turcotte interview.

[59] A. McCloud, E. McCloud interviews.

[60] Nordmark interview.

[61] Carbone interview.

- "Mike Faith was one of our [Standing Rock] council members. He received a large vote from the Indian community when he ran [for non-tribal office]."[62]

- "Yes they definitely do [Indians vote for Indians, Anglos for Anglos]. I can tell you we've had enrolled members run for county commissioner; there's been four or five of them. They ran against Whites that had college degrees and are well-known, and the Indian had maybe a fifth or sixth grade or high school education. But you can see the voting is so one-sided on the reservation they just put an x there. The Whites vote for the best candidates, but there's that cultural divide here. The Indians vote for Indians."[63]

31. Of course, exceptions do exist. The Voting Rights Act is about having an equal opportunity to elect candidates of choice, not necessarily of race. For example, many interviewees (as well as other sources) commented on how Indian voters came out forcefully for Heidi Heitkamp because they felt she cared about them, and had spent time on the reservations. And, as will be seen below, many Indian areas are represented by Anglos, so obviously Indians are voting for Anglos when there are few or no alternatives.

32. It is quite clear that race plays a role in elections in North Dakota, especially when an Anglo runs against an Indian. This may simply be a reflection of a larger racial divide in the state. Some Anglo people in North Dakota may not feel that racism is a problem, but the American Indians I interviewed—and most of the Anglos—certainly do. Indeed, differing perceptions regarding the existence or extent of discrimination is a symptom of polarization. Among the people I interviewed, only Anglos claimed discrimination did not exist. For example, in Sioux County, auditor Barb Hettich told me discrimination is not a problem in North Dakota, and that no racial polarization exists.[64] An Anglo Sioux County Commissioner told me that racial polarization was a problem in *other* places in the state and the country.[65] This is in contrast to the American Indian people I

---

[62] Eagle interview.

[63] anonymous1 interview.

[64] Hettich interview.

[65] Silbernagel interview.

interviewed at Standing Rock Sioux Tribal headquarters.[66] Thus, there is certainly a polarization in perception of how American Indians are treated. An administrator at the United Tribes Technical College succinctly made this point:

> "Yes, discrimination exists in North Dakota, and it's my perception that race matters are not perceived by people in the mainstream, but they are very much in the forefront of Native people's thinking. There are all sorts of problems that come from that, both problems, and perceptions of problems."[67]

Perhaps this explains why, in a recent survey of American Indians living in Bismarck/Mandan, nearly half of the respondents rated the friendliness of their community as "poor to fair."[68]

## IV.   North Dakota's New Voter ID Laws Have Adversely Affected The Ability of American Indians To Exercise Their Right To Vote (Senate Factors 3, 8, 9).

33.   A government-mandated procedure that makes it difficult for citizens to exercise their fundamental rights does not fit the model of a responsive government. North Dakota's new Voter ID Laws have established a cumbersome, labyrinthine process for obtaining an acceptable form of identification that has had an adverse impact on the ability of American Indians (and other citizens) to exercise their right to vote.

## A.   The North Dakota Legislature Resorted To Unusual Procedures To Adopt The New Voter ID Law.

34.   HB 1332 departed from normal procedures in a significant way; the entire bill was introduced as a "hog house" amendment. This procedure is usually reserved for incremental amendments to bills that have been introduced, but in this case the entire bill

---

[66] Morgan interview, Eagle interview, Agard interview.

[67] Neumann interview.

[68] Sacred Pipe Resource Center 2014.

was introduced as an amendment by Representative Randy Boehning.[69] As a result, there was no requirement to hold hearings on the bill because it was merely an amendment.[70] One former legislator characterized the hog house procedure as "a way to hide things that have already had a hearing."[71] Another critic of the new law suspected proponents used the hog house procedure "to avoid a public hearing. It was controversial and hearings would have been quite contentious."[72]

## B. There was a Tenuous Basis for Enacting the new Voter ID Laws (Senate Factor 9).

35. The word "tenuous" is defined as "lacking a sound basis, as reasoning; unsubstantiated; weak… of slight importance or significance."[73] Perhaps the best example of "tenuous" policy as it was described in the 1982 Senate Report would be a policy that is designed to solve a problem that does not exist. There is virtually no evidence that "voter fraud" is a problem in North Dakota, especially the kind of fraud—voter impersonation—that would be prevented by new ID laws. This theme—that the voter ID laws solve a problem that does not exist—runs through all the debates over election laws.

## 1. North Dakota has not had a voter fraud problem.

36. A former governor of North Dakota, Lloyd Omdahl, surveyed election officials in the 1970s, and asked if they had encountered any cases of voter fraud. They could only recall one instance of a prosecution for voter fraud, and this was a case where a farmer voted in his old precinct after he had re-located; he was acquitted of any wrong-doing.[74] In

---

[69] House Standing Committee 2013.

[70] Sorensen 2013; North Dakota Democratic Caucus 19 Feb. 2013.

[71] Boucher interview.

[72] Cook interview.

[73] dictionary.com.

[74] Omdahl 1971; 5 Nov. 2006; 1 May 2011.

2008 former Governor Omdahl stated that "North Dakota conducted elections without voter registration for 56 years without fraud. Voting fraud is not in our blood."[75] And in October 2006, Secretary of State Alvin A. Jaeger wrote to a professor: "While you might not believe this, during my fourteen years as Secretary of State and the state's chief election officer, my office has not referred any cases of voter fraud to the United States Attorney, the North Dakota Attorney General, or to local prosecutors. We haven't had any to refer. We are also the only state in the union that doesn't have voter registration. What we have works and works very well." He further said that North Dakota "has had an excellent history of conducting elections that are accurate and trustworthy. Our citizens respect the voting process."[76]

37.   In 2008, when some legislators evinced an interest in implementing a voter registration system, the *Bismarck Tribune* opined that voter registration was not necessary because the "apparent lack of voter fraud in the state suggests there's no need for additional rules and regulations."[77] In 2009, when a new ID law was first being considered, Representative Stacy Dahl of Grand Forks claimed there was no proof that voter fraud was a problem in the state.[78]

38.   When the imposition of a new voter ID requirement was being considered in 2013, the *Bismarck Tribune* said in an op-ed, "Talk about a solution looking for a problem… Republican House members see a threat that no one has clearly stated."[79] When HB 1332 was first introduced in 2013, Representative Marie Strinden asked: "I am wondering if this is a bill that is a solution looking for a problem?"[80] Another member, Representative Gail

---

[75] Omdahl 13 Jan. 2008.

[76] 10/9/2006 Jaeger letter to Lorraine C. Minnite.

[77] Opinion 3 Sept. 2008.

[78] *Bismarck Tribune* 10 Feb. 2009.

[79] *The Bismarck Tribune* 25 Mar. 2013.

[80] House Standing Committee 7 Feb. 2013.

Mooney, noted that even the Secretary of State had some concerns, and that he "made a mention that he felt this was a solution looking for a problem. I think this is looking for more problems going forward."[81] Even one of the bill's sponsors, Representative Kasper, tacitly acknowledged there was no evidence of voter fraud: "*If* [emphasis mine] there are people out there who are abusing the privilege of voting, that they are stopped."[82] During the debate over voter IDs in 2013, the auditor from Cass County testified that voter fraud was not a problem, but that, with the new restrictions on voting, there was a "very real possibility of disenfranchising thousands of eligible voters."[83]

39.   While the North Dakota Sentate was considering HB 1332, Senator Pollman asked the Deputy Secretary of State, Jim Silrum, "Out of the 10,517 people that voted by affidavit, how many are determined to be fraudulent?" Mr. Silrum answered: "I cannot give you an exact response on that."[84] Thus, even though the bill would abolish the affidavit option, there was no knowledge of whether anyone had actually abused that process. In a later hearing, the bill's sponsor was asked if there was any evidence of voter fraud. He replied: "There are currently 9 cases that the Secretary has found in the state that have voted twice."[85] The Secretary of State then clarified that: "In the last election, there were 10,517 voter affidavits; in 2010 we had approximately 4,000….. We had nine cases. They voted absentee in one county and then went to where they lived and voted again."[86] An opponent of the measure noted that these nine potential cases of voter fraud were out of 325,862 votes cast, or 0.0000276 percent.[87] Another legislator pointed out that there had

---

[81] House Standing Committee 8 Feb. 2013.

[82] House Standing Committee 2 Feb. 2013.

[83] North Dakota Democratic Caucus 13 Feb. 2013.

[84] Senate Standing Committee 21 Mar. 2013.

[85] Senate Standing Committee 2 April 2013.

[86] Senate Standing Committee 2 April 2013.

[87] Smith 3 April 2013.

been only one case of actual voter fraud in the last decade—out of more than two million votes cast, and only two or three cases in the last twenty years.[88] The Senate then heard testimony from the Associate Director of the AARP of North Dakota, who succinctly summarized the record:

> "There is virtually no evidence of actual in-person voter fraud in North Dakota. In fact published reports show that in North Dakota in the last ten years there has only been one instance of voter fraud that has been prosecuted. The real problem is not people trying to vote who should not— it's all the people who should vote and want to vote but cannot because of the rules that make it difficult...."[89]

40.   A national study of "voter fraud" completed in 2012 provided a state-by-state breakdown. That database reported three cases of people who voted twice in North Dakota (it is not clear if they were among the nine cases identified above). One of these cases resulted in a plea deal. The outcome of the other two is not known.[90]

41.   The debate continued when the state considered additional voter ID requirements in 2014. The Democratic candidate for Secretary of State in 2014, April Fairfield, argued that voter fraud had never been a problem in North Dakota.[91] Even some of those who supported the changes wrought by HB 1332 and 1333 could not identify any need for the measures. For example, the Grand Forks County auditor opposed the return of the affidavit process because some people might abuse it and vote multiple times, even though she admitted she was unaware of that *ever* happening.[92]

42.   When the Legislature discussed creating a voter registration system in 2015, some legislators noted that voter fraud was not a problem and that, therefore, voter

---

[88] Smith 4 April 2013.

[89] Askvig 2013.

[90] News21, 2012.

[91] Faulx 2014.

[92] Hageman 23 Jan. 2015 (emphasis added).

registration was not necessary.[93]

43.   Even the state's own website admits there is no significant problem with voter fraud. This Q&A is found on the state's "Voice Your Vote" website:

"Is voter fraud possible in North Dakota? Yes."

"Have there been incidents of widespread voter fraud in North Dakota? No."[94]

44.   There are three important factors to consider about the alleged cases of "voter fraud." First, the nine cases referenced above concerned absentee voting, not people showing up at the polls and pretending to be qualified when they were not. Second, the existing centralized system of voter records caught all of these—without any new voter ID requirements. Third, to my knowledge, none of the "nine cases" was prosecuted, even though voting twice is a crime. That is probably because their error was due to a misunderstanding of the voting system rather than malicious law-breaking. And the single case of the farmer voting where he was not supposed to vote did not lead to a conviction. Indeed, it appears that, at most, one person has possibly been convicted of voter fraud at the ballot box over several decades when millions of votes were cast. The type of crime that the new voter ID laws were designed to eliminate simply does not exist.[95] And yet, despite the lack of evidence of any voter fraud, the state legislature refused to re-instate the voter affidavit process in 2015.[96]

---

[93] Smith 18 Sept. 2015.

[94] North Dakota Voice Your Vote (July 2015).

[95] This absence of voter fraud is not limited to North Dakota. For complete nation-wide analyses see: Chapter 2 of *The Voting Wars*, by Richard Hasen (2012); chapter 6 of *Stealing Democracy*, by Spencer Overton (2006); and The Myth of *Voter Fraud*, by Lorraine Minnite (2010). Also see: Urbina (26 Oct. 2010). Even the U. S. Justice Department under President George W. Bush could not find evidence of significant voter fraud; see: Lipton and Urbina 12 April 2007).

[96] Hageman 23 Jan. 2015.

## 2. Laws already existed to deal with voter fraud in North Dakota.

45.    Another aspect of tenuousness is that voter fraud was already illegal under state law—before HB 1332 and HB 1333 became law. The kind of voter fraud that the newly restrictive ID laws would prevent—someone impersonating a qualified voter at the polls when in fact they are not qualified—was already illegal: "It is unlawful for an individual to … knowingly vote when not qualified to do so."[97]

46.    In sum, there does not appear to be a legitimate, substantiated need for the new voter ID laws. They have created a burden on people who face difficulty in obtaining one of the required IDs, they created a burden on the taxpayer, and they are redundant with existing law.

## 3. The cost of implementing the new Voter ID Law further reflects the tenousness of the policy.

47.    Another aspect of the tenuousness of the policy is the substantial cost. Despite the near complete absence of any voter fraud, the fiscally conservative state legislature was willing to expend significant amounts of money to implement the voter ID requirements. The fiscal note attached to HB 1332 was over a quarter of a million dollars.[98] The DOT estimated that it would cost them $12,966 to issue the "free" non-driver IDs, and they would then lose $245,888 on license fees that they would have been collected if a free alternative were not available.[99]

## 4. Partisan political explanations exist for the adoption of the new voter ID laws.

48.    In the near total absence of any actual voter fraud, we must ponder the motives of the North Dakota legislature in passing such restrictive voting laws. We may find clues

---

[97] North Dakota Election Laws 2015-2017: 38.

[98] Smith 22 Mar. 2013.

[99] House Standing Committee 2 Feb. 2013; Fiscal Note 12 Feb. 2013.

by examining the larger debate over the passage of newly restrictive voter ID laws.

49.   At the national level, proponents of strict ID laws claim their motivations have nothing to do with race or ethnicity or partisan advantage. However, there are several examples of partisan operatives who have openly admitted that voter ID laws help Republicans win elections by disenfranchising groups of people who typically vote for Democrats—and Indian voters would fall into that category.  The push for strict ID laws appears to have its roots in efforts made by the American Legislative Exchange Council (ALEC).  ALEC's founder, Paul Weyrich, explained in 1980 why he favored constricting the electorate: "Elections are not won by a majority of people.  They never have been from the beginning of our country, and they are not now.  As a matter of fact our leverage in elections quite candidly goes up as the voting populace goes down."[100]  In 2009, ALEC proposed a "model" voter ID law and began a campaign to encourage its membership, which included many state legislators, to adopt some form of a strict ID law in their state.  Many did so, which resulted in a wave of new voter ID laws.  According to a recent investigation, of the 62 voter ID laws proposed in 37 state legislatures in 2011 and 2012, more than half were sponsored by legislators who had attended ALEC conferences.[101]  A website that tracks ALEC membership claims that 25 members of the North Dakota House, and seven members of the North Dakota Senate, are members of ALEC, including the sponsor of HB 1332.[102]

50.   ALEC's strict "model" voter ID law provides for an affidavit process if the voter does not have an ID (Center for Media and Democracy 2016).  Thus, the North Dakota law is even more restrictive than the one suggested by ALEC.

51.   Following the push by Weyrich and ALEC, a number of Republicans have

---

[100] Weyrich 1980.

[101] Magoc 21 Aug. 2012.

[102] Sourcewatch 2016.

candidly admitted they don't want some people—who usually vote Democrat—to vote. Don Yelton, a GOP party operative in North Carolina (which passed a strict voter ID law), recently said: "The law is going to kick the Democrats in the butt…if it hurts a bunch of lazy blacks that want the government to give them everything, so be it."[103] Another North Carolina Republican, running as a candidate in the Republican primary for a seat in the U. S. Congress, freely admitted the voter ID law was discriminatory, but used language to describe it that would be inappropriate to quote in this report.[104]

52.   In Pennsylvania, the state House Republican leader commented during the 2012 elections that the state's new voter Id law would "allow" Mitt Romney to win the state.[105] In Texas, the former political director of the Republican Party explained that Republicans like voter ID laws because it is an "article of religious faith that voter fraud is causing us to lose elections," even though there was no evidence of voter impersonation in Texas.[106]

53.   The new voter ID law in Indiana was upheld at the appellate level by Judge Richard Posner. In later comments, Judge Posner was quite candid about the law's purpose: "I plead guilty to having written the majority opinion (affirmed by the Supreme Court) upholding Indiana's requirement that prospective voters prove their identity with a photo ID—a type of law now widely regarded as a means of voter suppression rather than of fraud prevention."[107]

54.   Several of the new voter ID laws were accompanied by sharp restrictions on early voting. These provisions may also have been motivated by partisan gain.  Phyllis Schlafly, the widely-known conservative, candidly said that the North Carolina legislature (dominated by Republicans) cut back on early voting because it favored Democrats: "The

---

[103] Farley 26 Oct. 2013.

[104] Reilly 28 Aug. 2013.

[105] Weinger 25 June 2012.

[106] Quoted in Mack 18 May 2007

[107] Posner 2013: 84-85.

reduction in the number of days allowed for early voting is particularly important because early voting plays a major role in Obama's ground game…. early voting is an essential component of the Democrats' get-out-the-vote campaign."[108] In Florida, a former GOP chairman explained the motive behind reducing early voting:

> "The Republican Party, the strategists, the consultants, they firmly believe that early voting is bad for Republican Party candidates…. It's done for one reason and one reason only…. 'We've got to cut down on early voting because early voting is not good for us,' Greer said he was told by those staffers and consultants. 'They never came in to see me and tell me we had a (voter) fraud issue… It's all a marketing ploy.'"[109]

Chris Christie, the Republican governor of New Jersey, vetoed a bill that would have expanded early voting, then noted it was important to elect Republic governors so they could "oversee the voting mechanism."[110] In Georgia, a Republican state senator complained that early voting (on a Sunday) made voting too convenient for Black voters: "Now we are to have Sunday voting at South DeKalb Mall just prior to the election… this location is dominated by African American shoppers and it is near several large African American mega churches."[111]

55.   The academic literature on the impact of voter ID laws supports the contention that voter ID laws have nearly always been passed by legislatures dominated by one party (Republicans) and have had a negative impact on the turnout of voters of another party (Democrats), especially minority voters.[112] A recent book on voter suppression summarized the latest literature:

---

[108] Schlafly 19 Aug. 2013.

