# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Richard Brakebill, Deloris Baker, Dorothy Herman, Della Merrick, Elvis Norquay, Ray Norquay, and Lucille Vivier, on behalf of themselves, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | ) ) | |
| Alvin Jaeger, in his official capacity as the North Dakota Secretary of State, | ) ) ) | |
| | ) | Case No. 1:16-cv-008 |
| | ) | |
| Defendants. | ) | |

Before the Court is the Plaintiffs' motion for a preliminary injunction. <u>See</u> Docket No. 42. The Plaintiffs seeks a preliminary injunction enjoining the Defendant from enforcing, during the pendency of this action, the voter ID requirements codified at N.D.C.C. § 16.1-05-07. The Plaintiffs request the Court grant an injunction requiring the voter ID laws in place during the 2012 election be put in place during the pendency of this action. Namely, the Plaintiffs request the Defendant reinstate certain "fail-safe" provisions that give poll workers the authority to allow Native Americans and others the ability to vote based on their personal knowledge of that person's voting eligibility. Plaintiffs also request Native Americans and others without sufficient ID be allowed to vote by signing an affidavit or declaration under penalty of perjury stating they are qualified to vote. The Defendant filed a response in opposition to the motion on July 5, 2016. <u>See</u> Docket No. 45. The Plaintiffs filed a reply on July 18, 2016. <u>See</u> Docket No. 48. For the reasons set forth below, the Court finds the lack of any "fail-safe" provisions to be dispositive in this matter. Although most voters in North Dakota either possess a qualifying ID or can obtain some form of acceptable identification, a safety net is needed for those voters who

cannot obtain a qualifying ID with reasonable effort.   Accordingly, the Court enjoins the Defendant from implementing the current voter ID laws without the existence of some form of a "fail-safe" provision.

I.  **BACKGROUND**

Until recently, North Dakota used a system of small voting precincts, whereby election boards and poll workers generally knew who were and who were not eligible voters in their precincts.  If a poll clerk happened not to know a voter, they could ask that voter to produce one of many forms of an acceptable identification ("ID") showing the voter's residential address and birthday.  Under the prior law, valid forms of ID included: a North Dakota driver's license or non-driver's license ID card; a U.S. passport; an ID card from a federal agency; an out of state driver's license or non-driver's ID card; an ID card issued by a tribal government; a valid student ID card; a military ID card; a utility bill dated 30 days before Election Day, including cell phone bills and student housing bills (online printouts were acceptable); and a change of address verification letter from the U.S. Postal Service.

If one form of ID did not provide a voter's address and birth date, a voter could use two forms of ID that, in combination, provided address and birth date information.  If a voter could not produce the requested ID, he or she could fall back on two "fail-safe" mechanisms to prove their voting eligibility.  First, a member of the election board or a poll clerk could simply vouch for the voter.  Second, the voter could execute an affidavit swearing under penalty of perjury that he or she was a qualified elector in the precinct.  N.D.C.C. § 16.1-05-07(3), amended by H.B. 1332, 63rd Leg. Assembly; Reg. Sess. § 5 (2013).

On April 19, 2013, the Legislative Assembly of North Dakota enacted HB 1332.  HB 1332 imposed new voter ID requirements on voting-eligible citizens:

- To be acceptable, any voter ID must provide the voter's residential address (post office box numbers are not sufficient) and his or her date of birth.

- A voter must submit one of these forms of ID (1) a North Dakota driver's license; (2) a North Dakota non-driver's ID card; (3) a tribal government-issued ID card; or (4) an alternative form of ID prescribed by the Secretary of State in a case where the voter did not possess any of the other acceptable forms of ID.

More importantly, the new law also did away with North Dakota's voucher and affidavit "fail-safe" mechanisms.  With respect to the fourth category of acceptable ID, the Secretary of State prescribed two forms: (1) a student ID certificate; and (2) a long-term care ID certificate.

Just over two years later, on April 24, 2015, North Dakota adopted HB 1333, which imposed additional restrictions on North Dakota voters:

- The bill removed the ability of the Secretary of State to prescribe new forms of qualifying ID, and denied students the option of using college ID certificates (leaving long-term care certificates as the only acceptable ID prescribed by the Secretary of State and limiting the number of acceptable ID's to four).

- The bill clarified that drive's licenses and non-driver ID cards must be current.

- The bill clarified that military ID is not acceptable, except for service members stationed away from their North Dakota residences

- The bill eliminated a voucher provision for absentee voting (except for disabled absentee voters).

A survey by the National Conference of State Legislatures (NCSL) classified North Dakota as a "strict" non-photo ID state.  See Docket No. 43, p. 15.  The record reveals that because North Dakota stands alone in not having any "fail-safe" provisions, its current voter ID laws are arguably some of the most restrictive voter ID laws in the nation. The record further reveals that proponents of HB 1332 and HB 1333 asserted the new laws were necessary to curb voter fraud.  Given the historical lack of voter fraud in the state, opponents complained that the new laws amounted to "a solution looking for a problem."  See Docket No. 44-2, p. 20.

