**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | |
|---|---|
| Richard Brakebill, Deloris Baker, Dorothy Herman, Della Merrick, Elvis Norquay, Ray Norquay, and Lucille Vivier, on behalf of themselves, | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| vs. | Civil No. 1:16-cv-8 |
| Alvin Jaeger, in his official capacity as the North Dakota Secretary of State, | |
| Defendant. | |

INTRODUCTION ........................................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 3

PARTIES ........................................................................................................................ 3

STATEMENT OF FACTS ............................................................................................. 9

I.     NORTH DAKOTA'S VOTER ID RULES BEFORE HB 1332, 1333, AND 1369 ................. 9

II.    DEFEAT OF HB 1447 IN 2011 ................................................................................. 11

III.   ELECTION OF SENATOR HEIDI HEITKAMP .............................................................. 15

IV.    ENACTMENT OF HB 1332 AND 1333 ...................................................................... 17

V.     THIS COURT ENJOINS ENFORCEMENT OF HB 1332 AND 1333 ................................. 25

VI.    IMPLEMENTATION OF THE 2016 "FAIL-SAFE" AFFIDAVIT SYSTEM ....................... 27

VII.   DELIBERATION OF HB 1369 .................................................................................. 30

VIII.  ENACTMENT OF HB 1369 ...................................................................................... 34

IX.    HB 1369 MAINTAINS HB 1332'S AND 1333'S BURDEN ON NATIVE AMERICANS ... 39

       A.    General Native American Demographics in North Dakota .............................. 39

       B.    Native Americans in North Dakota have higher unemployment rates than
             non-Native Americans ...................................................................................... 43

i

C.     Native Americans in North Dakota experience a higher rate of poverty than non-Native Americans ...................................................................................... 44

D.     Native Americans in North Dakota experience a higher rate of Homelessness than non-Native Americans.................................................................................. 48

E.     Native Americans in North Dakota Face Greater Health Threats than non-Native Americans ............................................................................................... 49

F.     Native Americans in North Dakota are more likely than non-Native Americans to Lack Qualifying IDs, Supplemental Documentation, and/or Street Addresses.................................................................................................. 50

       1.     Native Americans Disproportionately Lack Qualifying IDs ................ 50

       2.     Native Americans Disproportionately Lack Supplemental Documents ................................................................................................................ 51

       3.     Native Americans Disproportionally Lack Street Addresses ............. 52

G.     Obtaining a Qualifying ID in North Dakota is More Difficult For Native Americans ............................................................................................................... 54

       1.     Limited Hours of, and Distance to, North Dakota DLS Sites Increase The Burden On Native American Voters ................................................ 54

       2.     Native Americans are less likely to have access to transportation in North Dakota ............................................................................................ 60

       3.     The Costs of Obtaining Documentation Is Overly Burdensome For Native Americans ................................................................................... 61

X.     THE SECRETARY OF STATE'S CAMPAIGN FOR HB 1332 AND 1333 PROVIDED INADEQUATE NOTICE OF ID REQUIREMENTS ............................................................. 65

XI.     NATIVE AMERICANS ARE DISPROPORTIONATELY BURDENED BY A LACK OF A FAIL-SAFE VOTING OPTION ............................................................................................. 66

XII.     THE STATE'S INTERESTS ARE NOT OUTWEIGHED BY THE DISPROPORTIONATE BURDEN ON NATIVE AMERICANS' ABILITY TO VOTE ................................................. 69

XIII.     HISTORY OF DISCRIMINATION IN NORTH DAKOTA.................................................. 70

    A.     Discrimination in Voting.................................................................................... 70

    B.     Discrimination in Other Areas.......................................................................... 72

       1.     Education ................................................................................................. 72

       2.     Loss of Land ........................................................................................... 76

       3.     North Dakota Indian Affairs Commission ........................................... 77

       4.     Lending Discrimination ......................................................................... 78

CAUSES OF ACTION.................................................................................................................. 79

I.      COUNT ONE: THE VOTER ID REQUIREMENTS IN HB 1369 WERE ENACTED FOR THE PURPOSE OF DENYING OR ABRIDGING THE RIGHT TO VOTE ON THE ACCOUNT OF RACE IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT ... 79

II.     COUNT TWO: THE VOTER ID REQUIREMENTS OF HB 1332, HB 1333, AND HB 1369 VIOLATE SECTION 2 OF THE VOTING RIGHTS ACT BECAUSE THEY HAVE THE RESULT OF DENYING OR ABRIDGING THE RIGHT TO VOTE ON ACCOUNT OF RACE. ................................................................................................................................ 79

III.    COUNT THREE: THE LACK OF "FAIL-SAFE" VOTING MECHANISMS IN HB 1332, HB 1333, AND HB 1369 HAS THE RESULT OF DENYING OR ABRIDGING THE RIGHT TO VOTE ON ACCOUNT OF RACE IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT ..................................................................................................................... 80

IV.    COUNT FOUR: HB 1332, HB 1333, AND HB 1369 PLACE UNCONSTITUTIONAL BURDENS ON QUALIFIED ELECTORS IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT. ........................... 82

V.     COUNT FIVE: HB 1369 EXCLUDES NON-PROPERTY HOLDERS FROM VOTING IN ELECTIONS IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT ...................................................................................... 83

VI.    COUNT SIX: HB 1369 VIOLATES THE FIFTEENTH AMENDMENT.............................. 84

VII.   COUNT SEVEN: HB 1332, HB 1333, AND HB 1369 VIOLATE THE NORTH DAKOTA EQUAL PROTECTION CLAUSE IN ARTICLE I OF THE NORTH DAKOTA CONSTITUTION. ....................................................................................................... 84

VIII.  COUNT EIGHT: HB 1369 VIOLATES THE EQUAL PROTECTION CLAUSE IN ARTICLE I OF THE NORTH DAKOTA CONSTUTION BECAUSE IT EXCLUDES NON-PROPERTY HOLDERS FROM VOTING ............................................................. 86

IX.    COUNT NINE:HB 1332, HB 1333, AND HB 1369 VIOLATE ARTICLE II OF THE NORTH DAKOTA CONSTITUTION BY IMPOSING NEW VOTER QUALIFICATIONS ... 87

PRAYER FOR RELIEF .................................................................................................................. 88

Plaintiffs, by and through their undersigned attorneys, allege on information and belief as follows:

**<u>INTRODUCTION</u>**

1. This action is brought under the Voting Rights Act, 52 U.S.C. § 10301, and the Declaratory Judgment Act,  28 U.S.C. § 2201, by qualified Native American voters (or electors) in North Dakota who have been denied the right to vote and/or will be denied the right to vote through enforcement of North Dakota's recently enacted voter identification ("ID") laws.  Plaintiffs seek to protect their right to vote under the United States Constitution, the North Dakota Constitution, and the Voting Rights Act.

2. During the course of these proceedings, North Dakota House Bill 1369 ("HB 1369") was enacted on April 24, 2017, which preserved strict voter ID requirements that restricted access to voting and excluded a "fail-safe" mechanism. 65th Leg. Assemb., Reg. Sess. (N.D. 2017) (codified at N.D. Cent. Code § 16.1-01-04.1). The failure to provide a fail-safe mechanism is "unacceptable and violative of the Equal Protection Clause of the 14th Amendment" as well as the 15th Amendment, the Voting Rights Act, and the North Dakota Constitution.  Order Granting Pls.' Mot. for Prelim. Inj, Doc. 50 at 22; *see also* Doc. 50 at 1 (noting that the lack of a fail-safe mechanism is "dispositive"). The newest iteration of North Dakota's strict voter ID law is codified at N.D. Cent. Code 16.1-01-04, 16.1–01–04.1, and 16.1–01–04.2 among other places.

3. Prior to HB 1369, this litigation involved two statutes that made North Dakota's voting system the most restrictive in the nation - North Dakota House Bill 1332, 63rd Leg. Assemb., Reg. Sess. § 5 (N.D. 2013) (formerly codified at N.D. Cent. Code § 16.1-05-07) ("HB

1332"), and North Dakota House Bill 1333 ("HB 1333"), 64th Leg. Assemb., Reg. Sess. (N.D. 2015).

4. HB 1369 maintains North Dakota's restrictive voter ID requirements with no fail-safe mechanism.  Additionally, HB 1369 imposes a property requirement on electors. Plaintiffs seek a determination that  HB 1369 disproportionately burdens and disenfranchises Native Americans and: (a) has a discriminatory purpose in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2"); (b) has a discriminatory effect in violation of Section 2 through its voter ID requirements; (c) has a discriminatory effect in violation of Section 2 through its lack of a "fail-safe" voting mechanism; (d) imposes substantial and unjustified burdens on the fundamental right to vote in violation of the Equal Protection Clause of the Fourteenth Amendment; (e) excludes non-property holders from voting in elections in violation of the Equal Protection Clause of the Fourteenth Amendment; (f) imposes unjustified burdens on the fundamental right to vote because of Plaintiffs' race in violation of the Fifteenth Amendment; (g) denies qualified voters equal protection under the law in violation of the North Dakota Constitution because of its burdensome voter ID requirements and lack of fail-safe voting mechanism; and (h) denies qualified voters equal protection under the law in violation of the North Dakota Constitution because it excludes non-property holders from voting; (i) improperly makes ownership of a voter ID and possession of a street address a pre-condition and qualification to vote in violation of the North Dakota Constitution.  For these and other reasons, this law should be declared unlawful and enjoined.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and 52 U.S.C. § 10308(f).

6. Venue is proper in this court under 28 U.S.C. § 1391(b).

**PARTIES**

7. All of the Plaintiffs named in this Complaint are citizens of the United States, residents of North Dakota, Native Americans, and duly qualified electors eligible to vote in local, state, and federal elections in North Dakota. "The record reveals these Plaintiffs and others were denied the right to vote in November 2014 (even though the poll workers knew them personally and knew they were qualified to vote) because they had invalid ID's under the new laws." Doc. 50 at 17.

8. Under the new law, HB 1369, Plaintiffs likewise would have been disenfranchised or severely burdened despite being duly qualified electors. Therefore, all Plaintiffs have a direct, substantial, and legally protectable interest in the subject matter of this litigation.

9. Plaintiff Richard Brakebill is an enrolled member of the Turtle Mountain Band of Chippewa Indians and a United States Navy veteran. Mr. Brakebill is over the age of 18 and has lived in Rolla, North Dakota for at least ten years.  Mr. Brakebill is therefore a qualified elector in North Dakota. "Plaintiff Richard Brakebill was denied the right to vote in November 2014 because he had an expired driver's license. When he sought to remedy this problem at a North Dakota Driver's License Site, he was denied a new form of ID because he did not have a copy of his Arkansas birth certificate." Doc. 50 at 17. He had a tribal ID without an address and an expired state of North Dakota ID with an old address. Mr.

3

Brakebill lives on a fixed income and currently works a seasonal, inconsistent job, further constraining his ability to secure the documentation necessary to obtain a qualifying ID or supplement his existing ID.  "Nevertheless, Mr. Brakebill attempted to vote on election day in 2014 and presented his expired driver's license and his tribal ID. He was denied a ballot because his license had expired and his tribal ID did not reveal a current residential address." *Id.* Mr. Brakebill currently possesses a tribal ID that lists his street address but the ID expires August 2018, three months before the November 2018 election.  Mr. Brakebill had to pay $10 for his tribal ID, and will have to pay again next year for an updated tribal ID. Mr. Brakebill recently suffered a house fire and lost most of his possessions and is unsure whether he will be able to obtain another ID prior to the election due to the strain on his financial resources.  Mr. Brakebill has also been unable to secure a state ID due to the logistical difficulty of getting to a North Dakota Driver's License Site ("DLS").  Mr. Brakebill believes he has to travel to the Devil's Lake DLS to obtain an ID – an approximately 1 hour and 15 minute drive – because the DLS nearest to him in Rolla is open so infrequently that attempting to go there is, practically speaking, impossible. The DLS in Rolla is open the second Wednesday of every month from 10:20 a.m. to 2:35 p.m.

10. Plaintiff Elvis Norquay is an enrolled member of the Turtle Mountain Band of Chippewa Indians and U.S. Marine Corps veteran. He is over 18 years of age, a citizen of the United States, and a citizen of North Dakota. Mr. E. Norquay has lived in Belcourt, North Dakota for around 25 years, and is therefore a qualified North Dakota elector.  Mr. E. Norquay was denied the right to vote in the November 4, 2014 general election. When Mr. E. Norquay went to vote in November 2014, he presented his tribal ID, but was denied the

4

right to vote because his tribal ID listed no address. Mr. E. Norquay does not have a state driver's license or ID, and does not have a birth certificate. Mr. E. Norquay cannot afford the documentation he needs to obtain a state ID or the transportation to travel to a DLS. Mr. E. Norquay obtained a tribal ID for $10 in the last year, but following the theft of his wallet, lost that ID. Mr. E. Norquay again replaced his tribal ID for a cost of $15. Mr. E. Norquay, however, has since become homeless and is residing at the Fayes Albert building, a community homeless shelter. The address on his tribal ID is of his previous residence and is now therefore incorrect. He does not currently pay for his own utilities. He receives Social Security and disability which is directly deposited into his debit card. He has no written confirmation of his current residence at the Fayes Albert building. Mr. E. Norquay would prefer to pay for food rather than update the address on his tribal ID. Mr. E. Norquay is trying to secure other housing and does not view the shelter as permanent housing.

11. Plaintiff Ray Norquay is a member of the Turtle Mountain Band of Chippewa Indians.  Mr. R. Norquay has lived in Belcourt, North Dakota for most of his life, and consistently for about the last six years. He is over eighteen years of age and a citizen of the United States, and is therefore a qualified North Dakota elector.  Mr. R. Norquay attempted to vote in the November 4, 2014 general election, but he was denied the right to vote because he only had a tribal ID that did not list his street address.  As a result of being denied the right to vote, he went to the tribal offices that same day and had to purchase a new ID with his street address on it.  After purchasing the new ID, Mr. R. Norquay went back and was permitted to vote.  Thus, Mr. R. Norquay had to pay to vote.

12. Plaintiff Della Merrick is a member of the Turtle Mountain Band of Chippewa Indians.  Ms. Merrick has lived in Belcourt, North Dakota for about six years. She is over eighteen years of age and a citizen of the United States, and is therefore a qualified North Dakota elector.  Ms. Merrick attempted to vote in the November 4, 2014 general election, but she was denied the right to vote because she only had a tribal ID that did not list her street address.  As a result of being denied the right to vote, she went to the tribal offices that same day and had to purchase a new ID with her street address on it.  After purchasing the new ID, Ms. Merrick went back and was permitted to vote.  Thus, Ms. Merrick had to pay to vote.

13. Plaintiff Lucille Vivier is a member of the Turtle Mountain Band of Chippewa Indians. Ms. Vivier has lived in Dunseith, North Dakota for about 11 years, and before that she lived in Belcourt, North Dakota her whole life. She is over eighteen years of age, a citizen of the United States, a citizen of North Dakota, and is therefore a qualified North Dakota elector.  Ms. Vivier attempted to vote in Dunseith for the November 4, 2014 general election, but she was denied the right to vote because she only had a tribal ID that did not list her street address. Ms. Vivier knew and grew up with the poll worker who rejected her ID since she was 5 years old. Ms. Vivier does not have a Social Security card or a birth certificate.  Ms. Vivier only receives disability income and must pay for the needs of the five children she cares for. Three of the children she cares for have special needs, and thus Ms. Vivier has additional costs that are required for their care. "Impoverished Native Americans, such as Plaintiff Lucille Vivier, lack the disposable income necessary to obtain a birth certificate, and make the difficult decision not to spend their limited resources on a

birth certificate." Doc. 50 at 10. At significant cost, Ms. Vivier recently attempted to obtain a social security card, which she believed she needed in order to obtain a state ID. Because she does not own a car she paid $120 for a friend to drive her to the Social Security office in Minot, which is approximately 100 miles away and takes over an hour. The cost included payment to the driver, gas, and a meal for the driver.  She also paid another $40 to have another friend watch the five children she usually cares for so she could make the trip during business hours. She believed (because she was told either by social security staff or a social security form) that she could utilize her Turtle Mountain tribal ID to obtain a Social Security card.  When she arrived she was told the office would accept Standing Rock and Spirit Lake tribal IDs but not Turtle Mountain IDs and she was therefore denied a Social Security card. Ms. Vivier has since been unable to obtain a Social Security card or state ID. Ms. Vivier obtained a tribal ID at a cost of $10. Since obtaining her ID she has moved from her mother's home to her boyfriend's home, which also is located in Dunseith. Her tribal ID contains her mother's address where she used to reside and not her current address.

