# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
## SOUTHWESTERN DIVISION

| | |
|---|---|
| Richard Brakebill, Deloris Baker, Dorothy Herman, Della Merrick, Elvis Norquay, Ray Norquay, and Lucille Vivier, on behalf of themselves, | |
| Plaintiffs, | |
| vs. | Civil No. 1:16-cv-8 |
| Alvin Jaeger, in his official capacity as the North Dakota Secretary of State, | |
| Defendant. | |

**Plaintiffs' Corrected Memorandum in Support of**
**Second Motion for Preliminary Injunction and Response to Defendant's Motion to**
**Dissolve Preliminary Injunction**

## I.  **PRELIMINARY STATEMENT.**

Before the 2016 election, this Court enjoined Defendant from implementing the most restrictive voter ID laws in the nation because they would have a disproportionate and negative impact on the voting rights of Native Americans. This Court ordered a "safety net" for those voters who could not produce the required ID at their polling place with reasonable effort. During the 2016 election, many North Dakota voters, including thousands of Native Americans, relied on a "fail-safe" mechanism ordered by this Court in order to vote—they executed an affidavit swearing under penalty of perjury that they were qualified electors, in lieu of producing the voter ID required by House Bill 1332 ("HB 1332") and House Bill 1333 ("HB 1333"). Defendant is now asking the Court to dissolve its injunction, claiming new legislation, House Bill 1369 ("HB 1369"), has cured the defects in HB 1332 and 1333 while also providing the safety net this Court directed. Defendant is wrong.

Contrary to Defendant's assertions, HB 1369 still has a discriminatory effect. HB 1369 still requires voters to have one of the same forms of ID in order to vote. Thus, any voter who lacked the ID required under HB 1332 and 1333 will also lack ID under HB 1369. In 2016, when this Court issued its injunction, 23.5% of Native Americans did not have a qualifying ID. Today, 19% of Native Americans still lack qualifying ID. Only 64.6% of Native Americans possess a driver's license that satisfies the requirements of HB 1369 – whereas the percentage for non-Native Americans is over 20% higher (86.4%). Furthermore, the "set aside" ballot process Defendant touts as a "fail-safe" for those unable to obtain the required ID is just lip service. It will not help anyone who lacks the means to obtain a qualifying ID to cast a vote. The handwriting is clear: under HB 1369, thousands of Native Americans and other citizens will be denied their right to vote in 2018. Plaintiffs respectfully request that the Court deny Defendant's Motion to Dissolve ("Motion") its prior injunction and enter a revised preliminary injunction that applies to HB 1369.

### A.   HB 1369 is just as restrictive as the prior ID law and fails to provide a "fail-safe" mechanism

In November 2016, more than 16,000 North Dakota voters used the "fail-safe" procedure adopted by this Court. These people would not have been able to vote absent the Court's order. In response, the Republican-controlled Legislature, apparently still fearing a strong Native American turnout could tip a close election to a Democrat, set out to pass a new law that would reinstate the same obstacles to voting as HB 1332 and 1333. In April 2017, the Legislature passed HB 1369, which maintains HB 1332's and 1333's requirement that all voters must produce one of a limited set of IDs in order to qualify to vote.

As noted above, despite Defendant's claims, the discriminatory effect of HB 1369 is the same. Defendant claims HB 1369 allows voters to use certain documents reflecting identification information to supplement the required voter IDs, and this resolves the problems with HB 1332 and 1333. It does not. Of the Native Americans that lacked a valid ID, 48.7%, or 2,305, do not have any of the supplemental documents allowed under the law, and lack the resources to get them. Consequently, under HB 1369, thousands of Native Americans still will not be able to produce the required identification information.

Defendant also asserts HB 1369 contains a "fail-safe" by establishing a "set-aside" process for those voters who show up at the polls without the required IDs. Under this procedure, a voter is allowed to mark a ballot that is literally set aside. This ballot will only be counted if the voter can produce a satisfactory ID at the polling place before the polls close on Election Day, or at a state office within six days of the election. Defendant claims this "set-aside" procedure is a better "fail-safe" mechanism for disproportionately burdened voters than the affidavit procedure this Court adopted in its injunction.

However, HB 1369's "set-aside" process provides no safety net at all for North Dakota voters who are unable to produce the required ID information. Otherwise qualified voters who, because of their lack of financial and other resources, cannot produce the required voter ID when they appear to vote at a polling place, will similarly not be able to produce

the required ID within six days. Defendant not only recognizes this fact, but is indeed relying upon it.  In an email to Cass County Auditor Michael Montplaisir, Deputy Secretary of State Jim Silrum wrote: "As for the set-aside ballots, I hope *the fact that many individuals who cast them will not likely come into your office later to verify their qualifications will put some of the fears to rest about long lines outside your office in the six days after the election*."[1] Instead of a true safety net, the set-aside procedure is actually a cynical ruse that leaves a voter with the false impression that his or her vote will be counted and will affect the final outcome, when in truth it will simply be discarded within a week.

### A.  The case for injunctive relief remains

In support of their previous motion for a preliminary injunction, Plaintiffs submitted compelling and undisputed evidence regarding the numerous severe burdens Native Americans living in North Dakota face, including discrimination, dire poverty, low levels of education, little or no access to transportation, and limited or no access to housing. Because of this, this Court found HB 1332 and 1333 would impose disproportionate burdens on Native Americans, and that Plaintiffs were likely to prevail at trial on their Equal Protection Clause claim.

Two years later, the situation remains the same. With this Response and Motion, Plaintiffs are presenting updated evidence regarding the socioeconomic status of Native Americans in North Dakota, and the burdens they face in trying to comply with the extreme voter ID requirements of HB 1369. Today, the case for injunctive relief is just as strong as it was in 2016, when the Court issued its injunction. For example, in 2015, Drs. Barreto and Sanchez found that 23.5% of Native Americans lacked qualifying ID, and today it is still 19%.

Today, as in 2016, Defendant has no evidence that justifies its suppressive law.

---

[1] E-mail from Jim Silrum, Deputy of Secretary of State, to Michael Montplaisir, Cass County Auditor (Jan. 18, 2017, 2:29 PM) (attached as Exhibit 7) (emphasis added).

Defendant harps about a theoretical possibility of voter fraud arising from the use of an affidavit-based "fail-safe" mechanism, but this is simply speculation and fear-mongering. The undisputed fact is that North Dakota used the affidavit "fail-safe" process for many years without any voter fraud, and Defendant repeatedly acknowledged that North Dakota had no voter fraud. Defendant has no evidence that any voter fraud problem exists in North Dakota, or that there is any crisis of confidence in North Dakota's electoral system due to fears about voter fraud. The system worked well before the enactment of HB 1332 and 1333, and it worked well in 2016 after this Court issued its injunction. There is no need for HB 1369, and no justification for it.

For all these reasons, which are discussed below, Plaintiffs respectfully urge this Court to retain its previous injunction and to grant preliminary injunctive relief under both Section 2 of the Voting Rights Act and the Equal Protection Clause of the U.S. Constitution.

II. **NORTH DAKOTA'S NEWLY ENACTED VOTER ID LAW THAT FAILS TO PROVIDE A FAIL-SAFE MECHANISM FOR VOTERS LACKING THE REQUIRED ID FOLLOWS A PATTERN OF DISCRIMINATION AGAINST NATIVE AMERICANS**

   A. **North Dakota Historically Has Had Voter-Friendly Election Laws and No Voter Fraud Problem.**

Until the 2014 election, North Dakota was a voter friendly state. Prior to enactment of HB 1332, North Dakota used small voting precincts where election boards and poll workers typically knew the voters. In rare cases where a poll clerk did not know a voter, the clerk could ask for various forms of ID.[2] If a voter could not provide ID, the voter could still cast a ballot through employment of "fail-safe" mechanisms: (1) the poll clerk could personally vouch for the voter, or (2) the voter could execute an affidavit swearing under penalty of

---

   [2] Acceptable types of identification were a driver's license, non-driver's license ID card, U.S. passport, ID card from a federal agency, an out of state driver's license or non-driver's ID card, or an ID card issued by a tribal government, a valid student ID card, a military ID card, a utility bill dated 30 days before Election Day, including cell phone bills and student housing bills (online printouts were acceptable) and a change of address verification letter from the U.S. Postal Service. Doc. 50 at 2.

perjury that he or she was a qualified elector in the precinct. N.D Cent. Code §16.1-05-07(3), *amended by* H.B. 1332, 63rd Leg. Assemb., Reg. Sess. § 5 (2013). As detailed in Drs. Matthew A. Barreto and Dr. Gabriel R. Sanchez's second statistical survey of North Dakota voters ("2nd Barreto/Sanchez Survey"), Native Americans disproportionately relied on these fail-safe mechanisms. Barreto Decl., attached as Exhibit 1, ¶11(h); Exhibit 2.

Under this system there was virtually no voter fraud as the Secretary of State recognized in 2006. Order Granting Pls.' Mot. For Prelim. Inj. 22, ECF No. 50. Similarly, this Court concluded there "is a *total lack of any evidence to show voter fraud has ever been a problem in North Dakota*." *Id.* (emphasis added).

### B. In 2011, The North Dakota Legislature Rejected a Strict Voter ID Law Proposed to Address Possible Fraud Arising from Use of an Affidavit Fail-Safe System.

In January 2011, the North Dakota Legislature debated House Bill 1447 ("HB 1447"). The sponsor of the bill, Rep. Kim Koppelman, brought the bill out of concern that under North Dakota's existing voting system, a person could cast a fraudulent vote through a false affidavit. *See Hearing Minutes on H.B. 1447 Before H. Political Subdivisions Comm.*, 62nd Leg. Assemb. 1 (N.D. 2011) (Feb. 3, 2011 statement of Rep. Koppelman, H. Political Subdivisions Comm.) ("*HB 1447 Hearing Minutes*"). An amendment would have imposed stricter voter ID requirements. The amendment would have narrowed the set of acceptable voter IDs to an ID issued by the state, a tribal ID card, or a form of ID prescribed by the Secretary of State. S. Journal, 62nd Leg. Assemb., 74d Sess. 1642 (N.D. 2011). In addition, the amendment would have required any person who submitted an affidavit at the polling place to present an acceptable form of ID within a specified number of days. *Id.* at 1644. If the voter failed to produce a valid ID, his or her ballot would not be counted. *Id.*

At that time, legislators were highly skeptical of changing what had been a well-working election system, given the absence of any fraud. For example, Sen. Dwight Cook (R) observed that the "whole voting process is the basic core of the democratic process and we

certainly don't want to see somebody win an election because of voter fraud but to what degree we have any of that I am not sure if we have a great degree." *HB 1447 Hearing Minutes* at 3 (Apr. 12, 2011 statement of Sen. Dwight Cook, H. Political Subdivisions Comm).

Legislators modified HB 1447 via hoghouse (a rare Legislative maneuver that replaces an entire bill's text with new text), and proposed a voucher method as an alternative "fail-safe". The proposed voucher system preserved HB 1447's ID requirements but did away with the affidavit system. Instead, the proposed voucher system allowed for (1) a poll worker to vouch for the voter, (2) another voter to vouch for one additional person, or (3) a housemate to vouch for up to four people who lived at the same address. *HB 1447 Hearing Minutes* at 1-2 (statement of Chairman Koppelman, H. Political Subdivisions Comm. on Apr. 15, 2011). Legislators expressed concern that this system was also too strict and would make it more difficult for state citizens to vote. *HB 1447 Hearing Minutes* at 2 (Apr. 20, 2011 statement of Rep. Zaiser, H. Political Subdivisions Comm.).

When testifying on HB 1447, Silrum stated that a portion of the electorate could not produce an ID bearing a residential address. More specifically, Silrum reported that Native Americans were less likely to possess an ID that contained a residential address. Silrum stated: "This is very much the case also in small town North Dakota where if you sent something to their street address the post office will return it because it needs to go to their post office box . . . a couple of our counties that have reservations in the state have not completed their 911 addressing. Even if they have the residence of those counties [they] don't know what their 911 address is." *Id.* at 2-3 (Apr. 20, 2011 statement of Jim Silrum, H. Political Subdivisions Comm.). Silrum vowed his office would "work[] with the colleges; utility companies . . . all the avenues that will help those people who don't necessarily have ID's show where they live." *Id.* at 3 (Apr. 18, 2011 statement of Jim Silrum, H. Political Subdivisions Comm.). Thus, through the debate on HB 1447, North Dakota legislators knew that Native Americans disproportionately relied on P.O. box addresses, that they did not have or did not know their 911 addresses, and that they were less likely to have an ID

containing a residential address.

