# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Richard Brakebill, Dorothy Herman, Della Merrick, Elvis Norquay, Ray Norquay, and Lucille Vivier, on behalf of themselves, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>Alvin Jaeger, in his official capacity as the North Dakota Secretary of State, )<br><br>Defendants. ) | **ORDER GRANTING PLAINTIFFS' MOTION FOR SECOND PRELIMINARY INJUNCTION IN PART**<br><br>Case No. 1:16-cv-008 |

Before the Court is the Defendant's "Motion to Dissolve Preliminary Injunction" filed on January 16, 2018. See Docket No. 80. The Defendants seek to set aside the "Order Granting Plaintiffs' Motion for Preliminary Injunction" issued on August 1, 2016. Also before the Court is the Plaintiffs' Second Motion for Preliminary Injunction filed on February 16, 2018. See Docket Nos. 89 and 92.

In August 2016, this Court carefully considered the *Dataphase* factors and concluded the public interest in protecting the right to vote for thousands of Native Americans who lacked a qualifying ID and cannot obtain one, outweighed the purported interests and arguments of the State. As a result, the North Dakota Secretary of State was enjoined from enforcing N.D.C.C. § 16.1-05-07 without any adequate "fail-safe" provisions that had been provided to all voters in North Dakota prior to 2013. In the past, North Dakota allowed all citizens who were unable to provide acceptable ID's to cast their vote under two types of "fail-safe" provisions which were repealed in 2013.

1

In response to the preliminary injunction issued August 1, 2016, the North Dakota Legislative Assembly amended and enacted a new election law (House Bill 1369). Effective July 1, 2017, North Dakota law now permits individuals who do not present a valid ID when appearing to vote to mark a ballot that is then set aside until the individual's qualifications as an elector can be verified. See N.D.C.C. § 16.1-01-04.1(5). The new law provides in relevant part as follows:

> 1. A qualified elector shall provide a valid form of identification to the proper election official before receiving a ballot for voting.
>
> 2. The identification must provide the following information regarding the elector:
>
>   a. Legal name;
>
>   b. Current residential street address in North Dakota; and
>
>   c. Date of birth.
>
> 3.  a.  A valid form of identification is:
>
>     (1) A driver's license or nondriver's identification card issued by the North Dakota department of transportation; or
>
>     (2) An official form of identification issued by a tribal government to a tribal member residing in this state.
>
>   b. If an individual's valid form of identification does not include all the information required under subsection 2 or the information on the identification is not current, the identification must be supplemented by presenting any of the following issued to the individual which provides the missing or outdated information:
>
>     (1) A current utility bill;
>
>     (2) A current bank statement;
>
>     (3) A check issued by a federal, state, or local government;

        (4) A paycheck; or

        (5) A document issued by a federal, state, or local government.

5. If an individual is not able to show a valid form of identification but asserts qualifications as an elector in the precinct in which the individual desires to vote, the individual may mark a ballot that must be securely set aside in a sealed envelope designed by the secretary of state. After the ballot is set aside, the individual may show a valid form of identification to either a polling place election board member if the individual returns to the polling place before the polls close, or to an employee of the office of the election official responsible for the administration of the election before the meeting of the canvassing board occurring on the sixth day after the election. Each ballot set aside under this subsection must be presented to the members of the canvassing board for proper inclusion or exclusion from the tally.

6. The secretary of state shall develop uniform procedures for the requirements of subsection 5 which must be followed by the election official responsible for the administration of the election.

N.D.C.C. § 16.1-01-04.1 (2017).

The State of North Dakota seeks an "expedited review" and ruling on its motion to dissolve the earlier injunction because another statewide election will occur on June 12, 2018. See Docket No. 95. The Plaintiffs seek to enjoin the enforcement of the new law for the same reasons outlined in their original request for injunctive relief back in 2016. The new law was passed in April 2017, and became effective on July 1, 2017. No action was taken by the State until January 16, 2018, to seek to dissolve the preliminary injunction. Both parties were fully aware of the impact of the new law dating back to April 2017, but waited until mid January 2018, to take any legal action to address the impact of the new law. If the need for an immediate and expeditious ruling was critically necessary, both parties could have easily filed, and should have filed, motions to address the new law in the summer of 2017, and avoided these last minute heroics and demands for an expeditious ruling. The parties had more than nine (9) months to

take legal action on the new law. The Court has now carefully reviewed the entire record without the benefit of having nine (9) months to cerebrate on the matter as the parties have done. See Docket Nos. 81, 92, 94, and 98.