[109] Quigley 25 Nov. 2012.

[110] Hayes and Jackson 21 Oct. 2014.

[111] Quoted in Malloy and Galloway 9 Sept. 2014.

[112] See, for example: Hasen 2012: 32; Minnite 2010: 148-49, 153; Alth 2009; Atkeson et. al. 2010; Bentele and O'Brien 2014; GAO 2014: Brennan Center 2006; Pawasarat 2005.

"The potential for strict ID laws to skew election outcomes is huge.  About 11 percent of Americans do not have a driver's license or non-driver's government ID.  Voters without such documentation are far more likely to be among these demographics: African Americans, immigrants, the poor, people with disabilities, and senior citizens.  Academic study after study has shown this connection between demographics and ID Possession."[113]

56.   Some of those academic studies examine specific jurisdictions. One recent analysis in the city of Boston found "strong evidence that Hispanic and black voters were asked for identification at higher rates than white voters…. The magnitudes of the differences are significant."[114] A study in New Mexico concluded that "on some level discrimination at the polls is occurring, even if only in an unbalanced application of the voter identification law…."[115]

57.   Studies that cover the entire United States have found similar results. One analysis concluded that  "strict voter identification laws do, in fact, substantially alter the makeup of who votes and ultimately do skew democracy in favor of whites and those on the political right.  These laws significantly impact the representativeness of the vote and the fairness of democracy."[116] A wide-ranging survey of voter ID laws published in the scholarly journal, *Political Research Quarterly*, reached this conclusion:  "the GOP appears to have opted for coalition maintenance instead of coalition expansion… by embracing several restrictive voting reforms whose true purpose is to marginally curtail the participation of voters typically aligned with the Democratic Party."[117] Another comprehensive survey concluded:

"Our results indicate that proposal and passage [of voter ID laws] are highly partisan, strategic, and racialized affairs.  These findings are consistent with a

---

[113] Wang 2012: 83

[114] Cobb, Greiner, and Quinn 2012: 2

[115] Atkeson. et. al. 2010: 70

[116] Hajnal, Lajevardi, and Nielson 2014

[117] Hicks, et. al. 2014: 12.

scenario in which the targeted demobilization of minority voters and African Americans is a central driver of recent legislative developments.…  Recent legislative efforts to restrict voter access [are] pursued in order to demobilize and suppress particular categories of voters for partisan gain."[118]

A study by the Brennan Center found that the people most likely not to have proper identification were the elderly, minorities, and low-income people.[119] The Government Accountability Office (GAO) recently analyzed the research on the relationship between race and possession of a voter ID, and concluded that possession of an ID "varied by racial and ethnic groups," with Black and Hispanic voters less likely to have the appropriate ID.[120] Political Science Professor Lorraine Minnite suggests that voter ID laws are a "throwback to the post-Reconstruction era when the newly enfranchised freedmen of the South were often forced to carry their registration papers with them to the polls."[121]

58.   In sum, the "debate" over voter ID laws may be an example of what political scientist Henry Flores calls a "racial shield… best described as a device used in the policy process allowing decision makers to divert the attention of others from issues having to do with discriminatory practices."[122] In North Dakota, the reality revealed by these studies has significant negative implications for Native American voters.  As one interviewee put it, "…the case in point is the voter ID; people of color feel targeted."[123]

## C.   North Dakota's new Voter ID Laws Have Made It More Difficult For American Indians To Vote.

59.   Under the new voter ID laws, there are several ways to obtain a valid ID, but each option carries with it expenses and access problems. According to the state's website,

---

[118] Bentele and O'Brien 2013: 1104

[119] Brennan Center 2006.

[120] GAO 2015: 1.

[121] Minnite 2010: 152.

[122] Flores 2015: 26.

[123] B. Nelson interview.

the "ID required for voting," identifies the acceptable forms of ID.[124] There are problems with each one.

## 1. Current driver's license.

60.   The state website indicates that, if the address on a driver's license or a non-driver's ID card is not current, the potential voter can update it in three ways. Each way presents potential problems for some voting-eligible citizens.

- ▪ #1. Update the address online. This requires that the voter have access to a computer and an Internet connection.

- ▪ #2. Travel to a DOT Driver's License Site (DLS) to update a current license with a new address. This requires a car and sufficient money to cover fuel costs. Distances from reservation communities to DLSs can be quite significant, resulting in a costly trip to the DOT.

- ▪ #3. Travel to a DOT DLS to get a new driver's license. Many American Natives in North Dakota do not have a driver's license. A recent survey of Indians in the Bismarck/Mandan area found that 19 percent of the respondents did not have one.[125] Getting a new license costs $15, plus $5 for the written test, and $5 for the road test. The applicant must already have proof of identification to get this form of ID.[126] This also requires a car and travel expenses.[127]

## 2. Non-driver's identification card.

61.   There is an $8 charge to obtain a non-driver's ID if you have a driver's license, or to renew a non-driver's ID if you have a driver's license, or to replace a lost, stolen or destroyed ID card.

62.   According to the state's website, to obtain a "non-driver photo identification card," "you must visit one of the ND Drivers License Sites." This requires a car and travel expenses. But there appears to be a "catch-22" to the ID. The website says "proof of

---

[124] North Dakota Voice Your Vote 2015.

[125] Sacred Pipe Resource Center 2014.

[126] http://www.dot.nd.gov/divisions/driverslicense/dlrequirements.htm.

[127] North Dakota 2016b.

identification is required." In other words, like a new drivers license, one must have an ID to get an ID. There is an $8 fee for every form of ID, except for the non-Driver's license if you do not have a driver's license, and "Renewal of ID card and you do not possess a ND Driver's License," which are free.[128] Thus, to avoid having to pay for an ID required for voting, the procedure for obtaining the non-driver ID must be truly free. But this is not the case. The website indicates that "You will not be allowed to test or obtain a North Dakota Permit, license, or non-driver identification card without proper identification." It then lists the acceptable forms of ID that can be used to obtain an ID:[129]

- "Valid, unexpired U. S. Passport." A passport application costs $110.

- "Report of a Birth Abroad issued by the U. S. Department of State." This is irrelevant and unobtainable to Native Americans born in the United States.

- "Certificate of Naturalization." This is irrelevant and unobtainable to Native Americans born in the United States.

- "Certificate of Citizenship." This is irrelevant and unobtainable to Native Americans born in the United States.

- "Valid, unexpired Permanent Resident Card." This is irrelevant and unobtainable to Native Americans born in the United States.

- "Unexpired Employment Authorization Card." This is irrelevant and unobtainable to Native Americans born in the United States.

- "Unexpired Foreign Passport with I-94." This is irrelevant and unobtainable to Native Americans born in the United States.

- "I-94 Card Stamped Refugee or Asylee." This is irrelevant and unobtainable to Native Americans born in the United States.

- "U. S. birth certificate (state certified; Government issued)." This is the only form of ID that is relevant to American Indians born in the United States who do not already have a passport. Many American Indian people, especially those of an advanced age, were born on reservations and were not issued birth

---

[128] www.dot.nd.gov/divisions/driverslicense/idrequirements.htm.

[129] http://www.dot.nd.gov/divisions/driverslicense/docs/proof-of-identification-documents.pdf.

certificates. North Dakota will issue a birth certificate for $7.

63.    So, what does it take to obtain a birth certificate in North Dakota? According to the website of the North Dakota Department of Health, the applicant must first provide "proof of identity."[130] In other words, it takes a form of identification to get a birth certificate to use as an ID to get a state ID to vote. Ironically, the ID requirements for getting a birth certificate are considerably more liberal than the requirements for a voting ID. Acceptable forms of ID are:

- "State Government issued photo ID or Driver's License." As noted above, all of these cost money, and cannot be obtained without additional ID—such as a birth certificate.

- "Bureau of Indian Affairs issued tribal ID card." Unlike the voter ID law, this does not require that a person's residential address be listed on the card.

- "U.S. government issued Military ID card." This is irrelevant to American Indians unless they served in the military.

- "U. S. Government Passport or Visa." This costs $110.

- "U.S. Government issued Permanent Resident Card." This is irrelevant and unobtainable to Native Americans born in the United States.

64.    However, if the applicant does not have any of these, the applicant can provide two of the following:

- "Social Security card."

- "Utility bill with current address (can not be more than 3 months old)."

- "Bank statement with current address (can not be more than 3 months old)."

- "Pay stub (must include your name, SSN and the name and address of your employer)."

- "Car registration with current address (for the current registration year)."

- "IRS Tax Return (from the prior year)."

65.    The website then states that, if the applicant cannot provide any of these, they

---

[130] www.ndhealth.gov/vital/birth/htm.

can call their office or email them. This is an admirable attempt at providing flexibility but of course requires that the applicant have either a phone or a computer with an Internet connection. Once the applicant has achieved the required "proof of identity," they have four ways of submitting their application for a birth certificate:

- "Internet (Credit Card Only)." This requires a computer, an Internet connection, and a credit card.

- "FAX (Credit Card Only)." This requires a FAX machine and a credit card.

- "Mail (do not send cash)." To use this option, the applicant must "download and completely fill out request form." This requires a computer with an Internet connection and a printer. The fee can be paid by credit card, or with a check (which requires that the applicant have a bank account), or a money order.

- "Stopping by our Office." There is only one office—in the state capitol in Bismarck. This requires that applicants from Indian reservations travel a considerable distance.

## 3. Tribal government issued identification card.

66.   All forms of identification must have the "applicant's current or most recent North Dakota residential address." Such an address does not appear on many tribal IDs. Indeed, houses on Indian reservations may not have a residential address.[131] Several American Indians I interviewed showed me their tribal ID cards, and none had a residential street address. There is also a charge for a tribal ID in nearly all cases. Here are the parameters for getting a tribal ID:

- At Standing Rock Sioux, the first tribal ID is free, but a replacement card within five years is $5. Only some of the newer IDs have a residential address. So, if a voter wanted to use their tribal ID to vote but had an old card that did not have an address and was issued within the last five years, they would have to travel to Fort Yates and pay $5 for a new one.

- At Spirit Lake, a tribal ID costs $11. They are distributed by the tribe's Motor Vehicle Department. Only some of them have a residential address.

---

[131] Woodard 18 July 2014.

- At Turtle Mountain, a tribal ID costs $10. They are distributed by the tribe's Motor Vehicle Department. Only some of the newer IDs have a residential address.

- At Three Affiliated Tribes, a tribal ID costs $10 up to age 59; members who are 60 and over are not charged. Only some of the tribal IDs have a residential address.

67.   Thus, with few exceptions, there is a charge for tribal IDs, and to obtain an ID the applicant must travel to tribal headquarters.

## 4. Long term care identification certificate (provided by a North Dakota facility).

68.   This, of course, is only available to a small portion of the population.

69.   In sum, obtaining one of the forms of ID approved by the new voter ID laws almost always involves a fee or charge of some kind, and in nearly all cases requires travel. It also helps to have a computer with Internet access, a credit card, a car, and the ability to take time off work. Also helpful is a familiarity with the system of government and its bureaucracy. Thus, the voter ID requirement works best for people who live in urban areas, have a good income, are computer-literate and have a printer and/or FAX, have a good car and gas money, have a flexible schedule, and understand how to navigate the state's administrative procedures. For others, it places a significant burden on their ability to vote.

## D.   The New Voter ID Law Represented A Switch From A Liberal Voting System And Resulted In The Disenfranchisment Of Native American Voters.

70.   The imposition of new voter ID requirements was, in itself, a departure from normal procedures. North Dakota traditionally had a very open voting system. There was no voter registration—the only state in the country without that. Prior to the 2014 law there was no requirement of any kind for a voter ID, and a voter had an option to sign an affidavit in order to vote. In the 2012 election—the last election to take place before the voter ID requirements were instituted—10,517 voters took advantage of the affidavit

option.[132] In other words, the voting system was open and welcoming—and it worked well. Indeed, the state's election process was rated number one in a 2012 survey of all 50 states—before the new ID requirements were implemented.[133]

71.   That changed with the election in 2014, due to problems with the new voter ID requirements. In the 2014 election, "Some had problems casting a ballot in November,"[134] and some were "turned away."[135] Secretary of State Jaeger admitted that "a handful of voters' information" had not been updated in the central voter file.[136] Some members of the Spirit Lake Reservation were not allowed to vote because their tribal IDs did not include sufficient information.[137] The North Dakota Association of Counties surveyed the state's 53 counties to assess how many voters were turned away as a result of the new ID requirements. Only 30 counties responded, so the results are incomplete, but they revealed that 22 had failed to update their driver's license and 66 did not have an acceptable form of ID.[138]

72.   Some of the disenfranchised people were students at the state's public universities. A 2014 survey conducted by two professors from North Dakota State University found that "3.2 percent of respondents who attempted to vote in the 2014 midterm elections were unable to participate due to confusion over residency requirements … . Extrapolating the results of this survey to the general population indicates that 689 students were unable to vote due to residency issues."[139] According to

---

[132] Smith 3 April 2013; House Standing Committee 14 Feb. 2013.

[133] PEW 7 April 2014.

[134] Hageman 23 Jan. 2015.

[135] Smith 7 Nov. 2014.

[136] Smith 7 Nov. 2014.

[137] Monk 10 June 2014.

[138] Smith 10 July 2014.

[139] Bauroth and Nelson 2014.

the *United Tribes News*, some of the students who experienced problems were American Indians who were attending the United Tribes Technical College. However, the students did manage to vote after obtaining the proper ID from the registrar's office and returning to the poll a second time before it closed.[140]

73.   The sponsor of the second voter ID bill (HB 1333) admitted that the previous law, HB 1332, resulted in some voters who may have "fallen through the cracks."[141] Some of the problems may have been due to a voter information campaign the state designed (using $700,000 in federal money) to inform voters about the new requirements.[142] One county auditor admitted there may have been some "mixed messages" regarding the new requirements.[143] A tribal college administrator made reference to this problem:

> "When they changed the voter ID laws—which IDs are okay or not okay, or how it was affecting students, there wasn't enough public information out there to get that information to the people. That was the case two years ago for students on college campuses."[144]

74.   HB 1333 made the ID requirements for students even more cumbersome; it eliminated the use of student certificates as a viable form of identification.[145] As a consequence, some students at North Dakota's colleges and universities were prevented from voting by the new ID procedures.[146] Despite this, a bill introduced in 2015 to ease the ID restrictions on students was defeated.[147]

75.   Several interviewees experienced difficulties voting due to the new ID laws, or

---

[140] Neumann 2015.

[141] Hageman 22 Jan. 2015.

[142] Smith 10 July 2014.

[143] Hageman 21 April 2015.

[144] Neumann interview.

[145] Smith 7 April 2015.

[146] Hageman 21 April 2015.

[147] Hageman 11 Mar. 2015.

knew other people who had problems. Here are some of their comments:

- "The issue is the physical address. The Secretary of State Jaeger led the charge; he said you don't live at a P.O. box, you live at an address, so that needs to be there. They don't realize that, for many Indian families, you have multiple generations living in a house without door-to-door delivery. Their mail goes to a P. O. box—even here in Rolette. I have to go to the Post Office to get my mail. So a lot of people don't have a physical address."[148]

- "For a lot of our people we have a tribal ID; they [the state] said they would take those, but only if it has an address. Even for me I don't have an address; we are rural people, we have P.O. boxes. When I told them I don't have a physical address, they told me to GPS the location of my home—state officials told me that. People don't have GPS; a lot don't even have phones. It just doesn't happen because we don't have the equipment. When I told them we don't have a GPS, I never got a response from them."[149]

- "A couple of times [I have had problems voting]. We don't have a physical address, only a P. O. box in St. John. And my tribal ID does not have an address on it [he showed me his tribal ID; there was no address on it]."[150]

- "Most of the difficulties came from the Elders, who have a hard time getting a ride, and their ID doesn't have a physical address. So they come in to vote, but are turned away and have to go all the way home; I have seen that myself. One of our Elder ladies didn't have the right ID, but she said to the people at the voting: you know me, but they said: we can't let you vote because of the new laws. I saw that myself—people being turned away due to the ID law. That lady had a walker. I remember that."[151]

- "I'd gone to work at the Peace Gardens (which straddles the Canadian-U.S. border). My voting poll is in St. John. My husband picked me up from work because my truck was in the shop. I don't normally take a purse to work because I work outside. But I had my passport because I work in both Canada and the U.S. So I always have my passport so I can get back into the U.S. On the way home we went to the polling station. They would not allow me to use my passport. My comment was, it's an official ID issued by the federal government. They said you can't use it because it does not have your physical address on it. It says I live in St. John, North Dakota, but it does not have my street address, so they said no. By then it was too late to go home, get my purse, and go back to

---

[148] Boucher interview.

[149] Allard interview.

[150] J. Turcotte interview.

[151] Allard interview.

the poll; it would have been closed."[152]

- "There were people turned down if they only had their tribal ID without the address on it. People would even have their birth certificate, but they wouldn't let them use that either."[153]

- "A lot of people have been turned away because of that ID thing—probably 8 to 10 that they wouldn't let vote that I saw."[154]

- "Remember when we voted for the school district and they wouldn't let me vote. The poll worker was my niece. She knew me, but she would not let me vote even though she's known me all her life. She said it was against the rules."[155]

- "I was born and raised here, but I haven't changed my driver's license. I worked in Minot but I vote here, this is my home. The woman at the polls said I'm sorry, you can't vote. And there were people there at the polls saying they knew me, but she still would not let me vote. I'd lived in Minot for a short while. Maybe she was just doing her job and following the rules; I can't call it racism. The people in line said hi Matt; they knew me. I didn't get to vote."[156]

- "...people who are "doubling up" [Native Americans who live in the homes or apartments of family members] don't want to give an address that could lead to an eviction notice for their family members who are housing them. That proof of address is really the problem."[157]

- "We didn't see a lot... Some people got turned away. Residency issues need to be addressed; it is an ill-defined term."[158]

- "Some tribal IDs have physical addresses, but quite a few just have a P.O. box. People don't know street addresses; there are no street signs here [Fort Berthold] in many places."[159]

- "People who have tribal IDs; lots of them were turned away because they

---

[152] C. Turcotte interview.