The Plaintiffs are seven Native American voters from North Dakota who brought this action under the Voting Rights Act, and the United States and North Dakota Constitutions, to invalidate North Dakota's new voter ID requirements.  Under N.D.C.C. § 16.1-05-07, North Dakota voters must present a state-issued ID that shows both date of birth and a residential address to vote.  The following forms of ID are currently required to vote in North Dakota: (1) a current North Dakota driver's license' (2) a current North Dakota non-driver's ID card; (3) a long-term care certificate prescribed by the Secretary of State; or (4) a tribal government issued ID card. N.D.C.C. § 16.1-05-07(1)(a-c). A military ID card is not acceptable, except for service members stationed away from their North Dakota residences.  N.D.C.C. § 16.1-05-07(1)(d).

The Plaintiffs argue that, in the absence of any "fail-safe" provisions, North Dakota now has the nation's most restrictive voter ID requirements. The Plaintiffs contend these new ID requirements are needlessly and substantially burdensome for all the people of North Dakota, but impose particularly disproportionate burdens on Native Americans.  The Plaintiffs contend that thousands of Native Americans in North Dakota do not have qualifying voter ID's, or the resources to easily obtain qualifying ID's, because they do not have the money to pay the license

fees or for travel, or they do not have the forms of ID required to get a new ID card (e.g. a birth certificate or social security card), and/or they have neither the time nor the means of transportation to track down documents and travel to a state office which issues the required forms of ID.

## II.    LEGAL DISCUSSION

The Plaintiffs seek a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.  The primary purpose of a preliminary injunction is to preserve the status quo until a court can grant full, effective relief upon a final hearing.  Ferry-Morse Seed Co. v. Food Corn, Inc., 729 F.2d 589, 593 (8th Cir. 1984).  A preliminary injunction is an extraordinary remedy, with the burden of establishing the necessity of a preliminary injunction placed on the movant.  Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003); Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994); Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 737 (8th Cir. 1989).  The court determines whether the movant has met its burden of proof by weighing the factors set forth in Dataphase Systems, Inc., v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981).  The *Dataphase* factors include "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  Id.  "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction."  Baker Elec. Coop., Inc., 28 F.3d at 1472 (quoting Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987)); see CDI Energy

Servs., Inc. v. W. River Pumps, Inc., 567 F.3d 398, 401-03 (8th Cir. 2009).   The Court is required under Eighth Circuit case law to analyze each of these four *Dataphase* factors.

###   A.   PROBABILITY OF SUCCESS ON THE MERITS

The Plaintiffs contend in their complaint that North Dakota's voter ID requirements violate Section 2 of the Voting Rights Act and the Equal Protection clauses of both the North Dakota and United States Constitutions.   A party challenging a federal or state statute or other government action who seeks a preliminary injunction must demonstrate that it is "likely to prevail on the merits," a higher bar than the more familiar "fair chance of prevailing" test.   See Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732-33 (8th Cir. 2008); Johnson v. Minneapolis Park & Recreation Bd., 729 F.3d 1094, 1098 (8th Cir. 2013).   When evaluating a movant's "likelihood of success on the merits," the court should "flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" Calvin Klein Cosmetics Corp., 815 F.2d at 503 (quoting Dataphase, 640 F.2d at 113).   The Eighth Circuit has held that of the four factors to be considered by the district court in considering preliminary injunctive relief, the likelihood of success on the merits is "most significant."   S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992).

The Plaintiffs contend North Dakota's voter ID requirements violate the Equal Protection Clause of the 14th Amendment to the United States Constitution.  The United States Supreme Court has held:

> A court evaluating a constitutional challenge to an election regulation must weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule.

Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 190 (2008) (internal citations omitted). There is not a litmus test for measuring the severity of a burden a state law imposes on voters, but any burden must be justified by relevant and legitimate state interests "sufficiently weighty to justify the limitation." Id.  (quoting Norman v. Reed, 502 U.S. 279, 288-289 (1992).  As required in *Crawford*, the Court will make the "hard judgment" required after evaluating both the burdens placed upon Native American voters by North Dakota voter ID requirements, and North Dakota's justifications  for imposing those requirements.

### 1.      BURDENS PLACED UPON NATIVE AMERICANS

The Court will turn first to the burdens the Plaintiffs are alleged to have suffered, or will suffer, if the current voter ID requirements, codified at N.D.C.C. § 16.1-05-07, are not enjoined. It is undisputed that the more severe conditions in which Native Americans live translates to disproportionate burdens when it comes to complying with the new voter ID laws.  The Plaintiffs have presented a multitude of affidavits and declarations from lay witnesses and expert witnesses to support their legal arguments.  **It is important to note that with respect to the Plaintiffs' request for injunctive relief, none of the affidavits, declarations, surveys, studies, or data submitted by the Plaintiffs in support of their motion have been challenged or refuted by the State of North Dakota**.

The Plaintiffs cite to a statistical survey of North Dakota voters performed by Dr. Matthew A. Barreto and Dr. Gabriel R. Sanchez ("Barreto/Sanchez Survey") which revealed the following:

- 23.5% of Native Americans currently lack valid voter ID, compared to only 12% of non-Native Americans.  <u>See</u> Docket No. 44-1, p. 3.

- 15.4% of Native Americans who voted in 2012 currently lack qualifying voter ID, compared to only 6.9% of non-Native Americans.  <u>See</u> Docket No. 44-1, p. 19.

- Only 78.2% of Native Americans have a North Dakota driver's license, compared to 94.4% of non-Native Americans.  <u>See</u> Docket No. 44-1, p. 3.

- 47.7% of Native Americans who do not currently have a qualifying voter ID lack the underlying documents they need to obtain an acceptable ID.  <u>See</u> Docket No. 44-1, p. 21.