14. Plaintiff Dorothy Herman is an enrolled member of the Turtle Mountain Band of Chippewa Indians and a retired teacher. She is 77 years old, has lived in North Dakota for about 45 years, and has voted throughout that time. Ms. Herman lives in Rolla, North Dakota and has lived there for about ten years.  She is over eighteen years of age, a citizen of the United States and a citizen of North Dakota, and is therefore a qualified North Dakota elector. Prior to the election, Ms. Herman had in her possession an expired state ID with the correct residential address and a tribal ID without an address. Because her state ID was expired, Ms. Herman attempted to obtain a new state ID twice at the DLS in Rolla, North

Dakota during its advertised operating hours prior to the election. "Her first trip was unsuccessful because the Driver's License Site was closed, and her second trip was unsuccessful because her expired state card, with her current residential address, was insufficient to obtain a new state ID without a birth certificate." Doc. 50 at 17. To obtain an ID, they told her she would have to make a third trip to the DLS and pay $8 after she located all of her documentation.  Ms. Herman saw an advertisement about the new voter ID law prior to the 2014 general election, and based on that advertisement, she thought her tribal ID was a qualifying voter ID.  Thus, Ms. Herman did not make a third trip to the DLS prior to the election. When Ms. Herman attempted to vote in Rolla in the 2014 general election with her tribal ID and expired state ID, she was denied the right to vote because her tribal ID did not have an address and her state ID was expired. "Herman presumed her tribal ID would be sufficient to vote in 2014, but she was ultimately denied a ballot because her tribal ID did not contain a current residential address." *Id.* When she was turned away on the day of the election, she attempted to pay to get a tribal ID with an address, but the tribal office was closed due to the elections. She returned to the DLS a third time after the election and paid the $8 to obtain a new state identification card. Ms. Herman survives on her school teacher's retirement income and her husband's Social Security. For Ms. Herman, the expense and difficulty to obtain an ID ultimately prevented her from voting.

15. Defendant Alvin Jaeger is the North Dakota Secretary of State and is sued in his official capacity.  The North Dakota Secretary of State is the State's chief election officer. The Office of the North Dakota Secretary of State is responsible for coordinating the implementation of HB 1369.

## STATEMENT OF FACTS

### I.    NORTH DAKOTA'S VOTER ID RULES BEFORE HB 1332, 1333, AND 1369

16. North Dakota is the only state in the United States that does not have voter registration. N.D. Cent. Code § 16.1-01-5.1.  It was one of the first states to adopt voter registration in the 1800s, but was the first state to abolish it in 1951. Instead, North Dakota established numerous small voting precincts, which ensured that election boards knew the voters who came to the polls to vote on Election Day and could detect people who should not be voting in the precinct.

17. North Dakota elections have been ranked first in the nation for election performance by the Pew Charitable Trust in 2008, 2010, 2012, and 2014, indicating North Dakota has consistently administered effective elections without voter registration even before implementation of its voter ID laws. *Data Visualization: Elections Performance Index - EPI Rank*, The Pew Charitable Trust (Aug. 9, 2016), http://www.pewtrusts.org/en/multimedia/data-visualizations/2014/elections-performance-index#indicator.

18. This rating is based on the Elections Performance Index, or EPI, which "tracks 17 distinct indicators of election administration effectiveness. A state's overall average is calculated from its performance on all 17 indicators, relative to all states across comparable federal election cycles—either presidential or midterm." *Elections Performance Index - EPI 101*, *supra.* Some of the indicators include data completeness, voting wait time, provisional ballots cast, provisional ballots rejected, and registration or absentee ballot problems. *Elections Performance Index - Indicators*, *supra.*

19. Indeed, voter fraud in North Dakota "has been virtually non-existent." Doc. 50 at 25.

20. The North Dakota Constitution provides that there are only three qualifications to be an elector: "[e]very Citizen of the United States, who has attained the age of eighteen years and who is a North Dakota resident, shall be a qualified elector." N.D. Const. art. II, § 1. The North Dakota Constitution further provides: "When an elector moves within the state, he shall be entitled to vote in the precinct from which he moves until he establishes voting residence in another precinct. The legislative assembly shall provide by law for the determination of residence for voting eligibility, other than physical presence." *Id.* Prior to passage of North Dakota's strict voter ID laws, a poll clerk in North Dakota was merely required to "request" that a qualified voter show identification that included the individual's residential address and date of birth to verify eligibility. N.D. Cent. Code § 16.1-05-07(1), *amended by* HB 1332 § 5.  If one form of ID did not have both the residential address and birthdate, the voter could utilize two forms of ID in combination. N.D. Cent. Code § 16.1-05-07(1)(d); *see also* Doc. 50 at 2.

21. Valid forms of ID previously included: a North Dakota driver's license or non-driver's ID card; a U.S. passport; an ID card from a federal agency; an out of state driver's license or non-driver's ID card; an ID card issued by a tribal government; a valid student ID; a military ID card; a utility bill dated thirty days prior to Election Day, including cell phone bills and student housing bills (online printouts were acceptable); and a change of address verification letter from the U.S. Postal Service. Doc. 50 at 2.

22.  Alternatively, if the voter could not provide those forms of ID, there were two other fail-safe methods that would allow them to prove they were qualified. First, a member of

the election board or a poll clerk who knew the voter could personally vouch that the individual was a qualified elector in the precinct, and the person was then allowed to vote. N.D. Cent. Code § 16.1-05-07(2), *amended by* HB 1332 § 5; *see also* Doc. 50 at 2. Second, if no one could vouch for him or her, the election board challenged the person's right to vote, but the person could then execute a voter affidavit swearing to the fact that he or she was a qualified elector who could vote in the precinct. N.D. Cent. Code § 16.1-05-07(3), *amended by* HB 1332 § 5; *see also* Doc. 50 at 2. If the voter agreed to sign the affidavit, the election board and poll clerks were required to allow the voter to vote. Doc. 50 at 2.

## II. DEFEAT OF HB 1447 IN 2011

23. In January of 2011 the North Dakota legislature introduced a bill, House Bill 1447 ("HB 1447"), relating to the canvassing of ballots of voters who were challenged at the polls. In response to concerns that North Dakota's open registration system would lead to fraudulent voters, the State Senate weighed an amendment to HB 1447.

24. The Amendment would have instilled stricter voter ID requirements that would have narrowed the set of acceptable IDs to a driver's license, tribal ID card, or form of identification prescribed by the secretary of state. S. Journal, 62-1447, Reg. Sess., at 1642 (N.D. 2011).

25. The Amendment initially would have modified the voter affidavit system to allow a voter to vote via affidavit at the poll but then set aside that voter's ballot. The voter then would have had to return within a specified period to provide an acceptable form of ID in order for the vote to be counted. If the voter did not return and show an acceptable form of ID, the ballot would not be counted. *See Hearing Minutes on H.B. 1447 Before H. Political*

11

*Subdivision Comm.*, 62nd Leg. Assemb. 1 (N.D. Feb. 3, 2011) (statement of Rep. Koppelman, H. Comm. On Political Sub.) .

26. Senator Sorvaag (R) explained the purpose of the deliberations: "[w]e don't want people voting if they are not suppose [sic] to vote but we don't want to disenfranchise people either by making the process to [sic] cumbersome." *Hearing Minutes on H.B. 1447 Before H. Political Subdivision Comm.*, 62nd Leg. Assemb. 1 (N.D. Apr. 12, 2011) (statement of Sen. Ronald Sorvaag, S. Comm. On Political Sub.).

27. Senator Cook (R), noted the importance of a measured approach to modifying election laws: "[w]hen we do put a law in effect that is going to change how people are able to vote; we should make sure . . . we fully realize it; we discuss it; and we determine ourselves that is what we intend to do and justify it and I would hope that we give those people the opportunity to stick to the wisdom of that policy change. That is one of my concerns that kept me from embracing the bill that you brought before us. This is a very important issue; how people vote and they all look at it a little differently and we want to make sure we know all the consequences of it. That we fully vest the discussions and I think that leant a lot to the committee to put this into a study so we truly know what it is we are doing and what all the consequences are and we say this is the consequences we want." *Id.* at 4 (statement of Sen. Dwight Cook, H. Political Subdivisions Comm.).

28. Senator Cook also noted the importance of voting rights and expressed that he was unsure if voter fraud was even an issue in North Dakota, stating: "The whole voting process is the basic core of the democratic process and we certainly don't want to see somebody

win an election because of voter fraud but to what degree we have any of that I am not sure if we have a great degree." *Id.*

29. One of the sponsors of the bill, Chairman Koppelman, acknowledged that while he wanted to preserve the work already done, he thought "a study going forward to deal with some of the issues that have been discussed that aren't addressed in this bill might make some sense or to revisit this issue and see if it can be improved[.]" *Id.* at 6 (statement of Chairman Koppelman, H. Political Subdivisions Comm.).

30. During deliberations the Legislature modified the proposed amendment via hoghouse amendment to "do away with the affidavits" and "eliminat[ed] the issue of coming back with identification" since it "raised a lot of questions." *Hearing Minutes on H.B. 1447 Before H. Political Subdivision Comm.*, 62nd Leg. Assemb. 1 (N.D. Apr. 15, 2011) (statement of Chairman Koppelman, H. Political Subdivisions Comm.).

31. The modification to the amendment kept the ID requirements but removed the affidavit system entirely and instead devised a voucher system that allowed for either: a poll worker to vouch for the voter, another voter to vouch for one additional person, or a housemate to vouch for up to four people who lived at the same address. The Legislature used a hoghouse amendment to implement these modifications. *Id.* at 1-2.

32. Even under this amended version, members continued to raise concerns about accessibility for voters.

33. Rep. Zaiser (D) worried that under this system "[a]ssuming there is someone not well known in the district and they don't have their ID they are pretty much out of luck."

*Hearing Minutes on H.B. 1447 Before H. Political Subdivision Comm.*, 62nd Leg. Assemb. 2 (N.D. Apr. 20, 2011) (statement of Rep. Zaiser, H. Political Subdivisions Comm.).

34. Senator Nelson (D) expressed concerns "with some of the folks that live in the downtown areas of major cities that have post office boxes . . . Many of them are venerable people so I am worried about them being left out of the system." *Id.* at 2 (statement of Sen. Nelson, H. Political Subdivisions Comm.).

35. And, in response to Senator Nelson's concern, the Legislature was notified that some Native Americans would have a difficult or impossible time obtaining an ID that required a street address.

36. Jim Silrum, Deputy Secretary of State, confirmed that P.O. boxes were widely used and that Native Americans in particular utilized the P.O. box system: "This is very much the case also in small town North Dakota where if you sent something to their street address the post office will return it because it needs to go to their post office box . . . We are also going to need to work with the tribal governments to make sure because a couple of our counties that have reservations in the state have not completed their 911 addressing. Even if they have the residence of those counties [they] don't know what their 911 address is." *Id.* at 2-3 (statement of Jim Silrum, H. Political Subdivisions Comm.).

37. On April 25, 2011, the Senate on a bipartisan basis voted 38-8 to reject the proposed amendment and declined to change the voter ID requirements or modify the affidavit or voucher systems.

38. 8 Republicans voted for the Amendment. 27 Republicans joined 11 Democrats to vote against the amendment.

14

39. Rep. Cook (R), who expressed that he did not believe fraud was a substantial concern and who worried openly about the bill's effect on accessibility to the polls, voted against the amendment.

### III.   ELECTION OF SENATOR HEIDI HEITKAMP

40. On November 6, 2012, Heidi Heitkamp (D), was elected to North Dakota's United States Senate seat in what was described by national media outlets as an "upset win." *See* Kate Nocera, *Heitkamp Scores Upset Win*, Politico (Nov. 7, 2012), http://www.politico.com/story/2012/11/heitkamp-on-brink-of-upset-win-083466.

41. Senator Heitkamp prevailed by a margin of 50.2% over her opponent Rick Berg (R) who received 49.3% of the vote. *See* Official Results General Election – November 6, 2012, ND Voices,

http://results.sos.nd.gov/resultsSW.aspx?eid=35&text=Race&type=SW&map=CTY (last updated Nov. 15, 2012).

42. Senator Heitkamp won by nearly 3,000 votes, or one percentage point. *Id.*

43. Native Americans in North Dakota vote in a racially polarized manner and are generally Democrats. *See* Dr. Herron Decl., Doc. 44-7 at 3 ("my evidence implies that Native Americans in North Dakota vote for Democratic candidates at greater rates than do whites in the state"); *see also* Barreto Decl., Doc. 44-1 ¶ 51 ("[o]ur survey findings regarding the political preferences of Native Americans and non-Natives in North Dakota indicates a political environment characterized by racially divergent voting interests . . . Native Americans are much more likely to identify as Democrats than non-Native Americans . . . . There are dozens and dozens of similar election result patterns that show a very high

degree of correlation between the race and ethnicity of the voters within a precinct and their candidates of choice. Across almost any election in North Dakota, it is clear that Native American and non-Native American voters have different candidate preferences which amount to racially polarized voting.")

44. Accordingly, Sen. Heitkamp, a Democrat, had worked to secure the Native vote, making frequent trips to North Dakota reservations. *See* Vonnie Lone Chief, *How the Indian Vote Boosted Heidi Heitkamp* (Nov. 8, 2012), http://www.indianz.com/News/2012/007665.asp.

45. In the days immediately following her election, local blogs identified the Native American vote as critical to Senator Heitkamp's success. *See* Jim Fuglie, *United States Senator Mary Kathryn (Heidi) Heitkamp. How About That?*, The Prairie Blog (Nov. 9, 2012), http://theprairieblog.areavoices.com/2012/11/09/united-states-senator-mary-kathryn-heidi-heitkamp-how-about-that/; AnnMaria De Mars, *Native Americans: Why Heidi Heitkamp Won & Nate Silver Was Wrong?*, AnnMaria's Blog (Nov. 19, 2012), http://www.thejuliagroup.com/blog/?p=2808.

46. National news outlets carried the story as well. *See* Meteor Blades, *American Indian Voters and Indian Organizers Gave N.D. Senate Edge to Democrat Heidi Heitkamp* (Nov. 8, 2012),https://www.dailykos.com/stories/2012/11/8/1158417/-American-Indian-voters-and-Indian-organizers-gave-N-D-Senate-edge-to-Democrat-Heidi-Heitkamp.

47. Today, it is widely recognized that the Native American vote was critical to Senator Heitkamp's 2012 victory. Ari Natter, *Heitkamp Caught Between Constituencies in Pipeline Fight*, Bloomberg BNA (Sept. 19, 2012), https://www.bna.com/heitkamp-caught-

constituencies-n57982077265/); *see also* Paula McClain & Jessica Johnson Carew, *Can We All Get Along?: Racial and Ethnic Minorities in American Politics* (7th ed. 2017); *see also* Doc. 44-1 ¶ 53("[w]hile Heitkamp won 50.2 percent of the statewide vote, she dominated in counties heavily populated by Native Americans.").

## IV.     ENACTMENT OF HB 1332 AND 1333

48. In the legislative session immediately following Senator Heikamp's victory, HB 1332 was enacted on April 19, 2013.

49. HB 1332 significantly altered the voter ID requirements and eliminated the "fail safe" voucher and affidavit provisions in North Dakota.

50. Despite bipartisan concerns in the preceding legislative session in 2011 that modifying North Dakota's affidavit system would disenfranchise voters and that a study should be done to analyze the issue, no additional study measuring the impacts of changing voter ID requirements or eliminating the fail-safe provisions was conducted between the 2011 and 2013 legislative sessions.

51. Nor was any additional evidence presented proving fraud in North Dakota elections.

52. There were no prosecuted instances of voter fraud arising out of the 2012 election.

53. There were nine suspected instances of double voting that prosecutors declined to prosecute. In one of those instances, a stern talking to was deemed a sufficient deterrent. *See* Mem. from Alvin Jaeger, N.D. Secretary of State, on North Dakota – views and recommendations to The Presidential Advisory Commission on Election Integrity (Sept. 5, 2017), https://www.scribd.com/document/358292085/Sos-00435420170907141608 .