In the end, the Legislature rejected HB 1447 on a bipartisan basis by a 38-8 vote.  S. Journal, 62nd Leg. Assemb., 75d Sess. 1659 (N.D. 2011). The Legislature decided that warnings about the *possibility* of *hypothetical* abuse of the affidavit system was not enough to change North Dakota's laws.

### C.  Following the Election of Heidi Heitkamp, the Republican-Dominated Legislature Passed Restrictive Voter ID Laws.

In 2012, North Dakotans elected Democrat Heidi Heitkamp to the U.S. Senate. She won by less than 3,000 votes. *Official Results General Election – November 6, 2012*, ND Voices, http://results.sos.nd.gov/resultsSW.aspx?eid=35&text=Race&type=SW&map=CTY (last updated Nov. 15, 2012). Most Native Americans are Democrats and their votes were instrumental to Senator Heitkamp's success. *See* 2018 Declaration of Michael C. Herron ("2018 Herron Decl." at 17, attached as Exhibit 3) (Native Americans generally vote democratic); Jim Fuglie, *United States Senator Mary Kathryn (Heidi) Heitkamp. How About That?*, ( Nov. 9, 2012), http://theprairieblog.areavoices.com/2012/11/09/united-states-senator-mary-kathryn-heidi-heitkamp-how-about-that/ (attributing Sen. Heitkamp's success to Native Americans); Dr. AnnMaria De Mars, *Native Americans: Why Heidi Heitkamp Won & Nate Silver Was Wrong?* (Nov. 19, 2012) http://www.thejuliagroup.com/blog/?p=2808; Meteor Blades, *American Indian Voters and Indian Organizers Gave N.D. Senate Edge to Democrat Heidi Heitkamp* (Nov. 8, 2012), https://www.dailykos.com/stories/2012/11/8/1158417/-American-Indian-voters-and-Indian-organizers-gave-N-D-Senate-edge-to-Democrat-Heidi-Heitkamp.

During the 2013 legislative session, the Legislature enacted HB 1332 through a hoghouse amendment. This process expedited the bill's passage and stifled debate. At the time, Rep. Mock (D) protested use of the procedure because the bill would "completely change the way we handle voters in our state" and would deny the public and agencies impacted by the bill from providing input. *House Floor Session: Hearing on H.B. 1332*, 63rd

Leg. Assemb. (N.D. 2013) (Feb. 12, 2013 statement of Rep. Corey Mock) ("*HB 1332 Hearing*"). Rep. Marie Strinden (D) also objected, stating: "I take a lot of pride in the fact that this committee thinks very long and hard about all of our bills . . . I can't be proud of a bill that we all know has problems because no other bill that we passed out of here have we done it with such stealth without addressing those problems." *Hearing Minutes on H.B. 1332 Before H. Gov't and Veterans Affairs Comm.*, 63rd Leg. Assemb. (N.D. 2013) (Feb. 8, 2013 statement of Rep. Marie Strinden, H. Gov't and Veterans Affairs Comm.).

The Legislature passed HB 1332 by a 30-16 party-line vote on April 3, 2013 (only one Democrat voted in favor and three Republicans voted against). *Senate Floor Session Hearing on H.B. 1332*, 63rd Leg. Assemb. (N.D. 2013).  Nineteen of the senators who were in the Senate during the 2011 legislative voted against HB 1447, voted for HB 1332. *Compare* S. Journal, 62nd Leg. Assemb., 75d Sess. 1660 (N.D. 2011) *with* S. Journal, 63rd Leg. Assemb., 59d Sess. 1062 (N.D. 2013).

Under HB 1332, qualified voters who showed up at the polls without a qualifying ID would not be allowed to vote. N.D. Cent. Code § 16.1-01-04, *amended by* H.B. 1333, 64th Leg. Assemb. Reg. Sess. § 5 (2015). In addition, the law did not allow the use of P.O. boxes to verify a voter's residency, even though lawmakers knew that many Native Americans (as well as other citizens) relied upon P.O. boxes. *HB 1447 Hearing Minutes* (Apr. 20, 2011 statement of Jim Silrum, H. Political Subdivisions Comm.).

During the next legislative session in 2015, the legislature made the state's voter ID requirements even more restrictive by passing HB 1333.[3]

### D.  This Court Enjoined HB 1332 and 1333 and Ordered an Affidavit "Fail-Safe" Voting Mechanism

As this Court recognized, HB 1332 and 1333 were "arguably some of the most restrictive voter ID laws in the nation." Doc 50 at 4. In July 2016, Plaintiffs moved to enjoin

---

[3] HB 1333 removed the Secretary of State's discretion to allow other ID, and took away the option for students to use college identification certificates.  N.D. Cent. Code § 16.1-01-04, *amended by* H.B. 1369, 65th Leg. Assemb. Reg. Sess. § 5 (2017).

enforcement of the laws in connection with the 2016 general election. *See* Pls.' Mot. For Prelim. Inj., ECF No. 42. This Court granted Plaintiffs' motion on August 1, 2016, ruling that the Defendant could not enforce the laws without providing a safety net for "those voters who cannot obtain a qualifying ID with reasonable effort." Doc. 50 at 1-2. In its order, this Court found:

- Given "the disparities in living conditions, it is not surprising that North Dakota's new voter ID laws are having and will continue to have a disproportionately negative impact on Native American voting-eligible citizens." *Id.* at 18.

- "It is undisputed that the more severe conditions in which Native Americans live translates to disproportionate burdens when it comes to complying with the new voter ID laws." *Id.* at 7.

- "Native Americans face substantial and disproportionate burdens in obtaining each form of ID deemed acceptable. . . obtaining any one of the approved forms of ID almost always involves a fee or charge, and in nearly all cases requires travel." *Id.* at 9.

- To satisfy the laws' strict ID requirements, it "helps to have a computer with Internet access, a credit card, a car, the ability to take time off work, and familiarity with the government and its bureaucracy, " but "the typical Native American voter living in North Dakota who lacks qualifying ID simply does not have these assets." *Id.* at 9-10.

- "Although the majority of voters in North Dakota either possess a qualifying voter ID or can easily obtain one, it is clear that a safety net is needed for those voters who simply cannot obtain a qualifying voter ID with reasonable effort." *Id.* at 22.

- This Court could not "envision a compelling reason or a governmental interest which supports not providing such an avenue of relief for potentially

disenfranchised voters." *Id.*

- ▪ "The ill-advised repeal of all such 'fail-safe' provisions has resulted in an undue burden on Native American voters and others who attempt to exercise their right to vote. There are a multitude of easy remedies that most states have adopted in some form to alleviate this burden." *Id.* at 28-29.

### E. Thousands of Native Americans Voted Via The "Fail-Safe" Affidavit in the 2016 General Election and Before.

With HB 1332 and 1333's new strict ID requirements in place, and with many Native Americans unable to obtain qualifying ID without undue burden, thousands of Native Americans were only able to vote in 2016 by using the "fail-safe" affidavit adopted by the Court. Indeed, according to 2nd Barreto/Sanchez Survey, "Native Americans who were eligible to vote were more likely to report having signed an affidavit or having been vouched for a poll worker in the past." 2018 Barreto Decl. ¶ 44. For example, in Sioux County (the county with the highest Native American population in the state), 10.7% of all ballots cast in 2016 were by affidavit, as compared to only 2.3% in 2012. *Id.* ¶ 44(g). Similarly, in Rolette County, which is 77% Native American, 209 people voted by affidavit in 2016, compared to only 12 people in 2012. *Id.* at Exhibit D. Overall, the top three most heavily Native American counties (Sioux, Rolette, and Benson counties), which are all majority-Native American, experienced a 750% increase in the rate of affidavit usage. *Id.* at Exhibit D (figure calculated from raw data provided).

### F. There is No Evidence That The Increased Use of the Court-Adopted Affidavit Fail-Safe Resulted in an Increase in Voter Fraud, or Even Any Fraud At All

State reports indicate that 5,661 more people voted by affidavit in 2016 than in 2012 (16,180[4] compared to 10,519). *Id.* There is no evidence that the increased use of affidavits

---

[4] In its brief, the Defendant states that 16,215 affidavits were used in the 2016 general election. Mem. in Supp. Of Mot. to Dissolve Prelim. Inj. 9, ECF No. 81.  In a spreadsheet

resulted in any voter fraud. In its brief, Defendant presented various information in an attempt to suggest there was a fertile possibility of fraud. But none of Defendant's statistics or anecdotes are suggestive of any actual fraud caused by use of the affidavit fail-safe mechanism:

- Defendant asserts that 311 registered voters listed UPS stores as their residential street address. Doc. 81 at 7. There is no evidence that any of these 311 people committed voter fraud. The exhibit Defendant produced (presumably a copy of the central voter file) reveals only 30[5] of the 311 registrants actually voted, and that only *three* of those 30 used the affidavit. Doc. 81-68, Ex. S19 to Silrum Aff. And there is no assertion that these three people falsified their identity, or their status as North Dakota residents, or otherwise tried to commit fraud (*e.g.,* tried to vote twice, or voted in the wrong precinct).

- Defendant argues that through the affidavit, a "relatively small number of voters all using the same strategy could cast hundreds of thousands of fraudulent votes in a single election." Doc. 81 at 7. There is no evidence that anything remotely like this has ever happened. Defendant has no evidence that a single person ever exploited the affidavit to cast a single fraudulent vote, let alone "hundreds of thousands" of votes.

- Defendant cites to Barry Goldwater's memoir to suggest that a 1960 U.S. Senate election might have been affected by fraud. *Id.* at 8. But the only "evidence" of fraud is Goldwater's assertion that John Davis lost the election by

provided by the State's attorney, however, it notes that 16,180 affidavits were utilized. Barreto Decl. at Ex. D.

[5] Defendant even acknowledged it is possible that "these addresses found their way into the central voter file through the use of acceptable forms of ID rather than previous use of a Voter's Affidavit." Doc. 81 at 7.

about a thousand votes, "even though the polls had shown him in the lead." *Id.*. The Davis loss is just a provocative story. It is not evidence. Neither the North Dakota Legislature nor this Court should base policy on Barry Goldwater's speculation about what might have happened in a senate race more than 50 years ago.

▪ Defendant suggests that Senator Heitkamp's election in 2012 might have been the result of fraudulent votes cast through the affidavit fail-safe mechanism. *Id.* at 10-11. But this is just baseless conjecture. There is no evidence that the 10,519 votes by affidavit were cast by unqualified electors. There is simply no evidence that supports their assertions.

▪ Defendant implies that the fact that the state has not been able to verify the qualifications of 3,682 votes cast by affidavit in 2016 is suggestive of fraud, and points to the musings of conservative blogger Rob Port as proof. *Id.* at 12. Again, there is no evidence that any of these voters, even though their qualifications remain unverified as of today, did anything improper.

▪ Defendant references 348 cases from the 2016 election that were referred to state attorneys for "additional investigation and possible prosecution for voter fraud." *Id.* at 13. One case was prosecuted. It involved a person who voted both in person and as an absentee. *Id.* In one other case the Defendant mentioned, a person allegedly voted by absentee in North Dakota and in person in Idaho. *Id.* The State's Attorney declined to prosecute that person. *Id.* Critically, *the affidavit fail safe system was not utilized in either of these alleged instances of fraud,* and North Dakota's new stricter voter ID laws would not have prevented these instances of alleged fraud. With respect to all the other cases, the state attorneys did not find them worthy of further pursuit. The inaction indicates that no fraud was committed, not that it was.

▪ In his affidavit, Silrum describes how his office suspected seven affiants of

being non-U.S. citizens "based on information provided in the Voter's Temporary Affidavits." Aff. of Irwin James Narum (Jim) Silrum ¶ 42, ECF No. 81-55. Silrum does not clarify what his office found suspicious about these people. More importantly, Silrum admits that six were naturalized citizens and therefore qualified to vote, and that his office never found any evidence that the seventh person was not a citizen. Again, unfounded suspicion and speculation is not evidence of voter fraud.