Suffice it to say, the new law passed by the Legislative Assembly (House Bill 1369) in April 2017, still requires voters to have one of the very same forms of a qualifying ID's in order to vote that was previously found to impose a discriminatory and burdensome impact on Native Americans.

In support of the Plaintiffs' request for a second preliminary injunction, the record has been supplemented with the following statistical data which has not been challenged by the State:

- a. Consistent with the findings from the first survey, conducted in 2015, Native American eligible voters in North Dakota are less likely to possess a qualifying voter ID under current North Dakota law, as compared to non-Native Americans. The difference is statistically significant at the 99 percent level, the most rigorous level of social science testing.

- b. In the present survey, 19 percent of Native American eligible voters in North Dakota do not possess a qualifying voter ID. In contrast, 11.6 percent of non-Native Americans in North Dakota do not possess a valid ID. In 2015 we found that 23.5 percent of Native American eligible voters lacked an appropriate ID, compared to 12 percent of non-Native eligible voters. The findings from the present survey comport with those from 2015.

- c. Native Americans in North Dakota are significantly less likely to possess the most common type of ID-a driver's license. Only 64.6 percent of Native Americans indicated they have a driver's license that meets all requirements to vote. In contrast, 86.1 percent of non-Native Americans in North Dakota indicated they have a driver's license which meets all requirements.

- d. Native Americans face burdens in obtaining a state-issued ID. Many Native Americans lack the required underlying documents: Among those without a valid ID, 28.9 percent do not have a birth certificate or other

e.  proof of identity required by the state, such as a passport or naturalization card; 56.7 percent do not have two documents showing a residential street address; 16.7 percent lack a social security card or W2 showing a social security number. In total, 65.6 percent of Native Americans that currently do not have a valid voter ID do not have all three types of the underlying documents they would need to obtain a voter ID.

e.  The North Dakota voter identification law indicate certain documents bearing one's full name and full residential street address can be presented in the instance that one has an otherwise valid piece of identification, but lacks an appropriate residential street address. Native Americans are less likely to possess several of the accepted documents than are their non-Native counterparts. Among North Dakota residents who lack a valid piece of ID because of the address requirement, 48.7 percent of Native Americans, or an estimated 2,305 Native eligible voters, do not possess at least one of the supplemental address documents accepted under the law. Comparatively, only 26.2 percent of non-Natives who lack a valid piece of identification because of the residential address requirement do not possess at least one of the supplemental address documents acceptes under the law. This amounts to 15,908 non-native eligible voters.

f.  Knowledge levels regarding the law are very low in North Dakota, especially among Native Americans. In fact, 23.0 percent of Native Americans are not aware that a voter ID law exists, and only 12.7 percent of Native Americans reported they had heard or seen an official announcement or advertisement by the State of North Dakota about the new voter ID law.

g.  Native Americans are less likely than non-Natives to know that a residential street address is required on an ID to be valid. Among people who have an ID, but it lacks a residential street address, just 24.7 percent of Native Americans know that an ID must contain residential street address compared to 49.5 percent of non-Native Americans.

h.  Native Americans are more likely than are non-Natives to report having used a failsafe measure to vote in the past. Among all eligible voters, 12.1 percent of Native Americans reported having signed an affadit and 9.7 percent report that a poll worker vouched for them. Comparatively, only 9.1 and 7.4 percent of whites report signing an affidavit or having been vouched for when they tried to vote in a previous election. Among those who lack a valid ID, 14.4 percent of Native Americans reported having signed an affidavit, compared to 7.3 of non-Natives, and an 16.7 percent of Native Americans report that a poll worker vouched for them, compared to 6.4 percen of non-Natives for whom the same was true. This

> comports with analysis of the use of affadavits at the county level. Between 2012 and 2016, among the three counties with the highest percentage of Native American voters the number of affidavits used increased from 51 in 2012 to 390 in 2016. By comparison, in the three counties with the lowest percentage of Native American voters the number decreased by four affidavit ballots, from 38 to 34.

See Docket No. 90-1, pp. 3-6.