[153] C. Turcotte interview.

[154] A. McCloud interview. (Note: Mr. McCloud has been a poll worker for ten years.)

[155] E. McCloud interview.

[156] M. McCloud interview.

[157] Carbone interview.

[158] interview with five people from the North Dakota Association of Counties.

[159] Taft interview.

didn't have a current address. We are still nomadic. Some of our tribal IDs just have a P. O. box, or they don't have a house. Many people sometimes live in the same household. There are all these socially-based parameters that limit people to having an ID."[160]

- "Most Native people didn't realize that [that they needed a physical address on their tribal ID] until they showed up to vote because the publications all said it was easy as pie, and the options included a student certificate and tribal ID. But nobody really clarified what had to be on the ID."[161]

- "I have a brother-in-law who said his 911 address was wrong, so they wouldn't let him vote. He has a tribal ID, but it didn't have an address. His driver's license had the wrong 911 address so he did not vote as a result."[162]

- "Some people said they had ID problems, but it's the law."[163]

- "The top reason [why American Indians experienced difficulty voting] is IDs, not being able to get a state ID. The tribal IDs don't have addresses on them."[164]

76.   Problems with the ID are not the only challenges facing American Indians who want to vote. The location of polling places can also present a problem. Two of the people I interviewed commented on this:

- "The polling locations [at Fort Berthold] that Natives can access; they'll put a squad car out there, targeting Native Americans. They [Native Americans] can be threatened; you need a heightened level of awareness."[165]

- "They changed the polling place in my district (in Bismarck). It used to be closer to where the Natives live, at a golf course with three apartment buildings close by. They moved it to the civic center which is further away."[166]

---

[160] Morgan interview.

[161] Stromme interview.

[162] anonymous1 interview.

[163] Silbernagel interview.

[164] Kary interview.

[165] Jones interview.

[166] Kary interview.

## V.    North Dakota Officials Have Failed To Responsively Act to Address the Needs of American Indians (Senate Factor 8).

77.    The ability to obtain an ID to vote, and the act of voting itself, are greatly affected by both education and income. Indeed, it is well-recognized in political science that income and education correlate with voting turnout.[167]

78.    One of the hallmarks of "good" government is a government's ability to serve the needs of the people—all the people. One aspect of responsive government is its ability to provide for the public education of its citizens. Another type of responsiveness concerns the ability of a government to assist those in the lowest rungs of the economic ladder. In North Dakota, there are significant differences between Anglos and American Indians in regard to education and poverty.

## A.    American Indians Suffer From A Lack Of Educational Resources In North Dakota (Senate Factors 8, 5).

79.    North Dakota officials have failed to respond to the educational needs of American Indians. The lack of top-quality educational resources is reflected in ACT test scores. In a 2000 survey of ACT scores, white high school students in North Dakota scored an average of 21.6 (which is above the national average), but the state's Indian students scored an average of 17.1.[168]

80.    The latest data comes from the American Community Survey (ACS), 2011-13, and it demonstrates significant differences between Anglos and Indians. Only 8 percent of Anglos have less than a high school education, but the figure for Indians is 18.1 percent. And 20.2 percent of Anglos have a Bachelor's degree, while only 10.6 percent of Indians have that degree.[169]

---

[167] Lien 2000; Verba and Schlozman 1995; Wolfinger and Rosenstone 1980.

[168] Nicholson 16 Aug. 2001.

[169] ACS: 3.

## B.      American Indians Living In North Dakota Suffer From The Effects Of Poverty (Senate Factors 8, 5).

81.    North Dakota officials have failed to address the dire poverty of American Indians living in North Dakota. Data from the American Community Survey demonstrates the sharp contrast between the social and economic well-being of Anglos with that of American Indians living in North Dakota.[170] The rate of employment in the labor force for Anglos is 71 percent; for Indians it is 58 percent.[171] Another indicator of potential economic difficulties is the percentage of households headed by a female with no husband present. For Anglos, that rate is only 6.7 percent, but for Indians it is 29.5 percent.[172] Also, Indians tend to be employed in the lowest-paying jobs; 30.5 percent work in service occupations while only 16 percent of Anglos are in service jobs. At the other end of the spectrum, 35.2 percent of Anglos work in "management, business, science and arts," but only 25.6 percent of Indians have such jobs.[173] It is not surprising then, that there is a big difference in income. The median annual household income for Anglos is $56,566; for Indians it is not much more than half of that—$29,909.[174] The data for "mean earnings" also reflects a large gap:  for Anglos it is $73,313, for Indians it is 48,763.[175] The low pay, lack of jobs, and inadequate education have led to stark differences in poverty rates. Only 5.3 percent of Anglos families live below the poverty line, compared to 37.7 percent for American Indians.[176]

82.    These differences in economic circumstances are reflected in differential rates of

---

[170] ACS 2011-2013.

[171] ACS: 5.

[172] ACS: 2.

[173] ACS: 6.

[174] ACS: 7.

[175] ACS: 7.

[176] ACS: 7.

home ownership versus rentals. In a state where a physical street address is a prerequisite for voting, this difference becomes very important. 67.2 percent of Anglos live in owner-occupied housing, compared to just 46.3 percent for Indians. Conversely, only about a third of Anglos (32.8 percent) live in rentals, compared to over half (53.7 percent) of the Indian people in the state.[177] Also, the value of these homes are quite different. The average value of a home for Anglos is $144,400; the same figure for Indians is about half of that ($74,700).[178] Home ownership among urban Indians is also low. According to a 2014 study of Natives in the Bismarck/Mandan area, 46 percent of Indians live in a rented apartment, and 18 percent live in a rented trailer. This means that the residential address of these citizens may change more frequently than people who own their own homes.[179] Indeed, this population appears to be fairly transitory; the same survey found that 12 percent of the respondents had lived in the Bismarck/Mandan area for less than one year; and 31 percent for one-to-five years. That makes it more difficult to obtain an ID with the most current residential address.

83.   Another result of low income and lack of jobs is the inability to afford vehicles and phone service. Nearly all of the ID options described above require the potential voter to either travel long distances, or in a few options, call various state offices. Yet 13 percent of Indians do not have a vehicle, whereas only 5.1 percent of Anglos lack a vehicle. A recent survey of urban Indians in Bismarck/Mandan found that 19 percent of respondents did not own a vehicle.[180] And 3.6 percent of Indians do not have a phone, compared to 2.2 percent for Anglos.[181]

84.   Another important aspect of poverty is the extent to which low-income people

---

[177] ACS: 8.

[178] ACS: 9.

[179] Sacred Pipe Resource Center 2014.

[180] Sacred Pipe Resource Center 2014.

[181] ACS: 8.

have Internet access—required for many of the procedures described above. According to the chairman of the Federal Communications Commission, only between 5 and 10 percent of low-income households have broadband.[182] A recent survey of Indians in the Bismarck/Mandan area also found a low proportion with connectivity; only 61 percent own their own computers, and only half have their own Internet access. The rest have to access it through some other way.[183] It is probably a safe assumption that these figures are considerably lower for rural areas on Indian reservations in North Dakota.

85.   Poverty also results in less access to the legal system, and the need to rely on assistance: "Minorities constitute disproportionately large percentages of those using Legal Services North Dakota compared to minority populations in the state."[184]

86.   We can also examine data from particular reservations to get a clearer picture of the poverty that afflicts American Indians in North Dakota. Data from the 2000 census revealed that the poverty rate among tribal members of the Turtle Mountain Band was three times higher than the state average, and the unemployment rate was 65 percent, compared to 2.8 percent for the state as a whole.[185] At Standing Rock (North Dakota), data from that same time period indicated a poverty rate of 61.3 percent and an unemployment level of 50.2 percent.[186] Today, unemployment at Standing Rock is 69 percent.[187]

87.   The website for the Turtle Mountain Tribe provides data from 2010 on poverty rates among its members. They estimated unemployment on the reservation at 69.25 percent, with 40 percent of tribal families living below the poverty level. These dismal statistics are reflected in the high poverty levels of local towns. In Rolla, 18.9 percent of the

---

[182] Genachowski 2010.

[183] Sacred Pipe Resource Center 2014.

[184] North Dakota Commission 2012: 169.

[185] LJP & Associates 2008.

[186] Standing Rock Statistics.

[187] Standing Rock Sioux Tribe n.d.

people live below the poverty level; in St. John it is 16.2 percent, 32 percent in Dunseth, and 13.4 percent in Rolette.[188]

88.   Homelessness is also a significant problem on the Turtle Mountain reservation. According to a report by the Turtle Mountain Housing Authority, there are approximately 150 homeless people on the reservation.[189] This is especially relevant to this case because of the requirement that all voters have a residential address listed on their ID. This is obviously impossible for people without a home.

89.   Most of these data were collected before the decline in oil prices and the sudden economic collapse in the oil fields of North Dakota. The oil boom brought a great deal of money to some Indian communities in North Dakota, but it also brought a panoply of social problems and infrastructure problems that still plague American Indians in the region, even though the money and the boom have since departed.[190] Thus, the poverty, economic dislocation, and accompanying social problems are even worse today than they were when the data cited above were collected.

90.   The relationship between poverty and the ability to get an ID and vote was a theme in many of the interviews:

- ▪ "Take someone like X, a kid that I got through school. He has no car. He worked hard, got hurt, and they won't help him. So he's living on welfare. He's got no money."[191]

- ▪ "The problem is that the poverty is so high on the reservation that people can't afford to go and get a state ID, just a driver's license or state ID; they just can't afford it…everything falls back to poverty. They have no cars, no gas money, they have no resources to get to a state office."[192]

---

[188] Turtle Mountain Tribe n.d.

[189] LJP & Associates Feb. 2008.

[190] Horwitz 28 Sept. 2014; Horwitz 5 June 2014; Frank 14 Mar. 2016.

[191] J. Turcotte interview.

[192] M. McCloud interview.

- "I think poverty has a lot to do with it. It's having the gas to get there, having a car that runs. Living on benefits doesn't get you transportation."[193]

- "We have to travel long distances… it is an obstacle for people on fixed incomes, and some people do not have their own vehicle."[194]

- "Long distances are a challenge because you have poor people. Even if they have a car, they need gas. One loophole in the voter ID; on a tribal ID, you have to go to the tribal office. That can be a two-hour drive one-way here at Fort Berthhold."[195]

91.   There are four counties in North Dakota with Native populations that exceed 30 percent of the total population: Benson, Sioux, Rolette, and Mountrail. Each of them is a significant distance from Bismarck. Thus, any procedure that requires residents of these reservations to travel to Bismarck imposes significant travel costs.

92.   In sum, poverty, less education, and the requirements of the new voter ID laws conspire to make it difficult for many Indian people to vote.

## C.   American Indians Living In North Dakota Suffer From The Effects Of Poor Health And Health Care (Senate Factors 8, 5).

93.   The dominant society does a poor job of providing adequate health care to Native Americans. The Indian Health Service explains that:

> "The American Indian and Alaska Native people have long experienced lower health status when compared with other Americans. Lower life expectancy and the disproportionate disease burden exist perhaps because of inadequate education, disproportionate poverty, discrimination in the delivery of health services, and cultural differences."[196]

As a result, the mortality rate for American Indians in the United States is 943/10,000, whereas the average for all races is 774/10,000.[197] Infant mortality is especially high

---

[193] Nordmark interview.

[194] Eagle interview.

[195] Jones interview.

[196] Indian Health Service 2016.

[197] Indian Health Service 2016.

among American Indians (13.5) compared to Anglos nationally (7.5).[198]

94.   One of the problems that affect health care for American Indians is a presumption sometimes made by states that the Indian Health Service can provide for all the health care needs of Indian people. But in North Dakota, there are only two IHS hospitals (among the total of 50 hospitals)—one at Fort Yates and one at Belcourt—so Native people must rely on other sources of health care. However, American Indians are three times more likely to not have health insurance in the state, and nearly twice as many American Indians report that they needed a doctor in the past year but could not afford it.[199]

95.   For these and many other reasons, the health of American Indians in North Dakota is significantly compromised. The percentage of American Indians in the state with a disability, age 18-64, is 17.5 percent (for the state as a whole it is only 8.6 percent).[200] This is especially relevant to this case because a disability makes it even more difficult to obtain an ID.

96.   The health of Native people in North Dakota is also threatened by environmental variables. On the Standing Rock Reservation, "Problems with water quality and inadequate supply are common throughout the reservation and have a detrimental effect on health and quality of life."[201] Tribal members at Fort Berthold are dealing with the negative health impacts of the massive drilling boom in that area.[202]

97.   Another aspect of health is mental health. A survey of high school students found that 8.2 percent of white students had attempted suicide; the figure for American Indians is

---

[198] North Dakota Department of Health 2016, Table 14B

[199] North Dakota Department of Health 2016, Table 22

[200] North Dakota Department of Health 2016: Table 8.

[201] Standing Rock Environmental Profile 2016.

[202] Brown 30 Nov. 2013.

nearly twice that—14.3 percent.[203] The data are even more depressing for middle school kids: 5.2 percent of white students have tried to kill themselves, while 18.7 percent of American Indian kids have done so.[204]

98.   These demographic variables—inadequate education, poverty, and poor health care—tend to combine in a vicious cycle. The University of North Dakota's Center for Rural Health notes that:

> "People in poverty tend to have a lower health status. Poor housing, sanitation, and water supply can contribute to disease and ill health. Access to adequate and quality food sources is limited. Poverty is associated with greater rates of illness and shorter life spans."[205]

When people are dealing with survival, they are much less likely to have the time, energy, expertise, and desire to expend those resources on civic affairs. This is a very clear demonstration of Abraham Maslow's famous "hierarchy of needs." At the most basic level are physiological/biological needs—food, shelter, warmth. The next level is safety, including economic security and health. These needs must be met before the individual can aspire to higher levels of needs, such as political participation and civic engagement.[206] It is clear from the data cited above that many Indian people in North Dakota are struggling desperately to achieve their most basic needs; this condition automatically reduces their opportunities to vote and elect candidates of their choice.

# VI.   The Minimal Extent to Which American Indians are Elected to Office in North Dakota Reflects Discrimination (Senate Factor 7).

99.   American Indians in North Dakota are equal citizens of the county in which they

---

[203] North Dakota High School Survey 2015, QN29.

[204] North Dakota Middle School 2015, QN17.

[205] Center for Rural Health 2014: 8.

[206] Maslow 1954

reside, and the state, and for urban Indians, the city. Yet they have little or no voice in the governance and administration of these institutions of state.

## A.   Lack Of Representation In The State Legislature.

100. One of the most basic elements of representative government is the right to be represented by people who are "like-minded." This, in many situations, means people from similar socio-economic, cultural, and racial backgrounds. But the American Indians of North Dakota are almost exclusively represented in the state legislature by Anglos. The state's website for the Indian Affairs commission contains a list of the representatives from districts characterized as "Tribal Districts." Of the 24 listed legislators, only one is an American Indian—Senator Richard Marcellais from Turtle Mountain.[207] Another list, produced by the state legislature, lists districts "on/around" Indian reservations. This list names 42 representatives, and only one (Senator Marcellais again) is Native American.[208]

101. The legislature has a "Tribal and State Relations Committee." It has seven members—all of them Anglos.[209]

102. Senator Marcellais represents the area of Turtle Mountain (Rolette County). There are three other significant areas of the state with concentrations of American Indians: Sioux County (Standing Rock), Benson County (Spirit Lake), and the five counties that contain parts of the Fort Berthold Reservation. According to my sources, no American Indian enrolled in one of those tribes has ever been elected to the state legislature from these areas.

## B.   Lack Of Representation In County And Local Elective Offices.

103. American Indians are also very rare among elected officials at the county level.

---

[207] North Dakota Indian Affairs 2015.

[208] North Dakota 64th Legislative Assembly 2016.

[209] North Dakota State Government 2016a.

There are three counties with Indian populations that exceed 50 percent: Rolette, Benson, and Sioux. Rolette County (77 percent American Indian) has five county commissioners; only one is an enrolled member at Turtle Mountain. Sioux County (84 percent American Indian) has three commissioners; none is an enrolled member at Standing Rock. Benson County (55 percent American Indian) has five commissioners; one is American Indian.

104. At the local level, there is a considerable American Indian population in the Bismarck/Mandan area (2,973 according to the 2010 Census). Bismarck, which is 4.5 percent Indian, is governed by a city commission consisting of four commissioners and a mayor; none is American Indian. Mandan has a similar governing structure; it is 4.6 percent Indian, but no one on the city commission is American Indian. Fargo is 1.4 percent Indian, and has an all-white city commission.[210]

105. I also attempted to assess the extent to which American Indians have been elected to school boards in North Dakota. There are American Indians serving on school boards for districts on or near reservations (examples: Belcourt and St. John at Turtle Mountain, Parshall and New Town at Three Affiliated Tribes). As for the other areas of the state where reservations are located or there are significant concentrations of Indian people, I could not find evidence of American Indians serving on school boards

106. As for county sheriffs, there was a Native county sheriff in McLean County (Three Affiliated Tribes), but he retired. There also has been at least one American Indian sheriff in Rolette County. I do not believe there are any elected American Indian sheriffs at present.