- Only 73.9% of Native Americans who lack a qualifying voter ID own or lease a car, compared to 88% of non-Native Americans; and 10.5% of Native Americans lack any access to a motor vehicle, compared to only 4.8% of non-Native Americans.  <u>See</u> Docket No. 44-1, p. 22.

- Native Americans, on average, must travel twice as far as non-Native Americans to visit a Driver's License Site in North Dakota.  <u>See</u> Docket no. 44-1, p. 22.

- 21.4% of Native Americans are not at all aware of the new voter ID laws, and only 20.8% have heard about the law.  <u>See</u> Docket No. 44-1, p. 20.

**The Defendant neither disputes nor challenges these findings**.  As noted, there are no affidavits, declarations, surveys, studies, or exhibits attached to the Defendant's response in

opposition to the request for injunctive relief. The Defendant has provided no legislative testimony or findings to counter the Barreto/Sanchez Survey, nor in any manner challenged any of the evidence the Plaintiffs have submitted. The Defendant seems to rely on Justice Scalia's concurrence in *Crawford*, which argues that individually specific evidence of the burdens placed upon a voter by new election laws and regulations are irrelevant when the statute, on its face, is generally applicable and nondiscriminatory. See Crawford, at 206-206 (Scalia, concurring) ("The Indiana photo-ID law is a generally applicable, nondiscriminatory voting regulation, and our precedents refute the view that individual impacts are relevant to determining the severity of the burden it imposes"). However, this Court is required to follow the standard laid out in the plurality opinion of the Supreme Court in *Crawford* authored by Justice Stevens, which requires a particularized assessment of the burdens levied by an election law. See Obama for America v. Husted, 697 F.3d 423, 441 n.7 (6th Cir. 2012) (supporting the contention that Justice Stevens' opinion is the "controlling" opinion in *Crawford*). Given the thorough and unrefuted record developed by the Plaintiffs in this case, and the lack of any evidence presented by the Defendant to the contrary, the Court gives the findings of the Barreto/Sanchez Survey, and the other studies and data presented by the Plaintiffs, considerable weight.

The undisputed evidence before the Court reveals that Native Americans face substantial and disproportionate burdens in obtaining each form of ID deemed acceptable under the new law. As detailed below, obtaining any one of the approved forms of ID almost always involves a fee or charge, and in nearly all cases requires travel. It also helps to have a computer with Internet access, a credit card, a car, the ability to take time off work, and familiarity with the government and its bureaucracy. Thus, obtaining a qualifying voter ID is much easier to

accomplish for people who live in urban areas, have a good income, are computer-literate, have a computer and printer, have a good car and gas money, have a flexible schedule, and understand how to navigate the state's administrative procedures.   The declarations from the Plaintiffs' expert witnesses show that the typical Native American voter living in North Dakota who lacks qualifying ID simply does not have these assets.   See Docket No. 44-2, p. 33.

### (a) Native Americans Trying to Obtain a Non-Driver's License ID Face Substantial Burdens in Providing Proof of Identification

To obtain a non-driver's ID in North Dakota, "PROOF OF IDENTIFICATION IS REQUIRED."   In other words, you need an ID to get an ID.   The North Dakota Department of Transportation website lists nine "[a]cceptable forms of identification."   The first listed item is a U.S. birth certificate (state certified; Government issued).[1]   The Barreto/Sanchez Survey found that 32.9% of Native Americans who presently lack qualifying voter ID do not have a birth certificate.   See Docket No. 44-1, pp. 20-21.

One obstacle to obtain a birth certification is money.   To obtain a birth certificate, one must pay at least $7.   Impoverished Native Americans, such as Plaintiff Lucille Vivier, lack the disposable income necessary to obtain a birth certificate, and make the difficult decision not to spend their limited resources on a birth certificate.   See Docket No. 44-2, pp. 43-44.

Another barrier is that to obtain a birth certificate, a person must present "proof of identity."   Again, one needs an ID to get an ID.   This can be a state-issued photo ID, a driver's license, a Bureau of Indian Affairs tribal ID card, a military ID card, or a U.S. passport or visa. A Native American applicant lacking a qualifying voter ID probably lacks these forms of ID as

---

[1]North Dakota Department of Transporation, *ID Card Requirements (2015),*
http://dot.nd.gov/divisions/driverslicense/idrequirements.htm.

well.  Such applicants can still satisfy the ID requirement by presenting **two** of the following: social security card; utility bill with current address; pay stub showing name and social security number; car registration showing current address; and an IRS tax return.  The Barreto/Sanchez Survey found that many Native Americans who presently lack a qualifying voter ID cannot provide these documents:

- 21.6% of Native Americans do not have two documents that show their residential address.  One reason is that many Native Americans do not have residential addresses and the Post Office delivers their mail to a post office box.  See Docket No. 44-1, pp. 3, 20-21.  Another reason is that, on many reservations, the residential address system produces conflicting and problematic results.  See Docket No. 44-10, pp. 2-3.

- 5.6% of Native Americans in North Dakota do not have a social security card or a W2 evidencing their social security number.  See Docket No. 44-1, pp. 20-21.

- Many Native Americans lack access to transportation and have no car registration showing their current address.  See Docket No. 44-2, p. 41.