54. Moreover, the legislative procedure utilized to pass HB 1332 was unusual. A "hoghouse" amendment was used to pass HB 1332. A hoghouse amendment replaces the entire text of a bill with new text. *North Dakota Legislative Council*, North Dakota Legislative Drafting Manual 63 (2015),

http://www.legis.nd.gov/files/general/2015draftingmanual.pdf?20160111162015.

55. Public hearings are held on every bill in legislative standing committees. *See Legislative Branch Function and Process*, North Dakota Legislative Branch, http://www.legis.nd.gov/research-center/library/legislative-branch-function-and-process (last visited Nov. 30, 2017).

56. However, after the public hearings, these committees may choose to modify the contents of an original bill before they send it back to the house or senate for a vote. *See id*.

57. Because committee amendments are made after the public hearings take place, hoghouse amendments are not subject to public hearing.

58. Hoghouse amendments are disfavored. *Id*.

59. At the time of the bill's passage through the House, Rep. Mock, (D) strenuously objected to the use of a hoghouse amendment for HB 1332 since it would "completely change the way we handle voters" and using a hoghouse would circumvent input from the public and agencies impacted by the bill. *House Floor Session: Hearing on H.B. 1332*, 63rd Leg. Assemb. (N.D. Feb. 12, 2013) (statement of Rep. Corey Mock).

60. Rep. Marie Strinden (D) also protested the process used to pass HB 1332 stating: "I take a lot of pride in the fact that this committee thinks very long and hard about all of our bills. . . . I can't be proud of a bill that we all know has problems because no other bill that

we passed out of here have we done it with such stealth without addressing those problems." *Hearing Minutes on H.B. 1332 Before H. Gov't and Veterans Affairs Comm.*, 63rd Leg. Assemb. (N.D. Feb. 8, 2013) (statement of Rep. Marie Strinden, H. Gov't and Veterans Affairs Comm.) [hereinafter *Hearing Minutes on HB 1332*].

61.  Unlike the hoghouse amendment used for HB 1447, which arose in order to address the specific concerns raised by the legislature during deliberations, the hoghouse amendment here was not a consequence of the legislature's deliberations. Instead, it replaced a bill that was intended to change the deadline for requesting absentee ballots and had nothing to do with in-person voting.

62. Indeed, instead of modifying absentee voting, HB 1332 limited the forms of ID *all* voters could use at the polls.

63. First, it required that the ID used must contain the voter's residential address and date of birth.  P.O. Box numbers were excluded as an acceptable type of address.

64. The Legislature required residential addresses despite being warned in the previous Legislative session by Deputy Secretary of State Jim Silirum that Native Americans in particular would be disproportionately impacted by such a change. *See* discussion above at ¶ 36.

65. Second, HB 1332 restricted the acceptable forms of ID to: (1) a North Dakota driver's license; (2) a North Dakota non-driver's identification card; (3) a tribal government issued identification card; or (4) an alternative form of identification prescribed by the Secretary of State if a qualified voter did not possess one of the other official forms of identification.  HB 1332 § 5; *see* N.D. Cent. Code § 16.1-05-07(1)(a)-(c). The

Secretary of State only prescribed two additional forms of ID prior to the passage of HB 1333: (1) a student identification certificate, and (2) a long-term care identification certificate.

66.  HB 1332 also prevented voters from using a driver's license or ID from another state in combination with other ID in order to vote.

67.  HB 1332 limited a qualified elector's ability to vote in other ways as well.

68. Again, despite prior bipartisan concerns in the previous legislative session that removing the affidavit system and modifying the voucher system would disenfranchise too many voters, HB 1332 eliminated both the voucher and affidavit fail-safe provisions that previously could be utilized by qualified voters who could not produce an ID when requested by the poll clerk.

69. And, at the same time as passage of HB 1332, the Legislature rejected HB 1418, which would have allowed poll workers to vouch for eligible voters in their precincts that lacked ID.

70. This fail-safe would be as effective as an ID for addressing concerns of in-person voter fraud.

71. At the time of HB 1332's passage, Senators objected to HB 1332's harsh affects.

72. Sen. Warner (D) explained the bill's negative impacts on his rural district, which is 1/3 Native American, stating:

> My district covers about 5000 square miles . . . there are a lot places in my district where you will have a 90 minute to a two hour drive to the closest DMV which may be open only one day a week, or one day a month, during business hours during the working week, never on Saturdays. I would guess half of the urban residences . . . [indecipherable] . . . in my towns are very small. Very few of my towns

actually have street names. Almost everybody receives their mail in a post office box. In huge swaths of my area, entire counties within my district I don't think there would be a single street name.   I can't imagine how you start overcoming all of these obstacles. We have some pockets of extreme poverty in my district. I would guess no more than one in four or five adults has a car or a driver's license. If you need to get somewhere you have to find someone that will drive you there for that occasion. And I don't really think we need to be creating more impediments to voting in North Dakota. This is part of a national movement there may be a problem in other parts. We are very proud of our people in North Dakota and we don't need to be passing laws that we don't need.

*Senate Floor Session: Hearing on H.B. 1332*, 63rd Leg. Assemb. (N.D. Apr. 3, 2013)

(statement of Sen. John M. Warner).

73. Sen. Schneider likewise stated that the legislature was passing a bill to deal with a nonexistent problem resulting in a "human cost to some of our most vulnerable populations here in the state." *Id.*  (statement of Sen. Mac Schneider)).

74. HB 1332 passed on essentially a party-line vote, 30-16 with only 1 Democrat in favor and only 3 Republicans opposed.

75. Of the Senators that remained in the Senate from the 2011 legislative session and that voted on HB 1447, 19 Senators switched their votes from Nay to Yay.

76. Senator Cook, who had previously expressed doubt over the need for a change of law, and who had called for additional study into the effects of the law, changed his vote from Nay to Yay.

77. After passage of HB 1332, qualified voters that showed up to the polls but did not have a qualifying ID were completely denied their right to vote.

78. During the next legislative session, the legislature again made the voter ID law more restrictive with the passage of HB 1333. HB 1333 was enacted on April 24, 2015.

79. During this 2015 Legislative Session the Legislature authorized studies related to voting, but rejected additional research into the impact of HB 1332 or into the potential impacts of HB 1333.

80. For example, H.B. 1389 "Management Study Related to Verification of Citizenship Status for Voting and For Obtaining Driver's License and Non-photo ID cards," passed. 64th Leg. Assemb., Reg. Session (N.D. 2015).

81. Another bill, HB 1302, initially would have allowed for a voter without an ID to fill out an affidavit attesting to their qualifications in order to vote, but was changed entirely via hoghouse to a study of voter registration systems, which passed. 64th Leg. Assemb., Reg. Session (N.D. 2015).

82. Meanwhile, that same year, House Concurrent Resolution 3057, "Election Administration Study," which in relevant part sought to study "concerns that have arisen during recent elections regarding proof of eligibility to vote," did not pass. H. Con. Res. 3057, 64th Leg. Assembly (N.D. 2015).

83. In the 2015 Legislative session, the Legislature also rejected attempts to make the voter ID requirements more accessible. SB 2330 would have required higher education institutions to include date of birth and residential addresses of students on student photo identification and inform students of voting eligibility requirements.

84. The bill was intended to give students a way of identifying themselves instead of HB 1332's system of a student certificate prescribed by the Secretary of State.

85. It would have allowed student identification to be an acceptable form of ID to vote, but failed to pass.

86. The Legislature also rejected SB 2353, which would have allowed a voter to cast a provisional ballot if they provided their mailing address. The county auditor would have mailed a postcard to the provisional voter at the provided address that the voter would have had to return. The mailed form would include an oath that the voter had resided in the precinct for 30 days.

87. The Senate also made HB 1333 more stringent. When HB 1333 was first introduced in the North Dakota House, it would have alleviated some of the stringent requirements of HB 1332.

88. For instance, it would have permitted electors to use identification in combination in order to provide all of the required information. For example, an elector could present an expired driver's license plus a U.S. Postal Service change of address form, or bill and bank statement with an updated address plus identification with an incorrect address in order to prove current residency within the precinct.

89. The Senate, however, removed these provisions and amended the bill to make the voter ID requirements even more restrictive.

90. The amendment that became HB 1333 also removed the ability of the Secretary of State to prescribe new forms of qualifying ID, and took away the option for students to use college identification certificates that the Secretary had previously recognized as an acceptable voter ID. It did, however, statutorily keep the long-term care certificate as a valid form of ID.

91. Pursuant to HB 1333, North Dakota only permitted citizens to use four forms of qualifying ID in order to vote.

23

92. Additionally, HB 1333 mandated that driver's licenses and non-driver ID cards must be current to be accepted at the polls.

93. Under HB 1333, military identification was not an acceptable form of ID, except for service members stationed away from their North Dakota residence.

94. HB 1333 also restricted absentee voting.

95. Prior to passage of HB 1333, absentee voters without a qualifying ID could submit an absentee ballot if another qualified elector vouched for his or her qualifications.

96. HB 1333 removed this provision for everyone except disabled voters. Under HB 1333, disabled voters could still utilize a voucher fail-safe mechanism.

97. HB 1333 also added to the Section entitled "Qualification of electors – Voting requirements" a requirement that "[f]or the purposes of this title, an elector seeking to vote in an election must meet the identification requirements specified in sections 16.1-05-07 and 16.1-07-06." HB 1333 § 1(9).

98. The strict voter ID laws adopted by HB 1332 and 1333 were "arguably some of the most restrictive voter ID laws in the nation." Doc. 50 at 4.

99. Following HB 1333's passage, on January 23, 2016, Rep. Nelson, whose district is majority Native American, explained in an op-ed in the Grand Forks Herald that as a Legislator he was well aware of how "[i]t's not a question of ID. Tribal members have IDs, but they happen to be IDs that North Dakota decided weren't good enough" since "tribal IDs in North Dakota do not . . . list the person's address." The reasons for this are "many" but most notably because "[t]here still are rural residents who cannot count on their 911 address being correct. So a great many tribal IDs do not have a 911 address that can be

counted." Marvin Nelson, *N.D.'s Voter ID Laws Hurt Minorities' Voting Rights*, Grand Forks Herald (Jan. 30, 2016), http://www.grandforksherald.com/opinion/columns/3936274-marvin-nelson-nds-voter-id-laws-hurt-minorities-voting-rights.

100.    Enactment of HB 1332 and HB 1333 disenfranchised and imposed significant barriers for qualified Native American voters by establishing strict voter ID and residence requirements.

101.    Those requirements had the result of denying Native Americans, including Plaintiffs, an equal opportunity to participate in the political process. *See generally* Doc. 50.

102.     The strict voter ID requirements of HB 1332 and 1333 interacted with social and historical conditions to cause an inequality in the opportunities enjoyed by Native American and White voters to participate in the political process and elect their preferred representatives.

## V.    THIS COURT ENJOINS ENFORCEMENT OF HB 1332 AND 1333

103.    This Court granted the Plaintiffs' motion for preliminary injunction on August 1, 2016, and enjoined the Defendant from enforcing HB 1332 and 1333 "without any adequate 'fail-safe' provisions as had previously been provided to all voters in North Dakota prior to 2013." Doc. 50 at 28.

104.    This Court found that, "given the disparities in living conditions, it is not surprising that North Dakota's new voter ID laws," meaning HB 1332 and HB 1333, "are having and will continue to have a disproportionately negative impact on Native American voting-eligible citizens." *Id.* at 18.

105.     "It is undisputed that the more severe conditions in which Native Americans live translates to disproportionate burdens when it comes to complying with the new voter ID laws." *Id.* at 7.

106.     "Native Americans face substantial and disproportionate burdens in obtaining each form of ID deemed acceptable under [HB 1332 and HB 1333] . . . obtaining any one of the approved forms of ID almost always involves a fee or charge, and in nearly all cases requires travel." *Id.* at 9.

107.     "It also helps to have a computer with Internet access, a credit card, a car, the ability to take time off work, and familiarity with the government and its bureaucracy." *Id.*

108.     "The declarations from the Plaintiffs' expert witnesses show that the typical Native American voter living in North Dakota who lacks qualifying ID simply does not have these assets." *Id.* at 10.

109.     "Thus, obtaining a qualifying voter ID is much easier to accomplish for people who live in urban areas, have a good income, are computer-literate, have a computer and printer, have a good car and gas money, have a flexible schedule, and understand how to navigate the state's administrative procedures." *Id.* at 9-10.

110.     "In the past, North Dakota allowed all citizens who were unable to provide acceptable ID's to cast their vote under two types of 'fail-safe' provisions—which were repealed in 2013." *Id.* at 28.

111.   "The new voter ID laws," HB 1332 and HB 1333, "totally eliminated the previous 'fail-safe' provisions that existed in the past in North Dakota." *Id.* at 22.

26

112.   "Although the majority of voters in North Dakota either possess a qualifying voter ID or can easily obtain one, it is clear that a safety net is needed for those voters who simply cannot obtain a qualifying voter ID with reasonable effort." *Id.*

113. This Court could not "envision a compelling reason or a governmental interest which supports not providing such an avenue of relief for potentially disenfranchised voters." *Id.*

114. Thus, "[t]he ill-advised repeal of all such 'fail-safe' provisions has resulted in an undue burden on Native American voters and others who attempt to exercise their right to vote. There are a multitude of easy remedies that most states have adopted in some form to alleviate this burden." *Id.* at 28-29.

115. This Court, therefore, enjoined HB 1332 and HB 1333 until the State implemented a "fail-safe" provision. *Id.* at 28.

116. To comply with the Court's order, North Dakota elected an affidavit system as its "fail-safe" provision to remedy the undue burden that Native Americans faced in the 2016 General Election.

## VI.   IMPLEMENTATION OF THE 2016 "FAIL-SAFE" AFFIDAVIT SYSTEM

117. The 2016 election was the first election that featured both the strict ID requirements outlined by HB 1332 and HB 1333 and also allowed for the "fail-safe" affidavit system.  In contrast, the 2014 election required certain types of ID under HB 1332 but did not allow for the "fail-safe" affidavit option.

118. In the 2016 election, the "fail-safe" affidavit system was widely utilized.

119. The State reported that 16,180 affidavits were executed, which is 5,661 more affidavits executed than the last measured election that had the affidavit option in 2012 prior to the Legislature's implementation of strict voter ID requirements.

120. Across the 53 counties in North Dakota, counties with larger shares of Native American populations experienced higher usage rates of affidavits in 2016, as compared to counties with the lowest share of Native Americans.

121. In Sioux County, which is 83% Native American, 10.7% of all ballots cast in the 2016 general election used affidavits.

122. In 2012, IDs were not required and vouchers and affidavits acted as available fail-safes. Under the 2012 system, the fail-safe affidavit method only accounted for 2.3% of all ballots cast in Sioux County.

123. Rolette County, which is 77% Native American, had 12 affidavits utilized in 2012.

124. In 2016 that number grew to 209 - an increase of 1642%.

125. In 2012, just one fourth of one percent of ballots in Rolette were by affidavit and in 2016 they had accounted for over 5 percent of all ballots - a 20-fold increase.

126. Overall, the top three most heavily Native American counties (Sioux, Rolette, and Benson counties), which are all majority-Native American, experienced a 750% increase in the rate of affidavit usage, as compared to a statewide average of a 43% increase from 2012 to 2016.

127. In contrast, the three counties with the smallest share of Native Americans (Billings, Slope, and Steele counties) experienced a decrease in affidavit usage by 4 less affidavit votes in 2016, or an 11% decline.

28

128. According to the Secretary of State Alvin Jaeger, there were two cases of probable double voting arising out of the 2016 election.

129. One involved an elector voting absentee and again in person. The Burke County prosecutor reached a pretrial diversion agreement with the elector in that case.

130. Another involved an elector voting in state and out of state. The state declined to prosecute that case. *See* Mem. from Alvin Jaeger, N.D. Secretary of State on N.D. – Views and Recommendations to the Presidential Advisory Commission on Election Integrity 4 (Sept. 5, 2017), https://www.scribd.com/document/358292085/Sos-00435420170907141608; John Hageman, *Diversion Agreement Reached In Rare North Dakota Voter Fraud Case*, The Bismarck Tribune (Sept. 15, 2017), http://bismarcktribune.com/news/state-and-regional/diversion-agreement-reached-in-rare-north-dakota-voter-fraud-case/article_9d3da36d-f4d2-58d9-9471-697249e1359c.html.