In sum, North Dakota has used an affidavit fail-safe system for years. There has never been any evidence of actual pervasive fraud. Now, as before, there is a "*total lack of any evidence to show voter fraud has ever been a problem in North Dakota*." Doc. 50 at 22 (emphasis added).

### G. North Dakota Adopted HB 1369 Even Though Legislators Knew the Law Would Disproportionately Affect Native Americans.

In April 2017, North Dakota enacted House Bill 1369 ("HB 1369"). Defendant admits "HB 1369 (2017) maintains the requirement of an ID for every voter." Answer to First Am. Compl. ¶ 99, ECF No. 88. Under HB 1369, anyone desiring to vote must produce a North Dakota driver's license, a North Dakota non-driver's ID card, or "an official form of identification issued by a tribal government to a tribal member residing in this state." N.D. Cent. Code § 16.1-01-04.1(3)(a).[6]

HB 1369 allows a voter to supplement his or her ID with certain other documents if the information found on the ID is incorrect or missing. The acceptable supplemental documents include "(1) A current utility bill; (2) A current bank statement; (3) A check issued by a federal, state, or local government; (4) A paycheck; or (5) A document issued by

---

[6] Additional exceptions are available for those living in a long-term care facility and uniformed service members and their immediate family members outside of the state or country. Interestingly, individuals living with certain disabilities can use a signature (voucher) on an absentee or mail ballot from another qualified elector. N.D. Cent. Code § 16.1-01-04.1(4)(c).

a federal, state, or local government." *Id.* § 16.01-01-04.1(3)(b). The Help America Vote Act ("HAVA") allows for person to use this same set of documents to register to vote if they lack proper ID. 52 U.S.C. § 21083(b)(2)(A)(i). However, unlike HAVA, HB 1369 requires that an elector also possess a qualifying ID; supplemental documents alone are not sufficient under HB 1369.

### 1. North Dakota lawmakers knew HB 1369 would disproportionately impact Native Americans.

On January 30, 2016, Rep. Marvin Nelson, whose district is majority Native American, explained in an op-ed in the Grand Forks Herald that as a Legislator he was well aware of how "[i]t's not a question of ID. *Tribal members have IDs, but they happen to be IDs that North Dakota decided weren't good enough*" since "*tribal IDs in North Dakota do not . . . list the person's address.*" Marvin Nelson, *Marvin Nelson: N.D.'s Voter ID Laws Hurt Minorities' Voting Rights*, Grand Forks Herald (Jan. 30, 2016), http://www.grandforksherald.com/opinion/columns/3936274-marvin-nelson-nds-voter-id-laws-hurt-minorities-voting-rights (emphasis added). The reasons for this are "many" but most notably because there "are still rural residents who cannot count on their 911 address being correct. So a great many tribal IDs do not have a 911 address that can be counted." *Id.*

During the debate on HB 1369, the Native American Rights Fund ("NARF") provided testimony to both houses of the Legislature. NARF expressed its "deep[] concern[]" that the bill "d[id] not provide any fail-safe mechanisms" for voters that did not have a qualifying ID which was "one of the main reasons the federal court granted a preliminary injunction." House Testimony of Joel Williams Re HB 1369, attached as Exhibit 4 at 1 (the Senate testimony was identical).  NARF testified to, and provided *extensive* evidence of, the "estimated 7,984 Native Americans, or 23.5 percent of the total voting-eligible Native American population" that did not have a qualifying ID and briefed the Legislature about the hurdles faced by Native Americans to obtain qualifying ID. *Id.* at 3.  NARF explicitly

warned the Legislature "to carefully consider the disproportionate burdens North Dakota's voter ID requirements place on Native Americans." *Id.* at 6.

In a speech before the House, Rep. Johnson (R) warned that HB 1369 did not contain an adequate "fail-safe" mechanism, stating, "Judge Hovland spent a whole bunch of time in his order enjoining the 2015 bill regarding the burden placed on Native Americans on obtaining what is a valid ID as *provided* in the bill. And there it is again. Despite that you provide a provisional ballot *you are still requiring the same valid ID and that is not truly a fail-safe option like an affidavit is* . . . I would be remiss to substitute Judge Hovland's opinion for mine but I don't believe this will pass constitutional muster again . . . ." *House Floor Session: Hearing on H.B. 1369*, 65th Leg. Assemb. (N.D. 2017) (Apr. 17, 2017 statement of Rep. Mary C. Johnson) (emphasis added) (hereinafter "*HB 1369 Hearing*").

In considering HB 1369, the Legislature failed to study, in any way, the impact the law would have on Native Americans. It did not consult any tribal governments about whether its tribal members were negatively impacted by the bill or whether they supported or opposed the bill. Standing Rock Sioux Chairman Faith Decl. ¶¶4, 5, attached as Exhibit 5; Spirit Lake Tribe Chairman Pearson Decl. ¶¶ 5, 6 (attached as Exhibit 6). Despite making allowances and provisions for elderly, military, and disabled voters, the Legislature failed to consider the needs of Native American voters, even after being repeatedly warned of the disproportionately burdensome impact imposed by its ID requirements.

### 2. HB 1369 maintains HB 1332 and HB 1333's highly restrictive voter ID requirements.

Make no mistake, HB 1369's ID requirements are just as strict as HB 1332 and HB 1333. In its Motion to Dissolve ("Motion"), Defendant tries to soften the law by asserting, for the first time, that a tribal ID "need be nothing more than a document from tribal authorities setting forth the tribal member's name, date of birth, and current residential

*Richard Brakebill, et al. v. Alvin Jaeger*, Case No. 1:16-cv-0008
Corrected Memorandum ISO Motion for Preliminary Injunction

15

street address." Doc. 81 at 19. While Plaintiff's would welcome this reading,[7] Defendant relies solely upon the Silrum affidavit to support its new-found interpretation. The reality is that the text of HB 1369 mirrors the language in HB 1332 and HB 1333, which required "an official form of identification issued by a tribal government." *Compare* N.D. Cent. Code § 16.1-01-04.1 *with* N.D. Cent. Code § 16.1-01-04, *amended by* H.B. 1333, 64th Leg. Assemb. Reg. Sess. § 5 (2015) *and* N.D. Cent. Code § 16.1-01-04, *amended by* H.B. 1369, 65th Leg. Assemb. Reg. Sess. § 5 (2017). Defendant, throughout this case, has previously interpreted this to mean a tribally issued ID card. The State's own marketing materials only mention a "tribal ID *card*" (emphasis added) and make no reference to any letter. Doc. 81-55 Silrum Aff. Exhibits S3-S9. Furthermore, it is unclear under the plain language of the statute that a letter would meet the requirement of an "official form of identification." The placement of the tribal ID requirement with other traditional forms of ID cards such as a driver's license and a non-driver's ID makes this interpretation unlikely. Because some North Dakota tribal governments issue tribal ID cards, it's more likely that the plain language of the statute requires a tribal ID card and not just a letter.

Silrum asserts in his affidavit that the Turtle Mountain Tribal Chairman has been informed of this letter option since May 2014. Doc. 81-55 ¶ 43. However, there is no explanation of the type of public education campaign conducted. Silrum does not indicate whether the Standing Rock Sioux, Spirit Lake Tribe, or Mandan, Hidatsa & Arikara Nation have been informed of this informal option.

Finally, there is no official state regulation, guidance, or other document espousing

---

[7] Plaintiffs support providing more options for North Dakota voters. However, these letters may be impossible to issue as not all tribal members have readily accessible addresses. Moreover, this scheme shifts the administrative burden to tribal governments to locate the addresses for all of its rural members (who may not know their residential address), despite it being a State requirement to have a residential address in order to vote. Plaintiffs maintain a "fail-safe" option would still be necessary if a tribal letter were permissible identification.

Silrum's interpretation. Because there is no official State authority espousing that a letter issued by a tribal government would be an acceptable form of identification, and all of the State materials show an ID card as the acceptable form of tribal ID, it is dangerous for an elector to trust that poll workers would consistently accept such a letter.

Silrum also states—again without permanent or supporting authority—that the "State accepts Tribal IDs issued by a Tribe or by the Bureau of Indian Affairs as valid forms of ID as long as it includes the required information." Doc. 81-55 ¶ 43. However, HB 1369's plain language requires that the identification be "issued by a tribal government" and makes no mention of the Bureau of Indian Affairs. N.D. Cent. Code § 16.1-01-04.1(3)(a)(2). The Legislature was informed before passage of the law that the IDs of those living on the Standing Rock Reservation were issued by the Bureau of Indian Affairs and not their tribal government. Doc. 50 at 16. Despite these expressed concerns, the Legislature made no change to the law's language. Again, while Plaintiffs would support this broader interpretation, the plain language of the statute requires identification to be issued by a "tribal government" and not the Bureau of Indian Affairs in order to be acceptable under HB 1369. N.D. Cent. Code § 16.1-01-04.1(3)(a)(2).

### H.  In Enacting HB 1369, The Legislature Disregarded This Court's Mandate to Provide a "Fail-Safe" Mechanism for Voters Without The Required ID.

Under HB 1369, any citizen who does not have the required ID with them when they arrive at a polling place may mark a ballot that is then set-aside in an envelope. N.D. Cent. Code § 16.1-01-04.1(5). The votes marked on this ballot will not be counted unless the person produces a valid ID at the polling place before it closes on Election Day, or produces a valid ID within six days to "an employee of the office of the election official responsible for the administration of the election," and the ID is verified and "presented to the members of the canvassing board for proper inclusion or exclusion from the tally." *Id*. It is not clear whether the canvassing board has discretion to deny inclusion of any set-aside ballots. If so, even voters with an ID may have their ballots denied. Regardless, however, because a

voter must still show a valid ID, HB 1369's set-aside ballot process cannot be considered a fail-safe mechanism for those that simply do not have an ID.

In its Motion, Defendant maintains that through HB 1369 "the North Dakota Legislature amended its election laws to include a 'fail-safe' provision." Doc. 81 at 2. Defendant suggests that under HB 1369's set-aside process a qualified voter does not need an ID when they return within the six-day period. *Id.* at 2, 14. However, contrary to Defendant's argument, no provision of HB 1369 allows allow a voter to cure a lack of required ID "through supplemental documents" alone. HB 1369 still mandates that every elector possess one of the few types of qualifying ID, even when he returns within six days under the set-aside system. N.D. Cent. Code § 16.1-01-04.1(5). Indeed, Defendant admits that "HB 1369 (2017) maintains the requirement of an ID for every voter." Doc. 88 ¶ 99.

Another significant problem with HB 1369's purported "fail-safe" method is that it is not certain that every voter lacking the required ID actually would be given a set-aside ballot. Thus, HB 1369's set-aside ballot procedure might work, at most, for those voters who know to ask for a set-aside ballot, those who need one simply because they forgot the qualifying ID they have, and those who will suffer no substantial impediment to obtaining a qualifying ID or returning later cure the ballot. This Court cannot consider HB 1369's "set-aside" process a true fail-safe for voters who are not informed of the procedure, who do not already have qualifying ID, who do not have a birth certificate or other necessary documents to obtain an ID, or who do not have the means to return within the required six days.

Texas adopted a similar provisional "set-aside" system as part of its strict voter ID law. When challenged, the court held Texas's "set-aside" system was not a "fail-safe" for voters that do not have adequate resources. The court found that "[i]f a voter does not have that ID on election day, the evidence indicates that it will be very difficult for the voter to get it within six days." *Veasey v. Perry*, 71 F. Supp. 3d 627, 687 (S.D. Tex. 2014), *aff'd in part*, *vacated in part*, *rev'd in part sub nom.*  830 F.3d 216 (5th Cir. 2016).

Perhaps most disturbing is that Deputy Secretary of State Silrum, who drafted HB 1369, knew this "set-aside" system would prove too cumbersome for most voters, and actually boasted about its suppressive effects in urging others to support the bill. In an email to Cass County Auditor Michael Montplaisir, Silrum wrote: "As for the set-aside ballots, I hope the fact that many individuals who cast them will not likely come into your office later to verify their qualifications will put some of the fears to rest about long lines outside your office in the six days after the election." E-mail from Jim Silrum, N.D. Deputy of Sec'y of State, to Michael Montplaisir, Cass County Auditor (Jan. 18, 2017, 2:29 PM) (attached as Exhibit 7).

Simply put, HB 1369's "set-aside" process is not a fail-safe, and thus the law fails to meet this Court's requirement.