In August of 2016, the Court issued a 29-page order that included a careful analysis of the *Dataphase* factors as required under Eighth Circuit Court of Appeals case law. The State never appealed the order of injunction, despite their recent criticisms of the order. Rather than re-invent the wheel and again restate the same analysis and legal arguments enumerated in the August 1, 2016, Order (Docket No. 50), the Court expressly incorporates by reference the entirety of the facts and legal analysis set forth in that earlier order, all of which continue to be directly relevant to the *Dataphase* analysis of the new law.

The Court has also carefully reviewed the decisions of the United States Supreme Court in Crawford v. Marion Cty. Election Bd., 553 U.S. 181 (2008) and the Fourth Circuit Court of Appeals in Lee v. Va. Bd. of Elections, 843 F.3d 592 (4th Cir. 2016).

In *Crawford*, the Supreme Court rejected a facial challenge to Indiana's photo identification law and upheld its constitutionality. The Indiana law required that registered voters present a government-issued photo ID's in order to vote, and voters who did not have such identification could obtain one only if they presented proof of residence and identity, such as a birth certificate. Crawford, 553 U.S. at 185-86. No ID is required to register to vote and Indiana offers free photo ID to qualified voters who establish their residence and identity. Id. at 186. Voters lacking an ID on election day are permitted to cast a provisional ballot which will be counted if the voter executes an affidavit or brings an ID to the circuit court clerk's office

within ten (10) days of the election. Id. The Supreme Court found that Indiana had a valid interest in adopting standards that aligned with federal election statutes, including the Help America Vote Act ("HAVA") wherein Congress had indicated a belief that "photo identification is one effective method of establishing a voter's qualification to vote." Id. at 193. The Supreme Court also found that Indiana had valid interests in preventing voter fraud, even though there was no evidence of any in-person voter impersonation having occurred in Indiana, and the state had an independent interest in protecting voter confidence in the integrity of its elections. Id. at 194–97. The Supreme Court concluded that these state interests justified the burdens imposed by the photo identification requirements in its election law. Id. at 202. For voters who lacked the required identification, the Supreme Court explained the ability to obtain a free photo identification meant that the burden was not substantial. The "inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote." Id. at 198. While the Supreme Court recognized that for some voters, such as those who lacked a birth certificate or other documentation needed to obtain a free ID's, the burden was greater, it nonetheless concluded this greater burden was not sufficiently substantial to render the statute unconstitutional. Id. at 199–202.

In *Lee*, the Fourth Circuit Court of Appeals rejected a challenge to Virginia's photo ID law. The law in question required that all voters present a photo ID in order to cast a ballot. Lee, 843 F.3d at 594. Registered voters without an ID were allowed to cast a provisional ballot and cure their vote by presenting an ID in person, by fax, or by email within three days of the election. Id. Many types of ID were acceptable, and the Virginia Board or Elections provided free ID's to voters without any documentation. Id. To obtain a free ID the voter need only

provide a name, address, birthdate, and the last four digits of their social security number. Id. at 595. The Fourth Circuit found the burdens imposed by Virginia were lighter than the Indiana law challenged in *Crawford*. Id. at 606. The Court explained that Virginia voters were not required to present any documentation to obtain a free ID and the justifications – preventing voter fraud, preserving voter confidence in election integrity, and alignment with federal statutes like HAVA – were the same as those advanced by Indiana. Id. at 607. The burdens imposed by the law were mitigated by the acceptance of a broad range of ID's, providing for provisional ballots, and providing free ID's without the need for documentation along with other assistance. Id. at 607-08.

Based on a careful review of *Crawford*, the updated Barreto/Sanchez statistical data, and a careful analysis of the *Dataphase* factors enumerated in detail in the Court's earlier Order of August 1, 2016, - which are incorporated by reference - the following problems areas are identified:

1) At least 4,998 otherwise eligible Native Americans (and 64,618 non-Native voters) currently do not possess a qualifying voter ID under the new law. See Docket No. 90-1, ¶ 40. And 48.7% of Native Americans who lack a qualifying ID also lack the supplemental documentation needed - which means at least 2,305 Native Americans will not be able to vote in 2018 under the new law. Id. at ¶ 41.