107. It is clear that a Native American running for public office faces tremendous hurdles—unless the electorate is completely dominated by Indian voters. An Indian woman who ran for a House district was told by a more experienced politico that she would do

---

[210] U.S. Census 2010.

much better if she changed her name to "something sounding Scandinavian."[211] And I cited above the comments made to Merle Boucher when he ran for state-wide office; he is not an enrolled member of any tribe, but has Indian/Metí blood and an Indian-sounding name, and thus was mistaken for being Native. When handing out campaign literature he was told by one man: "You f____ Indians are all communists."[212] Another interviewee tried to explain why there are so few American Indians involved in governance: "It's systemic. We are not really a part of the system; it has been built around us.[213]

## C.    Lack Of Representation In Civil Service And On Commissions/Boards.

108. Many important decisions in government are made by civil service administrators. Although data is difficult to obtain, there are some relevant examples. A 2012 analysis of state employees found that only 1.23 percent of state employees identify themselves as American Indians.[214] A 2012 analysis discovered that minorities, including American Indians, were "not proportionally represented in North Dakota's legal profession or as state court employees."[215]

109. At the county level, it appears that there are very few administrative directors that are American Indian. The North Dakota Association of Counties produces a roster of elective officials and administrative heads in each county. Of all the names on that roster for Sioux County (84 percent American Indian), none is American Indian.[216] For Benson County (55 percent American Indian), the results are the same—no American Indians as

---

[211] Jones interview.

[212] Boucher interview.

[213] Kary interview.

[214] United Tribes Network 2013.

[215] North Dakota Commission: ix, 149. American Indians are 5.4 percent of the population, but only 0.8 percent of the state bar (North Dakota Commission (2012): 127.

[216] Hettich interview.

directors.[217] Rolette County (77 percent American Indian), however, is quite different: there are several Native people serving as county directors.

110. There also appears to be very few American Indians serving as appointed members of advisory boards and commissions. According to one source, "There is so much segregation we don't have representation on boards and advisory commissions. Just ask anybody and they'll know; they can't name a single Native American board member."[218] There are 137 commissions and boards listed on the state's website, and the race of the members is not denoted, so I have no way of independently verifying Ms. Kary's statement. The obvious exception is the state Indian Affairs Commission; of its ten members, most are American Indian. There is also a state Board of Indian Scholarships, chaired by the same individual as the Indian Affairs Commission, with two other voting members who appear to be non-Indian. The only other Indian commission I could find was for the city of Fargo, which has a Native American Commission composed mostly of American Indians. Apparently Fargo is the only city in North Dakota with such a commission.

## VII. Conclusion

111. In the *Spirit Lake v. Benson County* case, cited above, the judge noted that "there simply is no more essential duty of a democratic government than to provide open, fair elections that are accessible to all eligible voters."[219] American Indians constitute an important part of North Dakota's electorate, comprising 5.4 percent of the population, according to the 2010 census.[220] But turnout in areas predominantly American Indian is low; I compared the turnout rates for three counties that are predominately American Indian, and the forty counties that have virtually no American Indians. The three

---

[217] Weed interview.

[218] Kary interview.

[219] 2010: 7.

[220] U.S. Census Bureau 2010a.

predominantly Indian counties are: Benson with 55 percent; Rolette with 77 percent; and Sioux with 84 percent. The average turnout for those three counties in the 2014 general election was 30.58 percent. The average for the forty "Anglo" counties was 52.8 percent.[221]

112.  This difference in turnout between Anglos and American Indians, and the impact of the voter ID laws, can be placed in the larger context of research on the impact of requiring voter ID. Although this body of literature is quite recent, and some results are mixed,[222] there is evidence that requiring an ID to vote lowers turnout rates among voters with less education and less income.[223] One study found that states that imposed a non-photo ID law, such as North Dakota, lowered turnout by an average of 2.2 percent.[224] In the 2012 general election, 325,862 people voted in North Dakota;[225] 2.2 percent of that would be 7,168 voters. This should not be surprising, given recent research that indicates that perhaps 11 percent of U.S. citizens do not have a government issued photo ID. This percentage is even higher for Blacks, Hispanics, and low-income people.[226]

113. Obviously there is a great disparity in the level of electoral participation of

---

[221] Office of the North Dakota Secretary of State, n.d. This is an imperfect measure because there are significant numbers of Anglo people in these counties; thus, the real difference is probably higher. There is evidence that Native turnout is increasing. See: North Dakota Commission to Study Racial and Ethnic Bias in Courts (2012): 22.

[222] Some studies indicate that ID requirements only prevent a small percentage (1 to 1.2%) from voting; however, that is still thousands of voters at the state level, and the figure is almost certainly higher for American Indians due to the factors discussed in this report. For a survey of this complex literature, see: Pastor, Santos, Prevost, and Stoilov (2010). Part of the problem with this literature is that many of the studies pre-date the imposition of the latest voter ID laws. For example, nearly all of them pre-date the 2013 and 2015 laws passed in North Dakota. Also, they do not contain separate data for American Indians.

[223] Alvarez, Bailey, and Katz 2007; Vercellotti and Andersen 2006.

[224] Alth 2009.

[225] 2012 General Election-Official Results.

[226] Brennan Center 2006. It is probably a safe assumption that the same is true for American Indians, but the Brennan Center study did not separate out that group.

Anglos and American Indians. An American Indian woman, after encountering considerable difficulties in voting due to the new ID law, succinctly summarized some of the reasons why Native turnout may be low:

> "There is an inherent level of distrust between Native people and the government. Many Natives avoid state elections altogether because we've been screwed over by both Democrats and Republicans, at every point in history, on just about every issue. So when we do choose to participate, we should at least be treated with the same level of respect as our non-Native counterparts."[227]

114. Despite the great challenges to providing Indians an equal opportunity to vote, the state still chose to enact some of the strictest voter ID requirements in the nation. A survey by the National Conference of State Legislatures (NCSL) found that 36 states have recently passed some form of voter ID law (three of which have been struck down by the courts). North Dakota is classified in the NCSL survey as a "strict" non-photo ID state (with five other states). Thus, North Dakota has some of the most stringent requirements of any state in the nation. The NCSL definition of "strict" includes states that have an affidavit process or that allow for a provisional ballot. North Dakota allows neither, and thus might best be characterized as a "super-strict" state. Also, the NCSL analysis came out prior to the passage of HB 1333, which made the voter ID laws even stricter. The NCSL analysis notes that, in North Dakota, "If an individual offering to vote does not have or refuses to show an appropriate form of identification, he or she will not be able to vote."[228]

115. The American Indian people who live in North Dakota have, in the words of the state's Indian Affairs Commission, "endured and survived many oppressive federal policies."[229] Many of these oppressive policies were in response to the demands of local

---

[227] Luger 6 Nov. 2014.

[228] National Conference of State Legislatures 2015.

[229] North Dakota Indian Affairs Commission.

settlers and encroaching Anglos.[230] These demands from Anglos living close to Indian reservations was typical of that era, and clearly reflected in the language of the landmark U.S. Supreme Court case, *U. S. v. Kagama*: "They [Indian tribes] owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies."[231]

116. And yet, the Native tribes of the northern Plains have managed to survive. As one Lakota woman put it, "Just being alive is a political act for Native people."[232] In recent years, that survival has hinged in large part on their ability to protect themselves and promote their interests through the political process. And the most basic element in that process—the most fundamental right in a democracy—is the right to vote. Yet that right has clearly been affected by the new voter ID laws. It is my professional opinion that these laws have made it more difficult for American Indians in North Dakota to vote, and the extent of that difficulty is not shared by most non-Indian voters. When ask if American Indians in North Dakota have an equal opportunity to elect candidates of their choice, a tribal college administrator said: "No, it can't be, it's not balanced, there is no equity; the restrictions on their ID documents make it less than equal."[233] One of the American Indian people I interviewed summarized the situation this way: "Overall the state of North Dakota can do more. We're not asking them to pick us up and carry us to the poll, but just assist us, and don't ask questions about our IDs. Natives should be able to vote without the hardship of a state ID."[234]

117. Given historical trends, socio-economic conditions, troubled Indian-Anglo relations, geographical isolation, and the unique political position of Indian tribes in the

---

[230] Poitra and Poitra 1997; MHA Nation n.d.

[231] 1886.

[232] Morgan interview.

[233] Neumann interview.

[234] M. McCloud interview.

American polity, voter ID requirements have placed an especially difficult burden on American Indian people living in North Dakota. The large body of information I have collected supports the conclusion that North Dakota's voter ID laws have directly and demonstrably impaired the ability of some American Indians to participate in the electoral process and elect candidates of their choice.

Executed at Ogden, Utah, on June 17, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

_Daniel McCool_

_____

Dr. Daniel McCool

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2016, the document titled "**Declaration of Daniel McCool, Ph.D.**" was electronically filed with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing ("NEF") to:

Christopher S. Joseph
Assistant Attorney General
State Bar ID No. 07450
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
Email csjoseph@nd.gov

Dated:  June 20, 2016

By:  /s Matthew Campbell
        Matthew Campbell

Matthew Campbell, NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
**NATIVE AMERICAN RIGHTS FUND**
1506 Broadway
Boulder, Colorado 80302
Phone: (303) 447-8760
Fax: (303) 443-7776

# EXHIBIT A

Vita

**Daniel Craig McCool**

Political Science Department
University of Utah
260 S. Central Campus Drive, Rm 252
Salt Lake City, UT   84112
(801) 585-6455
email:  dan.mccool@poli-sci.utah.edu

May 2016

**EDUCATION**

Ph.D.  (1983)  University of Arizona (Political Science)
    Dissertation:  "Indian and Non-Indian Water Development."

Independent Doctoral Minor:  Latin American Studies, awarded by the Latin American Area Center, University of Arizona.

M.A.  (1978)  University of Arizona (Political Science)
    M.A. Thesis:  "The Budgeting Problems of the National Park Service."

B.A.  (1973)  Purdue University (Sociology).

Major Fields of Research:  voting rights, water resources, public lands, American Indian policy


Language Training:  Spanish


**WORK EXPERIENCE**

| | |
|---|---|
| 1996-present | Professor of Political Science, University of Utah |
| 2003-2015 | Director, Environmental and Sustainability Studies Program |
| 2011-2014 | Co-Director, University of Utah Sustainability Curriculum Development |
| 1998-2007 | Director, American West Center |
| 1989-1996 | Associate Professor of Political Science, University of Utah |
| 1990-1993 | Associate Dean, College of Social and Behavioral Science |
| 1987-1990 | Director of Public Administration Education, Center for Public Policy and Administration, University of Utah |
| 1987-1989 | Assistant Professor of Political Science, University of Utah |
| 1983-1987: | Assistant Professor, Texas A&M University |
| 1982-1983: | Visiting Lecturer, Texas A&M University |
| Spring, 1981: | Lecturer for the American Indian Education Program, University of Arizona |

| | |
|---|---|
| 1978-1982: | Research and Teaching Associate, Political Science Department, University of Arizona |
| June 1978-Oct., 1978: | Volunteer English Instructor for Project Ayuda in Cunen, Guatemala (7th, 8th, and 9th grade Mayan Indian students). |
| 1976-1978: | Research Assistant, Political Science Department, University of Arizona. |
| 1973-1974: | Research Assistant, Southwest Indian Youth Center, Tucson, Arizona. |

## PUBLICATIONS

*Books*:

**River Republic: The Fall and Rise of America's Rivers.**  Columbia University Press, 2012 (paperback 2014).  This book tells the story of America's rivers and the movement to bring them back to health and vigor.  I develop the theme of a "river republic" by focusing on citizens who become politically active to save a local river.  Runner-up, Science Category, Green Book Festival.

**The Most Fundamental Right: Contrasting Perspectives on the Voting Rights Act**.  Edited. Indiana University Press, 2012.  The book is a "debate in print" over the future of the Voting Rights Act.  The chapter authors are the leading voices in that debate.

**Native Vote: American Indians, the Voting Rights Act, and the Right to Vote**, with Susan Olson and Jennifer Robinson.  Cambridge University Press, 2007.  This book provides a history and analysis of Indian voting rights, with emphasis on cases brought under the Voting Rights Act.  Three case studies are used to illustrate the legal issues in such cases.  The final chapter describes contemporary efforts by American Indians to participate in the political system.

**Native Waters:  Contemporary Indian Water Settlements and the Second Treaty Era.**  University of Arizona Press, 2002.  This book analyzes the first fourteen negotiated settlements that attempted to resolve conflicts over Indian water rights.  I argue that these water settlements constitute a second treaty era, analogous to the first treaty era of the Nineteenth Century.

**Contested Landscape: The Politics of Wilderness in Utah and the West**  (with Doug Goodman).  University of Utah Press, 1999.  This edited book consists of chapters written by graduate and undergraduate students from the University of Utah.  My contributions include the Preface, co-authorship of the final chapter ("The Community Context Approach"),  and an introduction to each of the four sections of the book.

**Staking Out the Terrain:  Power Differentials Among Natural Resource Management Agencies**, second edition, with Jeanne Nienaber Clarke. SUNY Press, 1996.  This book formulates a model of agency power focusing on the ability of agencies to expand resources and jurisdiction.  A detailed analysis of seven federal agencies provides support for the model.  They are:  the Army Corps of Engineers, the Forest Service, the Bureau of Reclamation, the National Park Service, the Fish and Wildlife Service, the Natural Resource Conservation Service, and the Bureau of Land Management.

**Public Policy Theory, Concepts, and Models:  An Anthology**.  Englewood Cliffs, NJ: Prentice Hall, 1995.  This semi-edited book provides a comprehensive overview of the most influential theories, concepts, and approaches in policy studies.  It is an anthology of previously published work arranged into conceptual categories. My contributions include: Section One: "The Theoretical Foundation of Policy Studies;" Section 6: "Conflict and Choice in Policy Theory;" and an "Introduction" and "Discussion" to accompany Sections Two through Five.

**The Waters of Zion:  The Law, Policy, and Politics of Water in Utah**. University of Utah Press, 1995.  This edited book consists of chapters written by graduate and undergraduate students from the University of Utah.  My contributions include: Chapter One: "Politics, Water And Utah;" Chapter Nine: "The CUP Completion Act of 1992;" and an "Introduction" to each of the four sections of the book.

**Command of the Waters:  Iron Triangles, Federal Water Development, and Indian Water** . University of California Press, 1987, re-issued in paperback with a new chapter, 1994, by the University of Arizona Press.  This book is concerned with differential rates of water development on Indian and non-Indian lands.  Chapter one identifies factors that affect the political viability of iron triangles.  The book then examines a traditionally weak iron triangle -- the water development program of the Bureau of Indian Affairs, and a traditionally powerful iron triangle-- the federal water development program.

*Journal Articles***:**

"Social Science Expert Witness Testimony in Voting Rights Cases," with Richard Engstrom, Jorge Chapa, and Gerald Webster.  *National Political Science Review* 17, No. 1 (2015).

"Institutionalizing Interdisciplinary Sustainability Curriculum at a Large, Research-intensive University: Challenges and Opportunities," with M. Ward, A. Cachelin, B. Bowen, and S. Burian.  *Journal of Environmental Studies and Sciences* (Aug. 2015).

"Creating a "Water BRAC" Commission to Evaluate Existing Water Projects."  *Water Resources Impact* (Vol. 17, No. 5, 2015).

"Campus Sustainability in the U. S.: A Comparison of a Research and a Teaching University" with Janet Winniford. *International Journal of Environmental, Cultural, Economic, and Social Sustainability* (Vol. 6, No. 4, 2010).

"Rivers of the Homeland: River Restoration on Indian Reservations."  *Cornell Journal of Law and Public Policy* 16 (Summer 2007 No. 3): 539-561.

"The River Commons: A New Era in U. S. Water Policy."  *University of Texas Law Review*.  83 (June 2005): 1903-1927.

"Two Cultures, One County: Devolution and Indian Sovereignty," with F. Ted. Hebert and Doug Goodman *American Indian Culture and Research Journal* 29 (No. 2, 2005): 15-34.

"Grand Staircase-Escalante National Monument: Lessons for a Public Lands Peace Process in Utah."  *Journal of Land, Resources, and Environmental Law* 21 (No. 2b, 2001): 613-618.

"Field Essay: The Subsystem Family of Concepts: A Critique and A Proposal," *Political Research Quarterly*  51 (Number 2, 1998): 551-570.

"Indian Water Settlements: Negotiating Tribal Claims to Water." *Water Resources Update*  (Spring, 1997): 28-32.

"Implementing Public Action: Populist Bureaucracy and Program Politicians," *International Journal of Public Administration*  20 (4&5, 1997): 935-937.

"Indian Water Settlements:  The Prerequisites of Successful Negotiation," *Policy Studies Journal*  21 (#2, 1993): 227-247.

"Intergovernmental Conflict and Indian Water Rights:  An Assessment of Negotiated Settlements," *Publius*  23 (Winter, 1993): 85-101.

"Water Welfare, Green Pork, and the 'New' Politics of Water," *Halcyon*  14 (1992): 85-102.

"Subgovernments:  Determinants of Political Viability," *Political Science Quarterly*  105 (Summer, 1990):  269-93.

"Marketing of Water from Indian Lands," *Forum for Applied Research and Public Policy*  5 (Spring, 1990):  73-78.

"Subgovernments and the Impact of Policy Fragmentation and Accommodation," *Policy Studies Review*  8 (Winter, 1989):  264-87 .

"Precedent for the Winters Doctrine," *Journal of the Southwest*  29 (Summer, 1987):  164-78.

"Voting Patterns of American Indians in Arizona," *The Social Science Journal* 19 (July, 1982): 101-13.

"Federal Indian Policy and the Sacred Mountain of the Papago Indians," *Journal of Ethnic Studies* 9 (Fall, 1981):  58-69.

"Indian Water Rights, The Central Arizona Project and Water Policy in the Lower Colorado River Basin," *Journal of Energy Law and Policy*  2 (1981):  107-22.