Another acceptable form of ID is a "valid, unexpired U.S. Passport."  A passport application currently costs $110, which is a significant amount for a person with few resources.  See Docket No. 44-2, p. 30.  The other seven forms of acceptable ID– "Report of a Birth Abroad issued by the United States Department of State," "Certificate of Naturalization," "Certificate of Citizenship," "Valid unexpired Permanent Resident Card," "Unexpired Employment Authorization Card," "Unexpired Foreign Passport with I-94," and "I-94 Card Stamped Refugee

or Asylee"–are all irrelevant and unobtainable to Native Americans born in the United States.
<u>See</u> Docket No. 44-2, pp. 30-31.

**(b)**      <u>**Native Americans Trying Obtain a Non-Driver's ID Face Substantial Cost Burdens**</u>

Cost presents another barrier to obtaining a non-driver ID.  According to the North Dakota Department of Transportation website, it costs $8 to get a non-driver's ID card if you have a driver's license or need to replace a lost or stolen ID.[2]  Native Americans who currently lack a qualifying voter ID may not be able to afford that.

**(c)**      <u>**Native Americans Trying to Obtain a Non-Driver's ID Face Substantial Travel/Time Burdens**</u>

The record shows that having the ID documents needed to obtain a non-driver's ID is not enough.  A person must also personally "visit one of the ND Driver's License Sites."  The record reveals there are no Driver's License Sites on any of North Dakota's reservations.  Further, a successful visit to a site requires knowledge and experience dealing with bureaucratic institutions, a means of transportation, money to pay for transportation, and the free time to travel the often significant distances to such sites.  The <u>undisputed</u> evidence before the Court reveals that overcoming these obstacles can be difficult, particularly for an impoverished Native American.  The declarations of the Plaintiffs' expert witnesses, <u>which have not been disputed by the State</u>, disclose the following:

- **Many Native Americans do not know where Driver's License Sites are located.** According to the Barreto/Sanchez Survey, only 64.9% of Native Americans in North Dakota who lack a qualifying voter ID know the location of

---

[2]<u>See</u> North Dakota Department of Transportation, *ID Card Requirements* (2015), http://dot.nd.gov/divisions/driverslicense/idrequirements.htm

12

the nearest Driver's License Site (as compared to 85.2% of non-Native Americans). <u>See</u> Docket No. 44-1, pp. 23-24.

- **Many lack means of transportation.** According to the Barreto/Sanchez Survey, only 73.9% of Native Americans in North Dakota lacking a qualifying voter ID own or lease a car (as compared to 88% of non-Native Americans); and 47.3% of Native Americans in North Dakota believe it would be a hardship if they had to rely on public transportation to get to a Driver's License Site (as compared to 23.1% of non-Native Americans). <u>See</u> Docket No. 44-1, pp. 22-24.

- **Travel distances to a Driver's License Site are significant.** For the average voting-eligible Native American in North Dakota, the average travel distance to the closest site is nearly 20 miles (as compared to appx. 11 miles for non-Native Americans). This translates to more than 70 minutes of travel time for a round trip. For Native Americans in North Dakota living on a reservation, the travel distance can be as great as 60 miles one way.

- **Drivers License Sites are not easily accessible.** There are no sites on any of the reservations in North Dakota. Because there are no Driver's License Sites on any reservations in North Dakota, access for Native Americans is severely limited. North Dakota only has 27 Driver's License Sites in the entire state – just one site per 2,600 square miles. Only four of these sites are open five days a week (excepting holidays). Twelve of the sites are open less than six hours on one day a month (or even less than that). One office is open for a total of 28 hours per calendar year. <u>See</u> Docket No. 44-4, pp. 5, 14-16.

The <u>undisputed evidence</u> in this case has established that travel to a Driver's License Site to obtain a non-driver's ID card (or a driver's license) is substantially burdensome for Native Americans. The Barreto/Sanchez Survey found that 44.1% of Native Americans lacking a qualifying voter ID reported they would have difficulty taking time off from work to travel to a Driver's License Site (compared to 26.2% of non-Native Americans), and 36.7% of Native Americans said it would be a problem to travel even six miles each way to a site (compared to 17.3% of non-Native Americans). The personal experiences of Plaintiffs' declarants Richard Brakebill, Lucille Vivier, Dorothy Herman, and LaDonna Allard further confirm the substantial burdens Native Americans encounter in obtaining qualifying voter ID's. <u>See</u> Docket Nos. 44-9, 44-10, 44-11, and 44-12.

### (d)    <u>Native Americans Who Currently Lack Qualifying Voter ID's Face Substantial Burdens in Obtaining a New Driver's License</u>

One finding from the Barreto/Sanchez Survey is that only 78.2% of voting-age Native Americans have a driver's license. As with non-driver's ID's, acquiring a new driver's license also requires a personal visit to a Driver's License Site. As previously discussed, such a visit can be burdensome for Native Americans who currently lack a qualifying voter ID. Further, getting a new driver's license also requires proof of ID–the same forms of ID required to obtain a non-driver's ID, which is problematic for Native Americans.

According to the North Dakota Department of Transportation website, a new license can cost as much as $25 ($5 to take the written test, $5 to take a road test, and $15 for the license

fee).[3]  Many impoverished Native Americans do not have the disposable income to pay for these

fees.