131. Following the 2016 election, the state investigated voters it suspected to be non-citizens.

132. All but one were determined to in fact be citizens and the remaining voter was not identified in an immigration database. It is unknown if citizenship was proven through other means or if federal law enforcement intends to further pursue the issue. *See generally* Rob Port, *We Have No Idea If Voter Fraud Changed the Outcome of Some North Dakota Elections*, SayAnythingBlog (Sept. 12, 2017), https://www.sayanythingblog.com/entry/no-idea-voter-fraud-changed-outcome-north-dakota-elections/.

133. According to local news sources, twelve voters may have used a post office or UPS location as their address in the 2016 election. It is unknown if these voters lacked street addresses, believed their P.O. boxes counted as a street address, did not wish to reveal their residential address to voting officials, or intentionally falsified their address. *See* Max Grossfeld, *Dozens of People Voted With False Addresses Committing Voter Fraud*, West Dakota Fox (July 20, 2017), http://www.kfyrtv.com/content/news/Dozens-of-people-voted-with-false-addresses-committing-voter-fraud-435701893.html.

## VII.   DELIBERATION OF HB 1369

134. On January 18, 2017, Jim Silrum, Deputy Secretary of State, emailed Cass County Auditor Michael Monsplaisir to discuss the bill he had drafted (HB 1369) that was based on "specific requests . . . from certain legislators." E-mail from Jim Silrum, Deputy Secretary of State (Jan. 18, 2017) [hereinafter "Jan. 18th Communication"]

135. In a February 3, 2017 email to Hons von Spakovsky and Don Palmer, entitled *Re: Agenda & Info: Heritage Foundation Election Briefing for Secretaries of State – February 14-15, 2017*, Silrum stated the draft bill was "an attempt to keep our strong voter ID requirements" as well as provide a different form of "'fail safe' option for those who want to vote, but don't have an ID at the time of voting." E-Mail from Jim Silrum, Deputy Secretary of State (Feb. 3, 2017) [hereinafter "Feb. 3rd Communication"].

136. Silrum's proposed "fail-safe" option still required that every voter possess an ID and therefore is not, in fact, a "fail-safe" option for those that lack an ID.

137. The proposal was similar to the reformation of the affidavit system proposed and rejected by the Legislature in 2011 under HB 1447. There, the Legislature debated an

affidavit system where a voter would have to return to show an ID after casting a provisional ballot. *See* discussion above at ¶ 25.

138. Silrum's draft HB 1369 similarly proposed that a voter without a valid ID must cast a "set-aside" ballot. The voter would then have to return to the county auditor's office in the days following the election and show a valid form of ID in order for the set-aside ballot to be counted.

139. Silrum explained that he believed that this set-aside system, which still required a voter possess an ID, would be an adequate "fail-safe" option because he was "convinced [the Court] incorrectly applied to ND the federal law requiring states to provide a fail-safe option for people to <u>register</u> to vote." Feb. 3rd Communication (emphasis in original).

140. Silrum then explained that by circumventing the registration system, his "set-aside" ballot option could impose more stringent requirements on voters than the requirements for registration to vote in most states. *See* Voter Registration Rules, available at: <u>https://www.vote.org/voter-registration-rules/</u> (last visited September 20, 2017).

141. He explained: "this type of voter ID system is much better than voter registration since the use of [voter registration] would simply push the determination of qualifications to the point at which an individual registers. From what I have seen, many state's laws don't allow them to do much vetting of the qualifications of electors at the time of registration, so what good is it to register someone if there is no way to determine if they meet the qualifications to be registered for that precinct." Feb. 3rd Communication.

142. In a January 18, 2017 email, Silrum also went on to explain that he believed the "set-aside" option would result in fewer affidavit votes being counted. Jan. 18th Communication.

143. In response to Cass County Auditor, Michael Montplaisir's questions over the process for "dealing with provisional ballots," Silrum predicted that the "set-aside" affidavit process would end up with many fewer affidavits being counted. *Id.*

144. Silrum explained that in other states, the affidavit systems that require a voter to return to verify registration act as an effective deterrent and result in fewer affidavits being counted: "From the conversation I have had with my colleagues in other states, they have poll workers give provisional ballots to nearly everyone they can't verify as a registered voter since this removes the reasons for any arguments within the polling place as is the case when the poll worker is forced to tell that voter that they are not allowed to vote." *Id.*

145. Silrum went on: "My colleagues say that since these voters don't return to verify their registration status, the cost for a ballot and an envelope is a small price to pay to remove the conflict from the polling place while also keeping those voters who should not vote from casting a ballot." *Id.*

146. On that same day in another email to Cass County Auditor Michael Montplaisir, Silrum again emphasized that his "set-aside" system would result in fewer votes being counted stating: "As for the set-aside ballots, I hope the fact that many individuals who cast them will not likely come into your office later to verify their qualifications will put some of the fears to rest about long lines outside your office in the six days after the election." *Id.*

147. Silrum drafted HB 1369 with the intention of maintaining the requirement of an ID for every voter.

148. Silrum knew that the proposed system would likely result in fewer votes being counted.

149. Silrum also knew that the ID requirement coupled with a requirement of a verifiable street address placed a disproportionate and undue burden on Native American voters who attempt to exercise their right to vote. *See generally* Doc. 50; *see also Hearing Minutes on H.B. 1447 Before H. Political Subdivision Comm., 62nd Leg. Assemb.* 3 (N.D. Apr. 20, 2011) (statement of Jim Silrum, H. Political Subdivisions Comm.) ("We are also going to need to work with the tribal governments to make sure because a couple of our counties that have reservations in the state have not completed their 911 addressing. Even if they have the residence of those counties [they] don't know what their 911 address is.").

150. Prior to enactment of HB 1369, the Native American Rights Fund ("NARF") provided testimony to both houses of the North Dakota Legislature.  NARF explained that the "set-aside" system did not cure the disproportionate burden placed on Native American voters to obtain an ID in the first place and therefore would not adequately provide a "fail-safe" option for Native American voters that do not have an ID. *See Written Testimony of the Native American Rights Fund Regarding H.B. 1369*, Native American Rights Fund (Jan. 27, 2017),                                  http://www.narf.org/wordpress/wp-content/uploads/2017/02/NARF_HB_1369_Testimony-1.pdf.

151. During the House floor session considering HB 1369, Rep. Johnson, (R), stated plainly "Judge Hovland spent a whole bunch of time in his order enjoining the 2015 bill

regarding the burden placed on Native Americans in obtaining what is a valid ID as provided in the bill. And there it is again. Despite that you provide a provisional ballot you are still requiring the same valid ID and that is not truly a fail-safe option like an affidavit is. . . . I would be remissed to substitute Judge Hovland's opinion for mine but I don't believe this will pass constitutional muster again and I do hope to see some red votes." *House Floor Session: Hearing on H.B. 1369,* 65th Leg. Assemb. (N.D. Apr. 17, 2017) (statement of Rep. Mary C. Johnson).

152.  Despite being repeatedly warned of the disproportionate and burdensome impact that obtaining an ID with a permanent physical address has on Native Americans, *see generally* Doc. 50, the North Dakota Legislature failed to investigate the impact of HB 1369 on Native Americans prior to the bill's passage.

153.  Indeed, no studies were commissioned investigating the bill's potential impacts and no consultations were made with tribal governments to see if the bill would disproportionately affect their people.

## VIII.   ENACTMENT OF HB 1369

154. HB 1369 was enacted on April 24, 2017. HB 1369 requires that all voters must have one of only three forms of specific ID, or fall into one of the specific exceptions made for the elderly, certain veterans, or the disabled absentee voter.

155. HB 1369 was intended to "replace[] voter affidavits in favor of a set-aside ballot that would be excluded from the count until such time that . . . voter that voted without the proper identification returns and . . . identifies himself at the polling place to prove their

identity." *House Floor Session: Hearing on H.B. 1369,* 65th Leg. Assemb. (N.D. Feb. 2, 2017) (statement of Rep. Scott Louser, Member, H. Comm. on Gov't and Veterans Affairs).

156. HB 1369 continues to require Native Americans to overcome "substantial and disproportionate burdens in obtaining each form of ID deemed acceptable." Doc. 50 at 9.

157. Because HB 1369 still requires specific types of identification, HB 1369 does not contain any "fail-safe" provision to alleviate the disproportionate burden that Native Americans faced to comply with HB 1332 and HB 1333.

158. HB 1369 continues to limit the forms of ID that voters can use at the polls to (1) a North Dakota driver's license; (2) North Dakota non-driver's identification card; and (3) an official form of ID issued by a tribal government. *Compare* HB 1369 § 2 *with* HB 1332 § 5.

159. HB 1369 creates exceptions to the identification requirement for three classes of persons. It allows the secretary of state to prescribe a long-term care certificate for elderly individuals living in a long-term care facility to use as identification; allows uniformed service members or immediate family members temporarily stationed away from the residence or state to use a current military ID or passport; and allows for a person with a disability to have another qualified elector sign and certify the applicant is a qualified elector if the disabled person is voting absentee.  HB 1369 § 2(4)(a)-(c).

160. For everyone else, as with HB 1332, their ID must be one of the three types allowed and provide the voter's current residential street address and date of birth. HB 1369 § 2(2)(b),(c).

161. Additionally, H.B. 1369 established a section "Residence for voting – Rules for determining" that stated in relevant part "[f]or purposes of voting . . . [e]very qualified

elector may have only one residence, shown by an actual fixed permanent dwelling, establishment, or any other abode to which the individual returns when not called elsewhere for labor or other special or temporary purposes." HB 1369 § 3(1).

162. The "Residence for voting – Rules for determining" section also includes a rule that "[f]or purposes of voting" the "street address verified by the individual as provided in section 16.1-01-04.1 when requesting a ballot to vote must be the address of residence for the individual." HB 1369 § 3(2).

163. IDs with only a P.O. Box remain unacceptable as voter IDs under HB 1369.

164. If the voter presents one of the three forms of ID but the information on the ID is not current or lacks the voter's current residential address or date of birth, the ID must be supplemented with one of five documents issued in the voter's name and providing the missing or outdated information: (1) a current utility bill; (2) a current bank statement; (3) a check issued by a federal, state, or local government; (4) a paycheck; or (5) a document issued by a federal, state, or local government.  HB 1369 § 2(3)(b)(1)-(5).

165. If the voter shows up to the polls to vote without a valid form of ID but asserts that he or she is qualified to vote in that precinct, the voter cannot vote. Instead, he or she is allowed to submit a ballot that "must be securely set aside" and is not counted until the voter returns with a valid ID. HB 1369 § 2(5).

166. As noted above, this "set-aside" provision was intended to replace the only "fail-safe" provision available—affidavits—with ballots that "would be excluded from the count" until the voter "returns and identifies himself." *House Floor Session: Hearing on H.B. 1369,*

65th Leg. Assemb. (N.D. Feb. 2, 2017) (statement of Rep. Scott Louser, Member, H. Comm. on Gov't and Veterans Affairs).

167. The voter has until the polling place closes on Election Day to return to a "polling place election board member." HB 1369 § 2(5).

168. After Election Day, the voter has six days to travel to "an employee of the office of the election official responsible for the administration of the election" and show a valid ID. *Id.*

169. Following verification, "[e]ach ballot set aside . . . must be presented to the members of the canvassing board for proper inclusion or exclusion from the tally." *Id.*

170. Because a voter must still show a valid ID, and because the canvassing board may have discretion to deny inclusion of the vote, the provisional or set-aside ballot process is not a fail-safe mechanism for those that simply do not have an ID.

171. Further, the burden of traveling to present an ID for verification is especially burdensome for Native Americans who disproportionately lack resources for travel and access to transportation.

172. HB 1369 maintains HB 1332's elimination of the voucher and affidavit fail-safe that, prior to HB 1332, could be utilized by qualified voters who cannot produce an ID when requested by the poll clerk.

173. However, in the most recent election law guidance issued August 2017, the Secretary of State allows absentee voters to sign a Voter Affidavit if they lack an ID. *See North Dakota Residences Choosing to Vote Absentee or By Mail*, N.D. Secretary of State, https://vip.sos.nd.gov/pdfs/Portals/Voting-MailBallotAbsentee.pdf (last visited Dec. 5,

2017) (stating that you must be able to provide an ID or "you complete a Voter's Affidavit on which you attest to your qualifications as a voter").

174. Additionally, HB 1369 maintains HB 1333's mandate that driver's licenses and non-driver ID cards must be current to be accepted at the polls.

175. HB 1369 also maintains HB 1333's refusal to accept military identification as an acceptable form of ID except for service members stationed away from their North Dakota residence.

176. HB 1369 maintains HB 1333's restrictions on absentee voting.

177. Prior to passage of HB 1333, absentee voters without a qualifying ID could submit an absentee ballot if another qualified elector vouched for his or her qualifications.

178. HB 1333 removed this provision for everyone except disabled voters. HB 1369 maintains this restriction.

179. HB 1369 maintains HB 1333's modification to the "Qualification of electors – Voting requirements" section that "[a]n elector seeking to vote in an election must meet the identification requirements specified." HB 1369 § 1(4).

180. On April 25, 2017, North Dakota Governor Doug Burgum signed HB 1369 into law and it was codified in N.D. Cent. Code 16.1-01-04, 16.1–01–04.1, and 16.1–01–04.2

181. Enactment of HB 1369 preserves the disenfranchisement and significant barriers imposed by HB 1332 and 1333 on qualified Native American voters by maintaining strict voter ID and street address requirements.

182. These requirements deny Native Americans, including Plaintiffs, an equal opportunity to participate in the political process.

183.  Further, HB 1369's requirement that a qualified elector that utilized a "set-aside" ballot must make another trip to present an identification for verification is especially burdensome for Native Americans who disproportionately lack resources for travel and access to transportation.

184.  The strict voter ID requirements of HB 1369 interact with social and historical conditions to cause an inequality in the opportunities enjoyed by Native American and White voters to participate in the political process and elect their preferred representatives.

185.  Enactment of HB 1369 was intended to suppress the Native American vote.

## IX.    HB 1369 MAINTAINS HB 1332'S AND 1333'S BURDEN ON NATIVE AMERICANS

### A.    General Native American Demographics in North Dakota

186.  North Dakota had a total population of 672,591 in 2010.  Webster Decl., Doc. 44-4 ¶ 13.  In 2010, North Dakota had a Native American population of 36,591 (5.4%).  *Id.* According to the American Community Survey Five-Year Estimates 2011-2015, the Native American population rose to 38,286 (5.3%).

187.  In 2010, 8,319 Native Americans lived on the Turtle Mountain Reservation – home of the Turtle Mountain Band of Chippewa Indians. *Id.* at ¶ 37(Table 5). The Turtle Mountain Reservation is located in Rolette County, North Dakota.  *Id.* at ¶ 16. It is approximately 72 square miles in area.

188. The Fort Berthold Indian Reservation, home of the Three Affiliated Tribes (Mandan, Hidatsa, and Arikara), has 4,556 Native Americans living on the reservation according to the 2010 Census. *Id.* at ¶ 37 (Table 5). The Fort Berthold Indian Reservation

39

occupies sections of six counties in North Dakota: Mountrail, McLean, Dunn, McKenzie, Mercer, and Ward. *Id.* at ¶ 16. The Fort Berthold Indian Reservation covers approximately 980,000 acres.

189. The Spirit Lake Reservation, home of the Spirit Lake Tribe, has 3,595 Native Americans living on the reservation according to the 2010 Census. *Id.* at ¶ 37 (Table 5). The Spirit Lake Reservation occupies sections of four counties in North Dakota: Benson, Eddy, Nelson, and Ramsey. *Id.* at ¶ 16.The Spirit Lake Reservation covers approximately 245,120 acres.

190. The Lake Traverse Reservation is the home of the Sisseton Wahpeton Oyate, and has only eight Native Americans living on the North Dakota side of the reservation according to the 2010 Census. *Id.* at ¶ 37 (Table 5). According to the 2013 American Indian Population and Labor Force Report by the Bureau of Indian Affairs, there were 448 tribal members living on the North Dakota portion of the Lake Traverse Reservation. *2013 American Indian Population and Labor Force Report*, U.S. Dep't of the Interior 87 (2014), https://www.bia.gov/sites/bia.gov/files/assets/public/pdf/idc1-024782.pdf. The Lake Traverse Reservation covers approximately 250,000 acres. The northern portion of the Reservation is located in Sargent and Richland counties in southeastern North Dakota. Doc. 44-4 at ¶ 16.