### III. HB 1369 WILL DISPROPORTIONATELY DISENFRANCHISE NATIVE AMERICANS.

In its earlier motion for a preliminary injunction, Plaintiffs offered extensive and uncontroverted evidence establishing that Native Americans disproportionately lack qualifying IDs, and that obtaining qualifying ID is disproportionately burdensome for them. Pls.' Mem. in Supp. Of Mot. for Prelim. Inj. 3-17, ECF No. 43. Updated studies by Plaintiffs' earlier declarants—Messrs. McCool, Barreto & Sanchez, and Webster—prove those disparities remain and that HB 1369 does nothing to mitigate them. Defendants' Motion is bereft of any evidence indicating that any of the disproportionate impacts to Native Americans imposed by HB 1332 and HB 1333 have been mitigated, either through increased accessibility to the required forms of ID or through HB 1369.

#### A. Thousands of Native Americans in North Dakota Do Not Have Valid ID.

As mentioned, Dr. Matthew A. Barreto and Dr. Gabriel R. Sanchez performed a second statistical survey of North Dakota voters to analyze the impacts of HB 1369. *See generally* Barreto Decl. According to the 2nd Barreto/Sanchez survey: "approximately *4,998 otherwise eligible Native Americans and 64,618 non-Native voters* currently do not possess

qualifying voter ID in North Dakota." Barreto Decl. ¶ 40. In percentages, this equates to 19% of Native Americans that lack ID versus 11.6% of non-natives that lack valid ID. *Id.* at ¶ 39. These numbers are particularly high because it includes voters with expired IDs or IDs with outdated information. Because of the address requirement, "10.9 percent of non-Natives lack a valid ID" as compared to "18 percent of Native Americans." *Id.* at ¶ 41. Barreto and Sanchez concluded that their updated data compels the "conclusion that a racial disparity exists in possession rates of qualifying voter ID between Native Americans and non-Native Americans among both eligible voters generally, and also among those who voted in the previous presidential election, with Native American voters significantly less likely to have a qualifying voter ID." Barreto Decl. ¶ 42.

Defendant counters by arguing any problem is insignificant because 97.5% of previous voters have a qualifying ID. Doc. 81 at 29. This argument fails for numerous reasons:

- First, Defendant has failed to support its statistic with any underlying data or underlying methodology. As Declarant Herron explains: "Because the Silrum Affidavit does not define the criteria used to characterize a match between the CVF and NNDOT database, I cannot offer a judgment as to whether the 97.5 percent figure may be too high (because individuals listed in the CVF were incorrectly linked to the individuals in the NDDOT database) or too low (because the matching algorithm was excessively conservative)." 2018 Herron Decl. 20-21. In contrast, the 2nd Barreto/Sanchez Survey was able to assess how the North Dakota voter ID law affects all eligible voters across all types of ID, and is therefore much more reliable. Barreto Decl. ¶ 12. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009) (discussing problems with these types of match lists).

- Second, the number is misleading because it is only a percentage of those who have voted before, rather than a percentage of all qualified electors. 2018

Herron Decl. at 22-23. By definition, it underestimates the problem.

- ▪ Third, even if taken at face value, Defendant's asserted number still exposes the fact that 2.5% of North Dakota's qualified electors lack valid ID. Assuming North Dakota's voting age population is 583,001,[8] this means that 14,575 people do not have qualifying ID. And it is likely that a disproportionate number of these people are Native Americans.

### B. Thousands of Native Americans Lack Qualifying Supplemental Documentation.

A disproportionate number of Native Americans lack the documentation one may use to supplement an ID under HB 1369. Indeed, "48.7percent of Native Americans whose ID is otherwise valid do not have at least one of the five acceptable supplemental address documents required by the law," as compared to just 26.2% of non-Native Americans. Barreto Decl. ¶ 41.

The types of supplemental documents that North Dakota decided to find acceptable in HB 1369 again reflect a disregard for Native Americans. Because many Native Americans heavily rely on P.O. boxes to conduct their affairs, most of the correspondence that those Native Americans receive will be addressed to their P.O. box and will not contain a residential address. For example, many tribal members do not receive utility bills that reflect their residential address. In fact, for those that receive fuel assistance, the utility company may not even send a bill. 2018 Dir. Of LIHEAP Fuel Assistance Program, ("Frederick Decl.") ¶ 10 (attached as Exhibit 8). Utility companies often send their bills to the most reliable mailing addresses, and the addresses on those bills are often a P.O. Box. *See Id.* ¶ 12.

### C. Many Native Americans Cannot Produce an ID Showing Their Residential Address Because They Have No Residential Address.

Obviously, one cannot possibly have ID showing a residential address if one does not

---

[8] https://www.commerce.nd.gov/uploads/8/CensusNewsletterApr2016.pdf.

have a residential address. As Professor Daniel McCool explains, this is still the case for many:

> Many areas of reservations simply lack addresses; in some areas the streets do not even have names. Russ McDonald, the President of United Tribes Technical College, explained that on his reservation (Spirit Lake), *in many places there are no street addresses, no names on the roads, and the only way to navigate is to 'know the land'* (McDonald 5 Feb. 2018). Nancy Greene-Robertson, the former Secretary-Treasurer of the Spirit Lake Tribe, confirmed this: "It's huge that people don't have a street address; I can't even get a package here. There's *no street signs, no numbers on houses* unless it's a housing unit" (Greene-Robertson 5 Feb. 2018). Two members of the Turtle Mt. Band of Chippewas explained to me that, until recently, the BIA issued tribal IDs at Turtle Mountain, and virtually none of them had street addresses (C. Davis and L. Davis 2018). (emphasis added) 2018 Addendum to Daniel McCool, Ph.D. Decl. at 4, attached as Exhibit 9, "2018 McCool Decl."

Professor Jerry Webster's updated report ("2018 Webster Rep.," attached as Exhibit A to Exhibit 10, the Declaration of Dr. Gerald Webster, "2018 Webster Decl.") (further confirms that the "address requirement is problematic with most tribal members on the Spirit Lake Reservation using P.O. Box addresses (Lourens, 2016), and many tribal members on the Ft. Berthold Reservation either not knowing their actual residential address or preferring to use a P.O. Box address (Taft, 2015)." Webster Rep. ¶ 33. Tribal leaders report the same problem. *See* Faith Decl. ¶ 9; Pearson Decl. ¶ 9. In early 2016, Rep. Marvin Nelson explained that in his majority Native American district there "are still rural residents who cannot count on their 911 address being correct. So a great many tribal IDs do not have a 911 address that can be counted." *See* Marvin Nelson, *supra*.

The North Dakota Legislature has known since at least 2011 that there is a lack of residential addressing on North Dakotan reservations. *See*, *supra*, Section II(B) & II(G)(1). Nevertheless, the Legislature adopted HB 1332, 1333, and 1369, which all require IDs showing a residential address.

### D.  Many Native Americans Lack Qualifying Tribal IDs.

As this Court recognized:

> It is undisputed that many tribal ID's do not satisfy North Dakota's requirement of showing the "applicant's current or most recent North Dakota

residential address" under the new law. The record reveals that many homes on the reservations either do not have residential addresses (the Post Office delivers their mail to post office boxes), or there is no clear address, so tribal ID's do not reflect any residential addresses. . . . In addition, obtaining new tribal ID's can be burdensome because they cost money, and one must travel to tribal headquarters to obtain one. Further, many Native Americans (including all those living on the Standing Rock Reservation) only have ID's issued by the federal Bureau of Indian Affairs; they do not have ID's issued by tribal governments. Thus, these forms of ID's also do not satisfy the voter ID laws' definition of "tribal government issued" ID card. Doc. 50 at 16 (citations omitted).

HB 1369 does not materially change the tribal ID requirements previously imposed. Thus, this Court's earlier findings remain true today: many tribal ID cards do not meet all requirements of the law, and many Native Americans would need to either find supplemental documentation or acquire a different ID. As discussed above, Native Americans are less likely to possess supplemental documentation, *supra*, Section III(B), and lack the financial and other resources needed to acquire a different qualifying ID. *See* Faith Decl. at 2-3; Frederick Decl. ¶ 7 ("In my estimation, many indigent tribal members are unable to afford the $10 cost of a tribal ID."). Further, no Standing Rock Sioux members have a qualifying tribal ID under the plain language of HB 1369 because all their cards are issued by the BIA. Faith Decl. at 2.

As discussed, Defendant's attempt to circumvent the harsh requirements by stating, for the first time publicly, that a tribally issued letter would suffice is contrary to HB 1369's language and belied by the public advertisement campaigns. *Supra*, Section II(G)(2). Moreover, letters issued by tribal governments would shift a large administrative burden onto tribal governments to locate the residential addresses of members who may lack, or may not know, their addresses. *Id.* Practically speaking, this would be impossible for tribes to implement. Faith Decl. at 3.

### E. Native Americans Who Currently Lack Qualifying ID Face Substantial Burdens in Obtaining a Qualifying ID.

The burdens facing Native Americans in obtaining  or updating a qualifying ID are

discussed at length in Plaintiff's first Motion. *See* Doc. 43 at 9-17. As this Court observed, "[t]hese <u>undisputed</u> statistics and studies support the finding that, given the disparities in living conditions, it is not surprising that North Dakota's new voter ID laws are having and will continue to have a disproportionately negative impact on Native American voting-eligible citizens." Doc. 50 at 18. Plaintiffs incorporate these arguments, and this Court's findings, by reference here and note, as further discussed below, that the disparate conditions facing Native Americans *remain true today*, resulting in disproportionate impacts under HB 1369. *See* 2018 Barreto Decl. at 21-28 (discussing burdens); 2018 Webster Rep. at 4-5 (discussing burdens).

### 1. Native Americans disproportionately live in severe poverty.

As this Court found, Native Americans disproportionately live in severe poverty. Doc. 50 at 17. "While 8.7% of Whites in North Dakota had incomes below the poverty level, 37.5% of Native American North Dakotans had incomes below the poverty level 2012-2016 (Table 3). Thus, the poverty rate for Native Americans is over 4.3 times that for Whites in North Dakota." 2018 Webster Rep. ¶ 22. "There is a geographic association between counties with larger proportions of Native Americans and higher rates of poverty . . . For example, the counties with the highest poverty rates are Sioux (38.0%), Rolette (31.6%), and Benson (33.5%) with no other county in North Dakota having a poverty rate of 19% or more. These three counties are 84%, 77% and 55% Native American, respectively." *Id.* ¶ 23.

### 2. The cost of obtaining a qualifying ID is prohibitively expensive for Native Americans.

Plaintiff Lucille Vivier's story exemplifies how insurmountable it is for all too many impoverished Native Americans to obtain an ID card. Vivier lives in poverty. When she tried to obtain a social security card, she spent more than $150 of her $796 total monthly income. 2018 Vivier Decl. ¶¶ 6, 16 (attached as Exhibit 11). She paid for a driver, gas, a babysitter, and meals, and traveled nearly 100 miles to Minot. *Id.* ¶ 16. Vivier thought she

needed a social security card to obtain a state ID card. When she arrived, she was told the Social Security Office would not accept her tribal Turtle Mountain ID (even though it would accept other North Dakotan tribal IDs). She still does not have a social security card, or state driver's license, or an ID card. *Id.* ¶ 19. Given the money she already wasted on her earlier trip, Vivier does not know when or if she will again attempt to get another social security card or ID.

The administrative cost to obtain a tribal ID is also too much for indigent tribal members. For example, the Standing Rock Chairman and Turtle Mountain Low Income Energy Assistance Program (LIHEAP) Director that some that cannot afford the cost of a $10 tribal ID. Faith Decl. at 2; 2018 Frederick Dec. ¶ 7. Turtle Mountain Community Member, Carol Davis, stated, "I do not believe a significant portion of our members will be able to pay the $10 fee to obtain an updated card." Davis Decl. ¶ 20, attached as Exhibit 12. Plaintiffs Elvis Norquay and Vivier currently do not intend to update their out-of-date IDs that show a now-incorrect residential address because of the cost. 2018 Elvis Norquay Decl. ¶ 14, attached as Exhibit 13; 2018 Vivier Decl. at 3-4. Plaintiff Richard Brakebill currently cannot predict if he will be able to afford to update his tribal ID when it expires in August of 2018, three months before the November 2018 elections. 2018 Brakebill Decl. ¶ 19, attached as Exhibit 14.