2) The State has acknowledged that Native American communities often lack residential street addresses (See Docket No. 97, p. 6) or do not have clear residential addresses (Docket No. 90-9, at 3-8). Nevertheless, under current State law an individual who does not have a "current residential street address" will never be qualified to vote. This is a

clear "legal obstacle" inhibiting the opportunity to vote. The State can easily remedy this problem by simply eliminating the absolute need for a "current residential street address" and allowing for either a residential address, a mailing address (P.O. Box), or simply an address. Neither the National Registration Voting Act nor any other federal or state laws the Court is aware of require a "current residential street address" in order to be able to vote.

3) The "set aside" ballot process the State proclaims as a "fail-safe" measure will not help any voter who lacks the means to obtain a qualifying ID to cast a vote. When the Court issued the preliminary injunction on August 1, 2016, the undisputed evidence revealed that 23.5% Native Americans did not have a state qualifying ID. Today, the updated and unrefuted statistical data reveals that 19% of Native Americans still lack qualifying ID's.

4) The new law provides that voters who show up at the polls without the required ID's will be allowed to mark a ballot which is then set aside by poll workers. This ballot will only be counted if the voter can produce a satisfactory ID at the polling place before the polls close on election day, <u>or</u> at an undisclosed office within six (6) days of the election. The new law is vague and unclear as to where and to whom such a voter is to produce any documents because as the new law simply states:

> After the ballot is set aside, the individual may show a valid form of identification to either a polling place election board member if the individual returns to the polling place before the polls close, or to an employee of the office of the election official responsible for the administration of the election before the meeting of the canvassing board occurring on the sixth day after the election. Each ballot set aside under this subsection must be presented to the members of the canvassing board for proper inclusion or exclusion from the tally.
>
> N.D.C.C. § 16.1-01-04.1.

No reasonable person who reads this statute would have a clue as to where and to whom they need to report to present a valid ID. (emphasis added). Common sense requires more than stating the voter needs to return "to an employee of the office of the election official responsible for the administration of the election before the meeting of the canvassing board occurring on the sixth day after the election." The statute is vague and unclear at best. Further, otherwise qualified voters who cannot produce the required voter ID (because they have no "current residential street address") will obviously never be able to produce the required ID within six days after the election, and as a result will never be able to vote.

5) The State asserts that a tribal ID "need be nothing more than a document from tribal authorities setting forth the tribal member's name, date of birth, and current residential street address." See Docket No. 81, p. 19. The State relies upon the affidavit of Deputy Secretary of State James Silrum to support this new-found interpretation of the law. See Docket No. 81-55. The reality is that the text of HB 1369 mirrors the language in HB 1332 and HB 1333, which required "an official form of identification issued by a tribal government." Compare N.D.C.C. § 16.1-01-04.1 with N.D.C.C. § 16.1-01-04, amended by H.B. 1333, 64th Leg. Assemb. Reg. Sess. § 5 (2015) and N.D.C.C. § 16.1-01-04, amended by H.B. 1369, 65th Leg. Assemb. Reg. Sess. § 5 (2017). The State has previously interpreted this to mean a tribally-issued ID card. The State's own marketing materials only mention a "tribal ID card" and make no reference to a document or letter from the tribe being sufficient. See Docket Nos. 81-56 through 81-64. Further, it is unclear under the plain language of the statute that a document or letter would meet the

requirement of an "official form of identification." The placement of the tribal ID requirement with other traditional forms of ID cards such as a driver's license and a non-driver's ID makes this interpretation unlikely. Because it is undisputed not all North Dakota tribal governments issue tribal ID cards, it is more likely that the plain language of the statute requires a tribal ID card and not simply a letter from tribal authorities.

Silrum also asserts in his affidavit that the Turtle Mountain Tribal Chairman has been informed of this letter option since May 2014. See Docket No. 81-55, ¶ 43. However, there is no explanation of the type of public education campaign conducted to disclose this letter option, and the Deputy Secretary of State does not indicate whether the Standing Rock Sioux, Spirit Lake Tribe, or Mandan, Hidatsa & Arikara Nation have ever been informed of this informal letter option as an alternative to a qualifying ID.

Simply stated, there is no official state administrative rule, regulation, policy, procedure, memorandum, or any other document or public pronouncement espousing the Secretary of State's interpretation of what constitutes a letter option as an alternative to a qualifying ID. Because there is no official State authority espousing that a letter issued by a tribal authority would be an acceptable form of identification, and all of the State materials show an ID card as the acceptable form of tribal ID, it is dangerous for an elector to trust that poll workers would consistently accept such a letter from a tribe as a valid form of identification to comply with the new law.