"Indian Water Rights:  The Bureaucratic Response," *Hydrology and Water Resources in Arizona and the Southwest* 2 (May, 1981).

## Book Chapters:

"The Politics of Dam Removal and River Restoration."  In *Environmental Politics and Policy in the West*, rev. ed. Edited by Zachary Smith and John Freemuth.  University Press of Colorado, 2016.

"A New Water Ethic." In *Desert Water: The Future of Utah's Water Resources*, ed. by Hal Crimmel.  University of Utah Press, 2014.

 "Voting Rights and Electoral Representation in the United States."  *The Oxford Handbook of Indigenous Peoples' Politics*, Oxford University Press, 2014.

"Meaningful Votes."  Chapter One of *The Most Fundamental Right: Contrasting Perspectives of the Voting Rights Act*, 2012, Indiana University Press.

"Accomplishing the Impossible: Implementing River Restoration Projects."  In *Greening History: The Presence of the Past in Environmental Restoration*, edited by Marcus Hall.  Routledge Press, 2010.

 "As Dams Fall, A Chance for Redemption."  *Water in the 21st Century West*, edited by Char Miller. Oregon State University Press, 2009: 65-70.

"The Development of the Geographic Information System at Tohono O'odham Nation, Arizona," with Phoebe B. McNeally and Barry Biediger. *In The U. S.-Mexican Border Environments: Tribal Environmental Issues of the Border Region*, edited by Michael Wilken-Robertson.  SCERP Monograph No. 9. 2004.

"Evolving Political Institutions: A New Water Policy and Its Impact on the Border Region.."  In *The U. S. Mexican Border Environment*, edited by Suzanne Michel.  San Diego State University Press, 2003: 363-394

*Atlas of U. S. and Canadian Environmental History*. Chap. 4: "*Winters v. U. S*. and the Development of the Doctrine of Reserved Water Rights." Chap. 6: "Contemporary Indian Land and Resource Rights in the U. S."  Chap. 7: "River Restoration: The New Era in Federal Water Policy." New York:  Moschovitis Publishing Group, 2002.

"Negotiated  Water Settlements: Environmentalists and American Indians," with Laura Kirwan.  In *Trusteeship in Change: Toward Tribal Autonomy in Resource Management*, edited by Richmond Clow and Imre Sutton. University Press of Colorado ( 2001): 265-280.

"Native Americans, Who Were Forced to Give Up Most of their Land, Should Exercise Jurisdictional Sovereignty over Their Reservations."  In  *History in Dispute: Water and the Environment  Since 1945*, edited by Char Miller. Manly, Inc. (2001): 171-173.

"The CUP: A Project in Search of a Purpose,"  "Welcome, Floaters, to River City," and "The Northern Utes Long Water Ordeal." In *Water in the West*, edited by Char Miller.  Oregon State University Press  (2001).

"Contemporary Treaties: Indian Water Settlements."  In *Fluid Arguments: Water in the American West*, edited by Char Miller. University of Arizona Press ( 2001): 120-138.

"Negotiating Water Settlements:  Ten Common Themes," in *Indian Water in the New West*, edited by Thomas McGuire, William Lord, and Mary Wallace. University of Arizona Press (1993): 88-102.

"The Watering of the Reservation:  Native Americans and their Water," in *Environmental Politics and Policy in the West*, edited by Zachary Smith.  Kendall-Hunt Publishers (1993): 219-236.

"Water and the Future of Non-Indian Federal Lands in the Southwest," in *Water and the Future of the Southwest*, edited by Zachary Smith. University of New Mexico Press (1989): 113-32.

"Indian Voting," in *American Indian Policy in the Twentieth Century*, edited by Vine Deloria, Jr. University of Oklahoma Press (1985): 105-134.

"The Relevance of Management Information Systems to Policy Choices:  Lessons for the Bureau of Land Management" with Helen Ingram, in *Developing Strategies for Rangeland Management*, edited by the National Research Council and the National Academy of Science, Westview Press, Boulder, Colorado  (1984): 1785-1809.

## ENCYCLOPEDIA ARTICLES

"American Indians, 1975-Present."  *Encyclopedia of US Political History*, CQ Press, 2011.

"Dam Removal and River Restoration."  *Encyclopedia of Water Politics and Policy in the United States. CQ Press, 2011.*

"Applied Behavioral Science." *The International Encyclopedia of Public Policy and Administration.*, edited by Jay Shafritz. Westview Press (1997).

## MEDIA PUBLICATIONS

"The Solution to Utah's Water Problems." Op-Ed,  *Deseret News* (Jan. 5, 2016). http://www.deseretnews.com/article/865646997/The-solution-to-Utahs-water-problems.html

"Utah Rules of the Road."  *Salt Lake City Weekly* (Oct. 28, 2015). http://www.cityweekly.net/utah/utah-rules-of-the-road/Content?oid=3047281

"3 Myths Power Effort to Give Federal Lands to Utah."  Op-Ed, *Salt Lake Tribune* (July 3, 2014) http://www.sltrib.com/csp/cms/sites/sltrib/pages/printerfriendly.csp?id=58143192

"What Gettysburg Means to America Today."  Op-Ed, *Salt Lake Tribune* (July 12, 2013).

"The Big Shakeout and a New Water Ethic.  *RMS Journal* 26, No. 3 (Fall, 2013): 18-19. http://www.river-management.org/assets/Journals-Newsletters/2013fall.pdf

"A Coalition to Stop Water Grab."  Op-Ed*, Salt Lake Tribune* (April 2, 2013).

"Saving for the Future: Making a Commitment Now to Preserve Great Salt Lake."  *Friends of Great Salt Lake Newsletter* (Fall, 2011, # 4): 7.

"Warning: Water Policy Faces an Age of Limits."  *High Country News* (April 22, 2010), Reprinted in the *Salt Lake Tribune*, the *Summit Daily News*, *the Aspen Times, and the Cortez Journal*.

"Fall Creek."  *American Rivers* (Fall, 2009): 13.

"If I Were President.…*" The Canyon Country Zephyr* vol. 20, no. 4  (Oct/Nov 2008): 18.

"Native Vote in 2008."  ACLU Blog of Rights, Voting Rights Symposium, October 17, 2008.

"Perfect Moments." *The Canyon Country Zephyr*  vol. 19, no. 5 (Dec/Jan): 14.

"A Walking Tour of Washington's Civil War Statuary." *Civil War Historian*  3 (March/April 2007): 20-25.

"As Dams Fall, a Chance for Redemption."  *High Country News* (June 21, 2004): 12.

"Funding the Water System with Property Taxes Is Unfair."  *Salt Lake Tribune*, editorial (Sept. 2, 2001): AA2.

"Indian Reservations:  Environmental Refuge or Homeland?"  *High Country News* (10 April 2000): 10.

"Learning Vision."  *Continuum*  (Winter, 1998-99): 54.

"Want Less Government and Lower Taxes? Stop the Spanish Fork-Nephi Irrigation Project*." The Salt Lake Observer*  (July 17-30, 1998): 6.

"Wasteful Irrigation Subsidies Are All Wet."  *Salt Lake Tribune*, editorial (February 15, 1998): AA8.

"A River Between Two Cultures." *Catalyst*  (August, 1997): 14-15.  (Awarded second place, "Excellence in Journalism Award," by the Utah Society of Professional Journalists, 1998).

"Salt Lake's Water Needs are Real, but Let's Think Before Paying More." *Salt Lake Tribune*, editorial (August 3, 1997): AA6.

"Indian Water Settlements: Negotiating Tribal Claims to Water." *Red Ink* (Spring, 1996): 10-14.

"Utah and the Ute Tribe are at War." *High Country News* (June 27, 1994): 12. Reprinted in the *Ute Bulletin* (July 26, 1994): 5, and again (September 5, 1995): 4.

"Return to Bittersweet Memories:  A Family Vacation to WWII." *The Purdue Alumnus,* (Summer, 1993): 24-29.

"Welcome Floaters, to River City." *High Country News*  (Dec. 30, 1991): 15.

"The Northern Utes' Long Water Ordeal." *High Country News*  (July 15, 1991):  8-9.  Reprinted in the *Ute Bulletin* (Aug. 13, 1991):  6.

"The New Politics of the Environment and the Rise of 'Green Pork'," *Free Perspectives* IV(Dec., 1990): 5-7.

"Indians Defend Tribes from Attack," *High Country News* (May 21, 1990):  14.  Reprinted in the *Ute Bulletin* (June 27, 1990):  4.

"New Coalition Lobbies for Indians," *High Country News* (Feb. 26, 1990):  3.

"Pilgrimage to the Sacred Mountain," *Ascent:  The Mountain Experience in Word and Image,* Sierra Club Books, 1989.

"Let Taxpayers Devise Budget," *Salt Lake Tribune*, Common Carrier column (Mar. 26, 1989):  A18.

"Who's to Blame for $3.12 Trillion Debt Limit?  Look in Mirror," *Salt Lake Tribune*, editorial (Dec. 16, 1989): A14.  Also published in *The Park Record* as "The Debt-Makers:  Who Are Those Guys?" (Dec. 28, 1989):  A20.

"To Save a Sacred Mountain," *The Canyon Echo*  (April, 1982): 4.

"Climbing Tongue-in-Cheek," *Summit* (April-May, 1980).

"Baboquivari Endures as Center of World," with Richard Harding, *The Indian Trader*  (Aug., 1979): 3, 16.

"Orizaba: The Other Side of the Mountain," *Summit*  (June-July, 1979).

**EXPERT WITNESS IN VOTING RIGHTS ACT CASES**

*U. S. V. South Dakota,* 615 NW 2d 590 Dist. Court, South Dakota (2000) [mooted].  Sec. 2 case

*U.S. v. Blaine County*, 157 F. Supp. 2d 1145 - Dist. Court, D. Montana (2001). Sec. 2 case

*Bone Shirt v. Hazeltine*, 336 F.Supp.2d 976 Dist. Court, D. South Dakota (2004). Sec. 2 case

*Cottier v. City of Martin*, No. CIV. 2002-5021 Dist. Court, D. South Dakota, (2005). Sec. 2 case

*Koyukak v. Treadwell*, Case No. 3:13-cv-00137-JWS Dist. Court, D. Alaska (2014). Sec. 203 case

*Navajo Nation v. San Juan County, UT.*  Case. No. 2:12-cv-00039-DS (2016). Sec. 2 case

*Brakebill v. Jaeger,*  Civ. 1: 16-CV-08 Dist. Court, North Dakota (current).  Sec. 2 case

**BOOK REVIEWS**

*The Blue, The Gray, and the Green,* edited by Brian Allen Drake.  *Journal of American History,* 2015.

*Integrating Climate, Energy, and Air Pollution Policies,* by Gary Bryner with Robert Duffy.  *Perspectives in Politics, 2013.*

*The New Politics of Indian Gaming. American Review of Politics.* 2012.

*Stealing the Gila,* by David DeJong. *Pacific Historical Review, Vol. 80, No. 1,  2010.*

*Dividing Western Waters*, by Jack August. *Western Historical Quarterly*, 2009.

*The Silver Fox of the Rockies: Delphus E. Carpenter and the Western Water Compacts,* by Daniel Tyler. *The Jouranl of American History.* June 2004.

*Fuel for Growth: Water and Arizona's Urban Environment,* by Douglas Kupel.  *The Journal of American History.* June 2004.

*Indian Reserved Water Rights: The Winters Doctrine in Its Social and Legal Context,* by John Shurts. *Pacific Historical Review*  (Nov. 2001).

*The Struggle for Water: Politics, Rationality, and Identity in the American Southwest*, by Wendy Nelson Espeland. In *The American Political Science Review*, (Fall, 1999).

*A Sense of the American West: An Anthology of Environmental History*. Edited by James E. Sherow.  In *Utah Historical Quarterly*, (1999).

*The Weber River Basin: Grass Roots Democracy and Water Development,* by Richard Sadler and Richard Roberts. In *The Journal of American History* , (Sept., 1995).

*The Last Water Hole in the West*, by Daniel Tyler.  In *Western Historical Quarterly*, ( Aug., 1993).

*Senate Elections and Campaign Intensity,* by Mark Westlye.  In *Political Studies,* (1993).

*Water Resources Management,* by David Feldman.  In *Policy Currents*  (Aug., 1992).

*American Indian Water Rights and the Limits of Law,* by Lloyd Burton.  In *Pacific Historical  Quarterly*  (May, 1992).

*The Logic of Congressional Action*, by R. Douglas Arnold.  In *Political Studies*  (1992).

*Breaking the Iron Bonds*, by Marjane Ambler.  In *Natural Resources and Environmental Administration*  (June, 1991):  6-7.

*Environmental Politics and Policy:  Theories and Evidence*, edited by James P. Lester.  In *Journal of Politics* (Aug., 1991): 889.

*A Budget Quartet:  Critical Policy and Management Issues*, by Donald Axelrod.  In *Western Governmental Researcher*  (1990).

*Envisioning a Sustainable Society*, by Lester Milbrath.  In *Rivers*, (1991).

*Native American Estate:  The Struggle Over Indian and Hawaiian Lands*, by Linda S. Parker.  In *The National Political Science Review*   (1992).

*A Life of Its Own: The Politics  and Power  of Water ,* by Robert Gottlieb.  In *American Political Science Review* (Dec., 1989): 1382-83.

*As Long as the Rivers Run: Hydroelectric Development and Native  Communities in Western  Canada,*  by James B. Waldrum.  In *Western Historical Quarterly*  (Feb., 1989):  87-88.

*Controversies in Environmental Policy*,  edited by Sheldon Kamieniecki, Robert O'Brien, and Michael Clarke.  In *The American Review of Public Administration* (June, 1988).

*Water in New Mexico*,  by Ira G. Clark.  In *New Mexico Historical Review* (1989).


## INVITED TALKS

Speaker, Utah History Symposium, Salt Lake City, UT, May 12, 2016.

Speaker, Great Salt Lake Issues Forum, Salt Lake City, UT, May 11, 2016.

Speaker, Interagency Regional Wilderness Stewardship Training, St. George, UT, April 26, 2016.

Speaker, Spring Runoff Conference, Utah State University, Logan, UT, April 5, 2016.

Speaker, State of the Rockies Annual Speaker Series, Colorado College, Colorado Springs, CO, Mar. 28, 2016.

Speaker, Intermountain Sustainability Summit, Weber State University, Nov. 24, 2016.

Keynote speaker, Salt Lake County Water Symposium, Nov. 18-19, 2015

Speaker, Native Symposium, Weber State University, Ogden UT. Nov. 4, 2015.

Plenary Speaker, National Congress of American Indians, National Conference, San Diego, CA. Oct. 2015.

Keynote Speaker, Native American Rights Fund, Indian Voting Rights Symposium.  Washington, D.C. May 27-28, 2015.

Debate on Public Lands. Speaker of the House Rebecca Lockhart and Representative Ken Ivory vs. Robert Keiter and Daniel McCool. Southern Utah University, Sept. 18, 2014.
https://www.youtube.com/watch?v=1m631pbW6iU&feature=youtu.be

Debate on "Who Should Manage Utah's Public Lands?"  Speaker of the House Rebecca Lockhart and Representative Ken Ivory vs. Pat Shea and Daniel McCool. Salt Lake City, May 14, 2014.
https://www.youtube.com/watch?v=GEoEgBkotvA

Speaker, National Commission on Voting Rights, Las Vegas, NV, April 26, 2014.

Speaker, River Rendezvous, Moab, UT Nov. 9, 2013.

Speaker, Upper Colorado River Conference, Colorado Mesa University, Nov. 7, 2013.

Guest Speaker, Texas Tech University, Lubbock, TX, April 17, 2013.

Keynote Speaker, River Management Society annual conference, Grand Junction, CO, Mar. 12, 2013.

Guest Speaker, the Wild and Scenic Film Festival, Nevada City, CA. Jan. 11-13, 2013.

Guest Lecturer, Carleton College, April 19-20, 2011.

Speaker, League of Women Voters, Panel on the proposed Las Vegas Pipeline, Salt Lake City, UT, Sept. 15, 2010

Speaker, Utah State History Conference, panel on Oral History, Salt Lake City, UT, Sept. 10, 2010.

Speaker, Redistricting Institute, Duke University, July 28, 2010.

Census and Redistricting Institute, Participating Scholar, Atlanta, GA, July 20, 2009

Spring Runoff Conference, Keynote Speaker, Utah State University, April 3, 2009.

Law and Justice Center, Salt Lake City, UT, Feb. 5, 2009.

Special Collections Omnibus Lecture, Brigham Young University, Provo, UT, Nov. 5, 2008

Salt Lake Countywide Watershed Symposium, Salt Lake City, Oct. 29, 2008.

The *Winters* Centennial, Tamaya Resort, Santa Ana Pueblo, NM June 11, 2008.

Panel on Indian voting rights, National Indian Gaming Association, annual conference, San Diego, CA, April 22, 2008.

Panel on "Voting Rights in Indian Country," at the Indigenous Law and Policy Center, Michigan State University College of Law, Jan. 31, 2008.

Conference, "Overview of the Reauthorization and Amendment of the Federal Voting Rights Act."  University of California, Los Angeles, Jan. 25-26, 2008.

Symposium on the future of the Colorado River, College of Law, University of Utah, Oct. 25, 2007

Water Resources Seminar, Oregon State University, Corvallis, OR, Oct. 10, 2007.

American Comenius, University of Groningen, the Netherlands, U. S. program, Oct. 2, 2007.

 "Native Water Law & Public Policy:  Critical Issues in the Great Lakes and St. Lawrence Watersheds." Keynote Speaker, Cornell University, School of Law, Ithaca, NY, Nov. 17-18, 2006.

9

American Comenius, University of Groningen, the Netherlands, U. S. program, 2006.

Harvard University Law School symposium, "Preserving and Promoting the Native American Vote: A New Look at the Voting Rights Act Renewal Process."  Cambridge, MA, April 5, 2006.