      (e)      **Native Americans Who Currently Lack a Qualifying Voter ID Face Substantial Burdens in Updating Their Current Non-Driver ID or Driver's License**

Many existing non-driver's ID's and driver's licenses do not suffice as a qualifying voter

ID because they do not reflect the person's current residential address.  For voters who do have a

residential address, North Dakota provides three ways for a person to update their license to

show their current address, and each way presents burdens for Native Americans:

- The first way is to update the address online.  This requires the person to have access to a computer and an Internet connection which is a problem.  A survey of Native Americans in the Bismarck/Mandan area found that only 61% had their own computers, and only about half had access to the Internet.  The record reveals that those figures are likely much lower for Native Americans living in rural areas and on reservations given the higher levels of poverty.  See Docket No. 44-2, pp. 41-42.

- The second way is to visit a Driver's License Site and personally update the information, which as previously discussed can be burdensome.

- The third way to update a license (or non-driver ID) is to travel to a Driver's License Site and get a new one, which also poses a burden.

---

[3]North Dakot Department of Transportation, *Driver's License Requirements* (2015), http://dot.nd.gov/divisions/driverslicense/dlrequirement.htm.

      **(f)**    **Many Tribal Government Issued ID Cards Do Not Satisfy the New Law Because They Do Not Show a Residential Address and Are Substantially Burdensome to Obtain**

It in undisputed that many tribal ID's do not satisfy North Dakota's requirement of showing the "applicant's current or most recent North Dakota residential address" under the new law. The record reveals that many homes on the reservations either do not have residential addresses (the Post Office delivers their mail to post office boxes), or there is no clear address, so tribal ID's do not reflect any residential addresses. <u>See</u> Docket No. 44-2, pp. 36-38. In addition, obtaining new tribal ID's can be burdensome because they cost money, and one must travel to tribal headquarters to obtain one. Further, many Native Americans (including all those living on the Standing Rock Reservation) only have ID's issued by the federal Bureau of Indian Affairs; they do not have ID's issued by tribal governments. Thus, these forms of ID's also do not satisfy the voter ID laws' definition of "tribal government issued" ID card.

      **(g)**    **North Dakota's New Voter ID Laws Have Disenfranchised Native American Voters**

The Plaintiffs have presented evidence of disenfranchisement of voting-eligible Native Americans in the elections that have taken place since the amendments to N.D.C.C. § 16.1-05-07 in 2013 and 2015. The Plaintiffs have shown that North Dakota officials have admitted the new laws resulted in poll workers turning away voters because they did not have a qualifying ID. <u>See</u> Docket No. 44-2, p. 34. The record reveals that North Dakota poll workers turned away many Native Americans because their driver's licenses, non-driver ID, or tribal ID's did not disclose their current residential addresses. <u>See</u> Docket No. 44-2, pp. 35-36.

The difficulties cited above in obtaining a valid ID for the purposes of satisfying N.D.C.C. § 16.1-05-07, manifest themselves in the experiences of several of the named Plaintiffs

in this case.  Lucille Vivier attested that her tribal ID was rejected at her polling place and she was not able to vote in 2014 because her tribal ID did not have a current residential address listed.  See Docket No. 1, pp. 4-5.  Plaintiff Richard Brakebill was denied the right to vote in November 2014 because he had an expired driver's license.  When he sought to remedy this problem at a North Dakota Driver's License Site, he was denied a new form of ID because he did not have a copy of his Arkansas birth certificate.  See Docket No. 1, p. 3.  Nevertheless, Brakebill attempted to vote on election day in 2014 and presented his expired driver's license and his tribal ID.  He was denied a ballot because his license had expired and his tribal ID did not reveal a current residential address.

Dorothy Herman was similarly unsuccessful in obtaining a new form of ID after two trips to a North Dakota Driver's License Site before the 2014 general election.  Her first trip was unsuccessful because the Driver's License Site was closed, and her second trip was unsuccessful because her expired state  card, with her current residential address, was insufficient to obtain a new state ID without a birth certificate.  See Docket No. 1, p. 6.  Herman presumed her tribal ID would be sufficient to vote in 2014, but she was ultimately denied a ballot because her tribal ID did not contain a current residential address.  The record reveals these Plaintiffs and others were denied the right to vote in November 2014 (even though the poll workers knew them personally and knew they were qualified to vote) because they had invalid ID's under the new laws.

The undisputed evidence reveals that Native Americans living in North Dakota disproportionally live in severe poverty.  According to an American Community Survey (ACS) covering the years 2009-2013, 21.7% of voting-age Native Americans had incomes below the poverty line, compared to only 7.6% of non-Native Americans.  See Docket no. 44-4, pp. 6-7.

Another ACS study reported that 37.7% of all Native Americans live in poverty, compared to 5.3% of Anglo families.  See Docket No. 44-2, p. 40.

The undisputed evidence and statistical data demonstrate the following, which reflects the disparate living conditions for Native Americans:

- The ACS study reported a median household income for non-Native Americans at $56,566, compared to only $29,909 for Native Americans.

- The ACS study found that the average income for non-Native Americans living in North Dakota is $73,313, compared to $48,763 for Native Americans.

- The Barreto/Sanchez Survey found that 22.3% of Native Americans who lack voter ID's have household incomes less than $10,000.

- The unemployment rates on reservations are staggering.  For example, unemployment at the Standing Rock and Turtle Mountain reservations is nearly 70%.

These undisputed statistics and studies support the finding that, given the disparities in living conditions, it is not surprising that North Dakota's new voter ID laws are having and will continue to have a disproportionately negative impact on Native American voting-eligible citizens.