191. The Standing Rock Reservation, home of the Standing Rock Sioux Tribe, has 3,492 Native Americans living on the reservation according to the 2010 Census. *Id.* at ¶ 37 (Table 5). The Standing Rock Reservation is located in Sioux County, North Dakota. *Id.* at ¶ 16. The reservation covers approximately 2.3 million acres.

192.  Chart 1 below details the total and voting age Native American population residing on reservations in North Dakota in 2010.

*Chart 1*

| Reservation | Total Native American Population | Total Voting Age Native American Population |
|---|---|---|
| Ft. Berthold | 4,556 | 2,883 |
| Turtle Mountain | 8,319 | 5,172 |
| Spirit Lake | 3,595 | 1.983 |
| Standing Rock | 3,492 | 2,136 |
| Lake Traverse | 8 | 6 |
| TOTAL | 19,970 | 12,180 |

SOURCE: Census of Population, 2010.

*Id.* at ¶ 37.

193.  Chart 2 below provides the number of Native American people living in each of the fourteen North Dakota counties whose territory is wholly or partly on Indian reservations, according to the 2010 U.S. Census.

*Chart 2*

| North Dakota County | Reservation and Tribe(s) | Number of County Residents That are Native American; Percentage of the County Population (U.S. Census 2010) |
|---|---|---|
| Rolette | Turtle Mountain Reservation: Turtle Mountain Band of Chippewa Indians | 10,763; 77.2% |
| Mountrail | Fort Berthold: Three Affiliated Tribes | 2,348; 30.6% |
| McLean | Fort Berthold: Three Affiliated Tribes | 625; 7% |
| Dunn | Fort Berthold: Three Affiliated Tribes | 449; 12.7% |
| McKenzie | Fort Berthold: Three Affiliated Tribes | 1,412; 22.2% |
| Mercer | Fort Berthold: Three Affiliated Tribes | 196; 2.3% |
| Ward | Fort Berthold: Three Affiliated Tribes | 1630; 2.6% |
| Sargent | Lake Traverse: Sisseton Wahpeton Oyate | 20; 0.5% |
| Richland | Lake Traverse: Sisseton Wahpeton Oyate | 330; 2% |
| Benson | Spirit Lake Reservation: Spirit Lake Tribe | 3,663; 55% |

| Eddy | Spirit Lake Reservation: Spirit Lake Tribe | 58; 2.4% |
|------|---------------------------------------------|----------|
| Nelson | Spirit Lake Reservation; Spirit Lake Tribe | 30; 1% |
| Ramsey | Spirit Lake Reservation; Spirit Lake Tribe | 994; 8.7% |
| Sioux | Standing Rock Reservation; Standing Rock Sioux Tribe | 3,492; 84.1% |

*Profile of General Population and Housing Statistics: 2010 Demographic Profile Data*, U.S.

Census Bureau, Table DP-1 (2010),

http://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t (set to

decennial census and modified for state and county data sets).

### B. Native Americans in North Dakota have higher unemployment rates than non-Native Americans

194. "The unemployment rates on reservations are staggering. For example, unemployment at the Standing Rock and Turtle Mountain reservations is nearly 70%." Doc. 50 at 18.

195. According to the 2009-2013 American Community Survey 5-Year Estimates, North Dakota as a whole has an unemployment rate of 3.3%, and a not in labor force rate of 29.5%.

196. According to the same survey, the unemployment rate for the White population in North Dakota is 2.8%, while the unemployment rate for the Native American population in

43

North Dakota is 10.3%.  The percentage of White people not in the labor force in North Dakota is 29%, while the percentage of Native Americans not in the labor force in North Dakota is 42.8%.

197.  Chart 3 below displays the estimated percentage of employed American Indians and Alaska Natives in civilian jobs for each tribe in North Dakota, according to the federal Bureau of Indian Affairs ("BIA").

*Chart 3*

| Tribe | Estimated percentage of American Indian/Alaska Native Population Employed in Civilian Jobs in the Tribal Statistical Area | Estimated percentage of American Indian/Alaska Native Population Employed in Civilian Jobs in the Tribal Statistical Area and Nearby Counties |
|---|---|---|
| **Three Affiliated Tribes** | 50.9-61% | *Unavailable* |
| **Turtle Mountain Band of Chippewa Indians** | 35.4-44.1% | *Unavailable* |
| **Standing Rock Sioux Tribe** | *Unavailable* | 44.5-53.1% (North Dakota only) |
| **Spirit Lake Tribe** | 39.9-47.2% | 40.2-50.6% |
| **Sisseton-Wahpeton Oyate** | 48.7-57.9% (North and South Dakota) | |

*2013 American Indian Population and Labor Force Report, supra,* at 50-51 .

### C.    Native Americans in North Dakota experience a higher rate of poverty than non-Native Americans

198. "The undisputed evidence reveals that Native Americans living in North Dakota disproportionally live in severe poverty."  Doc. 50 at 17.

44

199. Native Americans experience "disparate living conditions": non-Native Americans earn "a median household income" of $56,566 while Native Americans make "only $29,909." *Id.* at 18. "[T]he average income for non-Native Americans living in North Dakota is $73,313, compared to $48,763 for Native Americans." *Id.* And "22.3% of Native Americans who lack voter ID's have household incomes less than $10,000." *Id.*

200. According to the 2009-2013 American Community Survey 5-Year Estimates, North Dakota as a whole has a family poverty rate of 7.1%. This statistic represents the number of families whose income in the past 12 months was below the poverty level. The state has an individual poverty rate of 11.9%, which includes individuals whose income in the past 12 months was below the poverty level. Doc. 44-4 ¶ 18.

201. Within the Native American community in North Dakota, "21.7% of voting-age Native Americans had incomes below the poverty line, compared to only 7.6% of non-Native Americans." Doc. 50 at 17.  Overall, "37.7% of all Native Americans live in poverty, compared to 5.3% of Anglo families." *Id.* at 18.

202. "Thus, the poverty rate for Native Americans of voting age is nearly three times that for Whites of voting age in North Dakota." Doc. 44-4 ¶ 18.

203. The poverty rate for each reservation in North Dakota is similar. According to the 2009-2013 American Community Survey, the Fort Berthold Reservation has a family poverty rate of 18.6%. Families with at least one Native American household member have a poverty rate of 27.3%. Native American individuals have a poverty rate of 29.2%.

45

204. The Lake Traverse Reservation has a family poverty rate of 15%. Families with at least one Native American household member have a poverty rate of 36.9%. Native American individuals have a poverty rate of 40.8%. *Id.*

205. The Spirit Lake Reservation has a family poverty rate of 41.3%. Families with at least one Native American household member have a poverty rate of 49.9%. Native American individuals have a poverty rate of 53.5%. *Id.*

206. The Standing Rock Reservation has a family poverty rate of 33.6%. Families with at least one Native American household member have a poverty rate of 46%. Native American individuals have a poverty rate of 51.3%. *Id.*

207. The Turtle Mountain Reservation has a family poverty rate of 36.9%. Families with at least one Native American household member also have a poverty rate of 36.9%. Native American individuals have a poverty rate of 40.1%. *Id.*

208. As Chart 4 below reveals, the 2009-2013 American Community Survey 5-Year Estimates also shows that a disproportionately large percentage of individual Native Americans live below the poverty line when compared with White North Dakotans when broken down by county.

*Chart 4*

|  | Percentage of all Citizens Living Below Poverty Line | Native Americans Living Below Poverty Line | White North Dakotans Living Below Poverty Line |
|---|---|---|---|
|  |  |  |  |

| | | | |
|---|---|---|---|
| ***North Dakota*** | *11.9%* | *39.6%* | *9.6%* |
| **Sioux County** | 40.5% | 45% | 10.6% |
| **Rolette County** | 36% | 41.4% | 13.5% |
| **Benson County** | 35.8% | 53.2% | 13.8% |
| **Mountrail County** | 12.3% | 21.9% | 7.8% |
| **McKenzie County** | 13.8% | 47.2% | 6% |
| **Dunn County** | 10.1% | 21.1% | 9.1% |
| **Ramsey County** | 12.1% | 47.1% | 7.7% |
| **McLean County** | 10.9% | 18.5% | 10.4% |
| **Sargent County** | 7.4% | 31.6% | 7% |
| **Ward County** | 9.1% | 29% | 8.5% |
| **Mercer County** | 7.3% | 29.8% | 6.8% |
| **Richland County** | 11.8% | 22.9% | 11.1% |

*Poverty Status in Past 12 Months, 2009-2013 American Community Survey 5-Year Estimates*,

U.S. Census Bureau, Table S1701,

47

http://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t (last

visited May 2, 2017) (modified for county and state data sets).

### D.   Native Americans in North Dakota experience a higher rate of Homelessness than non-Native Americans

209. Native American people make up a disproportionate part of the state's homeless

population. According to a 2014 point-in-time survey of homeless persons conducted for

the U.S. Department of Housing and Development by the North Dakota Coalition for

Homeless People, the total homeless population in North Dakota was 1,258. Of the total

number of homeless people, 213 were American Indian or Alaska Native, making up 16.9%

of the total, despite the fact that Native Americans make up only about 5% of the total state

population. The point in time survey for 2015 had similar results.   North Dakota Coalition

for   Homeless   People,   Inc.,   *News   &   Publications,   Point   in   Time   Counts*,

https://www.ndhomelesscoalition.org/new-page-2/ (last visited Dec. 6, 2017).

210. Beginning in 2016, the total number of homeless in North Dakota declined

markedly to 261 individuals. However, of the total homeless people, 70 were Native

American, increasing the percentage of Native American homeless to 26.8%. In 2017 the

total homeless population again decreased to 257 but the total of Native American

homeless instead increased to 76. In 2017, 29.5% of the homeless population is Native

American despite Native Americans only comprising 5% of the population.

211. Additionally, homeless does not necessarily mean without a roof over their head,

and many homeless would not be captured by the point-in-time survey. For example,

according to the Turtle Mountain Housing Authority 2008 Preliminary Ten-Year Strategic

Plan to End Homelessness, "[t]he homeless at Turtle Mountain are described as

48

'precariously housed' – that is, people who are imminent risk of becoming literally homeless at any time. Often, they are temporarily doubled up with friends or relatives – contributing to the overcrowding of many reservation homes."

212. The precariously housed rely on the temporary goodwill of their family and friends and lack a permanent mailing address of their own.

### E.   Native Americans in North Dakota Face Greater Health Threats than non-Native Americans

213. The North Dakota Department of Health has released data from the 2010 census showing that among ten leading causes of death, the rate of death for Native American North Dakotans is higher than for the state's general population. N.D. Dept. of Health, *North Dakota American Indian Health Profile* (2014), http://www.ndhealth.gov/healthdata/communityhealthprofiles/American%20Indian%20 Community%20Profile.pdf.

214.  The rate of infant and child deaths is also much higher among Native Americans in North Dakota than among the general population. *Id.*

215.  Greater numbers of Native Americans in North Dakota are living with a disability than in the general North Dakotan population. While 8.6% of North Dakotans 18-65 live with a disability, 17.5% of Native Americans in the state do. *Id.*

216. Where 8.2% of white high school students have attempted suicide, Native American high school students' suicide rate is nearly double at 14.3%. Among middle school students, Native American students attempt suicide at rates roughly triple that of their non-Native peers. 5.2% of white middle school children have attempted suicide, while

49

18.7% Native American middle school children have attempted suicide. McCool Decl., Doc. 44-2 ¶ 97.

217.  North Dakota only has two Indian Health Service hospitals out of the 50 hospitals in the state. Therefore, many Native Americans must access health care outside of Indian Health Services, yet Native Americans are three times less likely than whites to have health insurance in the state. *Id.* at ¶ 94.

218.  Nearly twice as many Native Americans than whites have reported they needed a doctor in the past year that they cannot afford. *Id.*

219.  Native Americans in North Dakota are struggling to meet their most basic needs. *Id.* at ¶ 98.

   **F.    Native Americans in North Dakota are more likely than non-Native Americans to Lack Qualifying IDs, Supplemental Documentation, and/or Street Addresses**

   **1.    Native Americans Disproportionately Lack Qualifying IDs**

220.  "23.5% of Native Americans currently lack valid voter ID, compared to only 12% of non-Native Americans." Doc. 44-1 ¶ 11.

221.  "15.4% of Native Americans who voted in 2012 currently lack qualifying voter ID, compared to only 6.9% of non-Native Americans." *Id.* ¶ 41.

222.  "Only 78.2% of Native Americans have a driver's license that they could potentially use as a qualifying voter ID. In contrast, 94.4% of non-Native Americans have a driver's license." *Id.* ¶ 11.

223.  "47.7% of Native Americans who do not currently have a qualifying voter ID lack the underlying documents they need to obtain an acceptable ID." *Id.*

224. According to a nationwide study, citizens earning less than $25,000 a year are twice as likely to lack documentation necessary to obtain qualifying forms of ID. Brennan Ctr. for Justice, *Citizens Without Proof*: *A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification*, 2(2006), http://www.brennancenter.org/sites/default/files/legacy/d/download_file_39242.pdf.

225.  The same report found that citizens earning less than $35,000 a year are more than twice as likely to lack current government-issued photo identification. *Id.*

226. Additionally, although North Dakota law allows for use of an "official form of identification issued by a tribal government," (N.D. Cent. Code § 16 1-01-04.1), Plaintiffs, as well as many other Native Americans in North Dakota, do not possess tribal government IDs, or do not possess tribal government IDs that contain a current physical address.

227.  Further, some tribal IDs, like those issued to Standing Rock Sioux tribal members, are issued by the BIA and may not meet the requirement of an "identification issued by a tribal government" as required by HB 1369 § 2.

**2.    Native Americans Disproportionately Lack Supplemental Documents**

228. Even though HB 1369 allows voters to supplement required information where missing from the ID, many Native Americans will not have the supplemental documents required to prove a physical address.

229.  "5.6% of Native Americans in North Dakota do not have a social security card or a W2 evidencing their social security number." Doc. 44-1 ¶ 11.

230.  Many Native Americans lack access to transportation and have no car registration showing their current address. *Id.* ¶ 47.

231. "21.6% of Native Americans do not have two documents that show their residential address." *Id.* ¶ 11.

232. Native Americans are less likely than whites to have a bank statement in their name that has a street address.

233. Native Americans are less likely than whites to have a utility bill in their name that contains a street address.

234. Native Americans are less likely than whites to have a pay stub or earning statement with their name and street address.

235. Native Americans are less likely than whites to have a document from a state, local, or federal government agency that contains their name and street address.

### 3.   Native Americans Disproportionally Lack Street Addresses

236. "21.6% of Native Americans do not have two documents that show their residential address. One reason is that many Native Americans do not have residential addresses and the Post Office delivers their mail to a post office box."  Doc. 50 at 11.

237. Another reason is that, "on many reservations, the residential address system produces conflicting and problematic results." *Id.*

238. In fact, many tribal members do not even know their street address.

239. Some tribal members have been told they have more than one street address, and many either may not have one, or believe they do not.

240. Many tribal IDs do not include any address, and most tribes and the BIA do not require that tribal citizens put a street address on tribal IDs.

241.  Even among tribal IDs that include a form of address, due to lack of, or relatively recent arrival of, residential mail delivery, many tribal citizens only list a P.O. Box address on their tribal IDs because that is the address they utilize for conducting their affairs or the address that they know.

242.  Indeed, from 2011 to 2017, the Legislature was aware that Native Americans may not possess a street address or may not know their street address.

243.  In 2011, Deputy Secretary Silrum testified to the Legislature: "[t]his is very much the case also in small town North Dakota where if you sent something to their street address the post office will return it because it needs to go to their post office box . . . We are also going to need to work with the tribal governments to make sure because a couple of our counties that have reservations in the state have not completed their 911 addressing. Even if they have the residence of those counties don't know what their 911 address is [sic]." *Hearing Minutes on H.B. 1447 Before H. Political Subdivision Comm.*, 62nd Leg. Assemb. 3 (N.D. Apr. 20, 2011) (statement of Jim Silrum, H. Political Subcomm.).