### 3. The substantial cost/travel burdens have become even more severe.

This Court found that "a successful visit" to a Driver's License Site ("DLS") "requires knowledge and experience dealing with bureaucratic institutions, a means of transportation, money to pay for transportation, and the free time to travel the often significant distances to such sites . . . overcoming these obstacles can be difficult, particularly for an impoverished Native American." Doc. 50 at 12.

Since this Court's Order, North Dakota has made it significantly more difficult for Native Americans to get to a DLS. In 2017, the state closed eight DLS sites, leaving just 19

statewide. Webster Rep. ¶ 30. There are still no DLS sites on any reservation in North Dakota. The sites closest to Native American reservations are now even less accessible than before. For example, the closest DLS to the Turtle Mountain Reservation recently had its operating hours cut from twice a month to just once a month. *Id.* ¶ 31. It is now only open the second Wednesday of every month. *Id.* That site also cut its operating hours from 9:40 a.m. to 3:20 p.m. to 10:20 a.m. to 2:35 p.m. *Id.* In addition to the few available hours per month, the distances Native Americans must traverse to reach a DLS site poses a significant burden. According to Professor Webster, while "a potential Native American voter on the Turtle Mountain Reservation would need to travel 12.6 miles to a Driver's License Site, the comparable estimates for potential voters on the Standing Rock Reservation is nearly 66 miles one way, and the comparable distance for potential Native American voters on the Ft. Berthold reservation is over 54 miles one way." Webster Rep. ¶ 46. The distance barriers remain significantly higher for Native Americans than white North Dakotans. Native Americans need to drive on average 1.6 times further. Webster Rep. ¶¶ 40, 41. For Native Americans residing on reservations the disparity is even higher. "On average, Native Americans of voting age residing on reservations in North Dakota must travel nearly 33 miles to visit a Driver's License Site which is greater than the statewide estimates for both Whites (13.5 miles) or Native Americans (21.9 miles)." Webster Rep. ¶ 46.

### 4.   Native Americans disproportionately lack access to transportation.

As this Court noted, "only 73.9% of Native Americans who lack a qualifying voter ID own or lease a car, compared to 88% of non-Native Americans; and 10.5% of Native Americans lack any access to a motor vehicle, compared to only 4.8% of non-Native Americans. Doc. 50 at 8. This disparate access has "remained steady" the last six years. Webster Rep. ¶ 24. This lack of access to transportation hinders the ability to obtain qualifying IDs.

### 5.   Native Americans disproportionately lack access to stable housing.

Reservation communities in North Dakota face severe housing shortages. *See* Faith

Decl. ¶ 10; Pearson Decl. ¶ 14; Davis Decl. ¶¶ 3, 6. It is not uncommon for Native Americans to be what the Turtle Mountain Housing Authority described in its 2008 Preliminary Strategic Plan to End Homelessness (attached as Exhibit 15 at 7), as "precariously housed"—meaning people are at imminent risk of becoming literally homeless at any time. These people must rely on the goodwill of family and friends to keep a roof over their head.

It is also not uncommon to have several generations of individuals living in one house at a time. *See* Faith Decl. ¶ 12; Pearson Decl. ¶ 16; Frederick Decl. ¶ 8; Davis Decl. ¶¶ 3-6. A 2015 Community Assessment of the Spirit Lake Reservation concluded that Spirit Lake has a much higher percentage of households with five or more persons (33% of households) compared to the statewide average of 8%. *See* Cankdeska Cikana Community College, *Spirit Lake Nation Comprehensive Community Assessment* (2015), www.littlehoop.edu/pdf/CAA_Final_Full_Report_3_30_16.pdf . Indeed, 11.4% of households on the Spirit Lake Reservation house seven or more people. *Id.* at Table 1.8. In 2016, then Chairman  Richard McCloud remarked, "I've seen as many as 20 people in one dwelling, in a two-bedroom house." Amy Dairymple, *Statistics Point to Tribal Housing Crisis, Summit Seeks Solutions*, Bismarck Tribune (Aug. 2, 2016), http://bismarcktribune.com/news/state-and-regional/statistics-point-to-tribal-housing-crisis-summit-seeks-solutions/article_3f13cf65-340b-5ac8-ac92-0124f9d36be2.html. To further complicate matters, the houses being shared by many may not have a residential address. *See supra* Section III(C).

Moreover, outright homelessness continues to plague Native Americans at disproportionate rates. According to a 2014 point-in-time survey of homeless persons conducted for the U.S. Department of Housing and Development by the North Dakota Coalition for Homeless People, 16.9% of the total homeless population in North Dakota was American Indian or Alaska Native, even though Native Americans make up only about 5% of the total state population. The Point In Time survey for 2015 had similar results. *News & Publications, Point in Time Counts*, North Dakota Coalition for Homeless People, https://www.ndhomelesscoalition.org/new-page-2/ (last visited Feb. 16, 2018). In 2016,

the percentage which were Native American rose to 26.8% and in 2017, the percentage of Native American homeless further increased to 29.5%. *Id.*

Despite HB 1369's fatal flaws, Defendant now urges the Court to dissolve its injunction order because HB 1369 purportedly fixes the shortcomings this Court found. This Court should deny Defendant's Motion and reaffirm that any election held before this action is resolved must have a fail-safe for those voters who cannot obtain ID with reasonable effort.

## IV. <u>THE COURT SHOULD NOT DISSOLVE ITS INJUNCTION.</u>

### A. **Legal Test for a Motion to Dissolve.**

District courts have equitable discretion to determine what circumstances justify dissolution of an injunction under Federal Rules of Civil Procedure 60(b). *United States v. Gray*, No. 4:15CV1580 RLW, 2016 WL 3181116, at *1 (E.D. Mo. June 3, 2016) (citing *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008)); *see also Ams. United for Separation of Church & State v. Prison Fellowship Ministries*, 555 F. Supp. 2d 988, 991 (S.D. Iowa 2008). Rule 60(b) relief, however, is "an extraordinary remedy and is granted only in exceptional circumstances." *Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 690 (7th Cir. 2014). "The burden is on the party seeking modification or dissolution of the injunction to demonstrate 'that a significant change in circumstances warrants revision of the [injunction].'" *Prison Fellowship Ministries*, 555 F. Supp. 2d at 992 (quoting *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992)). Defendant may satisfy this burden by showing a significant change in either the factual conditions or the law. *Id.* (citation and internal quotation omitted); *see also Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 241-42 (3d Cir. 2003). Here, Defendant has not identified any significant change in the factual conditions relating to Native Americans and their ability to obtain voter ID or the law governing voting rights issues.

### B. **There Is No Significant Change in the Factual Conditions or the Law Justifying Dissolution of the Preliminary Injunction.**

This Court already has considered Defendant's contention about voter responsibility and the burdens the law places on Native American voters. *Id.* at 20-22.   The Court concluded "the record clearly belies [Defendant's] contention, given the socio-economic disparities between Native American and non-Native American populations in North Dakota as demonstrated in the numerous studies and statistics presented by the Plaintiffs." Doc. 50 at 19-20. HB 1369 still maintains HB 1332 and HB 1333's operative conditions—it requires that electors possess one of only a few types of ID. Moreover, the law does not contain any "fail-safe" mechanism that would enable qualified Native American electors to vote if they cannot obtain a qualifying ID with reasonable effort. Doc. 50 at 1-2, 22. And, as discussed above, the "severe burden" placed upon Native Americans persists under HB 1369. Doc. 50 at 21. Thus, there is no significant change in the facts or law that supports Defendant's Motion.

### C. Defendant's Attempt to Relitigate HB 1332 and HB 1333's Violation of the Equal Protection Clause is Inappropriate.

Defendant argues this Court wrongly enjoined the State and now attempts to relitigate whether its interests justify the burdens placed upon Native Americans, arguing that this Court's injunction should be lifted "even in the absence of a change in the law." Doc. 81 at 27.  Defendant's motion is effectively a motion for reconsideration. "A motion to reconsider, however, 'should not serve as a vehicle to identify facts or raise legal arguments which could have been,  but were not,  raised or adduced during the pendency of the motion of which reconsideration is sought.'" *Gardner v. First Am. Title Ins. Co.,* 218 F.R.D. 216, 218 (D. Minn. 2003); *see also Broadway v. Norris*, 193 F.3d 987, 990 (8th Cir. 1999) (Rule 60(b) "is not a vehicle for simple reargument on the merits.").

Here, Defendant cites three decisions as purportedly justifying dissolution. None of them constitutes a new development in the law:

- Defendant's appeal to *Crawford*, fails to justify reconsideration because this Court already considered the *Crawford* decision. 553 U.S. 181. As the Court

*Richard Brakebill, et al. v. Alvin Jaeger*, Case No. 1:16-cv-0008
Corrected Memorandum ISO Motion for Preliminary Injunction

29

stated in its Order: "this Court is required to follow the standard laid out in the plurality opinion of the Supreme Court in *Crawford* authored by Justice Stevens, which requires a particularized assessment of the burdens levied by an election law . . . The undisputed evidence before the Court reveals that Native Americans face substantial and disproportionate burdens in obtaining each form of ID deemed acceptable under the new law." Doc. 50 at 9. In its Motion, Defendant fails to produce any evidence that HB 1369 alleviates in any way the burdens placed on Native Americans by HB 1332 and HB 1333.

▪ Defendant notes that since this Court ordered a preliminary injunction, a district court in Virginia evaluated Virginia's voter ID laws and concluded they did not unduly burden the class of voters challenging the law. *See Lee v. Va. State Bd. Of Elections*, 843 F.3d 592 (4th Cir. 2016). This Court considered a nearly identical argument with regard to the *Crawford* case, and thus should not entertain Defendant's purportedly "new" argument. In any event, the burdens at issue in *Lee*—in logistics and financial cost—were significantly less than those faced by Native American North Dakota electors. For example, Virginia provides free voter IDs *absent any underlying documentation* and the registrar will send someone to a voter's house to issue an ID. *Lee*, 843 F3d at 597, 606. In light of this, any comparison to Native American North Dakota voters, who face significant challenges obtaining underlying documentation and shouldering the associated costs, are inapt.

▪ Defendant's reliance on *Gonzales v. Arizona*, 677 F.3d 383, 409 (9th Cir. 2012), is also misplaced. *Gonzalez* is readily distinguishable because the plaintiffs in that case provided "no evidence" that Latinos were less likely to possess identification than whites. *Id.* at 407. Here, this Court already considered this argument and found that substantial and unchallenged evidence established that North Dakota's voter ID laws impose disparate burdens on Native

American voters in comparison to white North Dakota voters. Doc. 50 at 9.

Defendant raises multiple arguments regarding the practicability of using the affidavit system as a "fail-safe" mechanism. Of course, North Dakota was and is free to amend its laws to include some other "fail-safe" mechanism, but it chose not to do so, despite this Court's order indicating a "fail-safe" was needed.

Finally, Defendant argues the Court's Order is too broad. Doc. 81 at 27. When this Court issued its Order, it stated that "a safety net is needed for those voters who cannot obtain a qualifying ID with reasonable effort." Doc. 50 at 1-2. Thus, the Court clearly was contemplating the Plaintiffs' as-applied challenge and intended to provide a safety net to Plaintiffs and those similarly situated. Moreover, the Court accepted the Defendant's affidavit system for use. Doc. 62 at 2. Defendant now complains about the very affidavit system it crafted and sought to be implemented. To the extent Defendant may wish to narrow the relief it crafted, applicable models can be found in Texas, which the Plaintiffs support. *See, e.g.,* https://www.sos.state.tx.us/elections/forms/pol-sub/reasonable-impediment-declaration.pdf. This Court may also wish to expand upon the Texas template to provide relief for North Dakota voters who may be able to obtain an ID, but who may not be able to meet the State's residence definition, codified through the requirement of a "residential address" in order to vote. N.D. Cent. Code § 16.1-01-04.1(2)(b).

Even if Defendant has shown there are significant changes in facts or law justifying reconsideration (which it has not), Defendant's proposed dissolution is not suitably tailored to the dispositive fact that remains the same—that a safety net is needed for those voters who cannot obtain a qualifying ID with reasonable effort. Any modification must be suitably tailored to that still existing circumstance, and Defendant's proposed dissolution fails that standard. *Mays v. Board of Educ. of Hamburg Sch. Dist.*, 834 F.3d 910, 918 (8th Cir. 2016); *Smith v. Board of Educ. Palestine-Wheatley Sch. Dist.*, 769 F.3d 566, 573 (8th Cir. 2014).