Silrum also states — without any supporting authority — that the "State accepts Tribal IDs issued by a Tribe or by the Bureau of Indian Affairs as valid forms of ID as long as it includes the required information." See Docket No. 81-55, ¶ 43. However, HB

1369's plain language requires that the identification be "issued by a tribal government" and makes no mention of the Bureau of Indian Affairs ("BIA") which is a federal agency. N.D.C.C. § 16.1-01-04.1(3)(a)(2). The Legislature was informed before the passage of the new law that the ID's of those living on the Standing Rock Reservation were issued by the BIA and not their tribal government. See Docket No. 50, p. 16. Despite these expressed concerns, the Legislature never changed the law's language. The plain language of the statute requires identification to be issued by a "tribal government" and not the BIA in order to be acceptable under HB 1369. N.D.C.C. § 16.1-01-04.1(3)(a)(2). The Secretary of State has now adopted a different interpretation of the new law, and the various types of identification and ID's that will be accepted at the polls, but no official announcement of this interpretation has been made to date.

6) Although the theoretical possibility of voter fraud exists with every election nationwide, the record before the Court has revealed no evidence of voter fraud in the past, and no evidence of voter fraud in 2016.

7) The parties have stated that North Dakota is the only State in the country without voter registration. Common sense and simplistic revisions to the existing law; the launching of a state-wide pre-election campaign informing all voters of the ID requirements, as now broadly interpreted by the Secretary of State; or a system of voter registration like that used in the other 49 states which allows for verification before the election rather than afterward would be an easy solution. North Dakota already maintains a Central Voter File in the Secretary of State's office.

8) The current law (N.D.C.C. § 16.1-01-04.1) completely disenfranchises anyone who does not have a "current residential street address." This includes homeless persons as well as many persons living on Native American reservations. The "current residential street address" requirement is not required by the North Dakota Constitution, and is not required for registering or voting in other states. Under *Crawford*, this requirement is unquestionably a legal obstacle inhibiting the right to vote.

9) State non-driver ID cards still cost $8, (See N.D.C.C. § 39-06-49(2)(a)) whereas most states provide such ID's at no cost. There is no apparent reason North Dakota cannot provide free photo ID's to all voters. For example, Virginia requires a photo ID for all voters in all elections. However, a free photo ID is available without requiring the voter to provided any documents. Voters can obtain free photo ID's by simply providing his or her name, address, birthdate, and last four digits of their social security number.

10) Section 16.1-01-04.1(3)(a) does not permit the use of other tribal documents as a valid ID. More important, as previously noted the new law again fails to recognize that the BIA - rather than a tribal government - actually issues ID's to many Native Americans. This was a problem previously identified by the Plaintiffs and the Court in August 2016, but was never addressed by the Legislature in the enactment of the new law. Further, Section 16.1-01-04.1(3)(b) does not permit the use of any other forms of tribal government documents (or letters from tribal authorities) or BIA-issued ID's to be used to supplement an invalid ID.

11) Deputy Secretary of State James Silrum stated in his affidavit (Docket No. 81-55, ¶ 14) that State non-driver ID cards are issued at no charge but offers no authority for this

statement - and this fact is contradicted by the North Dakota DOT website which reveals a fee for the ID. Silrum also stated that the State will accept ID's issued by the BIA or a letter from a tribal official that lists the tribal members' name, residential street address (which often does not exist), and date of birth as an acceptable ID. See Docket No. 81-55, ¶ 43. However, as previously noted, the State fails to cite any authority permitting such rule making or demonstrating that any such rules have actually been promulgated by the Secretary of State.

After a review of the entire record, and careful consideration of all of the *Dataphase* factors, the Court finds the *Dataphase* factors, when viewed in their totality, weigh in favor of the issuance of a very limited preliminary injunction. There is no need to invalidate the entire new law passed by the Legislature in April 2017. However, the public interest in protecting the most cherished right to vote for thousands of Native Americans who currently lack a qualifying ID and cannot obtain one, outweighs the purported interest and arguments of the State. No eligible voter, regardless of their station in life, should be denied the opportunity to vote.