American Comenius, University of Groningen, the Netherlands, U. S program, 2005.

Testimony before the National Committee for the Voting Rights Act, Rapid City, SD, September 9, 2005.

River Management Society, annual conference, Keynote speaker, Salt Lake City, UT May 10, 2005.

Colorado Plateau River Guides, annual conference. Cataract Canyon, May 2-5, 2005.

Invited speaker, National Congress of American Indians, national convention , panel on Native Voting Rights, Tulsa, OK, November 2005.

Invited speaker, Biannual Symposium on the Colorado River, sponsored by the Water Education Foundation. Bishop's Lodge, Santa Fe, NM.  Sept. 29, 2005.

Symposium: "Changing Directions in Water Law." University of Texas School of Law. Feb. 4-5, 2005.

Mni-Sose Intertribal Water Coalition, board of directors meeting, Rapid City, SD.  September 2004

"Water in Utah," sponsored by the Utah Science Center, Public Dialogue Series, September 2004 (aired on KCPW radio, September 20, 2004).

BLM Recreation/Wilderness/Cultural/VRM Workshop, Moab, Utah. September 2004.

Utah State Historical Society, annual meeting, panel on Lake Powell. September 2004.

Mni-Sose Intertribal Water Coalition, Annual conference, Denver, CO. January 2004.

The Utah Environmental Symposium, Salt Lake City, UT, Nov. 2003.

Utah State University, Natural Resources and Environmental Policy Program, November 28, 2001.

U. S. Department of the Interior, Office of Indian Water Rights, annual negotiation teams meeting, Seattle, WA, November, 2000.

Conference on "Rivers, Dams and the Future of the West."  Sponsored by the Utah Wetlands and Riparian Center, Salt Lake City, UT, November, 1999.

Symposium on "Where the Rivers Flow," sponsored by the Wallace Stegner Center, Salt Lake City, Utah, April, 1999.

Symposium on Tribal Survival, sponsored by Dine' College, Flagstaff, Arizona, April, 1999.

Symposium on "Changing Water Regimes in Drylands," sponsored by the Desert Research Institute.  June 10-12, 1997, Lake Tahoe, CA.

Indian Water Rights Symposium sponsored by the All-Indian Pueblo Council,  Indian Pueblo Cultural Center, Albuquerque, NM, April, 1994.

Symposium on the Future of the Colorado River Plateau, University of Utah School of Law, Sept., 1993.

"Arizona Water 2000," sponsored by the Commission on the Arizona Environment, Sedona, Arizona, Sept. 1992.

Invited Speaker, conference titled "A River Too Far:  Water in the Arid West."  Sponsored by the Nevada Humanities Committee, Reno, Nevada, 1991.

Symposium on "Water in the 20th Century," Phoenix, Arizona, 1990.

Bureau of Land Management, "Image Enhancement Seminar," Park City, Utah, 1989.

Workshop on Indian Land and Water Rights sponsored by the American Indian Lawyer Training Program, Albuquerque, N. M., 1987.


CONFERENCE PAPERS

"The Voting Rights Act and the Potential for "Bail-in" After *Shelby County v. Holder*." The Midwest Political Science Association, Chicago, IL, April 2016.

 "Pockets of Discrimination: The Voting Rights Act and the Role of 'Bail-in' After *Shelby County v. Holder*."  The International Social Sciences Conference, Split, Croatia, June 2015.

"Creating a 'Water BRAC" Commission to Evaluate Existing Water Projects."  American Water Resources Association, Vienna, VA, November, 2014.

"River Policy in Crisis: the Klamath River." American Political Science Association, Washington, D. C. August, 2014.

"Social Science Expert Witness Testimony in Voting Rights Act Cases."  With Richard Engstrom,  Jorge Chapa, and Gerald Webster.  Eighth International Conference on Interdisciplinary Social Science, Charles University, Prague, The Czech Republic, August, 2013.

"Campus Sustainability in the U. S.: A Comparison of a Research and a Teaching University," with Janet Winniford.  2010 Conference on Environmental, Cultural, Economic and Social Sustainability University of Cuenca, Cuenca, Ecuador January 5-7.

"Rivers of the Homeland: River Restoration on Indian Reservations."  International Congress of Americanists, Sevilla, Spain, July, 2006.

"From Insanity to Enlightenment: Changing Perceptions of River Restoration and River Restorationists." Transatlantic Workshop on "Restoring or Renaturing."  Zurich, Switzerland, July, 2006.

"The Community Context Approach: Cross-Boundary Management and the Protection of Parks and Wild Lands." International Symposium on Society and Resource Management, Sardinia, Italy, 2002.

"The Wilderness Debate in Utah: Using Community Values and Education to Resolve Conflict." International Symposium on Society and Resource Management. Indiana University, 2002.

"Evolving Political Institutions: A New Water Policy and its Impact on the Border Region" Southwest Center for Environmental Research and Policy, Bi-National Water Program. Rio Rico, AZ, 2002.

"Indian Water Rights in the Settlement Era."  American Political Science Association, Washington, D. C. 2000.

"Land Use, Borders, and Environmental Policy: Tribal Autonomy and Ecosystem Management." International Conference on "Nature, Society and History," Vienna, Austria, 1999.

"Two Cultures, Two Communities, One County: Devolution and Retrenchment in Indian Country."  With F. Ted Hebert and Doug Goodman.  American Political Science Association, 1998.

"Subsystem Theory and the Hierarchy of Conflict."  Western Political Science Association, 1997.

"Environmentalists, Tribes, and Negotiated Water Settlements," with Laura Kirwan.  American Political Science Association, 1995

"Successes and Failures of Policy Theory."  Western Political Science Association, 1992.

"Indian Water Rights:  The End of the Negotiation Era?" Western Political Science Association, 1991.

"Indian Water Rights: Negotiation; Agreement; Legislative Settlement."  American Water Resources Association, 1989.

"Using Measures of Budgetary Success to Evaluate Subgovernment Theory:  The Case of Federal Water Resource Development."  Western Political Science Association, 1988.

"Policy Theory, Policy Typologies, and Decision-making." Midwestern Political Science Association, 1987.

"Federal Water Development:  Changing Theoretical Assumptions." Western Political Science Association, 1987.

"Subgovernments, Political Viability, and Budgetary Constraints."  Western Political Science Association,  1986.

"Subgovernments, Autonomy, and Stability:  The Case of Federal Water Resource Development." Western Social Science Association, 1986.

"Western Water Policy and Federalism:  Two Conflicting Doctrines." Southwestern Social Science Association, 1984.

"Contemporary Federal Water Policy:  The Battle Over Water Project Expenditures During the Carter and Reagan Administrations." Western Social Science Association, 1983.

"Indian and Non-Indian Water Development:  Competition for Water and Water Projects."  Western Social Science Association, 1983.

"The Theoretical Origins of the *Winters*  Doctrine."  Southwestern Social Science Association, 1982.

"For Richer or for Poorer:  A Comparative Approach to the Study of Bureaucracy," with Jeanne Nienaber.  Western Political Science Association, 1981.

"Indian Water Rights:  The Bureaucratic Response."  Arizona Section of the American Water Resources Association, 1981.

"Indian Water Rights, The Central Arizona Project, and Water Policy in the Lower Colorado River Basin."  Western Social Science Association, 1980.

"Federal Indian Policy and the Sacred Mountain of the Papago Indians."  Southwestern Social Science Association, 1980.

## OTHER CONFERENCE ROLES

Discussant, panel on "The Most Fundamental Right: Voting Now and Then, Here and There."  The Midwest Political Science Association, Chicago, IL, April 2016.

Moderator, panel on "Flood Management."  American Water Resources Association, Vienna, VA, November 2014.

Delegate, NASPA Exchange Program with Deutsches Studentenwerk (Germany), February 2014, focusing on campus sustainability.

Presenter, American Water Resources Association, annual meeting, panel on dam removal and river restoration, Seattle, WA, November 2005.

Discussant, panel on "Native Americans in the Twenty First Century."  Western Social Science Association. April 2005.

Chair, panel on "Revisions in Policy Subsystem Theory." Western Political Science Association, 1997.

Invited Participant, Moscow State University Symposium on Training Public Administrators, Moscow, Russia, March 1993.

Chair, panel on "Public Policy Theory:  Past, Present, Future."  Western Political Science Association, 1992.

Invited Discussant, conference on "Innovation in Western Water Law and Management," University of Colorado School of Law, 1991.

Delegate, Citizen Ambassador Program, Environmental Technology Delegation to the Soviet Union, 1990.

Organizer and Moderator, panel on "Hosting the Olympics," National Association of Schools of Public Affairs and Administration, 1990.

Invited Discussant, Symposium on "Indian Water Rights," University of Colorado School of Law, 1990.

Invited Discussant, Arizona Historical Society, symposium on Water, Tucson, Arizona, 1989.

Chair, panel on "Executive MPA Programs," National Association of Schools of Public Affairs and Administration, 1989.

Discussant, Sixth Annual Women in Public Administration Conference, Salt Lake City, Utah, 1989.

Chair, panel on "Models of Policy Analysis."  Western Political Science Association, 1989.

Discussant, panel on "Natural Resource Management in the Post-Reagan Era."  American Society for Public Administration, 1989.

Convener and discussant, panel on "Administrative Practice and Organization Theory."  Public Administration Theory Symposium, American Society for Public Administration, 1989.

Participant, Minnowbrook II Conference on the Future of Public Administration, Syracuse University, Sept., 1988.

Discussant, panel on "Limited Perspectives:  Traditional Methods and Models and the Study of Native American Political Participation."  American Political Science Association, 1988.

Chair, panel on "Alternative Models of Environmental Policy Formulation and Implementation."  Western Political Science Association, 1988.

Chair, panel on "Policy Models and Theories."  American Political Science Association, 1986.

Chair, panel on "Environmental Policy," Western Political Science Association, 1986.

Chair, panel on "Subsystems and Natural Resource Policy."  Western Social Science Association, 1986.

Discussant, panel on "Environmental Politics and Policy:  A Synthesis and Critique."  Western Political Science Association, 1985.

Discussant, panel on "The Political Context of Environmental Policy."  Western Political Science Association, 1984.

Chair, panel on "Indian Water Rights and Water Development."  Western Political Science Association, 1982.

**PUBLIC COMMUNICATIONS**

Quoted interview, *Mother Jones*, Mar. 25, 2016 (topic:  Indian voting rights)

NPR, All Things Considered, recorded interview, Jan. 18, 2016 (topic: Marketing Indian water)
http://www.npr.org/2016/01/18/463503934/arizona-tribes-wade-into-the-water-business

Market Place, Oregon Public Broadcasting, quoted interview, Jan. 4, 2016 (topic: public lands)
http://www.marketplace.org/2016/01/04/world/how-feds-came-own-west

KRCL, Radioactive Show, on-air interview, Sept. 20, 2015 (topic: Navajo water)
http://www.krcl.org/tag/dan-mccool/

CBS Sunday Morning, on-camera interview Aug. 15, 2015 (topic:  Navajo water)
http://www.cbsnews.com/news/the-water-lady-a-savior-among-the-navajo/

BYU Radio, on-air interview. May 15, 2015 (topic: river restoration and water management)
http://www.byuradio.org/episode/b98b846e-feea-4401-a14f-c288370763f4/top-of-mind-with-julie-rose-the-river-republic-straight-talk-parenting

KSRW Radio, Santa Monica, CA. on-air guest, April 3, 2015 (topic:  western water)
http://kcrw.com/news-culture/shows/to-the-point/a-parched-west-struggles-to-adapt-to-the-realities-of-drought

Trib Talk, on-air interview. Mar. 10, 2015 (topic: Utah water policy).
*http://www.sltrib.com/blogs/tribtalk/2270151-155/trib-talk-is-bear-river-project*

Quoted interview, *Salt Lake Tribune*, March 9, 2015 (topic:  The Bear River Project).
http://www.sltrib.com/csp/mediapool/sites/sltrib/pages/printfriendly.csp?id=2230808

*Environment*, quoted interview, Dec. 11, 2014 (topic: Utah water)

KSUB, Cedar City, UT, Sept. 18, 2014 (topic: public lands)

KUER, Radio West, Salt Lake City, on-air guest, April 23, 2014 (topic: public lands grazing)
http://radiowest.kuer.org/post/cliven-bundys-range-war

On-film interview for movie, "Black Hawk."  Mar. 2014.
https://www.youtube.com/watch?v=liLXujigjPY

KUER, Radio West, Salt Lake City, on-air guest, Sept. 3, 2013 (topic: Colorado River)
http://radiowest.kuer.org/post/sharing-colorado

Quoted interview, *Anchorage Press*, July 18, 2013 (topic: The Voting Rights Act).

Blog post for Indiana University Press, June 28, 2013 (topic: The Voting Rights Act)
http://iupress.typepad.com/blog/2013/06/how-does-shelby-county-v-holder-impact-the-voting-rights-act.html

*Indian Country Today*, quoted interview, June 28, 2013 (topic: The Voting Rights Act)

Quoted interview, *DebtWire*, May 1, 2013 (topic: Las Vegas pipeline)

Quoted interview, *Huffington Post*, April 8, 2013 (topic: Las Vegas pipeline)
http://www.huffingtonpost.com/mobileweb/2013/04/08/utah-nevada-water-deal-colorado-river_n_3038477.html

KUER, Radio West, Salt Lake City, on-air guest, April 4, 2013 (topic: Las Vegas pipeline)
http://radiowest.kuer.org/post/protecting-snake-valley

*New York Times*, quoted interview, Mar. 26, 2013 (topic: the Pecos River and western drought).
http://www.nytimes.com/2013/03/27/us/new-mexico-farmers-push-to-be-made-a-priority-in-drought.html?pagewanted=all&_r=0

New Books in Political Science*,* blog, interview with Heath Brown. Feb. 26, 2012 (topic: *The Most Fundamental Right).*
http://newbooksinpoliticalscience.com/2013/02/27/daniel-mccool-the-most-fundamental-right-contrasting-perspectives-on-the-voting-rights-act-indiana-up-2012/

*Albuquerque Journal,* quoted interview, Feb. 10, 2013 (Topic: Navajo water settlement)

*River Management Society Journal*, book review of *River Republic*, Winter, 2012 (Topic: *River Republic*):
http://www.river-management.org/assets/Journals-Newsletters/2012%20winter.pdf

Suburban Wildlife Magazine Blog, interview, January 13, 2013. (topic: *River Republic*):
http://blog.suburbanwildlifemagazine.com/2013/01/13/daniel-mccool.aspx

KDVS Radio, Davis, CA, interview, Jan. 5, 2013 (topic: The Wild and Scenic Film Festival)

*Western Water,* quoted interview, Nov/Dec 2012 (topic: the Colorado River)

*Salt Lake Tribune,* Editorial, "Protect our Rivers." Dec. 22, 2012.

KSFR Radio, interview with Diego Mulligan on the "Journey Home" Show, Albuquerque, NM, Dec. 11, 2012 (topic: *River Republic*)

*KCPW* Radio, interview, Oct. 23, 2012 (topic: *The Most Fundamental Right*)
http://redthread.utah.edu/take-a-longer-view-of-election-day/7780

The King's English Bookstore, reading, Oct. 18, 2012 (topic: *River Republic*)

*Salt Lake Tribune*, featured column, Oct. 4, 2012 (topic*: River Republic*)
http://www.sltrib.com/sltrib/entertainment2/54996363-223/rivers-america-mccool-utah.html.csp

Interview, KUER Radio, Sept. 10, 2012 (topic: *River Republic):*
http://www.kuer.org/post/u-professor-optimistic-about-americas-rivers

Interview, The Park Visitor, Sept. 10, 2012 (topic: *River Republic):*
http://parkvisitor.com/blog/2012/09/10/daniel-craig-mccools-outdoor-adventure-and-conservation-tips/

 Page 99 Blog , September, 2012 (topic: *River Republic):*
http://page99test.blogspot.com/2012/09/daniel-mccools-river-republic.html

KCPW Radio, interview, Aug. 20, 2012 (topic: *River Republic*)

*Indian Country Today,* quoted interview, June 15, 2012 (topic: Indian voters)

*Salt Lake City Weekly,* quoted interview, May 9, 2012 (topic: Las Vegas Pipeline).

*The New York Times,* quoted interview, April 11, 2011 (topic: Indian water rights)

*KSL TV News,* interview, April 1, 2011 (topic: Colorado River)

*Associated Press,* quoted statement, Sept. 29, 2010 (topic: Navajo water settlement)

*Salt Lake Tribune,* quoted statement, Sept. 17, 2010 (topic: proposed Green River pipeline)

*Tooele Transcript Bulletin,* quoted statement, Sept. 16, 2010 (topic: proposed Las Vegas pipeline)

*USA Today*, quoted statement, Aug. 24, 2010 (topic:  Grand Canyon). This article was picked up by 75 newspapers.

*The Salt Lake Tribune*, quoted statement, Aug. 24, 2010 (topic: Grand Canyon)

KUER Radio, quoted statement, Aug. 23, 2010 (topic:  Grand Canyon)

KSL TV news, interview. April 21, 2010 (topic:  reservoirs in Utah)

Fox News Utah, news coverage, Feb. 14, 2010 (topic:  climate change*)*

*Indian Country Today*, quoted interview, Feb. 4, 2010 (topic: Indian voting rights)

*Indian Country Today*, quoted interview, Oct. 20, 2009 (topic: Indian voting rights)

*High Country News* blog, quoted interview. Oct. 15, 2009 (topic: Indian voting rights)

KUED "Utah Now" television program, August 21, 2009 (topic:  western water policy)

*Salt Lake Tribune*, quoted interview, Nov. 28, 2008 (topic: Navajo water rights)

*Indian Country Today*, quoted interview, Oct. 26, 2008 (topic: American Indian voting)

KCPW Radio, interview, Oct. 22, 2007 (topic: western water policy)

KUER Radio, interview, Oct. 2, 2007 (topic:  water policy in Utah)

*Calibre*, quoted interview, June 11, 2007 (topic:  Indian voting rights)

*Los Angeles Times,* quoted interview, April 22, 2007 (topic: federal public lands)

*The New Standard* (national on-line news publication), quoted interview, January 22, 2007 (topic: American Indian water rights)

*Salt Lake Tribune*, quoted interview, Oct. 30, 2006 (topic: global warming and water)

KUSU Radio interview, August 31, 2006. (topic: Utah water).