The undisputed declarations of the Plaintiffs' expert witnesses also established the following:

- 23.5% of Native American eligible voters do not currently possess a qualifying voter ID.  In contrast, only 12% of non-Native Americans do not possess a valid ID.  See Docket No. 44-1, pp. 3-4.

- 15.4% of Native Americans who voted in the 2012 presidential election currently lack a valid voter ID, compared to only 6.9% of non-Native Americans who voted in the 2012 presidential election.

- Only 78.2% of Native Americans have a driver's license that they could potentially use as a qualifying voter ID. In contrast, 94.4% of non-Native Americans have a driver's license.

- Native Americans are disproportionately more likely to lack the formal educational background that could help them obtain qualifying forms of voter ID. For example, 34.5% of Native Americans who lack voter ID never finished high school, compared to only 5.7% of non-Native Americans.

- Native Americans who currently lack a qualifying voter ID disproportionally face logistical and financial burdens in obtaining a qualifying ID.  For example, only 64.9% of Native Americans lacking voter ID know the location of the nearest Driver's License Site, compared to 85.2% on non-Native Americans; only 73.9% of Native Americans who lack voter ID own or lease a car, compared to 88% of non-Native Americans; 10.5% of Native Americans lack access to a motor vehicle, compared to only 4.8% of white households' 44.1% of Native Americans who lack a qualifying voter ID would have a problem getting time off work to go to a Driver's License Site to obtain qualifying ID, compared to only 26.2% of non-Native Americans.  On the average, Native Americans in North Dakota must travel twice as far as non-Natives to visit a Driver's License Site.

The Defendant contends the requirements of N.D.C.C. § 16.1-05-07 are reasonable and that, at some point, each citizen has to take responsibility for his or her vote, including obtaining

the proper documentation necessary in order to cast that vote.  <u>See</u> Docket No. 45, p. 6.  The Defendant asserts the Plaintiffs have not shown that any burdens associated with obtaining a valid ID are any more restrictive on Native Americans in North Dakotan than upon hundreds of thousands of similarly-situated non-Native Americans living in rural North Dakota.   The Court finds the record clearly belies that contention, given the socio-economic disparities between Native American and non-Native American populations in North Dakota as demonstrated in the numerous studies and statistics presented by the Plaintiffs.  Again, <u>none</u> of the studies have been challenged or refuted by the State.  The Court will now weigh the burdens placed upon the Native American population in North Dakota with the Defendant's justifications for the voter ID requirements in N.D.C.C. § 16.1-05-07.

## 2.   <u>NORTH DAKOTA'S INTEREST</u>

The Defendant relies heavily upon the United States Supreme Court's *Crawford* decision to support the contention that "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."  <u>Crawford</u>, 553 U.S. at 195.  The Court agrees with the Defendant and the Supreme Court when it said that "the electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters."  <u>Id.</u> at 194.  The Defendant has cited *Crawford* for the contention that "for most voters who need them [photo ID], the inconvenience of making a trip to the [North Dakota Driver's License Site], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."  <u>Id.</u> at 198.  However, what is ignored is that the United States Supreme Court in *Crawford* expressly recognized that "[b]oth evidence in the

20

record and facts of which we may take judicial notice, however, indicate that a somewhat heavier burden may be placed on a limited number of persons." Id. at 199.  The Indiana law that was challenged in *Crawford* allowed indigent voters, religious objectors, and voters who did not have the required photo ID when they went to vote, to cast provisional ballots which the state would count if the voter signed an affidavit.  In contrast, North Dakota's new voter ID laws completely eliminated the affidavit and voucher "fail-safe" mechanisms designated to protect those voters who do not possess an ID and who cannot obtain one with reasonable effort.

The undisputed evidence in the record clearly establishes that the Native American population in North Dakota bears a severe burden under the current version of N.D.C.C. § 16.1-05-07.  The plurality of the Supreme Court in *Crawford* upheld the voter ID laws at issue in Indiana primarily because of a poorly developed record by the Plaintiffs.  The record in *Crawford* did not provide "the number of registered voters without photo ID;" did not "provide any concrete evidence of the burden imposed on voters" who lacked photo ID; and the record said "virtually nothing" about the difficulties indigent voters faced.  Id. at 200-201.  To the contrary, the record before this Court does not suffer the same lack of support present in *Crawford*.  The Plaintiffs here have developed a very thorough record that clearly apprises the Court of the significant number of voting-age Native Americans who reside in North Dakota whom lack a qualifying voter ID under N.D.C.C. § 16.1-05-07.  The record is replete with concrete evidence of significant burdens imposed on Native American voters attempting to exercise their right to vote in North Dakota.

The Court finds that the undisputed evidence in the record reveals that N.D.C.C. § 16.1-05-07 imposes "excessively burdensome requirements" on Native American voters in North Dakota that far outweighs the interests put forth by the State of North Dakota. Further, the Court

finds the lack of any current "fail-safe" provisions in the North Dakota Century Code to be unacceptable and violative of the Equal Protection Clause of the 14th Amendment.