244.  On January 23, 2016, Rep. Marvin Nelson, whose district is majority Native American, explained in an op-ed in the Grand Forks Herald that as a Legislator he was well aware of how "it's not a question of ID. Tribal members have IDs, but they happen to be IDs that North Dakota decided weren't good enough" since "tribal Ids in North Dakota do not . . . list the person's address." The reasons for this are "many" but most notably because "[t]here are still rural residents who cannot count on their 911 address being correct. So a great many tribal IDs do not have a 911 address that can be counted." *See* Marvin Nelson, *N.D's Voter ID Laws Hurt Minorities*, *supra*.

### G.   Obtaining a Qualifying ID in North Dakota is More Difficult For Native Americans

245. "Native Americans who currently lack a qualifying voter ID disproportionally face logistical and financial burdens in obtaining a qualifying ID."  Doc. 50 at 19.

246. "Further, getting a new driver's license also requires proof of ID–the same forms of ID required to obtain a non-driver's ID, which is problematic for Native Americans." *Id.* at 14.

247. Social and historical conditions lead to high rates of poverty and unemployment among Native Americans in North Dakota, which prevent and will continue to prevent many Native Americans from obtaining the requisite underlying documentation necessary to obtain an ID required for voting.

### 1.   Limited Hours of, and Distance to, North Dakota DLS Sites Increase The Burden On Native American Voters

248. "[T]ravel to a Driver's License Site to obtain a non-driver's ID card (or a driver's license) is substantially burdensome for Native Americans." *Id.* at 14.

249. "As with non-driver's ID's, acquiring a new driver's license also requires a personal visit to a Driver's License Site. . . . such a visit can be burdensome for Native Americans who currently lack a qualifying voter ID." *Id.*

250. In order to obtain a North Dakota driver's license or a nondriver ID card, a qualified voter in North Dakota must go to one of North Dakota's remaining 19 DLSs.

251. There are only 19 DLS locations because eight DLSs have closed down since Dr. Gerald R. Webster submitted his analysis of DLSs on June 20, 2016, now making obtaining a driver's license or nondriver ID card even more difficult. *Compare* N.D. Dep't of Transp.,

*Schedules, hours, and addresses for ND Drivers License sites*, https://www.dot.nd.gov/divisions/driverslicense/docs/Drivers%20Lic%20Sites.pdf (last visited Dec. 1, 2017) ("2017 Drivers License Sites") *with* Doc. 44-4 at ¶ 24.

252.   There is not a single DLS on an Indian reservation in North Dakota.  Doc. 50 at 12.

253.   Because there are no Driver's License Sites on any reservations in North Dakota, access for Native Americans is severely limited.

254.   Moreover, the DLSs closest to North Dakota Indian reservations typically have very limited hours and are often located in places that are difficult for Native Americans to access. Doc. 44-4 ¶¶ 25, 39.

255.   For instance, the closest DLS to the Turtle Mountain Reservation, located in Rolla, has recently decreased its operating hours from twice a month to once a month. It is now only open the first Wednesday of every month. It has also decreased its operating hours from 9:40 a.m. to 3:20 p.m. to 10:20 a.m. to 2:35 p.m. This DLS site, the nearest to all Plaintiffs in this case, now operates the most restrictive hours of any DLS location. *Compare* N.D. Dep't of Transp., *Drivers License Sites* (revised Feb. 2014), https://web.archive.org/web/20140327204243/http://www.dot.nd.gov/divisions/driverslicense/docs/Drivers%20Lic%20Sites.pdf *with* 2017 Drivers License Sites.

256.   The next closest site to the Turtle Mountain Reservation, located in Bottineau, is only open the first and third Tuesday of every month and only from 9:40 a.m. to 3:05 p.m. *Id.* The mean travel distance for voting age Native Americans from Turtle Mountain Reservation to a DLS is eleven miles, and the mean travel time is 17.4 minutes. Doc. 44-4 ¶¶ 38–39, Table 6.

257.  The closest DLS to the Standing Rock Reservation was in Carson or Bismarck.

258.  The Carson site closed in early August 2017.

259.  An individual living on the Standing Rock Reservation will now have to travel to Bismarck to obtain a state ID. The mean travel distance for voting age Native Americans from the Standing Rock Reservation to a DLS is now 65.8 miles, and the mean travel time is approximately 112.4 minutes.

260.  The closest DLS to the Fort Berthold Reservation is either in Watford City or Beulah.  The Watford City site is only open on the first and third Wednesday of each month from 9:40 a.m. to 3:40 p.m.  The Beulah site is only open on the second and fourth Wednesday of each month from 9:40 a.m. to 3:20 p.m.  Otherwise, a tribal member on the Fort Berthold Reservation would have to travel farther to Williston or Minot.  The mean travel distance for voting age Native Americans from Fort Berthold Reservation to a DLS is 49.6 miles. The mean travel time is 84.6 minutes. *Id.* at ¶ 38, 39, Table 6.

261.  The closest DLS to the Lake Traverse Reservation is either the Oakes site or the Wahpeton site.  The Oakes DLS is only open on the second Wednesday of each month from 10:00 a.m. to 3:00 p.m. The Wahpeton site is only open on the first and third Thursday of each month from 9:20 a.m. to 3:40 p.m. *See* 2017 Revised Drivers License Sites. The mean travel distance for voting age Native Americans from Lake Traverse Reservation to a DLS is 40.1 miles, and the mean travel time is 64.3 minutes. Doc. 44-4 at ¶ 39.

262.  The closest DLS to the Spirit Lake Reservation is in Devil's Lake.  That site is open every weekday from 8:00 a.m. to 4:45 p.m., except it is closed on the first and third Wednesdays of the month.  *See* 2017 Revised Drivers License Sites, *supra*. The mean travel

distance for voting age Native Americans from Spirit Lake Reservation to a DLS is 14 miles. The mean travel time is 25.3 minutes. Doc. 44-4 at ¶ 39.

263.  There are no DLS sites open on Saturday or Sunday in North Dakota.  2017 Drivers License Sites.

264.  The times and hours that the DLS sites are open change periodically.

265.  For some Native Americans, traveling these distances would be unduly burdensome and costly given their lack of access to transportation and the time needed during working hours.

266.  Charts 5 and 6 below illustrate the limited hours of, and average travel distances and times to, a DLS from each North Dakota reservation.

*Chart 5*

| Reservation | Mean Travel Distance to a DLS for Voting Age Native Americans | Mean Travel Time to a DLS for Voting Age Native Americans |
|---|---|---|
| Ft. Berthold | 49.6 miles | 84.6 minutes |
| Turtle Mountain | 11.0 miles | 17.4 minutes |
| Spirit Lake | 14.0 miles | 25.3 minutes |
| Standing Rock | 65.8 miles | 112.4 minutes |
| Lake Traverse | 40.1 miles | 64.3 minutes |
| All Reservations | 29.4 miles | 50.3 minutes |

*Chart 6*

| Reservation | Closest Driver's Licensing Site(s) | Hours of Operation* |
|---|---|---|
|  |  |  |
| Standing Rock | Bismarck | Mon.-Fri., 7:30 AM-4:45 PM |
| Turtle Mountain | Rolla | 1st Wed., 10:20 AM -2:35 PM |
| Turtle Mountain | Bottineau | 1st and 3rd Tues., 9:40 AM-3:05 PM |
| Fort Berthold | Watford City | 1st and 3rd Wed., 9:40 AM-3:40 PM |
| Fort Berthold | Beulah | 2nd and 4th Wed., 9:40 AM-3:20 PM |
| Lake Traverse | Oakes | 2nd Wed., 10:00 AM-3:00 PM |
| Lake Traverse | Wahpeton | 1st and 3rd Thurs., 9:20 AM-3:40 PM |
| Spirit Lake | Devil's Lake | Mon., Tues, Thurs., Fri., 2nd and 4th Wed., 8:00 AM-4:45 PM |

*Hours of operation are based on a North Dakota Department of Transportation document revised August 2017. *See* 2017 Drivers License Sites.

267.  There was a 29.6% reduction of sites between 2015 and August 2017.

268. Following the 2017 closure of DLS sites there has been an 11.4% increase in distance that the Native American voting age population has to travel to get to a DLS site.

269.  There was a 1.7% decrease in operating hours.

270. "[A] successful visit to a site requires knowledge and experience dealing with bureaucratic institutions, a means of transportation, money to pay for transportation, and the free time to travel the often significant distances to such sites. The undisputed evidence before the Court reveals that overcoming these obstacles can be difficult, particularly for an impoverished Native American." Doc. 50 at 12.

271. "[O]nly 64.9% of Native Americans in North Dakota who lack a qualifying voter ID know the location of the nearest Driver's License Site (as compared to 85.2% of non-Native Americans)." *Id.* at 12-13

272. "[O]nly 73.9% of Native Americans in North Dakota lacking a qualifying voter ID own or lease a car (as compared to 88% of non-Native Americans); and 47.3% of Native Americans in North Dakota believe it would be a hardship if they had to rely on public transportation to get to a Driver's License Site (as compared to 23.1% of non-Native Americans)." *Id.* at 13.

273. "For the average voting-eligible Native American in North Dakota, the average travel distance to the closest site is nearly 20 miles (as compared to appx. 11 miles for non-Native Americans)." *Id.*

274. And indeed, as explained above, this distance has since increased based on the August 28, 2017 revisions to North Dakota DLS locations.

275. "On the average, Native Americans in North Dakota must travel twice as far as non-Natives to visit a Driver's License Site." *Id.* at 8.

276. "This translates to more than 70 minutes of travel time for a round trip. For Native Americans in North Dakota living on a reservation, the travel distance can be as great as 60 miles one way." *Id* at 13.

277. "44.1% of Native Americans lacking a qualifying voter ID reported they would have difficulty taking time off from work to travel to a Driver's License Site (compared to 26.2% of non-Native Americans), and 36.7% of Native Americans said it would be a problem to travel even six miles each way to a site (compared to 17.3% of non-Native Americans)." *Id.* at 14.

278. It will be overly burdensome or impossible for many Native Americans to access a DLS.

## 2. Native Americans are less likely to have access to transportation in North Dakota

279. "Many [Native Americans] lack means of transportation. According to the Barreto/Sanchez Survey, only 73.9% of Native Americans in North Dakota lacking a qualifying voter ID own or lease a car (as compared to 88% of non-Native Americans); and 47.3% of Native Americans in North Dakota believe it would be a hardship if they had to rely on public transportation to get a Driver's License Site (as compared to 23.1% of non-Native Americans)." *Id.* at 13 (emphasis in original).

280. "Many Native American lack access to transportation and have no car registration showing their current address." Doc. 50 at 11.

281. The 2006-2010 American Community Survey shows that 4.8% of White households in North Dakota lacked access to a vehicle, while 10.5% of Native American

households did not have access to a vehicle. Native American households are twice as likely to be unable to access a motor vehicle. Doc. 44-4 ¶ 20.

282.  In four counties in North Dakota, 8% or more of households lack access to a motor vehicle. Those counties include Sioux (12.5%); Benson (8.4%); Pierce (8.3%); and Rolette (8.2%). Sioux, Benson, and Rolette counties have the largest percentages of Native American residents of North Dakotan counties. *Id.* at ¶ 21.

283. In sum, "a successful visit to a [Driver's License] site requires . . . a means of transportation, money to pay for transportation, and the free time to travel the often significant distances to such sites . . . . The <u>undisputed</u> evidence before the Court reveals that overcoming these obstacles can be difficult, particularly for an impoverished Native American." Doc. 50. at 12 (emphasis in original, referring to declarations of Plaintiff's expert witnesses).

284. "The <u>undisputed evidence</u> in this case has established that travel to a Driver's License Site to obtain a non-driver's ID card (or a driver's license) is substantially burdensome for Native Americans." *Id.* at 14 (emphasis in original).

### 3.  The Costs of Obtaining Documentation Is Overly Burdensome For Native Americans

285.  High rates of poverty and unemployment and the lack of access to transportation among Native Americans in North Dakota prevent, and will continue to prevent, many Native Americans from travelling to a DLS and obtaining a requisite ID for voting.

286. HB 1369 increases the proof of identity that a person had to show to get an ID under HB 1332 from three requirements to four: name, date of birth, legal presence in the

United States, and citizenship. *See* N.D. Cent. Code § 39-06-07.1 (adding proof of citizenship).

287.  A renewal for a non-commercial driver's license is $15 and "a new license can cost as much as $25 ($5 to take the written test, $5 to take a road test, and $15 for the license fee)." *See* Doc. 50 at 14.

288.  "Many impoverished Native Americans do not have the disposable income to pay for these fees." *Id.* at 15.

289. HB 1369 maintains HB 1332's fee waiver for the issuance or renewal of a non-driver ID card for eligible applicants that do not already have a North Dakota Driver's license. If, however, an eligible applicant for a non-driver ID already has a driver's license, is seeking a replacement for an unexpired non-driver ID, or is seeking a duplicate non-driver ID, there is an $8 fee. *See* N.D. Cent. Code § 39-06; 49; 39-06-03.1.

290.  However, the North Dakota DLSs apply the non-driver fee waiver inconsistently.

291. For example, on the North Dakota Department of Transportation's website, it provides that the only time there is no fee associated with obtaining a non-driver ID card is when you are *renewing* an ID and do not possess a North Dakota driver's license. N.D. Dep't of Transp., *ID Card Requirements*, https://www.dot.nd.gov/divisions/driverslicense/idrequirements.htm (last visited Nov. 29, 2017).  The law, however, is supposed to waive the fee for issuance or renewal of a non-driver ID, not just for the renewal.  *See* N.D. Cent. Code §§ 39-06-03.1, 39-06-49.

292.  According to the DOT website, even when you do not have a North Dakota driver's license, you still have to pay eight dollars for a non-driver ID.  *ID Card Requirements, supra.*

293. What's more, for someone seeking a license or non-driver ID, proof of a physical residential address is required. Doc. 44-2 ¶ 75.

294. The Department of Transportation does not accept a P.O. Box as proof of a residential address. *Id.*

295. Many qualified Native American voters will have a hard time furnishing one or more of the limited, acceptable forms of proof of residential address in order to obtain a qualifying ID in North Dakota. *Id.*

296. Individuals without a physical residential address will not be able to obtain a free non-driver ID.

297. Additionally, obtaining the required documentation to prove identity costs time and money.

298. For example, obtaining a North Dakota birth certificate and driver's license or non-driver ID presents a conundrum for many Native American voters: the North Dakota Department of Health ("DOH") requires an ID to obtain a certified copy of a birth certificate, but the applicant needs the birth certificate to procure the state ID necessary to obtain the birth certificate; other forms of ID accepted by DOH are either expensive or have limited availability.

299. The least expensive document to prove identity is a North Dakota birth certificate, which costs $7. Doc. 50 at 10.

300. If a voter is born out of state, however, the cost is likely more.

301. Native Americans disproportionately lack birth certificates. Indeed, "32.9% of Native Americans who presently lack [a] qualifying voter ID do not have a birth certificate." *Id.*

302. "Impoverished Native Americans, such as Plaintiff Lucille Vivier, lack the disposable income necessary to obtain a birth certificate, and make the difficult decision not to spend their limited resources on a birth certificate." *Id*.

303. Additional documentation – and additional costs – are required if the person's name has changed, for example due to marriage.

304. HB 1369 maintains the lack of waiver or exemption under HB 1332 and HB 1333 from the underlying documentation required for an applicant to obtain a non-driver ID card, or from the costs and fees associated with obtaining this underlying documentation.

305. Nor does HB 1369 address any fees that will be imposed on voters who must obtain the requisite underlying documentation from out-of-state agencies.

306. Similarly, North Dakota has not provided any funding to offset the cost faced by prospective voters for purchasing new tribal ID cards that have residential addresses.

307. For example, a new Turtle Mountain tribal ID card is $10 and a replacement ID is $15.

308. Even though the state advertises the non-driver IDs as "free," there is a disproportionate cost to obtain the ID for some voters.

309. There is the burden of time, transportation, and cost to obtain an ID and the documentation needed to get one, and many Native American voters will find it impossible

to overcome all these hurdles to obtain the required ID and documentation due to social and historical conditions that led to their economic circumstances.

310. Due to the costs involved in obtaining a qualifying ID, many Native American voters have been, and will continue to be, disproportionately burdened and disenfranchised.