**V.  The Court Should Grant Plaintiffs' Request For A Preliminary Injunction.**

### A. The Legal Test for Preliminary Injunctions.

Plaintiffs seek a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure. The moving party bears the burden of establishing the necessity of a preliminary injunction. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). This Court outlined the relevant factors as "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Doc. 50 at 5-6 (citation omitted). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Id*. (citation omitted).

### B. Plaintiffs are Likely to Prevail on Their Claim That HB 1369 Violates the 14th Amendment's Equal Protection Clause by Placing Severe Burdens on Native Americans' Right to Vote.

"[R]ational restrictions on the right to vote are invidious if they are unrelated to voter qualifications. *Crawford*, 553 U.S. at 189 (internal citation omitted). For evenhanded restrictions that are not invidious, a court must still "weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* at 190 (internal citation omitted). As this Court observed, "[t]here is not a litmus test for measuring the severity of a burden a state law imposes on voters, but any burden must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." Doc. 50 at 7 (internal citations omitted). This Court must simply "make the 'hard judgment' required after evaluating both the burdens placed upon Native American voters by North Dakota voter ID requirements, and North Dakota's justifications for imposing those requirements." *Id.* Here, because the burden on the right of some to vote is so severe, the State's regulation must be "narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

#### 1. HB 1369 makes voting substantially more burdensome for Native

**Americans than for white North Dakotans.**

As discussed above, HB 1369 continues to lack a "fail-safe" mechanism for voters who cannot obtain a valid ID through reasonable effort. Thousands of Native Americans lack qualifying voter ID. Moreover, 48.7% of Native voters who lack the qualifying ID lack the supplemental documentation as well. *See supra,* Section III(B). For those citizens to ever vote again, they will have to overcome significant burdens. As this Court noted, "you need an ID to get an ID." Doc. 50 at 10. Some IDs and the underlying documentation to get an ID are not free. Hence, many North Dakotans will have to pay fees to secure the right to vote, which the Supreme Court has held to be *per se* unconstitutional. *Burdick*, 504 U.S. at 434 (citations omitted).

The burdens placed on Plaintiffs Brakebill, Elvis Norquay, Vivier, and others similarly situated, are severe. *See generally* Brakebill Decl.; E. Norquay Decl.; Vivier Decl. The time needed to navigate through government bureaucracies to obtain the necessary documentation, the cost of travel, and the costs associated with taking time off work are no small matters for many citizens. These hurdles are disproportionately born by Native American voters because the disparities recognized by this Court with respect to poverty, unemployment, homelessness, education levels, access to transportation, etc. still remain. Doc. 50 at 7-16; *see*, *supra*, Section III(E).

### 2.   No compelling state interest necessitates HB 1369.

In its Motion, Defendant alleges the State has an interest in preventing voter fraud, aligning its ID requirements with those of HAVA, and promoting voter confidence. Doc. 81 at 19-20. Sprinkled throughout its Motion, Defendant also argues an interest in establishing voters' qualifications without imposing upon them a burden to register, responding to changing demographics, and establishing an elector's current residential address. None of these purported interests justifies HB 1369.

### a)   Defendant's interest in preventing fraud does not justify disproportionately burdening Native American voters.

*Richard Brakebill, et al. v. Alvin Jaeger*, Case No. 1:16-cv-0008
Corrected Memorandum ISO Motion for Preliminary Injunction

Plaintiffs do not dispute North Dakota has an interest in "protecting the integrity and reliability of the electoral process" and in "deterring and detecting voter fraud." *Crawford*, 553 U.S. 181. However, the State cannot severely burden and discriminate against Native Americans voters just to meet this interest. Instead, the State must narrowly draw any regulation to advance a compelling state interest. *Burdick*, 504 U.S. at 434. The State fails to meet that burden with respect to HB 1369.

Defendant's position is especially meritless in view of the fact that for decades, voter fraud has essentially been non-existent in North Dakota. *See supra*, Section II(A) & (F). In its Motion, Defendant attempts to show that fraud can occur and might have occurred as a result of the use of the affidavit "fail-safe" system. But as discussed above, Defendant's arguments rely entirely on speculation and hypotheticals, and are belied by the Defendant's "acknowledge[ment] in 2006 that he was unaware of any voter in North Dakota." Doc. 50 at 22. Defendant has failed to show there is any fraud problem in North Dakota, let alone a significant enough problem to justify extreme voter suppression laws.

### b) Defendant's desire to forgo voter registration does not justify burdening and disenfranchising Native Americans.

Defendant takes issue with its affidavit "fail-safe" method that the Court adopted, which was previously used by the State for many years, because it purportedly results in the State combining affidavit ballots with the rest of the ballots without verification. Doc. 81 at 6. To the contrary, requiring voters who cannot obtain voter ID with reasonable effort to sign an affidavit under penalty of a class C felony[9] provides sufficient verification. Further, the "potential" problem Defendant speculates about is nothing more than speculation. North Dakota is free to fashion whatever election system it desires, including a system that does not require voter registration. However, the State cannot adopt a scheme

---

[9] Through HB 1369, the state raised the penalty for voter fraud to a class C Felony. During deliberations, this was criticized. *Hearing on HB 1369* (Feb. 2, 2017 statement of Rep. Jon Nelson).

that disproportionately burdens Native Americans. The affidavit system adopted by this Court provides qualified Native electors who cannot reasonably obtain identification with relief from a system that requires that identification in order to vote.

Defendant also fails to note that, in most states, registration does not require ID. In fact, registration does not require much at all. As Deputy Secretary Silrum explained in a recent email, North Dakota's ID requirements under HB 1369 are much more stringent than states with registration:

> this type of voter ID system is much better than voter registration since the use of [voter registration] would simply push the determination of qualifications to the point at which an individual registers. From what I have seen, many state's [sic] laws don't allow them to do much vetting of the qualifications of electors at the time of registration, so what good is it to register someone if there is no way to determine if they meet the qualifications to be registered for that precinct." E-mail from Jim Silrum, Deputy of Secretary of State, to Hans von Spakovsky, Senior Legal Fellow at Heritage Foundation (Feb. 3, 2017, 8:04 AM) attached as Exhibit 16 (emphasis in original).

Defendant also argues that this Court erred in comparing affidavit systems in North Dakota with those in other states, asserting that "any comparison of North Dakota's process to another state's registration process is necessarily flawed because an affidavit in a registration state serves an entirely different purpose than it serves in a non-registration state." Doc. 81 at 21. Defendant then proceeds to survey states that have an affidavit fail-safe method but asserts that because these states also require registration, they are, purportedly, not appropriate for comparison. *Id.* at 21-25. Yet Defendant's survey is unremarkable because all states other than North Dakota require registration, but none of them requires a residential street address to register or qualify to vote.[10] However, states

---

**[10]** *See Register To Vote In Your State By Using This Postcard Form and Guide*, U.S. Election Assistance Commission, https://www.eac.gov/assets/1/6/Federal_Voter_Registration_9-21-17_ENG.pdf (last visited Feb. 16, 2018); *Idaho Voter Registration Form*, Idaho Secretary of State, https://sos.idaho.gov/elect/VoterReg/voter_registration.pdf (last visited Feb. 16, 2018); Voter Registration, IN.gov, http://www.in.gov/sos/elections/2403.htm (providing a link to the registration form that does not require a residential street address); *Louisiana*

with functioning affidavit systems are still valuable to the analysis of North Dakota's affidavit system. The fact that fraud does not occur in other states with affidavit systems is probative because it suggests that an ID card is not the only way in which an elector can identify her or himself, and that taking someone at their word under penalty of perjury sufficiently identifies an elector for the purposes of voting. The reason the North Dakota Legislature increased the penalty for voter fraud in HB 1369 to a remarkably harsh class C felony was to deter this exact activity. *Hearing on HB 1369*, *supra*. The fact that fraud can, in theory, occur under North Dakota's system does not change the fact that affidavit systems have generally proven trustworthy. Indeed, Texas and North Carolina have employed affidavit systems to remedy burdensome ID laws.

Finally, it is especially suspect that Defendant would take issue with the affidavit system that existed for years prior to HB 1332. In 2011, in considering HB 1447, the Legislature extensively debated whether the threat of fraud under the affidavit system merited revision. *See supra*, Section II(B). The Legislature rejected any modifications on a bipartisan basis. *Id*. It was not until after Senator Heitkamp's election (and the perception that Native Americans provided the decisive votes in favor of Heitkamp) that the Legislature, in the next session, through an unusual process, chose to abolish the affidavit

---

*Voter Registration Application*, Louisiana Secretary of State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/ApplicationToRegisterToVote.pdf (last visited Feb. 16, 2018); *State of Michigan Voter Registration Application*, Michigan Secretary of State, https://www.michigan.gov/documents/MIVoterRegistration_97046_7.pdf (last visited Feb. 16, 2018); *North Carolina Voter Registration Application*, North Carolina State Board of Elections & Ethics Enforcement, https://www.ncsbe.gov/Portals/0/Forms/NCVoterRegForm06W.pdf; https://www.scvotes.org/files/VR_Blank_Form.pdf. (last visited Feb. 16, 2018); *South Carolina Voter Registration Mail Application*, South Carolina Election Commission, https://www.scvotes.org/files/VR_Blank_Form.pdf (last visited Feb. 16, 2018) (providing a link to the registration form that does not require a residential street address).

system upon which Native Americans disproportionately relied. *See supra*, Section II(C). And now, following Native Americans' significant reliance on the affidavit system in the 2016 election, *see supra*, Section II(E), and despite repeated warnings that HB 1369 would disproportionately burden Native Americans, *See supra*, Section II(C)&(G), Defendant has again targeted the one part of the election law that Native Americans disproportionately rely upon. *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 215 (4th Cir. 2016) ("[T]he State took away [minority voters'] opportunity because [they] were about to exercise it . . . this bears the mark of intentional discrimination.") (citation and quotation omitted); see Doc. 77 at 79, 84. Defendant is free to modify any parts of its process for verifying electors, including instituting or modifying a registration system, as long as it does not lead to disparate outcomes. HB 1369 leads to disparate outcomes.

### c) Defendant's interest in preserving voter confidence does not justify disproportionately burdening Native American voters.

Much of the hysteria about the possibility of voter fraud arising from North Dakota's voter system is manufactured by Defendant's own speculative, unproven assertions about fraud. Defendant's only evidence of lack of voter confidence is an article written by a conservative blogger, who admits these laws are "prohibitive to groups like the poor and the elderly" and notes an "outreach" program may be needed. Doc. 81 at 12; Rob Port, *We Have No Idea If Voter Fraud Changed the Outcome of Some North Dakota Elections*, SayAnythingBlog (Sept. 12, 2017), https://www.sayanythingblog.com/entry/no-idea-voter-fraud-changed-outcome-north-dakota-elections/. Defendant has not pointed to anyone "abstaining from voting out of concern for voter fraud[.]"*Abbott*, 830 F.3d at 263. In fact, the opposite is likely true. Participation in elections carries costs for voters, with greater costs generally leading to lower rates of participation. Webster Rep. ¶¶ 10, 33. Increased burdens that decrease turnout decreases confidence in the electoral system. *See Abbott*, 830 F.3d at 263. Indeed, North Dakota used the affidavit system until 2012. Defendants have shown no evidence that public voter confidence ever wavered as a result

of the availability of that system. In contrast, Plaintiffs have submitted significant and unchallenged evidence of disenfranchisement and severe burdens caused by the new system.

### d) Changes in demographics do not justify disproportionately burdening Native American voters.

Defendant laments the "unique challenges in ensuring the integrity of its elections due to the more mobile, diverse, and transient population," and asserts that in recent years North Dakota gained 85,000 residents. Doc. 81 at 9. Defendant asserts this increase is higher in minorities and therefore it is impossible to implement a voucher fail-safe mechanism. Doc 81 at 9.