Accordingly, the Plaintiffs' Motion for a Second Preliminary Injunction (Docket No. 89) is **GRANTED** in limited part until further order of the Court. Specifically, the North Dakota Secretary of State is enjoined from enforcing only certain subsections of N.D.C.C. § 16.1-01-04.1 and only to the limited extent outlined below:

(1) The Secretary of State is enjoined from enforcing Section 16.1-01-04.1(2)(b) which mandates the need for a "current residential street address." The Court is unaware of any other state that imposes such a requirement to vote. Neither the North Dakota Constitution nor the National Registration Voting Act imposes such

a strict requirement. Instead, the Secretary of State shall allow a qualified voter to receive a ballot if they provide a valid form of ID as recognized in Section 16.1-01-04.1(3)(a) <u>or</u> another form of identification that includes either a "current residential street address" or a current mailing address (P.O. Box or other address) in North Dakota.

(2) The Secretary of State in enjoined from enforcing N.D.C.C. § 16.1-01-04.1(3)(a)(2) which mandates only certain valid forms of identification. Instead, the Secretary of State shall also allow and accept as a valid form of identification an official form of identification issued by a tribal government; the Bureau of Indian Affairs (BIA), any other tribal agency or entity, or any other document, letter, writing, enrollment card, or other form of tribal identification issued by a tribal authority so long as those other forms of identification, (documents, letters, writings) set forth the tribal members name, date of birth, and current residential street address <u>or</u> mailing address. As previously noted, the affidavit of James Silrum submitted by the State reveals that the Secretary of State has already interpreted the new law to allow for these other valid forms of identification.

(3) The Secretary of State is enjoined from enforcing N.D.C.C. § 16.1-01-04.1(3)(b)(5) which allows for supplemental documents from a federal, state, or local government. The Secretary of State shall also allow and accept any documents issued by a tribal government, the Bureau of Indian Affairs (BIA), other tribal agencies or authorities, <u>or</u> any other document, letter, writing, enrollment card, or other forms of tribal identification which provide the missing

15

or outdated information, i.e., name, current residential street address or mailing address, and date of birth. Again, the Secretary of State has already interpreted the new law to allow for those other forms of supplemental documents.

(4) The Secretary of State shall provide clarification as to the meaning of N.D.C.C. § 16.1-01-04.1(5). Specifically, voters need to know where, when, and to whom a voter needs to present a valid form of identification if their ballot was set aside. The Court notes that N.D.C.C. § 16.1-01-04.1(6) provides that the Secretary of State shall develop uniform procedures to implement subsection 5. As a result, all that is needed are plans, procedures, rules, regulations, or some public pronouncement to inform voters of what they need to do.

In summary, the implementation of only a few selected subsections of N.D.C.C. § 16.1-01-04.1 is enjoined, in limited part, and only to the extent that the Secretary of State develop uniform policies, procedures, rules and regulations that incorporate the above-identified requirements. There is no need to invalidate the entire law. Further, nearly all of the above-identified requirements are based on the Secretary of State's own interpretations of the new election laws as revealed in the affidavit of Deputy Secretary of State James Silrum. See Docket No. 81-55.

The State needs to launch a state-wide pre-election campaign to inform voters of the ID requirements. The State of Virginia had no problem educating its voters in 2016 when the state was faced with similar challenges to its voting laws. See Lee v. Virginia Board of Elections, 843 F.3d 592, 596 (4th Cir. 2016). The educational campaign in Virginia involved the public posting of 500,000 posters describing the law and sending 86,000 postcards to persons on the active

voter list who did not possess a DMV-issued ID. The State of Virginia, as well as many other states, provide free photo ID's for all voters without requiring any documentation. This Court is not suggesting the North Dakota Secretary of State implement the same educational measures used in Virginia. The need to educate the voting public is obvious, but the method of doing so is left to the discretion of the Secretary of State.

In summary, common sense and a sense of fairness can easily remedy the above-identified problems to ensure that all residents of North Dakota, including the homeless as well as those who live on the reservations, will have an equal and meaningful opportunity to vote. The Defendant's "Motion to Dissolve Preliminary Injunction" (Docket No. 80) which relates to the August 1, 2016, Order - and the now repealed N.D.C.C. 16.1-05-07, is **GRANTED** as the earlier order is now moot. The Defendant's "Motion for Expedited Review" (Docket No. 95) is also **GRANTED**.

**IT IS SO ORDERED**.

Dated this 3rd day of April, 2018.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court