*Salt Lake Tribune*, quoted interview, August 8, 2006. (topic: Utah water).

KUER, Radio West program*,* live interview, March 7, 2006 (topic: Women war veterans).

KCPW Radio, live interview, March 7, 2006 (topic: Women war veterans).

*Salt Lake Tribune*, quoted interview, February 16, 2006 (topic: American Indian voting rights).

*Native American Times*, secondary quote, November 1, 2005 (topic: American Indian voting).

*Time Magazine,* quoted interview, July 18, 2005 (topic: dam removal)

*Salt Lake Tribune,* quoted interview, June 23, 2005 (topic: river restoration)

*Los Angeles Times*, quoted interview, April 26, 2005 (topic: National Park Service)

Associated Press, quoted interview, October 25, 2004 (Nov. 2 in *Tri-Valley Central*)  (topic: dam removal).

*Deseret Morning News,* quoted interview, Aug. 8, 2004 (topic: the law of the river)

*East Valley Times (Arizona  Tribune),* secondary quote, June 4, 2004 (topic: the drought)

*Los Angeles Times*, quoted interview, May 22, 2004 (topic: American Indian voting rights)

Weather Notebook, Public Radio program, Boise, ID, interview, May 24, 2004 (topic: the impact of drought on western water policy)

Airtalk, KPCC Southern California Public Radio, interview,  May 6, 2004 (topic: western water policy)

*New York Times,* quoted interview, May 2, 2004 (Topic: western water policy)

*Rapid City Journal,* quoted interview, April 12, 2004 (Topic: Indian voting rights)

*High Country News*, quoted interview, March 2004 (Topic:  Indian water settlements)

Fox News, interview, Sept. 2, 2003 (Topic: Leavitt's appointment to EPA)

KUED Public Affairs Television presentation, "The Price of Water," April 22, 2003

AP Wire Service, interview, Aug. 29, 2003 (Topic: Leavitt's appointment to EPA)

KSL TV News, interview, Aug. 28, 2003  (Topic: water use in Salt Lake City)

*City Weekly*, interview, Feb. 13, 2003 (Topic: water policy)

High Country News Radio, interview, Aug. 19, 2002 (Topic: wilderness policy)

Associated Press, June 1, 2002, feature story  (Topic: irrigation subsidies)

KSL TV News, May 6, 2002, interview  (Topic: water use in Salt Lake City)

KUED Radio interview, April 17, 2002 (Topic: water policy in the Salt Lake Valley)

KUED Radio interview, Nov. 19, 2001 ("Radio West" special program on water policy in Utah)

KRCL Radio interview, Sept. 13, 2001 (topic: Utah water policy)

KCPW Radio interview, Aug. 23, 2001 (topic: Utah water policy)

KCPW Radio interview, August 27, 1999 (topic: BLM wilderness policy)

KUER Radio interview, August 20, 1999 (topic: Utah water policy)

KUED, Civic Dialogue, televised interview, June 20, 1997 (topic: Utah water policy)

ABC Evening News, televised interview, June 4, 1997 (topic:  The CUP)

KUER Radio interview, May 23, 1997 (topic:  Poverty on Indian reservations)

KRCL Radio interview, January 8, 1996 (topic: Utah water policy)

KCPW Radio interview, January 2, 1996 (topic: Utah water policy)

KRCL Radio interview, August 20, 1995 (topic:  American Indian Resource Center)

KUER Radio interview, August 14, 1995 (topic: Northern Ute tribal government)

KTALK Radio interview, May 6, 1995 (topic:  taxes)

KCPW Radio interview, July 6, 1994 (topic: the Northern Ute jurisdiction case).

KUER Radio interview, Feb. 16, 1994 (topic: the Northern Ute jurisdiction case).

Special Feature article in the *Utah Government Connection* titled: "The Moscow Kremlin: Closed for Cleaning."
Oct., 1993.

 *Deseret News*, quoted interview. April 18, 1993 (topic: Russia).

*The Public's Capital*, quoted interview, April, 1993 (topic: federal water policy).

*Las Vegas Review -Journal*,  quoted interview, Oct. 31, 1992 (topic:  Western Water Policy).

Testimony before the State and Local Affairs Interim Committee of the Utah State Legislature, Jan. 8, 1992 (topic:
Utah Navajo Royalty Trust Fund).

 *Los Angeles Times*, quoted interview, Aug. 27, 1990 (topic:  Navajo voting rights).

*Congressional Quarterly Weekly Report*, quoted interview, Jan. 13, 1990 (topic:  federal Indian policy).

*High Country News*, quoted interview, July 30, 1990 (topic:  Navajo voting rights).

"The Central Utah Project:  A Legacy of Promise and Controversy."  *Public Policy Perspective* (newsletter of the
Center for Public Policy and Administration, University of Utah), Spring, 1990.

"Recent Events in Treaty Rights."  *Native American Policy Network Newsletter*, July, 1990.

KRCL Radio interview, June 5, 1990 (topic:  The Central Utah Project).

KSL Radio interview, Sept. 5, 1989 (topic:  Indian water rights).

KTKT Radio interview, Dec. 27, 1989 (topic:  taxes).

KUED Television, "Civic Dialogue," Dec. 19, 1989 (topic:  Indian water rights).


COURSES TAUGHT

     Graduate Level:
          Water Policy
          Public Policy: Analysis and Theory
          Environmental and Sustainability Policy
          Administrative Theory
          American Institutions Seminar: Subsystem Theory
          Survey of American Politics and Government
          The Politics of Western Water
          Special Topics: Wilderness Policy in Utah and the West
          The Politics of Public Lands Management

     Undergraduate Level:
          Water Policy
          Bureaucracy and Politics
          Environmental and Sustainability Policy
          Minority Group Politics
          Introduction to American Government
          Introduction to Public Administration

Senior Seminar:  Who Rules America?
Introduction to Environmental and Sustainability Studies
Public Land Management in Costa Rica
Environmental and Sustainability Studies Field Seminar
Environmental and Sustainability Studies Capstone

## GRANTS

Senior Consultant, USAID-funded Pakistan Centers for Advanced Studies in Water, 2014--present.

Faculty Consultant, "The Western Waters Digital Library: The Foundations of American Water Policy."  National Endowment for the Humanities, 2007-2009.  Funding = 5% time

Tanner Humanities Center, University of Utah. Research Interest Group grant to create a "Nuclear Utah" educational forum, 2006-07. Funding = $1,200.

Applied Ethics and Human Values, University of Utah.  2005-06. Grant proposal: "Environmental Ethics and the Costa Rican Model of Ecotourism."  $6,200. With Professor Anya Plutynski.

National Endowment for the Humanities, program to create and preserve access to Humanities Collections, to digitize and archive 1,814 oral history interviews of American Indians, 2005-06.  $127,518 matching grant.

Quality Initiative Grant, University of Utah.  To perform a complete program assessment of the Environmental Studies Program. 2003-2004.  Funding = $14,200.

Southwest Center for Environmental Research and Policy, Border Tribes Program.  Co-P.I.  This federally funded project developed a GIS Environmental Baseline for the Tohono O'odham Nation.  1999-2002. Funding = $140,000.

Quality Initiative Grant, University of Utah.  To create a new curriculum and program for the Red Rock Institute. 2001-2002. Funding = $17,000.

U.S. Geological Survey, Water Resources Research Act Grant Program.  Principle Investigator.  "Negotiating Indian Water Rights Settlements:  The Efficacy of Negotiation as a Dispute Resolution Strategy."  1992-1995. Funding = $189,394.

University of Utah Teaching Committee.  Awarded in 1996 to fund field trip for Wilderness Policy Class, $1,200.

College of Social and Behavioral Science, University of Utah. Proposal Initiative Grant.  $4,000.  Awarded summer, 1995.

University of Utah Research Committee.  Grant to facilitate research on Indian Water Settlements:  $4,409. Awarded 1992.

Rural Utah Grant Program, Center for Public Policy and Administration, University of Utah.  Project Title: "Ute and Navajo Water Rights:  The Impact on Rural Utah."  $10,000.  Awarded 1992-1993.

National Institute for Dispute Resolution, Higher and Professional Education Program, research grant for comparing negotiation and litigation as dispute resolution forums for Indian water rights: $4,000.  Awarded 1990.

University Teaching Grant to develop new course on water policy. University of Utah. Awarded 1989.

The Dean's R&D Fund.  Project Title:  "Conflict over Western Water:  The Impact of 'Landmark' Decisions." College of Social and Behavioral Science, University of Utah. Awarded 1988.

Texas A&M University, Summer Research Grant, for project entitled "Water on the Hill:  Subcommittees, Subgovernments, and Federal Water Development":  $5,000.  Awarded 1986.

AWARDS

Runner-up, Science Category, Green Book Festival, for *River Republic: The Fall and Rise of America's Rivers*, *2013.*

Finalist, College of Social and Behavioral Science, Superior Research Award, 2008, 2009

Finalist, College of Social and Behavioral Science Superior Teaching Award, 2011

Indigenous Day Dinner, Annual Awards, 2007, for "providing leadership for the American West Center on behalf of American Indians in the State of Utah."

University of Utah 2004 Diversity Award, presented to the American West Center.

Second place, "Excellence in Journalism Award," by the Utah Society of Professional Journalists, 1998 for "A River Between Two Cultures." *Catalyst* (August, 1997): 14-15.

Superior Research Award for Junior Faculty, College of Social and Behavioral Science, University of Utah, 1989.


ADMINISTRATIVE INITIATIVES

As co-Director of Sustainability Curriculum Development at the University of Utah:

Created, with my co-directors, the Undergraduate Certificate in Sustainability

Created, with my co-directors, the Graduate Certificate in Sustainability


As Director of the Environmental and Sustainability Studies Program:

Created a new Environmental and Sustainability Studies Minor

Directed the administration of an extensive program assessment and evaluation

Redesigned the Introductory course, ENVST 2100, required of all majors

Designed a new introductory field course, ENVST 2000, now required of all majors

Initiated the first Study Abroad program (Costa Rica) for Environmental and Sustainability Studies

Developed a new teaching curriculum, the Red Rock Institute, which explores environmental issues in the West.

Led the development of five new courses that focus on: sustainability science, environmental justice, global sustainability, leadership, and a senior capstone course


As Director of the American West Center:

Organized the 2006 Siciliano Forum. Topic: The Reauthorization of the Voting Rights Act

Negotiated numerous contracts for studies of Indian hunting and fishing rights and tribal archives.

Organized an annual conference called "Women at War," that featured female veterans.

Initiated a new oral history project of Utah's veterans, "Saving the Legacy," with over 500 interviews completed.

Wrote a successful NEH grant application to digitize the entire oral history collection of the Center—approximately 3,000 tapes.

As Associate Dean:

Initiated the effort that led to the establishment of the American Indian Resource Center on campus.

Created a new College grants program, the Proposal Initiative Grant, to help generate externally funded grants for College faculty.

Implemented a computerized search process to help College faculty find potential sources of external funding.

Created a Faculty Research Compendium that identified the major research activities of college faculty.

As Director of Public Administration Education:

Executive MPA:  designed a new MPA program for middle- and upper-level administrators.

Public Administration Workshop for the Ute Indian Tribe:  designed and implemented an annual intensive-session workshop for Ute tribal administrators.

Conference for Minority Public Administrators:  designed and implemented Salt Lake City's first conference for minorities in the public sector work force.

COMMUNITY SERVICE AND CONSULTING

Member, Governor's Water Strategy Advisory Team, 2014-15.

Advisory Board, National Parks Conservation Association, Southwest Regional Office, 2009-present.

Co-author, *amicus* brief, in *Northwest Austin Municipal Utility District Number One v. Holder*, U. S. Supreme Court, No. 08-322, 2009.

Volunteer Tutor, Guadalupe Schools, 2007-2009.

Advisor, Rocky Mountain American Indian Economic and Education Foundation, 2003-2006.

Member, National Council of Scholars, Presidents Park, Williamsburg, VA. 2002-2004.

 Consultant, National Oceanic and Atmospheric Administration, research project investigating the use of long-range weather data in water management planning for water conservancy districts and Indian reservations, 1999-2002.

Participating author and consultant, contract to facilitate meetings and research a proposal to divide San Juan County, UT.  Final Report titled: "San Juan County Division Study," Prepared by the Center for Public Policy and Administration, University of Utah, 1997.

Member, Board of Directors, the Indian Walk-In Center, Salt Lake City, Utah, 1994 - 2000.

Advisory Committee for the American Indian Resource Center, University of Utah, 1990 -2000.

# EXHIBIT B

# Reference Materials for Daniel McCool, Ph.D.

## Sources

Alth, Shelley de (2009). "ID at the Polls: Assessing the Impact of Recent State Voter ID Laws on Voter Turnout." *Harvard Law and Policy Review* 3 (1) 185-202.

Alvarez, Michael, Delia Bailey, and Jonathan Katz (2007). "The Effect of Voter identification Laws on Turnout. California State Institute of Technology, Scientific Working Paper No. 1267.

American Community Survey (ACS) 2011-2013. "Selected Population Profile in the United States, 3-Year Estimates, North Dakota. U. S. Census Bureau.

American Political Science Association (n.d.). Section on Qualitative Methods (http://www.apsanet.org/content_57139.cfm).

Askvig, Josh. (2013). Testimony to the Senate Government and Veterans Affairs Committee, in opposition to HB 1332. 21 Mar.

Atkeson, Lonna Rae, et. al. 2014. "A New Barrier to Participation: Heterogenous Application of Voter Identification Policies." *Electoral Studies* 29 (1): 66-73.

Bartolini, Stefano. 2013. "The Temporal Dynamics of the Franchise Expansion: Timing, Tempo, and Reversals." *Qualitative & Multi-Method Research* 11 (Fall, No. 2): 3-7.

Bauroth, Nick, and Kjersten Nelson (2014). "Results of a Survey of North Dakota College Students on Their Voting Experiences in the 2014 Election." https://www.ndsu.edu/fileadmin/centers/publicpolicy/2014_North_Dakota_Student_Voter_study_report.pdf

Bennett, Andrew, Aaron Barth, and Kenneth Rutherford. 2003. "Do We Preach What We

Practice? A Survey of Methods in Journals and Graduate Curricula." *PS: Political Science and Politics*, 36 (3), 372-376.

*Bismarck Tribune* (10 Feb. 2009). "Closer Checking of Voters Defeated in N. D. House."

____ (25 Mar. 2013). "State ID Card for Voting Unnecessary."

Bentele, Keith, and Erin O'Brien (2013). "Jim Crow 2.0? Why States Consider and Adopt Restrictive Voter Access Policies." *Perspectives on Politics*. 11 (04) Dec: 1088-1116.

Bouie, Jamelle (28 Aug. 2013). "Republicans Admit Voter-ID Laws are Aimed at Democratic Voters." *The Daily Beast*.

Brady, H., S. Verba, and K. Schlozman (1995). "Beyond SES: A Resource Model of Political Participation." *American Political Science Review* 89 (June): 272.

Brennan Center for Justice. 2006. "Citizens Without Proof: A Survey of American's Possession of Documentary Proof of Citizenship and Photo Identification."  New York: Brennan Center for Justice.

Consortium on Qualitative Research Methods (n.d.). http://www.maxwell.syr.edu/moynihan/programs/cqrm/

Denzin and Lincoln (2000, 2011). *The SAGE Handbook of Qualitative Research*, 1st ed., 4th ed. SAGE Publications.

Dick, Hilary, and Kristina Wirtz (2011). "Racializing Discourses: A Special Issue of the *Journal of Linguistic Anthropology*." *Journal of Linguistic Anthropology* 21 (S1).

Dickinson Press Staff (29 Mar. 2013). "Spirit Lake Tribe Denounces Remarks by Representative Kevin Cramer." *The Dickinson Press*.

Dictionary.com (n.d.). http://www.dictionary.com/browse/tenuous?s=t

Ecoffey, Brandon (4 April 2013). "Rep. Cramer Verbally Attacks Indian Woman." *Native Sun News*.

Faulx, Nadya (2014). "General Election Will Bring New Voters: Officials Fear Regulation Will Deter Participation."  *The Dickinson Press*. 1 Nov.

Fiscal Note (12 Feb. 2013).  North Dakota Legislative Council.  Amendment to HB 1332.

Frank, Matthew (14 Mar. 2016). "Over a Barrel: The Boom and Bust, the Promise and Peril, of the Bakken."  *Mountain West News*.

Futterman, Matthew (26 Mar. 2015). "North Dakota Needs a Nickname (And No, 'Fighting Sioux' Won't Do."  *Wall Street Journal*.

Genachowski, Julius (2 Mar. 2010). "Remarks of the FCC Chairman to the National Congress of American Indians."

Government Accountability Office (Sept. 2014). "Elections: Issues Related to State Voter Identification Laws." Report to Congressional Requesters.  GAO-14-634.

Hageman, John (23 Nov. 2014). "Voter ID Proposals in the Works to Tweak N.D. Law." *Grand Forks Herald*.