It appears from the record that North Dakota may be the only state in the country that does not allow for some type of a provisional ballot casting if a voting-age citizen does not have the requisite ID on election day. The new voter ID laws totally eliminated the previous "fail-safe" provisions that existed in the past in North Dakota. Although the majority of voters in North Dakota either possess a qualifying voter ID or can easily obtain one, it is clear that a safety net is needed for those voters who simply cannot obtain a qualifying voter ID with reasonable effort. The Court cannot envision a compelling reason or a governmental interest which supports not providing such an avenue of relief for potentially disenfranchised voters.

The Defendant has not offered any purported compelling state interest as to why North Dakota no longer provides any "fail-safe" mechanisms which would enable a person who could not produce a required voter ID to nevertheless be able to vote - just as North Dakota voters were allowed to do prior to 2013. The Defendant has failed to present any evidence showing that "fail-safe" provisions or provisional have resulted in voter fraud in the past, or are particularly susceptible to voter fraud in the future. To the contrary, the record before the Court reveals that the Secretary of State acknowledged in 2006 that he was unaware of any voter fraud in North Dakota. See Docket No. 44-2, pp. 18-21. There is a total lack of any evidence to show voter fraud has ever been a problem in North Dakota. Accordingly, the Court finds that the Plaintiffs are likely to succeed on the merits of their claim against the Defendant under the Equal Protection Clause of the 14th Amendment to the United States Constitution. Thus, this *Dataphase* factor weighs strongly in favor of the issuance of a preliminary injunction.

Having determined the Plaintiffs are likely to succeed on their claim under the 14th Amendment to the United States Constitution, the Court need not address their claims under the Voting Rights Act or the North Dakota Constitution.  See Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1, 690 F.3d 996, 1004 n. 4 (8th Cir. 2012) (concluding that if one claim for relief satisfies the requirements for a preliminary injunction, other claims need not be considered).


**B.     IRREPARABLE HARM**

The Plaintiffs contend they will suffer irreparable harm if N.D.C.C. § 16.1-05-07 is fully implemented without any "fail-safe" provisions.  "The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999).  It is well-established that when there is an adequate remedy at law, a preliminary injunction is not appropriate.  Modern Computer Sys., Inc., 871 F.2d at 738.  To demonstrate irreparable harm, a plaintiff must show the harm is not compensable through an award of monetary damages.  Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 371 (8th Cir. 1991); Doe v. LaDue, 514 F. Supp. 2d 1131, 1135 (D. Minn. 2007) (citing Northland Ins. Co. v. Blaylock, 115 F. Supp. 2d 1108, 1116 (D. Minn. 2000)).  The Eighth Circuit has explained that a district court can presume irreparable harm if the movant is likely to succeed on the merits.  Calvin Klein Cosmetics Corp., 815 F.2d at 505 (citing Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc., 633 F.2d 746, 753  (8th Cir. 1980)).

The irreparable harm the Plaintiffs will suffer if N.D.C.C. § 16.1-05-07 is implemented without any form of a "fail-safe" provision as had previously existed under state law is easy to understand.  The right to vote holds a special place in our republic:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

Wesberry v. Sanders, 376 U.S. 1, 17 (1964).

It is clear that no legal remedy other than enjoining the State of North Dakota from implementing N.D.C.C. § 16.1-05-07 without any "fail-safe" provisions will be sufficient to ensure Native Americans, and any other citizens struggling to comply with the new voter ID requirements, have a clear and unequivocal opportunity to have their voice heard in future elections. The Plaintiffs have presented undisputed evidence that more than **3,800** Native Americans may likely be denied the right to vote in the upcoming general election in November 2016 absent injunctive relief. See Docket no. 44, p. 12. Thus, this *Dataphase* factor weighs in favor of the issuance of a preliminary injunction at this stage

### C.   BALANCE OF HARMS AND THE PUBLIC INTEREST

The balance of harm factor analysis examines the harm to all parties involved in the dispute and other interested parties, including the public. Dataphase, 640 F.2d at 114; Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 372 (8th Cir. 1991). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (citation omitted). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987). These factors—the balance of harms and the public interest—"merge when the Government is the opposing party."

Nken v. Holder, 556 U.S. 418, 435 (2009).  Moreover, granting preliminary injunctive relief is only proper if the moving party establishes that entry of an injunction would serve the public interest.  Dataphase, 640 F.2d at 113.

The undisputed evidence in the record clearly demonstrates there are likely thousands of eligible voters in North Dakota who lack a qualifying ID.  The undisputed evidence produced to date supports the conclusion that some of those voters will simply be unable to obtain the necessary ID, no matter how hard they try.

The State of North Dakota's interests must be measured against the specific remedy the Plaintiffs' seek, which is an injunction requiring the Defendant to implement a "fail-safe" measure as a part of its voter ID laws.  The State's interests in requiring a voter ID are to prevent voter fraud and promote voter confidence.  However, those interests would not be undermined by allowing Native American voters, or any other voters who cannot obtain an ID, to present an affidavit or declaration in lieu of one of the four (4) forms of permissible voter ID's.  The undisputed evidence before the Court reveals that voter fraud in North Dakota has been virtually non-existent.  In addition, the Defendant has produced no evidence suggesting the public's confidence in the electoral process would be undermined by excusing those voters who cannot reasonably obtain an ID from actually presenting an ID at the polls on election day.