## X.  THE SECRETARY OF STATE'S CAMPAIGN FOR HB 1332 AND 1333 PROVIDED INADEQUATE NOTICE OF ID REQUIREMENTS

311. In March of 2014, the Secretary of State announced a statewide advertising campaign, utilizing federal funds, to educate the North Dakota public on the requirements of HB 1332 - then the new voter ID law.

312. The Secretary of State's campaign to educate qualified electors about HB 1332 and 1333's requirements was insufficient. Not all qualified electors heard or saw the educational materials, and electors who did hear or see the materials found them misleading.

313. "21.4% of Native Americans [we]re not at all aware of the new voter ID laws [under HB 1332 and HB 1333], and only 20.8% have heard about the law." Doc. 44-1 ¶ 43.

314. The State's education materials left qualified electors believing that their tribal ID was a qualifying form of ID, when many tribal IDs do not contain a residential address as required under HB 1332 and 1333. Because electors believed they had qualifying ID, they did not attempt to obtain a new ID before attempting to vote and were ultimately denied the right to vote due to lack of a qualifying ID.

315. There is no known additional campaign to alert voters that they need a specific type of ID to vote pursuant to HB 1369.

## XI.    NATIVE AMERICANS ARE DISPROPORTIONATELY BURDENED BY A LACK OF A FAIL-SAFE VOTING OPTION

316.  The Secretary of State stated that the total number of individuals who utilized the affidavit provision in the election before the adoption of HB 1332 was 10,517.    *Hearing Minutes on H.B. 1332 Before the S. Appropriations Comm.*, 63rd Leg. Assemb. (N.D. Apr. 2, 2013) (statement of Al Jaeger, N.D. Sec'y of State).

317.  In compliance with this Court's ruling that a "fail-safe" provision be provided for the November 2016 General Election, North Dakota provided an affidavit provision, which was utilized by over 16,000 individuals as stated in the legislative hearings for HB 1369. NDACo Legislative Blog, *ND Legislative Approves New Voter ID Law Allows for Set Aside Ballots*, http://ndcounties.blogspot.com/2017/04/ (Apr. 26, 2017)

318.  As explained above, *see* above discussion at ¶¶ 118-127, Native Americans disproportionately relied on the affidavit and voucher "fail-safe" provisions that were first removed by HB 1332 and whose absence is maintained by HB 1369.

319.  Native Americans therefore are disproportionately burdened by the continued elimination of those provisions.

320.  The Secretary of State's office and North Dakota Association of Counties endeavored to track the number of people who attempted to vote, and were disenfranchised, in the June 2014 primaries when there was no voucher or affidavit option.

321.   Chart 6 below provides the number of people denied the right to vote in North Dakota counties where reservations are located, and the number of those who returned to vote with qualifying ID in the 2014 primary election.

66

*Chart 6*

| COUNTY | Number with ID, But Not Updated | Number with No ID | Number who Returned to Vote | Comments |
|---|---|---|---|---|
| **Benson** | 0 | 6 | 1 | One returned with ID and voted – several attempted to use a Tribal ID with no physical address listed |
| **Dunn** | No Response | | | |
| **McKenzie** | No Response | | | |
| **McLean** | No Response | | | |
| **Mercer** | 0 | 0 | 0 | |
| **Mountrail** | No Response | | | |
| **Ramsey** | 0 | 0 | 0 | There were a few tribal members who had tribal IDs with no residential address, but they all had driver's licenses, so they were able to vote successfully. |
| **Richland** | 0 | 1 | 0 | |
| **Rolette** | 20 | 35 | 0 | 30-35 of the people turned away only had tribal IDs that did not have their residential address on it. The remaining 15-20 had drivers' licenses but their records did |

| | | | | not place them in the precinct in Rolette County. |
|---|---|---|---|---|
| **Sargent** | 0 | 2 | 0 | One individual claimed not to have an ID. The other attempted to use their passport to vote in person. |
| **Sioux** | 0 | 4 | 4 | All returned with ID and voted. |
| **Ward** | 0 | 2 | 0 | Long term residents had not yet obtained ND IDs. |

322. During the 2014 general election, voters were turned away from polling locations because they did not meet the requirements set forth by the voter ID law and the Secretary of State's office.

323. After the 2014 primary election, the Secretary of State noted that the number of problems were higher with tribal IDs during that election.

324. Since this lawsuit was filed, the Secretary of State, upon our knowledge and belief, has stopped attempting to track the number of people who attempted to vote and were disenfranchised.

325. Following the 2014 general election, the North Dakota Association of Counties surveyed all 53 county auditors, over 25 of which responded.

326. In the counties that responded to the survey, around 1200 voters were disenfranchised due to improper voter ID.  (In addition, an unknown number of voters were disenfranchised in the over 25 counties that did not respond to the survey).

327. Upon our knowledge and belief, the North Dakota Association of Counties has not surveyed its county auditors since this lawsuit was filed.

## XII.   THE STATE'S INTERESTS ARE NOT OUTWEIGHED BY THE DISPROPORTIONATE BURDEN ON NATIVE AMERICANS' ABILITY TO VOTE

328. The state has identified four reasons why the voter ID law was purportedly necessary despite its sound election administration: (1) to prevent and cut down on voter fraud; (2) to streamline the voting process; (3) to cut down on the perception that the affidavit ballots get mixed in with the other ballots and they cannot be retrieved; and (4) to make the election process fair, open, and honest.

329.  Voter ID laws only address one type of fraud: in-person voter fraud.

330. The legislative record, however, is devoid of any evidence of in person voter fraud in North Dakota.

331. Moreover, North Dakota "failed to present any evidence showing that 'fail-safe' provisions . . . have resulted in voter fraud in the past, or are particularly susceptible to voter fraud in the future." Doc. 50 at 22.

332. In his September 5, 2017 letter to the Presidential Advisory Commission on Election Integrity, Secretary of State Alvin A. Jaeger admitted that "[i]f convictions exist [for election-related crimes including voter fraud], this office is not aware of them." Letter from Alvin A. Jaeger, N.D. Sec'y of State to The Presidential Advisory Commission on Election Integrity (Sep. 5, 2017) (on file at: https://www.scribd.com/document/358292085/Sos-00435420170907141608 .

333. Regardless of its effectiveness, the very strict approach that North Dakota took results in disenfranchisement of significant numbers of qualified Native American and other voters.

334. The strict approach that North Dakota took was intended to disproportionately burden and disenfranchise Native American voters.

335.  An election where a large percentage of voters cannot vote because of obstacles created by the state, which are restrictive and not necessary, is not free, fair, and open.

**XIII.     HISTORY OF DISCRIMINATION IN NORTH DAKOTA**

336.  North Dakota has a long history of discrimination against Native Americans generally, and of denying Native Americans the right to vote in particular.

**A.  Discrimination in Voting**

337. This Court has recognized the history of discrimination in North Dakota against Native Americans with regard to voting. *See Spirit Lake Tribe v. Benson Cty., N.D.*, No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. 2010); Consent Judgment and Decree, *United States v. Benson Cty.*, Civ. A.  No. A2-00-30 (D.N.D. Mar. 10, 2000) ; *State ex rel. Tompton v. Denoyer*, 72 N.W. 1014, 1019 (N.D. 1897)

338. In 1897, Native American voters in North Dakota had to take their quest to get a voting precinct on the Spirit Lake Reservation to the North Dakota Supreme Court because the County had denied them the right to have a precinct on the reservation. *Denoyer*, 72 N.W. at 1015.  At that time, North Dakota Code had, under "section 480, Rev. Codes," a provision that did not allow Native Americans to be voters "unless they had entirely

abandoned their tribal relations, and were in no manner subject to the authority of any Indian chief or Indian agent." *Id.* at 1019.

339. Additionally, in the late 19th Century, an Amendment to North Dakota's initial Constitution, adopted and ratified in 1898, provided that only "[c]ivilized persons of Indian descent" who "severed their tribal relations two years next preceding such election" were eligible to vote. N.D. Const., art. V, § 121 (1898). Thus, in order to vote, Native Americans had to be "civilized" and had to have explicitly "severed their tribal relations." *Id.* This insidious classification only applied to Native Americans and was not removed until 1922.

340. The North Dakota Constitution also established an educational test requirement as a precondition for voting. The requirement stated "the legislature shall by law establish an educational test as a qualification, and may prescribe penalties for failing, neglecting, or refusing to vote at any general election." N.D. Const. art. II, §§ 121, 127 (ratified by vote on Nov. 8, 1898). Literacy tests were a common method used to disenfranchise minority voters, and were addressed by the Voting Rights Act. *See South Carolina v. Katzenbach*, 383 U.S. 301, 312, 316 (1966) (discussing the discriminatory use of literacy tests and the Voting Rights Act's ban of such tests).

341. Indeed, racism against Native Americans by the state of North Dakota persisted into the 20th century. In 1920 in *Swift v. Leach*, 178 N.W. 437 (N.D. 1920), the North Dakota Supreme Court was asked to apply the "civilized persons" constitutional provision to Native American voters. While the Court found that the Native American plaintiffs were eligible voters in that case, it required the local Superintendent of the Bureau of Indian Affairs, as well as other witnesses, to testify that the Natives "live just the same as white

71

people" to show that they were "civilized" and had "severed" their tribal relationship. *Id.* at 438-40. This was despite the Appellant's argument that the Native Americans, by being dependent on the federal government, could not be "civilized persons." *Id.* at 441.

342.  Indeed, discrimination against Native Americans persists today.

343.  Discrimination against Native American voters in North Dakota is not a relic of the 19th and early 20th Centuries.   In 2000, the Justice Department filed an action against Benson County, North Dakota in this Court to enforce Section 2 of the Voting Rights Act because Benson County's at large elections that gave Native Americans less opportunity to participate in the political process. *See* Consent Judgment at preamble, *Benson Cty*.

344. The parties entered into a consent decree, and Benson County agreed to change the way it conducted elections from one at-large district to five separate districts, with two majority Native American districts. *Id.* ¶ 6.

345. The Spirit Lake Tribe had to sue again in 2010 to keep a polling place on its reservation, some 100 years after that Tribe first sued to establish a polling place on its reservation. This Court found that the removal of Spirit Lake's polling place was likely a violation of Section 2. *Spirit Lake Tribe*, 2010 WL 4226614, at *3.   After a preliminary injunction hearing, the polling place was reestablished on the reservation. *Id.*, at *6.

**B.  Discrimination in Other Areas**

346.  Native Americans in North Dakota face discrimination in other arenas as well, which hinders their ability to participate effectively in the political process.

**1.  Education**

347. The "past federal policy was to assimilate American Indians into United States culture, in part by deliberately suppressing, and even destroying, traditional tribal religions and culture in the 19th and early 20th centuries." *Bear Lodge Multiple Use Ass'n v. Babbit*, 175 F.3d 814, 817 (10th Cir. 1999). "By the late 19th Century federal attempts to replace traditional Indian religions with Christianity grew violent. In 1890 for example, the United States Cavalry shot and killed 300 unarmed Sioux men, women and children en route to an Indian religious ceremony called the Ghost Dance[.]" *Id.*

348. Indeed, the government administered Indian trust funds to pay Christian denominations to educate the Indians about Christianity – a policy upheld by the Supreme Court. *Reuben Quick Bear v. Leupp*, 210 U.S. 50, 81-82 (1908).

349. Native Americans in North Dakota were not exempt from this overt discrimination and cultural assimilation.

350. Christian and government boarding schools were set up all over in North Dakota to indoctrinate the Native Americans into Christianity, or "civilization." *See e.g.* U.S. Dep't of Interior, *Extracts from the Annual Report of the Secretary of the Interior For Fiscal Year, 1927*45                                                                                                                                                (1927), https://babel.hathitrust.org/cgi/pt?id=umn.31951t003938445;view=1up;seq=1.

351. There were at least 19 boarding or day schools in North Dakota for Native Americans.  W.A. Jones, *Report of the Commissioner of Indian Affairs* 18, 20, 23 (Oct. 15, 1903).

352. In 1921, the federal government recognized the disparity in Native American education in *The Problem of Indian Administration*.  Lewis Meriam, Tech. Dir. for Inst. for

Gov't Research, *The Problem of Indian Administration, Report of a Survey made at the request of Hubert Work, Secretary of the Interior, and submitted to him, Feb. 21, 1928*,https://www.narf.org/nill/documents/merriam/b_meriam_letter.pdf   (hereinafter "Meriam Report").  The Meriam Report showed that the theory of removing Native children "as far as possible" from their home environment did not work, and that Native schools in general were "distinctly below the accepted social and educational standards of school systems in most cities and the better rural communities."  Meriam report at 346 .  For instance, in 1920 in North Dakota the rural illiteracy rate was only 2.2%, but the Native Americans had an illiteracy rate of 29.6%. *Id.* at 357.

353. While many Native Americans attended federal schools, the effects of discrimination were still felt. The 1969 report by the Senate Committee on Labor and Public Welfare, entitled *Indian Education: A National Tragedy – A National Challenge*, highlighted the failure of public schools. Special Subcomm. on Indian Educ., 91st Cong., S. R. No.                        91-501                        (1969), https://ia801305.us.archive.org/30/items/ERIC_ED034625/ERIC_ED034625.pdf (hereinafter "Kennedy Report").

354. The Kennedy Report found that Indian children in public schools were subjected to humiliating stereotypes, faced language discrimination, felt a sense of powerlessness, experienced depression, and generally did not receive education relevant to their cultures. Evidence showed that dropout rates were higher and reading levels lower among Indian children. *Id.* at 23-31.

74

355.  The Kennedy Report also found that Indian people were generally prevented from serving on school boards. *Id.*

356. The effects of discrimination in the educational setting are still felt by Native Americans in North Dakota.

357.  The North Dakota Native Education Division in the North Dakota Department of Public Instruction has noted that Native American students constitute approximately 8.9% of the total North Dakota enrolled student population.

358.  The North Dakota Native Education Division found that

> [f]or many Native students, the dominant culture of the public school is incompatible with their own cultures and languages. There are differences in distinct and various ways of acquiring knowledge, forms of communication, familial structures, and sociological, cultural, and linguistic modes [sic] learning of Native learners, which can cause problems for Native American students in the school environment. Socio-economic issues also complicate the learning environment as well. The consequences of these issues are realized by low achievement scores, [and] high dropout and transfer rates. For example, the 1999 dropout rate for Native American students [in North Dakota] was 42.2 percent. The economic conditions of many Native communities reveal high incidences of poverty, unemployment, and health problems for Native children and their families.

*Educational Condition*, N.D. Dep't of Pub. Education.,

https://web.archive.org/web/20151225031658/https://www.nd.gov/dpi/SchoolStaff/IME/Programs_Initiatives/IndianEd/resources/EducationalCondition/ (last visited Dec. 7, 2017).

359. According to the 2009-2013 American Community Survey 5-Year Estimates, Native American residents in North Dakota are far more likely to lack a high school diploma than other groups in the state as a whole—18.6% of Native American residents over the

age of 25 lack a high school diploma compared to 9.1% of the state as a whole and only 8.4% of White residents.

360. According to the U.S. Department of Education Office of Civil Rights, Native American students receive out of school suspensions at much higher rates than their White counterparts.

361. From 2011-2012, 9% of male Native Americans were given out of school suspensions in North Dakota, while only 2% of White male students were given out of school suspension. Likewise, 6% of female Native American students were given out of school suspensions in 2011-2012, while only 1% of White female students were given out of school suspensions.

362. The kindergarten retention rate in North Dakota shows similar disparity. According to the U.S. Department of Education Office of Civil Rights, between 2011-2012, 8% of Native American kindergarten students in North Dakota were retained an extra year in North Dakota compared to 4% of their White counterparts.

363. Thus, as the North Dakota Native American Education division documented, the effects of historical discrimination in North Dakota continue to have a negative impact on Native Americans.

## 2. Loss of Land

364. The loss of Native American land through the discriminatory allotment policies also still plagues Native Americans. According to the 1948 Hoover Commission's evaluation of the allotment policy: "Two-thirds of Indian-owned land, including much of the best land, was alienated before the Allotment policy was abandoned. If the 90 million acres

lost through the process had remained in Indian ownership, the problem of poverty among most tribes could be solved with less difficulty and with more certainty today."  Kennedy Report at Appendix I, 149-150.