An increasingly diverse population may necessitate changes to a state's election system. For example, increasing the types of ID available (such as out-of-state licenses) and allowing supplemental documentation without an ID as an option may be necessary to ensure that all recently arrived qualified electors have a fair opportunity to vote. But Defendant's unsubstantiated assertion that a poll-voucher "fail-safe" would no longer be acceptable because it would raise the State's liability mischaracterizes the nature of Constitutional challenges in the context of voting rights. Doc. 81 at 10. For example, not all voters are elderly, yet the presence of a long-term care certificate does not impinge upon the rights of all non-elderly electors. Likewise, a voucher system that could be widely utilized would not pose an equal protection/discrimination problem. *See Abbott*, 830 F.3d at 279 , cert. denied, 137 S. Ct. 612, 197 L. Ed. 2d 78 (2017) ("There is a difference between making voting harder in ways that interact with historical and social conditions to disproportionately burden minorities and making voting easier in ways that may not benefit all demographics equally (like motor-voter). The former can be characterized as 'abridging' the right to vote; the latter cannot.") (emphasis in original) (internal citations omitted).

Defendant also declares 4,849 affiants listed an address in another state as their

former residence. Doc. 81 at 9. But voters coming from another state can legally vote in North Dakota if they become North Dakota residents. Defendant offers no evidence that these 4,849 voters were not qualified North Dakota voters, and it is irrelevant where these voters used to reside.

The changing population in North Dakota is not a legal justification to substantially burden the right to vote.

### e) Establishing an elector's current residential address does not justify disproportionately burdening Native American voters.

Defendant goes to great lengths to show that establishing a voter's residential address is necessary to ensure the voter is given the proper ballot, because different localities need different ballots. *See* Arnold Aff., ¶ 13 & Exhibits A1-A53. Plaintiffs do not dispute the importance of ensuring a voter receives a proper ballot. However, Defendant does not show why one must provide documentary proof of a residential address to ensure one receives the proper ballot. For example, Defendant fails to explain why a voter pointing to a map to show where they live would not suffice to provide the poll worker with sufficient information to provide the proper ballot to the voter. Such an informal approach has worked well in Arizona and Virginia. *See generally Arizona Voter Registration Form*, Arizona Secretary of State, https://www.azsos.gov/sites/azsos.gov/files/voter_registration_form.pdf (last visited Feb. 16, 2018) (allowing a person registering to vote to provide, as an alternative to a residential address, "[description of] residence location, using mileage, cross streets, parcel #, subdivision name and lot, or landmarks"); *Virginia Voter Registration Application*, Virginia Dep't of Elections, https://www.elections.virginia.gov/Files/Forms/VoterForms/VoterRegistrationApplication.pdf (last visited Feb. 16, 2018) (including check-boxes for voters who cannot provide an address because, inter alia, their "residence address is not serviced by the U.S. Postal Service or I am homeless" (emphasis in original)). Box C of the National Mail Voter Registration Form provided by the U.S. Election Assistance Commission shows that every registration state

allows voters to draw a small map showing where they reside if they do not have a residential address. Election Assistance Commission, *supra*.

And, as discussed above, it may be impossible for some Native American voters who do not have a residential address to comply with this requirement (which only North Dakota requires), because there may not be 911 addressing where they live or it may not be up to date on their homes. *See supra*, Section III(C).

> **f)  HB 1369 does not satisfy Defendant's interest in aligning North Dakota's ID requirements with those of HAVA.**

Defendant makes much of the fact that the supplemental documentation allowed under HB 1369 consists of the same documents that an elector can use to register to vote under the Help America Vote Act ("HAVA"). 52 U.S.C. § 21083(b)(2)(A)(i). HAVA, however, allows a voter to register with *either* a photo ID *or* a supplemental document. HB 1369, on the other hand, still requires that an elector possess one of a few types of ID cards; supplemental documents alone are not sufficient. Therefore, HB 1369 does not "align[]" the State's "election provisions with those of federal law under HAVA" as Defendant claims, Doc. 81 at 14; rather, it imposes a stricter burden than HAVA requires. Therefore, HB 1369's seeming similarity to with HAVA does not support HB 1369's burdensome and discriminatory effects.

> **C.  Plaintiffs Are Likely to Prevail on Their Facial and As Applied Claim That HB 1369 Unconstitutionally Defines Residence and Requires Qualifying IDs to have a Residential Street Address.**

The equal protection clause applies when a state either disenfranchises voters by fixing voter qualifications that invidiously discriminate, or places restrictions on the right to vote that are not justified by a significantly weighty state interest. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966); *see also Crawford*, 553 U.S. at 188. "[S]tatutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect

their lives." *See Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626-267 (1969). However, "[a] governmental entity is not justified in excluding otherwise qualified voters who have no way of making themselves eligible to vote." *Collier v. Menzel*, 176 Cal. App. 3d 24, 33 (Cal. Ct. App. 1985) (citations omitted) (referring to homeless denied voting because they lacked a residential address); *see also Pitts v. Black*, 608 F.Supp. 696, 699 (S.D.N.Y. 1984) (citations omitted). Classifications that deny the right to vote based on an interest in property are unconstitutional because having an interest in property does not relate to voter qualifications. *Kramer*, 395 U.S. at 631-33 (discussing the denial of the vote to those that are not property tax payers). If a challenged statute denies the franchise to citizens who are bona fide residents, strict scrutiny applies. *Dunn v. Blumstein*, 405 U.S. 330, 334-337 (1972) (holding that durational residence requirements of "one year or even three months" were unconstitutional); *Evans v. Cornman*, 398 U.S. 419, 421 (1970) (holding that state could not deny the franchise to residents of federal enclave within state boundaries.). North Dakota's definition of "residence" and requirement that every qualifying voter have a qualifying ID that has a current "residential street address" cannot withstand strict scrutiny. N.D. Cent. Code § 16.1-01-04.1(2)(b).

North Dakota defines residence as "an actual fixed permanent dwelling, establishment, or any other abode to which the individual returns when not called elsewhere for labor or other special or temporary purposes." N.D. Cent. Code § 16.1-01-04.2(1). The plain language of North Dakota's definition of "residence" requires that a person reside or have an interest in a permanent building or structure in order to have a legal residence that qualifies them to vote. Black's law dictionary defines "dwelling-house," (which it notes is synonymous with "dwelling") as "the house or other structure in which one or more people live; a residence or abode." Dwelling House, Black's Law Dictionary (10th ed. 2014). An "establishment" is "an institution or place of business." Establishment, Black's Law Dictionary (10th ed. 2014). A "fixed abode" is a "permanent home or place of residence." *Fix Abode*, Black's Law Dictionary (10th ed. 2014).

By defining residence this way and requiring a "residential address" on a voter's ID or supplemental documentation, North Dakota is denying electors who are homeless, lack a physical address, or are precariously housed, their right to vote, without an ability to cure. *Collier*, 176 Cal.App. 3d at 33 (citations omitted) (finding homeless were unconstitutionally denied their right to vote because they lacked a residential address); *Pitts*, 608 F.Supp. at 699 (citations omitted).

California and New York – whose residential requirements were found unconstitutional – echoed North Dakota's definition of "residence" that precludes those that do not have a residential address, or homeless people who do not live in a fixed or permanent home, from being considered qualified electors. *Pitts*, 608 F. Supp. 696, 698 (S.D.N.Y. 1984) (defining residence as "that place where a person maintains a fixed, permanent and principal home and to which he, wherever temporarily located, always intends to return."); *Collier v. Menzel*, 176 Cal. App. 3d 24, 31, 221 Cal. Rptr. 110 (Ct. App. 1985). This Court should likewise find that North Dakota's definition of residence is too narrow.

Defendant admits North Dakota's current population is "mobile and transient." Doc. 81 at 9. Indeed, Plaintiffs have shown Native Americans are mobile and transient, often living in overcrowded homes, are "precariously housed," and disproportionately homeless. *See supra*, III(E)(5). A Native American without a residential address, or homeless person, would not be able to supply the necessary documentation for proof of residence.  For example, Plaintiff Elvis Norquay was recently homeless and has moved three times over the last six months to various temporary residences. 2018 E. Norquay Decl. 2-3. Lucille Vivier was denied the right to vote even though she had a tribal ID with her residential address. 2018 Vivier Dec. ¶¶ 21-22. Richard Brakebill and Dorothy Herman were denied the right to vote because their tribal IDs did not have a residential address.  Doc. 43 at 18; 2018 Brakebill Decl.¶ 6.  The LIHEAP Director at Turtle Mountain confirmed that some utility bills will only contain a P.O. Box, not a residential street address.   Frederick Decl. ¶ 12.

The Defendant argues that the 311 voters in the largest population centers that used the UPS as their address were likely committing fraud. Doc. 81 at 7. However, Defendant does not specify whether this location is "a gathering place for homeless persons." *Collier*, 176 Cal. App. 3d 24. Today, if Defendant's Motion is granted, a qualified elector who shows up to vote with an ID or a supplemental document without a residential address will be denied the right to vote. Because those who do not have a residential address, but are otherwise eligible electors, cannot vote, this requirement is a discriminatory denial of the vote and is subject to strict scrutiny.

North Dakota does not have a compelling interest to deny qualified voters the right to vote in this way, nor is the statute narrowly tailored. Defendant's reason for requiring a residential address—to ensure that voters receive the proper ballots—is easily remedied by allowing a person to point out where they live on a map or describe where they live as all registration states allow. *See supra*, Section V(B)(2)(b) (describing how states register voters without residential addresses). As such, North Dakota's requirement that an elector have an interest in property and/or reside in a permanent structure that has a residential address, and that it be identified on an ID or supplemental document, is facially unconstitutional, as well as unconstitutional as applied to the Plaintiffs.

### D. Plaintiffs are Likely to Prevail On Their Claims That HB 1369 Violates Section 2 of the Voting Rights Act.

Section 2 forbids any "voting qualification or prerequisite to voting standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). It "applies to any 'standard, practice, or procedure' that makes it harder for an eligible voter to cast a ballot, not just those that actually prevent individuals from voting." *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 552 (6th Cir. 2014), *vacated as moot*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014). Section 2 voter ID claims are evaluated under a two-part framework:

*Richard Brakebill, et al. v. Alvin Jaeger*, Case No. 1:16-cv-0008
Corrected Memorandum ISO Motion for Preliminary Injunction

43

> (1) [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of the protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and
>
> (2) [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Abbott,* 830 F.3d at 244 (citing *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014)). In "assessing both elements, courts should consider 'the totality of the circumstances.'" *League of Women Voters N.C.*, 769 F.3d at 240. In analyzing the "totality of the circumstances," "courts have looked to certain 'typical' factors pulled directly from the Voting Rights Act's legislative history." *Id.* These nine factors are called the "Senate factors."

### 1. HB 1369 imposes a discriminatory burden on Native Americans.

As detailed above, HB 1369 imposes a discriminatory burden on Native Americans. Among other things, Native Americans disproportionately lack necessary ID, supporting documentation, and the economic resources to get IDs, have to travel further to obtain ID, lack residential addresses, and have less access to transportation. *See supra*, Section III(E). Because the requirements imposed by HB 1332 and HB 1333 were especially burdensome for Natives to satisfy, Native Americans disproportionately relied on the affidavit "fail-safe" adopted by this Court during the 2016 election. Barreto Decl. at 25-26. HB 1369's attempted abolition of the affidavit "fail-safe" mechanism and its attempt to reimpose the suppressive requirements of HB 1332 and 1333, disproportionately burdens Native Americans. *See supra*, Section II(H). Moreover, contrary to Defendant's assertions, HB 1369' "set-aside" system does not provide any meaningful fail-safe to Native American voters. *Id.*

### 2. The discriminatory burden is caused by and linked to social and historical factors

Seven of the nine Senate factors are relevant here, and support Plaintiffs' motion.

**Senate factor 1: North Dakota has a long history of voting-related discrimination.** As detailed in Plaintiffs' first Motion for Preliminary Injunction, North Dakota has a long history of voting-related discrimination. Doc. 43 at 25. That history – of "[s]ystemic discrimination"; subjection to racial slurs; and laws that only allowed "civilized" Native Americans to vote – endures. *Id.* As recently as 2010, this Court entered a preliminary injunction enjoining the closing of polling locations used by the Spirit Lake Tribe referencing the "historic pattern of discrimination suffered by members of the Spirt Lake Tribe." *Spirit Lake Tribe v. Benson Cty.,* N.D., No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. Oct. 21, 2010). Most recently, North Dakota passed arguably the most restrictive voter ID laws in history after Senator Heitkamp was elected purportedly based on carrying the Native vote, and again in 2017 despite being warned of the harsh effects the law would have on Native voters. As discussed in more detail under Senate Factor 3 below, the history is not just part of the ancient past.