_____ (22 Jan. 2015). "Lawmakers Float Changes to North Dakota's Voter ID Law." Inforum.com.

_____ (23 Jan. 2015). "Lawmakers Float Voter ID Proposals."  *Forum News Service*.

____ (11 Mar. 2015). "ND House Defeats Student ID Bill Intended to Make Voting Easier." *Grand Forks Herald.*

____ (21 April 2015). "Legislature Passes Voter ID Bill." *Forum News Service.*

Hajnal, Zoltan, Nazita Lajevardi, and Lindsay Nielson (2014). "Voter Identification Law and Suppression of Minority Voters." http://pages.ucsd.edu/~zhajnal/page5/documents/voterIDhajnaletal.pdf

Hayes, Melissa, and Herb Jackson (21 Oct. 2014). "Christie Says GOP Gubernatorial Candidates Need to Win so They Control 'Voting Mechanisms.'" NorthJersey.com.

Hasen, Richard (2012). *The Voting Wars: From Florida 2000 to the Next Election Meltdown.* Yale University Press.

Hicks, William, et. al. (2014). "A Principle or a Strategy? Voter Identification Laws and Partisan Competition in the American States." *Political Research Quarterly* 68 (21): 1-16.

Hill, Jane (2008). *The Everyday Language of Racism.* Wiley-Blackwell.

Horwitz, Sari (5 June 2014). "Attorney General Eric Holder Talks with Native American Teenage Boys in North Dakota." *The Washington Post.*

____ (28 Sept. 2014). North Dakota's Oil Rush Brings Cash and Promise to Reservation, Along with Drug-fueled Crime." *The Washington Post.*

House Standing Committee (2 Feb. 2013). "Minutes." House Government and Veterans Affairs Committee. HB 1332, Job # 19351. North Dakota State Legislature.

____ (7 Feb. 2013). "Minutes." House Government and Veterans Affairs Committee. HB 1332, HB 18506. North Dakota State Legislature.

____ (8 Feb. 2013). ). "Minutes." House Government and Veterans Affairs Committee. HB 1332, HB 18629. North Dakota State Legislature.

____ (14 Feb. 2013). "Minutes." House Appropriations Committee. HB 1332, 18984. North Dakota State Legislature.

Houska, Tara (20 Nov. 2015). "Legislation, Litigation, and the Kitchen Sink, But the Fighting Sioux Mascot is Done." *Indian Country Today.*

ICTMN Staff (14 May 2014). "Super Dumb at UND: It's Hard to Shake the Racism You've Enabled for So Long." *Indian Country Today Media Network.*

Indian Affairs Commission (n.d.). "About Us." North Dakota State Government. http://www.nd.gov/indianaffairs/?id=38

Kamp, Karin (24 Oct. 2014). "Unbelievable GOP Statements on Voter Suppression."  Bill Moyers & Company.

Karolevitz, Robert (1975). *Challenge: The South Dakota Story*.  Sioux Falls: Brevet Press.

Katz, Ellen (2005). "Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982."  Final Report of the Voting Rights Initiative, University of Michigan Law School.

Kolpack, Dave (18 Nov. 2015). "Fighting Hawks: New Mascot for UND."  Associated Press, reported in *U. S. News and World Report*.

Lamont, Michèle, and Patricia White.  2009. Workshop on Interdisciplinary Standards for

 Systematic Qualitative Research. Washington, DC: National Science Foundation, Cultural Anthropology, Law and Social Science, Political Science, and Sociology Programs.

 www.nsf.gov/sbe/ses/soc/ISSQR_workshop_rpt.pdf.

Lien, Pei-te (2000). "Who Votes in Multiracial America? An Analysis of Voting Registration and Turnout by Race and Ethnicity, 1990-1996."  In *Black Politics in Multiracial America*, edited by Yvette Alex-Assensoh and Lawrence Hanks.  New York: New York University Press.

Lipton, Eric, and Ian Urbina (12 April 2007). "In 5-Year Effort, Scant Evidence of Voter Fraud."  *The New York Times*.

LJP & Associates (Feb. 2008). "Preliminary Ten-Year Strategic Plan to End Homelessness." Prepared for the Turtle Mountain Housing Authority.

Luger, Chelsey (6 Nov. 2014). "Turned Away from Voting with a Tribal ID: Why This Matters."  *Indian Country Today Media Network*.

Mathews, Kevin (28 Oct. 2013). "5 Republicans Who are Getting Honest About Voter ID Laws."  *Care2*.

Merrick, Melissa (n.d.). "North Dakota Congressman Kevin Cramer Verbally Attacks Native Victims' Assistance Program Director at State Meeting, Threatens to Ring Spirit Lake Tribal Council's Necks."

Minnite, Lorraine (2010). *The Myth of Voter Fraud*.  Cornell University Press.

MHA Nation (n.d.). "MHA History."  Mandan, Hidatsa & Arikara Nation.  Home of the Three Affiliated Tribes.  http://mhanation.com/main2/history/html

Monk, Jim (10 June 2014). "Voter ID Law Causes Some to be Turned Away at ND Polls." KFGO Radio.

**Reference Materials for Declaration of Daniel McCool, Ph.D.**
**Page 4**

National Conference of State Legislatures (2015). "Voter Identification Requirements/Voter ID Laws."  Wendy Underhill, Sept. 10.

News21 (12 Aug. 2012). http://votingrights.news21.com/interactive/election-fraud-database/

Neumann, Dennis (2015). "Student Voters Turned Away at UTTC Polling Site." *United Tribes News* (Winter): 26.

Nicholson, Blake (16 Aug. 2001). "American Indians Lag Behind Whites on ACT Exam." Associated Press.

North Dakota Advisory Committee to the U. S. Commission on Civil Rights (1999).  "Civil Rights Enforcement Efforts in North Dakota."  November.

North Dakota Commission to Study Racial and Ethnic Bias in the Courts (2012). "Final Report and Recommendations. June.

North Dakota Department of Health. "Ordering a Certified Copy of a Birth Certificate." (www.ndhealth.gov/vital/birth/htm).

North Dakota Democratic Caucus (19 Feb. 2013). "Voter ID's and Disenfranchisement: There is No Voter Fraud, Just Vote Suppression." http://demcaucus.areavoices.com/tag/dienfranshisement

North Dakota Department of Transportation. "ID Card Requirements."

www.dot.nd.gov/divisions/driverslicense/idrequirements.htm).

_____. "Proof of Identification is Required." http://www.dot.nd.gov/divisions/driverslicense/docs/proof-of-identification-documents.pdf

North Dakota Election Laws (2015-2017). 16.1-01-12.

North Dakota Indian Affairs (15 June 2015). "Tribal Districts." www.nd.gov/indianaffairs/?id=32

North Dakota 64th Legislative Assembly (2016). "64th Legislative (2015-2016) List of Districts on/around Reservations."

North Dakota Legislative Council (July 1997). "Discrimination in North Dakota— Background Memorandum."  Prepared by the North Dakota Legislative Council for the Judiciary Committee.

North Dakota State Government (2016a).  "Tribal and State  Relations Committee."

http://www.legis.nd.gov/assembly/64-2015/committees/interim/tribal-and-state-relations-committee

_____ (2016b) "Q: What if the address on my driver's license/non-driver's identification card is no longer my current address?  Will I be able to vote at the polling place for my new address?"  http://vip.sos.nd.gov/PortalListDetails.aspx?plhPKID=107&ptlRKID-7

North Dakota Voice Your Vote (July 2015).  Secretary of State Elections Division.

http://vip.sos.nd.gov/PortalListDetails.aspx?/plhPKID=71&ptlPKID=7

Office of the North Dakota Secretary of State (n.d.).  Voter Turnout (North Dakota).  Precincts Reporting: 427/427—Total Ballots Cast: 255128. 2014 General Election—Official Results.

Omdahl, Lloyd (1971). "Fraud Free Elections Are Possible Without Voter Registration." Bureau of Government Affairs.

_____ (5 Nov. 2006). "Opinion: N.D. Voters an Honest Lot." *The Bismarck Tribune.*

_____ (13 Jan. 2008). "Voting by Mail Will Get a True Test in N.D." *The Bismarck Tribune.*

_____ (1 May 2011). "Senate Defends N.D. Voters' Integrity."  *The Bismarck Tribune*.

_____ (3 Sept. 2008). "Opinion."  *The Bismarck Tribune.*

Overton, Spencer (2006). *Stealing Democracy: The New Politics of Voter Suppression*. W. W. Norton & Co.

Pastor, Roberet, Robert Santos, Alison Prevost, and Vassia Stoilov (2010). "Voting and ID Requirements: A Survey of Registered Voters in Three States."  *The American Review of Public Administration* 40 (4): 461-81.

PEW (7 April 2014). "Elections Performance Index."  Pew Charitable Trusts. http://www.pewtrusts.org/en/multimedia/data-visualizations/2014/elections-performance-index#state-ND

Poitra, Patricia, and Karen Poitra (1997). "The History and Culture of the Turtle Mountain Band of Chippewa."  North Dakota Department of Public Instruction.

Politico (2012). http://www.politico.com/2012-election/results/president/north-dakota/).

*Pope v. Albany* (2015). 1:11-cv-0736 (LEK/CFH). Memorandum Decision and Order (Dist. Ct. N. Dist. NY) 24 Mar.

Reilly, Ryan (25 June 2012). "Pennsylvania GOP Leaders: Voter ID Will Help Romney Win State." PM Muckraker.

**Reference Materials for Declaration of Daniel McCool, Ph.D.**
**Page 6**

Richardson, Heather Cox (2011). *Wounded Knee: Party Politics and the Road to an American Massacre.* Basic Books.

Qualitative Data Repository (n.d.). https://qdr.syr.edu

Sacred Pipe Resource Center (2014). Project Guide Survey. Mandan, ND. Principle author: Cheryl Kary.

Schilling, Vincent (1 April 2013). "North Dakota Congressman Kevin Cramer Allegedly Verbally Attacks Abused Native Women's Advocate." *Indian Country Today*. http://indiancountrytodaymedianetwork.com/2013/04/01/north-dakota-congressman-kevin-cramer-allegedly-verbally-attacks-abused-native-womens

Senate Report (1982). No. 97-417, accompanying the Voting Rights Act Amendments of 1982.

Senate Standing Committee (21 Mar. 2013). "Minutes."  Senate Government and Veterans Affairs Committee. HB 1332, Job Number.  North Dakota State Legislature.

____. (2 April 2013). "Minutes."  Senate Appropriations Committee. HB 1332, Job # 20748. North Dakota State Legislature.

Smith, Nick (22 Mar. 2013). "Voter Identification Measure Debated." *The Bismarck Tribune.*

____ (3 April 2013). "Split Committee Backs Voter ID Bill." *The Bismarck Tribune.*

____ (4 April 2013). "Dakota Wire."  *The Bismarck Tribune.*

____ (7 Nov. 2014). No headline. *The Bismarck Tribune.*

____ (10 July 2014). "Candidates Differ on Voter ID Law."  *The Bismarck Tribune.*

____ (7 April 2015). "Senate Approves Voter ID Bill." *The Bismarck Tribune.*

____ (18 Sept. 2015). "Support Lackluster for Voter Registration."  *The Bismarck Tribune.*

Sorensen, Sally Jo (24 Feb. 2013). "N. Dakota Voter Restriction Advocate Uses 'hog house' Bill to Block Public Comment on Photo ID."  *Blue Stem Prairie.*

Spirit Lake Tribe (29 Mar. 2013).  Press Release, "Spirit Lake Nation Official Response to Kevin Cramer (ND Congressman)."

Standing Rock Sioux Tribe (n.d.). Brochure available at tribal headquarters.  Prepared by LaDonna Brave Bull Allard.

Standing Rock Statistics (n.d.). "Bureau of Indian Affairs Labor Force Data for Tribal Members, Standing Rock Sioux Tribe-1999."  http://standingrock.org/statistics/.

Stenehjem, Wayne (2015). http://www.ag.ag.nd.gov/Opinions/2015/Letter/2015-L-08.pdf.

*Thornburg v Gingles (1986). 478 U. S. 30.*

Turtle Mountain Tribe (n.d.). "Turtle Mountain Band of Chippewas." http://turtlemountaintribe.businesscatalyst.com/idex.html.

*Turtle Mountain Band of Chippewa Indians v. United States* (Turtle Mountain Band), 490 F.2d 935, 938 (Ct. Cl. 1974).

United Tribes Network (June/July 2013).  "Native People as Public Employees."  The original data can be found at: http://www.nd.gov/hrms/managers/presentations.html.

University of North Dakota Graduates (n.d.). "The UND Fighting Sioux."  Presented by the UND Graduates from Standing Rock."  Powerpoint presentation provided by Kelly Morgan, Tribal Archaeologist, Standing Rock Sioux Tribe.

Urbina, Ian (26 Oct. 2010). "Fraudulent Voting Reemerges as a Campaign Issue."  *The New York Times*.

U. S. Census Bureau (2010 a). "2010 Census: North Dakota Profile."  U. S. Department of Commerce, Economics and Statistics Administration.

U. S. Census Bureau (2010b). "Race and Hispanic or Latino Origin."  2010 Summary File 1, for Bismarck, ND, and Mandan, ND.  Files QT-P3, and QT-P7.

*U. S. v. Benson County, North Dakota (2000). United States District Court for the District of North Dakota Northeastern Division.  Civ. No. A2-00-30.*

*U. S. v. Kagama (1886).* 118 U. S. 375.

Vercellotti, Timothy, and David Andersen (2006). "Protecting the Franchise, or Restricting It? The Effects of Voter Identification Requirements on Turnout."  Paper presented at the 2006 annual meeting of the American Political Science Association.

*Village of Arlington Heights v. Metropolitan Housing Development Corporation* (1977). 429 U. S. 252.

Walsh, Paul (19 Oct. 2015). "As Voting Begins for UND Nickname, ex-Sioux Zach Parise Weighs In."  *The Minneapolis Star-Tribune*.

Wolfinger, Raymond, and Steven Rosenstone (1980). *Who Votes?*  Yale University Press.

Woodard, Stephanie (11 July 2014). "Got Tribal ID? North Dakota Natives may not Be Able to Use Theirs to Vote."  *Indian Country To*day.

October 9, 2006 letter from North Dakota Secretary of State Alvin A. Jaeger to Lorraine C. Minnite, Assistant Professor in the Department of Political Science at  Barnard College.

## Interviewees

Agard, Jamie. Tribal Enrollment Technician for the Standing Rock Sioux Tribe.  Telephone interview. 14 Mar. 2016.

Allard, LaDonna. Section 106 Coordinator for Tribal Preservation, Tribal Historian, and Tribal Genealogist. Telephone interview. 22 Mar. 2016.

Anonymous1

Anonymous2

Anonymous3

Askvig, Josh. Director AARP of North Dakota.  In-person interview, Bismarck, ND. 3 Mar. 2016.

Bauroth, Nicholas. Professor of Political Science.  Telephone interview. 8 Mar. 2016.

Birst, Aaron. Legal Counsel, North Dakota Association of Counties. In-person interview, Bismarck, ND. 4 Mar. 2016.

Boucher, Merle.  Rolette County Commissioner. In-person interview, Rolette, ND. 5 Mar. 2016.

Carbone, Michael.  Director, North Dakota Coalition for Homeless People.  In-person interview, Bismarck, ND. 4 Mar. 2016.

Cook, Jennifer. North Dakota Director of the American Civil Liberties Union.  Telephone interview. 7 Mar. 2016.

Doherty, Steven. Professor of Political Science, Dickinson State University. Telephone interview. 1 Mar. 2016.

Eagle, John, Sr. Director, Tribal Historic Preservation Office, Standing Rock Sioux Tribe. In–person interview, Fort Yates, ND. 3 Mar. 2016.

Hettich, Barb. Sioux County Auditor.  Telephone interview. 14 Mar. 2016.

Hushka, Donnell.  Legislative Liaison, North Dakota Association of Counties. In-person interview, Bismarck, ND. 4 Mar. 2016.

Johnson, Mark. Director, North Dakota Association of Counties. In-person interview,

**Reference Materials for Declaration of Daniel McCool, Ph.D.**
**Page 9**

Bismarck, ND. 4 Mar. 2016.

Kary, Cheryl.  Executive Director, Sacred Pipe Resource Center.  Telephone interview. 21 Mar. 2016.

McCloud, Alvin. Retired. Poll worker. In-person interview, Belcourt, ND. 5 Mar. 2016.

McCloud, Ella. Retired.  In-person interview, Belcourt, ND. 5 Mar. 2016.

McCloud, Matthew. Retired.  In-person interview, Sky Dancer Casino, 5 Mar. 2016.

Morgan, Kelly. Tribal Archaeologist.  In-person interview, Fort Yates, ND. 3 Mar. 2016.

Nordmark, Jason.  Owner and Editor, *Turtle Mountain Star*.  In-person interview, Rolla, ND. 4 Mar. 2016.

Nelson, Barry. Organizer for the North Dakota Human Rights Coalition.  Telephone interview. 14 Mar. 2016.

Nelson, Kjersten. Professor of Political Science, North Dakota State University. Telephone interview. 8 Mar. 2016.

Neumann, Dennis J., Public Information Director at United Tribes Technical College, Bismarck.  Telephone interview. 15 Mar. 2016.

Silbernagel, Larry. County Commissioner, Sioux County.  Telephone interview. 15 Mar. 2016.

Stromme, Renee.  Director, North Dakota Women's Network.  In-person interview, Bismarck, ND. 3 Mar. 2016.

Taft, Sevant.  Enrollment Director, Three Affiliated Tribes. Telephone interview. 23 Mar. 2016.

Traynor, Terry. Assistant Director, North Dakota Association of Counties. In-person interview, Bismarck, ND. 4 Mar. 2016.

Turcotte, John. Retired policeman. In-person interview, St. John, ND. 5 Mar. 2016.

Turcotte, Catherine.  Small business owner.  In-person interview, Rolla, ND. 5 Mar. 2016.

Weed, Shelly. Deputy Auditor, Benson County.  Telephone interview (brief). 22 Mar. 2016.