The Court notes that many states that have voter photo-identification requirements allow those who lack ID's to vote by signing an affidavit or other statement or declaration to that effect, rather than being required to present an ID.  The Defendant has never suggested the laws of those states fail to prevent fraud and promote voter confidence.  See Idaho Code § 34-1114; Ind. Code § 3-11.7-5-2.(c); La. Rev. Stat § 18:562; Mich. Comp. Laws § 168.523(2); N.C. Gen. Stat. § 163-166.13(c)(2); S.C. Code § 7-13-710(D)(1)(b).  Some of the states that accept

affidavits or statements in lieu of an ID require the use of provisional ballots as well as other procedures for challenging the ballots cast by those who do not present an ID. However, some states do not. See Idaho Code § 34-1114; La. Rev. Stat. § 18:562. The State of North Dakota has not argued that the use of provisional ballots is necessary to protect the state's interests.

Furthermore, the State has not shown it would be difficult to implement a remedy in time for the general election on November 8, 2016. To implement a "fail-safe" remedy, the State need only look to the law it repealed in 2013. The State need only direct election officials to print an affidavit form or a declaration form to be made available at the polls, and to accept a properly completed affidavit or declaration from voters in lieu of an ID – precisely what had been done in North Dakota prior to 2013 when the "fail-safe" provisions existed under North Dakota law.[4] The Defendant may have to revise its voting materials relating to the voter ID requirements to include information about an affidavit option, but it is certainly practical to complete such tasks in time for the November 2016 election. There is no need to reinvent the wheel because prior to 2013, North Dakota had "fail-safe" provisions in place to ensure that all voters without an appropriate ID could nevertheless vote at the poll, rather than be denied the right to vote.

More importantly, the undersigned was informed by both parties during a status conference on May 12, 2016, that the State would be able to implement any injunction order if it was issued by early September 2016. Thereafter, the parties jointly agreed to a briefing schedule, which the Court approved, based on the Defendant's representations that the State could comply with any Order if issued by early September 2016.

---

[4]For an example of the affidavit or declaration form that was ordered on July 27, 2016, in Wisconsin, see Docket No. 49-1, p. 44.

The Court has carefully considered the balance of harms and the public interest *Dataphase* factors and finds that the right of voting-age Native Americans to cast a ballot outweighs any interest North Dakota may have in refusing to implement certain "fail-safe" provisions. The Defendant argues that the timing between the date of this order and election day is insufficient to train poll workers and implement new procedures at polling places across the state to reflect the nature of the injunction. The Court finds these arguments unpersuasive, particularly after the Court was informed by the State that it could comply with any order so long as an order was issued by early September 2016. The Court relied on those assurances and has issued this Order more than one month earlier than the parties requested.

The State of North Dakota conducted elections with "fail-safe" provisions in the North Dakota Century Code during numerous election cycles before 2013 and 2015. It is a minimal burden for the State to conduct this year's election in the same manner it successfully administered elections for decades before the enactment of the new voter ID laws. The State can easily reinstate the "fail-safe" provisions that were repealed in 2013, and/or implement other "fail-safe" provisions utilized in many other states. It is difficult to believe it would be unduly burdensome to revert to a system that was in place just one election cycle ago.

The State also argues there is no viable way to authenticate affidavits signed pursuant to a "fail-safe" provision and, without authentication, voters will be deprived of the assurance that only qualified voters were allowed to cast ballots. The Court finds that the State of North Dakota has produced <u>no evidence</u> suggesting that the public's confidence in the electoral process will be undermined by allowing voters disenfranchised by N.D.C.C. § 16.1-05-07 to vote under a "fail-safe" provision, as has been done in the past. The record reveals that North Dakota is apparently the only state without any "fail-safe" provisions in its election laws. There is no

evidence before the Court that every other state in the nation has been unable to prevent fraud and promote voter confidence by simply allowing the casting of provisional ballots or the implementation of other recognized "fail-safe" provisions as previously existed in this state.  In balancing the equities and the public interest, the Court finds these *Dataphase* factors also weigh in favor of the issuance of a preliminary injunction.


III.   <u>**CONCLUSION**</u>

After a careful review of the entire record, and careful consideration of all of the *Dataphase* factors, the Court finds the *Dataphase* factors, when viewed in their totality, weigh in favor of the issuance of a preliminary injunction.  The Plaintiffs have met their burden of establishing the necessity of a preliminary injunction at this early stage.  The public interest in protecting the most cherished right to vote for thousands of Native Americans who currently lack a qualifying ID and cannot obtain one, outweighs the purported interest and arguments of the State.  It is critical the State of North Dakota provide Native Americans an equal and meaningful opportunity to vote in the 2016 election.  No eligible voter, regardless of their station in life, should be denied the opportunity to vote.  Accordingly, the Plaintiffs' motion for a preliminary injunction (Docket No. 42) is **GRANTED** until further order of the Court.  The North Dakota Secretary of State is enjoined from enforcing N.D.C.C. § 16.1-05-07 without any adequate "fail-safe" provisions as had previously been provided to all voters in North Dakota prior to 2013.  In the past, North Dakota allowed all citizens who were unable to provide acceptable ID's to cast their vote under two types of "fail-safe" provisions - which were repealed in 2013.  The ill-advised repeal of all such "fail-safe" provisions has resulted in an undue burden

on Native American voters and others who attempt to exercise their right to vote.  There are a multitude of easy remedies that most states have adopted in some form to alleviate this burden.

**IT IS SO ORDERED**.

Dated this 1st day of August, 2016.

/s/ Daniel L. Hovland
Daniel L. Hovland, District Judge
United States District Court