365.  Likewise, Senator Robert Kennedy recognized in 1968 that the "Allotment Act succeeded in the period of the next 40 years in diminishing the Indian tribal economic base from 140 million acres to approximately 50 million acres of the least desirable land.  Greed for Indian resources and intolerance of Indian cultures combined in one act to drive the American Indian into the depths of a poverty from which he has never recovered."  *Id.* at 150.

366.  For instance, in 1882 the Turtle Mountain Reservation constituted 22 townships in North Dakota, but by 1884 it was reduced to two townships and the remainder was opened up to the public domain.

367.  Likewise, the Great Sioux Reservation, which covered parts of Wyoming, Montana, Nebraska, Colorado, North Dakota, and South Dakota, was diminished greatly by 1890, with some nine million acres of land lost even by that time.

### 3.    North Dakota Indian Affairs Commission

368. The State of North Dakota also effected discrimination in North Dakota through the North Dakota Indian Affairs Commission, which from its inception made several recommendations to purportedly "assimilate" Native Americans into mainstream culture. This was despite the fact that the Commission was established to facilitate relationships with North Dakota Tribes. As the North Dakota Indian Affairs Commission has recognized, it has at times embraced the negative rhetoric of termination, assimilation, and relocation

77

for Indian tribes. It was not until 1959 and the roots of self-determination that the tribes within North Dakota acquired representation on the Commission.

### 4.     Lending Discrimination

369. Federal judicial intervention has been necessary to eliminate numerous other devices intentionally used to discriminate against Native Americans in North Dakota. One notable example includes lending discrimination directed at Native Americans. In 2010, Native American farmers settled a class-action lawsuit alleging that they had been systematically denied farm loans. The lead plaintiff, Marilyn Keepseagle was from the Standing Rock Sioux Reservation. Evidence in the lawsuit showed that farm agents discriminated against Native farmers systematically. *Keepseagle v. Vilsack*, 118 F. Supp. 3d. 98 (D.D.C. 2015), *appeal denied*, 2015 WL 9310099 (D.C. Cir. 2015). In 2014, the Department of Housing and Urban Development settled a suit on behalf of a Native American couple from North Dakota who were refused a loan because their property was located on the reservation. *See* News Release, U.S. Dep't of Housing and Urban Dev., HUD Reaches Settlement with US Bank Resolving Allegations of Lending Discrimination Against Native American Couple (Sept. 15, 2014) (available at: https://archives.hud.gov/news/2014/pr14-106.cfm).

370. As the unemployment, poverty, education and other statistics above show, Native Americans in North Dakota have been subject to social and historical discrimination that still impacts them to this day.

371. This social and historical discrimination hinders North Dakota Native Americans' ability to participate effectively in the political process because they are now less able, and

often unable, to obtain the necessary documentation and qualifying ID that continues to be a prerequisite to vote.

372. The Legislature was aware of these social and historical factors and intended to use these disadvantages to hinder Native American's ability to vote.

## CAUSES OF ACTION

**I.     COUNT ONE: THE VOTER ID REQUIREMENTS IN HB 1369 WERE ENACTED FOR THE PURPOSE OF DENYING OR ABRIDGING THE RIGHT TO VOTE ON THE ACCOUNT OF RACE IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT**

373. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all preceding paragraphs of this complaint.

374. Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

375. HB 1369 violates Section 2 because it was passed with the purpose to deny and abridge the right to vote on account of race.

376. Without an order enjoining the implementation and enforcement of HB 1369, Defendants will continue to violate Section 2, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

**II.     COUNT TWO: THE VOTER ID REQUIREMENTS OF HB 1332, HB 1333, AND HB 1369 VIOLATE SECTION 2 OF THE VOTING RIGHTS ACT BECAUSE THEY HAVE THE RESULT OF DENYING OR ABRIDGING THE RIGHT TO VOTE ON ACCOUNT OF RACE.**

377. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all preceding paragraphs of this complaint.

378. Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has the result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

379. HB 1332, HB 1333, and HB 1369 require an ID that Native Americans disproportionately lack, and obtaining and maintaining such an ID current is unreasonably burdensome for Native Americans.  Furthermore, Native Americans are disproportionately less likely to possess the supplemental documentation permitted under HB 1369.

380. Accordingly, North Dakota's implementation and enforcement of HB 1332, HB 1333, and HB 1369 continues to result in a denial or abridgement of equal opportunities for Native American voters to participate in the political process, in violation of Section 2 of the Voting Rights Act.

381. Without an order permanently enjoining the implementation and enforcement of HB 1332, 1333, and 1369, Defendants will continue to violate Section 2, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

**III.** **COUNT THREE: THE LACK OF "FAIL-SAFE" VOTING MECHANISMS IN HB 1332, HB 1333, AND HB 1369 HAS THE RESULT OF DENYING OR ABRIDGING THE RIGHT TO VOTE ON ACCOUNT OF RACE IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT.**

382. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all preceding paragraphs of this complaint.

383. Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has the result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

384. HB 1332 and 1333 eliminated the voucher and affidavit processes that a qualified elector previously could use to prove his or her qualifications without having a qualifying ID. HB 1369 failed to restore the of voucher and affidavit processes and otherwise lacks an effective "fail-safe" provision.

385. Native Americans disproportionately relied on the voucher and affidavit process to vote in North Dakota and the elimination of these fail-safe methods resulted in an adverse discriminatory impact on Native American voters.

386. Additionally, the "set-aside" system adopted by North Dakota in lieu of a "fail-safe" method requires burdensome travel that Native Americans are disproportionately unable to make.

387. Accordingly, North Dakota's implementation and enforcement of HB 1332, HB 1333, and HB 1369 continues to result  in a denial or abridgement of equal opportunities for Native American voters to participate in the political process, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

388.  Without an order permanently enjoining the implementation and enforcement of HB 1332, 1333, and 1369, Defendants will continue to violate Section 2, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

IV. **COUNT FOUR: HB 1332, HB 1333, AND HB 1369 PLACE UNCONSTITUTIONAL BURDENS ON QUALIFIED ELECTORS IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.**

389. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all preceding paragraphs of this complaint.

390. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides in relevant part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

391. The Fourteenth Amendment prohibits the imposition of severe burdens on the fundamental right to vote unless they are "'narrowly drawn to advance a compelling state interest.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citation omitted).

392. The burdens of HB 1332 and 1333 on qualified North Dakota electors, especially qualified Native American electors in North Dakota, were severe. HB 1369 fails to alleviate those burdens.

393. Here, as set forth above, Plaintiffs' right to vote is burdened by the arbitrary and unjustified imposition of a strict voter ID law with no fail-safe provision and no provision to protect the right of indigent qualified electors to vote. Plaintiffs, as well as many other qualified electors do not possess a qualifying ID or supplemental documentation and face significant obstacles to procuring these items. This has resulted, and will continue to result in, disenfranchisement of Plaintiffs and other qualified voters. After observing and documenting evidence of disenfranchisement, the State did not attempt to protect the rights of these voters but rather tightened the restrictions on qualified electors.

394. After this Court enjoined HB 1332 and 1333 for lack of a "fail-safe" provision, holding there was a substantial likelihood that Plaintiffs would succeed on the merits, the State enacted new legislation, HB 1369, that also lacked any meaningful "fail-safe" provision.

395. The State's interest is not compelling, and the law is not narrowly tailored to advance the State's asserted interest.

396. HB 1332 and 1333 did not actually further a compelling State interest.  HB 1369 does not either.

397. Additionally, HB 1332, 1333, and 1369 are not reasonable restrictions on the right to vote.

398. Without an order permanently enjoining the implementation and enforcement of HB 1332, 1333 and HB 1369 Defendants will continue to violate the Equal Protection Clause, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

**V.   COUNT FIVE: HB 1369 EXCLUDES NON-PROPERTY HOLDERS FROM VOTING IN ELECTIONS IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT**

399. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all preceding paragraphs of this complaint.

400. The Equal Protection Clause provides in relevant part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

401. HB 1369 violates the Equal Protection Clause because it excludes non-property holders from voting in elections by requiring that "[e]very qualified elector may have only one residence, shown by an actual fixed permanent dwelling, establishment, or any other abode to which the individual returns when not called elsewhere for labor or other special or temporary purposes" and that a "street address verified by the individual as provided in section 16.1-01-04.1 when requesting a ballot to vote must be the address of residence for the individual." HB 1369 § 3.

402. Without an order permanently enjoining the implementation and enforcement of HB 1332, 1333, and 1369, Defendants will continue to violate the Equal Protection Clause, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

**VI.    COUNT SIX: HB 1369 VIOLATES THE FIFTEENTH AMENDMENT.**

403. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all preceding paragraphs of this complaint.

404. HB 1369 violates the Fifteenth Amendment to the Constitution of the United States because it purposely denies and abridges the right to vote to Plaintiffs and other minority voters on the account of race and ethnic origin.  U.S. Const. amend. XV, § 1.

405. Without an order enjoining the implementation and enforcement of HB 1369, Defendants will continue to violate the Fifteenth Amendment, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

**VII.   COUNT SEVEN: HB 1332, HB 1333, AND HB 1369 VIOLATE THE NORTH DAKOTA EQUAL PROTECTION CLAUSE IN ARTICLE I OF THE NORTH DAKOTA CONSTITUTION.**

406. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all preceding paragraphs of this complaint.

407. North Dakota Constitution article I, section 21 provides the State's guarantee of equal protection to its citizens. Section 21 states: "No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens." In North Dakota, strict scrutiny is applied to "an inherently suspect classification or infringement of a fundamental right." *Hector v. City of Fargo*, 844 N.W. 2d 542, 554 (N.D. 2014) (quoting *Gange v. Clerk of Burleigh Cty. Dist. Court*, 429 N.W.2d 429, 433 (N.D. 1988)). A law that significantly interferes with such a right must "'promot[e] a compelling [state] interest and that the distinctions drawn by the law [must be] necessary to further its purpose'". *Id.*

408. Article II, section 1 of the North Dakota Constitution provides that "every citizen of the United States, who has attained the age of eighteen years and who is a North Dakota resident shall be a qualified elector."

409. The right to vote is a fundamental right and the most essential part of a functional democratic system. North Dakota's "whole election system . . . is built up and founded on the fundamental principle that every elector shall be given the opportunity to vote for or against any candidate." *Stern v. City of Fargo*, 122 N.W. 403, 408 (N.D. 1909).

410. HB 1332 and 1333 severely burdened and significantly interfered with the fundamental right of qualified Native American and other North Dakota electors to vote. HB 1369 preserves that burden and interference and does not actually further a compelling

interest, is not narrowly tailored to a compelling interest, and is not carried out by the least restrictive means.

411.  Without an order permanently enjoining the implementation and enforcement of HB 1332, 1333, and HB 1369 Defendants will continue to violate the North Dakota Equal Protection Clause, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

**VIII.   COUNT EIGHT: HB 1369 VIOLATES THE EQUAL PROTECTION CLAUSE IN ARTICLE I OF THE NORTH DAKOTA CONSTUTION BECAUSE IT EXCLUDES NON-PROPERTY HOLDERS FROM VOTING**

412.  The Plaintiffs re-allege and incorporate by reference the allegations set forth in all preceding paragraphs of this complaint.

413. North Dakota Constitution Article I, sections 21 and 22 provide the State's guarantee of equal protection to its citizens. Section 21 states: "No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens."

414. HB 1369 violates North Dakota's equal protection guarantee because it excludes non-property holders from voting in elections by providing that "[e]very qualified elector may have only one residence, shown by an actual fixed permanent dwelling, establishment, or any other abode to which the individual returns when not called elsewhere for labor or other special or temporary purposes" and that a "street address verified by the individual as provided in section 16.1-01-04.1 when requesting a ballot to vote must be the address of residence for the individual." HB 1369 § 3.

415. Without an order permanently enjoining the implementation and enforcement of HB 1332, 1333, and 1369, Defendants will continue to violate the North Dakota Constitution, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

## IX.   COUNT NINE:HB 1332, HB 1333, AND HB 1369 VIOLATE ARTICLE II OF THE NORTH DAKOTA CONSTITUTION BY IMPOSING NEW VOTER QUALIFICATIONS

416. The Plaintiffs re-allege and incorporate by reference the allegations set forth in all other paragraphs of this complaint.

417. Under the North Dakota Constitution, "[e]very citizen of the United States, who has attained the age of eighteen years and who is a North Dakota resident, shall be a qualified elector." N.D. Const., art. II, § 1.

418. The North Dakota Supreme Court has stated that "where the Constitution prescribes the qualifications of electors the Legislature is powerless to add or subtract from those qualifications." *Spatgen v. O'Neil*, 169 N.W. 491, 494 (N.D. 1918).

419. The requirements in HB 1332 and 1333 mandating possession of a specific form of state or tribally issued ID in order to vote was an elector qualification added by the legislature that is not in the North Dakota constitution. HB 1369 preserves those requirements and, so, is likewise an elector qualification added by the legislature that is not in the North Dakota constitution. N.D. Cent. Code § 16.1-01-04(4).

420. Additionally, North Dakota's requirement that "[e]very qualified elector may have only one residence, shown by an actual fixed permanent dwelling, establishment, or any other abode to which the individual returns when not called elsewhere for labor or other

special or temporary purposes" is an elector qualification added by the legislature that is not in the North Dakota constitution. *Id.* § 16.1-01-04.2.

421. Finally, North Dakota Code's requirement that a "street address verified by the individual as provided in section 16.1-01-04.1 when requesting a ballot to vote must be the address of residence for the individual" is an elector qualification added by the legislature that is not in the North Dakota constitution. *Id.* § 16.1-01-04.2(2.)

422. Because the legislature cannot add additional qualifications to those contained in the North Dakota Constitution, these additional qualifications are unconstitutional.

423. Without an order permanently enjoining the implementation and enforcement of HB 1332, HB 1333, and HB 1369 Defendants will continue to violate the North Dakota Constitution, resulting in the denial of the right of qualified Native American electors in North Dakota to vote.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court enter an order:

424. Permanently enjoining HB 1332, 1333, and 1369;

425. Declaring HB 1369 unconstitutional under Fourteenth and the Fifteenth Amendments of the U.S. Constitution and enjoining Defendants from enforcing the requirements of those provisions;

426. Declaring that HB 1369 violates Section 2 of the Voting Rights Act, and

**a.** enjoining Defendants from enforcing the requirements of HB 1369; and

**b.** authorizing the appointment of Federal observers by the Director of the Office of Personnel Management in accordance with Section 8 of the Voting Rights Act to serve for

such period of time as the Court shall determine is appropriate to enforce the guarantees of the Fifteenth Amendment to the U.S. Constitution, as provided by 52 U.S.C. § 10302(a);

427. Declaring HB 1369 unconstitutional under the Equal Protection Clause of the North Dakota Constitution;

428. Declaring HB 1369 unconstitutional under article II, section I of the North Dakota Constitution;

429. Awarding Plaintiffs' attorney fees and costs as allowed and required by law, including, but not limited to, 42 U.S.C. § 1988, 52 U.S.C. § 10310, and the Private Attorney General Doctrine; and

430. Ordering such additional relief as the interests of justice may require, together with the costs and disbursements in maintaining this action.


Respectfully submitted: December 13, 2017



 _/s/ Matthew Campbell_____

Matthew Campbell, NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
Telephone:  (303) 447-8760

Jacqueline De León, CA Bar No. 288192, DC Bar No. 1023035
jdeleon@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, Colorado 80302
Telephone:  (303) 447-8760

Joel West Williams, PA Bar No. 91691
williams@narf.org
NATIVE AMERICAN RIGHTS FUND
1514 P Street NW (Rear), Suite D
Washington, D.C. 20005
Telephone:  (202) 785-4166

Daniel David Lewerenz, WI Bar No. 1069385, OK Bar No. 30627
williams@narf.org
NATIVE AMERICAN RIGHTS FUND
1514 P Street NW (Rear), Suite D
Washington, D.C. 20005
Telephone:  (202) 785-4166

Richard de Bodo, CA Bar No. 128199
rich.debodo@morganlewis.com
Morgan, Lewis & Bockius LLP
2049 Century Place East, Suite 700
Los Angeles, CA 90067
Phone 1.310.255.9055
Fax 1.310.907.2000

Tom Dickson, ND Bar No. 03800
tdickson@dicksonlaw.com
Dickson Law Office
P.O. Box 1896
Bismarck, North Dakota 58502
P: (701) 222-4400
F: (701) 258-4684