**Senate factor 2: Voting in North Dakota is racially polarized.** Native Americans in North Dakota vote in a racially polarized manner, favoring Democratic candidates. *See supra*, Section II(C). This trend was dramatically demonstrated when the Native American vote was widely credited with securing Senator Heitkamp's election in 2012. *Id*. According to Plaintiff's expert Michael Herron's updated report: "2012, 2014, and 2016 General Elections in North Dakota, are consistent with the key conclusion from my original declaration, dated June 18, 2016, that there has been racially polarized voting in North Dakota and, in particular, that Native American voters in the state support Democratic candidates at higher rates than white voters." Herron Decl. at 17.

**Senate factor 3: North Dakota has used voting practices or procedures to enhance the opportunity for discrimination against Native Americans.** HB 1332 and HB 1333 were passed in the wake of a narrowly decided election where many believe the Native American vote was a decisive factor. *See supra*, Section II(D). *See e.g.*, *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 215 (4th Cir. 2016) ("[T]he State took away

[minority voters'] opportunity because [they] were about to exercise it . . . this bears the mark of intentional discrimination.") (internal citation omitted).

Through these laws, the Legislature took care to prohibit the use of identification that listed P.O. boxes on voter's IDs and instead required a residential address that the Legislature knew many Native Americans did not have. *See supra*, Section II(B). The enactment of HB 1332 was especially suspicious because the Legislature had just debated, in the previous Legislative session, whether to pass a similarly restrictive voter ID law and had resoundingly voted not to. *Id*. Additionally, the hoghouse procedure used to pass HB 1332 was unusual and stifled debate. *See supra*, Section II(D).  Thus, the North Dakota legislature used its voting laws to discriminate against Native Americans as evidenced by the suspect timing of the passage of HB 1332; the insertion of a residential address provision that the Legislature knew would negatively impact Native Americans; and the Legislature's deviation from its previous conclusions and the normal course of legislative procedure.

In the wake of HB 1332 and HB 1333's suppressive effects on the Native vote, this Court acknowledged "North Dakota's . . . Voter ID Laws Have Disenfranchised Native American Voters." Doc. 50 at 16. Consequently, this Court held that HB 1332 and HB 1333 violate the Equal Protection Clause of the U.S. Constitution due to the lack of "fail-safe" mechanism for voters without ID. *Id*. at 20-22.

The Legislature brazenly disregarded this Court's order and again used its voting practices to discriminate against Native Americans through passage of HB 1369. The Legislature was warned explicitly about the discriminatory impact of HB 1369 on Native American voters through testimony provided by the Native American Rights Fund. Contemporaneous to its passage, lawmakers expressed skepticism it would meet this Court's mandate that the law provide a "fail-safe." *See supra*, Section II(G); Doc. 50 at 22. Despite making additional accommodations for military persons, and continued accommodations for the assisted living elderly and disabled, the Legislature failed to

consider the impact of the bill on Native Americans. The Legislature also did not conduct any studies or reach out to the North Dakota tribes to see if the law would impact their communities. Faith Decl.¶ 4; Pearson Decl.¶ 5.  Instead, they forged ahead with their forgone conclusion: there would be no "fail-safe" and the efforts to suppress the Native vote would continue.

Finally, HB 1369 was introduced during an "atmosphere of heightened racial tensions" following large demonstrations by Native Americans and allies in protest of the Dakota Access Pipeline ("DAPL").  McCool Decl. at 8-11. At least eight bills were introduced in response to the protestors, such as making it a felony to cause economic harm while committing disorderly conduct (HB 1193) and making it unlawful not to vacate an area, even public property, if ordered to do so by police (SB 2246).  McCool Decl. at 9-11 (those particular bills did not pass). Rep. Al Carlson introduced legislation proposing six state-regulated casinos, which was widely seen as "retaliatory" against Native Americans who were supportive of DAPL. McCool Decl. at 11-12 (the bill did not pass). Rep. Carlson also sponsored HB 1369. *Id.*

**Senate factor 5: The ability of Native Americans to vote is hindered by the effects of past discrimination in the areas of education, employment, and health.** As detailed in Plaintiffs' 2016 Motion for Preliminary Injunction, the ability of Native Americans living in North Dakota to vote is hindered by the effects of past discrimination in the areas of education, employment, and health. Doc. 43 at 31. Dr. Dan McCool has confirmed that Native Americans remain hindered concluding "the same limitations I described in my previous report – the poverty, lack of computer access, distance from government office, poor transportation, etc. – all still operate to disadvantage Native Americans in the political process." McCool Decl. 23; *see also* Spirit Lake Nation Comprehensive Community Assessment, *supra.* (detailing disparate education, employment, and health statistics on the Spirit Lake reservation).

**Senate factor 7: Native Americans are not fairly represented in elective offices**

**in North Dakota.** As detailed in Plaintiffs' 2016 Motion for Preliminary Injunction, Native Americans are not fairly represented in elective offices in North Dakota. Doc. 43 at 33-34. "In districts characterized by the Indian Affairs Commission as 'Tribal Districts,' only one of the 24 elected legislators is Native American . . . only one Native American appears on a state produced list of 42 representatives of districts 'on/around' American Indian reservations." Doc. 43 at 33. Dr. McCool has confirmed that Native Americans remain hindered by these past discriminatory effects. McCool Decl. at 23.

**Senate factor 8: North Dakota's elected officials have not been responsive to the needs of Native Americans.** As detailed in Plaintiff's 2016 Motion, North Dakota's elected officials have not been responsive to the needs of Native Americans. Doc. 43 at 33.

Indeed, HB 1332 and HB 1333 demonstrate that the Legislature has acted adverse to Native American interests since they placed disproportionate burdens on Native Americans. Doc. 50 at 20. And, after being extensively warned about HB 1369's discriminatory impacts, the Legislature failed to reach out to any of the tribes to discuss the potential effects of the bill, and passed HB 1369 anyway. Faith Decl. ¶ 4-5; Pearson Decl. ¶ 5-6.

Due to lack of representation and political clout, Native Americans continue to exist in a class unto themselves, with disproportionately high poverty rates, worse health outcomes, and higher rates of homelessness. *See supra*, Section III(E).

**Senate factor 9: The Policy Underlying the Law is Tenuous.** As described extensively above, North Dakota has provided no sound basis for the new voter ID laws. Voter fraud has not increased - it remains virtually non-existent. *See supra*, Section II(F). Compliance with HAVA does not mandate HB 1369's strict identification requirement. *Id.* at II(G). And Defendant's fears of a lack of confidence in North Dakota's voter system are not supported by any evidence. *Id.* at II (F). There is no sound basis for the new voter ID law, and all that remains is that Native American voters predominantly vote for the Democrat party and given some recent success, they are now being penalized for it.

### E.  Plaintiffs Will Suffer Irreparable Injury Without Preliminary Injunctive Relief

In the 1886 case of *Yick Wo v. Hopkins*, the U.S. Supreme Court stated that "the political franchise of voting" is "a fundamental political right, because [it is] preservative of all rights." 118 U.S. 356, 370 (1886). When constitutional rights such as the right to vote "are threatened or impaired, irreparable injury is presumed." *Obama for Am.*, 697 F.3d 423, 436 (6th Cir. 2012). As the court in *Spirit Lake Tribe v. Benson County*, stated:

> Once a citizen is deprived of his right of suffrage in an election there is usually no way to remedy the wrong. There is no process for ordering 're-votes' in Congressional or legislative elections. Once an election is over, it is over and it is little consolation to say that the problem will be remedied in the next election.

No. 2:10-cv-095, 2010 WL 4226614, at *5 (D.N.D. Oct. 21, 2010).

As the evidence shows, Plaintiffs have been disenfranchised before, and their right to vote is again threatened due to North Dakota's strict voter ID law. Lucile Vivier was disenfranchised even though she had a proper ID, showing harm is threatened. Vivier Decl. ¶ 20. The right to vote of many other citizens is also threatened if the Court does not enjoin these laws. As such, Plaintiffs have satisfied the irreparable injury element.

### F.  The Balance of Hardships Weighs in Favor of Preliminary Injunctive Relief

Without preliminary injunctive relief, thousands of North Dakota Native American electors (and other North Dakota citizens) are at risk of being denied their right to participate in the upcoming 2018 elections, which will constitute a permanent and irreversible injury. Because there is little or no evidence of voter fraud in North Dakota, North Dakota will suffer no hardship if the Court issues injunctive relief and mandates a "fail-safe" mechanism for voters who cannot obtain ID or supplemental documents with reasonable effort. Further, Plaintiffs have made this motion early enough to allow the State to obtain the Court's decision before training any of its election workers for this year's election. Thus, the State will suffer no prejudice by having to re-train election workers.

### G.  Preliminary Injunctive Relief Will Serve the Public Interest

Voting is itself a public good—it is "a fundamental political right, because [it is] preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). The public has a strong interest in protecting all eligible citizens' right to vote. *See Obama for Am.*, 697 F.3d at 436-437 (internal citation omitted). The "public interest . . . favors permitting as many qualified voters to vote as possible." *Id.* at 437. (internal citation omitted). The public interest will be served by the issuance of a preliminary injunction that will ensure that all eligible electors, including Native American voters, have the opportunity to vote. In sum, the underlying "dispositive" issue remains—HB 1369 fails to provide a "fail-safe" voting mechanism for those voters who cannot obtain ID with reasonable effort. Doc. at 55, 1-2, 22. Defendants provide no evidence that the disproportionate burdens on Native Americans this Court previously found have been relieved by HB 1369. Consequently, this Court should deny Defendant's motion to dissolve and grant Plaintiffs' motion for preliminary injunction.

## VII.  Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court: 1) deny Defendant's Motion to Dissolve and grant Plaintiffs' Motion for Preliminary Injunction; 2) find Defendant's enforcement of HB 1369 would violate Section 2 of the Voting Rights Act and the Equal Protection Clause of the U.S. Constitution; 3) find Defendant's enforcement of HB 1369 voter ID requirements relating to residency requirements would be facially unconstitutional as well as unconstitutional as applied to Plaintiffs; and 4) enjoin Defendant from enforcing HB 1369 without adequate fail-safe provisions, such as an affidavit for voters who cannot obtain qualifying ID, supplemental documents, or a residential address with reasonable effort.

Dated: February 22, 2018                    Respectfully submitted,

By:  /s Matthew Campbell
                Matthew Campbell

Matthew Campbell,
NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
**NATIVE AMERICAN RIGHTS FUND**
1506 Broadway
Boulder, Colorado 80302
Phone:  (303) 447-8760

Jacqueline De León, CA Bar No. 288192,
DC Bar No. 40808
jdeleon@narf.org
1506 Broadway
Boulder, Colorado 80302
Phone: (303) 447-8760

Daniel David Lewerenz, WI Bar No. 1069385,
OK Bar No. 30627
lewerenz@narf.org
1514 P Street NW (Rear), Suite D
Washington, D.C. 20005
Phone: (202) 785-4166

Richard de Bodo, CA Bar No. 128199
Rich.debodo@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1601 Cloverfield Blvd., Suite 2050 North
Santa Monica, CA  90404-4082
Phone:  (310) 255-9055
Fax:      (310) 907-2000

Tom Dickson, ND Bar No. 03800
tdickson@dicksonlaw.com
**DICKSON LAW OFFICE**
P.O. Box 1896
Bismarck, North Dakota  58502
Phone:   (701) 222-4400
Fax:       (701) 258-4684

Joel West Williams, PA Bar No. 91691

williams@narf.org
**NATIVE AMERICAN RIGHTS FUND**
1514 P Street NW (Rear), Suite D
Washington, D.C. 20005
Phone:  (202) 785-4166

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2018, the document titled "**Plaintiffs' Corrected Memorandum in Support of Second Motion for Preliminary Injunction and Response to Defendant's Motion to Dissolve Preliminary Injunction**" was electronically filed with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing ("NEF") to:

James E. Nicolai
Deputy Solicitor General
State Bar ID No. 04789
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
Email jnicolai@nd.gov

Elizabeth A. Fischer
Assistant Attorney General
State Bar ID No. 07288
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
Dated:   February 16, 2018


By:  /s Matthew Campbell
        Matthew Campbell

Matthew Campbell,
NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
**NATIVE AMERICAN RIGHTS FUND**
1506 Broadway
Boulder, Colorado 80302
Phone: (303) 447-8760